2025 10 16 25 GJ 994 ███████ colloquy

Page 1

RE: GRAND JURY ) GRAND JURY

INVESTIGATION ) NO. 25 GJ 994

BEFORE THE FEDERAL GRAND JURY

(SPECIAL JUNE, 2024 - GRAND JURY)

COLLOQUY

OCTOBER 16, 2025 - THURSDAY

PRESENT:

THE HONORABLE ANDREW J. BOUTROS,

Acting United States Attorney

219 South Dearborn Street

Chicago, Illinois 60604

BY SHERI H. MECKLENBURG and

MATTHEW SKIBA

Assistant United States Attorneys.

2025 10 16 25 GJ 994 ██████ colloquy

Page 2

(The Grand Jury, having

reconvened on October 16,

2025, pursuant to adjournment,

met in closed session and

the following proceedings

were had herein.  This transcription

does not contain the testimony given at

this proceeding.)

(Background discussion and laughing.)

MS. MECKLENBURG:  So again, Sheri
Mecklenburg and Matthew Skiba.  We're here again on
25 GJ 994.  It's the same case we were here last
week on.

I am back because if you did not --
between the questions and not getting an indictment,  09:21:38
I did not do my job.  I did not explain it to you
well enough.  I didn't explain the law to you.  I
know we were running out of time, and I knew it at
the time, but I realize it's on me.  I did not do my
job last week well enough for you.  09:21:52

So I'm coming back today with two things.
We're going to learn about the law.  I'm going to
explain to you the law again.  Actually, Matt's
going to do that part.  He's going to do -- we're

Veritext Legal Solutions

2025 10 16 25 GJ 994 ███████ colloquy

Page 3

going to do like a little mini class on the law.

GRAND JURY FOREPERSON: Let me make sure the transcript recorders are on. Yeah. Let me check.

MS. MECKLENBURG: This one here.

What's your last name?

MS. MECKLENBURG: Skiba. S-k-i-b-a.

MR. SKIBA: Yeah.

MS. MECKLENBURG: Yeah. The orange light is on which means that it's working, right? 09:22:21

GRAND JURY FOREPERSON: Does it say RAZ on it?

MS. MECKLENBURG: It sure does. Okay.

And the second part -- I'm going to have three parts. The first one is Matt is going to do a 09:22:28 little class. I won't promise that I won't jump in a little because I can't help myself, but I will try not to.

The second part will be I am bringing you testimony today of Agent A. You're going to hear 09:22:40 right from the agent who was driving the car. Let's see what you think.

And the reason that we're doing the law before we bring you Agent A is so that you know,

2025 10 16 25 GJ 994 ███████ colloquy

Page 4

one, what to listen for; and two, what are relevant questions.

And we'll go over some of your questions from last week that are not relevant so that you don't spend your time on irrelevant questions.  09:23:09

And then third part will be that we will discuss the indictment, and we'll talk it through and see if you think we're missing anything, and we'll fill it in.  And then we'll present the indictment to you again.  09:23:27

Okay.  So we're going to start -- and remember -- well, I'll do that at the end.  Okay. So let's start with Professor Skiba and our class.

MR. SKIBA:  Good afternoon, everyone. I'm going to try to make this as not boring as  09:23:45 possible.  Will be like going back to school again.

So as Sheri alluded to, you know, the question here is whether there is going to be probable cause, so the facts that we presented to you and will present to you match up to what the  09:24:00 elements are and what the law is.

So we're going to go through the two statutes that we are presenting to you in this indictment, and we're going to kind of walk through

2025 10 16 25 GJ 994 ███████ colloquy

Page 5

some of the language to kind of break it down piece by piece to tell you what's relevant for probable cause determination and what's not relevant.

So we're going to start with 372, and I want to make sure this is -- okay. Auto focus. 09:24:33 This is -- can everybody see this okay?

GRAND JUROR: Yes.

MR. SKIBA: Okay. So this is 372, which the title of the statute is Conspiracy to Impede or Injure an Officer. 09:24:57

And so you have the statutory language here. I won't read it to you verbatim unless you want me to, but I've outlined some of the key language that we're going to be talking about.

And so for purposes of this indictment, 09:25:10 here are the elements at the bottom:

So you need two or more people to conspire. And then one of the following. And this is what I outlined above. So one is to prevent by force, intimidation, or threat, the discharging of the 09:25:27 duties, to injure an officer of the United States or its property on account of his lawful discharge of the duties of his office or while engaged in the lawful discharge of his duties.

2025 10 16 25 GJ 994 ███████ colloquy

Page 6

I'm going to stop a minute on this one. So that there was some question about last time, is it relevant that he's on his way to work.

We're going to tell you later on that he was engaged in his official duties while he was on his way to work, but regardless, for this statute, there is "or" here, he's either on account of or because of the discharge of his duties, or while engaged in those duties. And then finally, the other alternative --

MS. MECKLENBURG: Let me stop you.

MR. SKIBA: Yeah.

MS. MECKLENBURG: So that means that it doesn't have to be while he's actually doing his duties. It also means that they are taking their action -- the conspirators are taking their actions because of his lawful discharge of his duties. Because of who he is or what he does.

MR. SKIBA: Yeah.

MS. MECKLENBURG: So I just wanted to --

MR. SKIBA: Absolutely right.

And then finally, and again the only -- for this second requirement, the one of the following, you only need to find one of these three are met.

2025 10 16 25 GJ 994 ██████ colloquy

Page 7

But the last one is to injure the property of an officer of the United States so as to molest, interrupt, hinder, or impede him.

Does anybody have any questions just about the elements before I drill down into some of the    09:27:05 specific language?

GRAND JUROR:  What's the count?

MR. SKIBA:  This is Count 1 of the indictment.

GRAND JUROR:  I wasn't here last week.    09:27:18 What is the count?

MS. MECKLENBURG:  Okay.  So you know that the indictment consists of a single count of 372, Count 1 for all six people charged.  And then we have six counts of 111.  Each person is charged in a  09:27:34 separate count for 111.

GRAND JUROR:  Okay.  Both --

MS. MECKLENBURG:  372 and 111.  Does that answer your question?

GRAND JUROR:  Six people, one count?    09:27:48

MS. MECKLENBURG:  No.  Six people.  One count.  First count is for all six.

GRAND JUROR:  Got you.

MS. MECKLENBURG:  372, the conspiracy, and

2025 10 16 25 GJ 994 ███████ colloquy

Page 8

then a single count for each of them on 111.

So each person is charged in two counts. The first, and then their -- whatever their 111 is.

GRAND JUROR: Okay.

GRAND JUROR: She didn't watch the video. 09:28:08 The person that wasn't here last week, that was on a video so maybe that will help you as well.

MS. MECKLENBURG: We will play the video again. Thank you. That's a great point. Somebody here have a question? 09:28:21

GRAND JUROR: I wasn't here last week.

MS. MECKLENBURG: We'll play the video again for you. Thanks. That's a great point.

GRAND JUROR: Do you have unlimited tries?

MS. MECKLENBURG: Do we have -- what did 09:28:31 you ask?

GRAND JUROR: Unlimited tries. Like you keep coming back as many times as you want?

MS. MECKLENBURG: Well, I don't think we have to worry about that. I think we're going to be 09:28:41 just fine.

MR. SKIBA: I think the saying is the second time is the charm.

MS. MECKLENBURG: I hope you don't have

2025 10 16 25 GJ 994 ████████ colloquy

Page 9

your mind made up already that I'm going to need more tries.

MR. SKIBA: Yeah, I think that --

MS. MECKLENBURG: Wait, wait, wait. You just responded like, well, maybe I do. Do you?                    09:28:54

GRAND JUROR: I mean I'll listen.

MS. MECKLENBURG: Do you have an open mind for deliberation and returning a verdict if the facts meet the law?

GRAND JUROR: Yes.                    09:29:06

MS. MECKLENBURG: Okay. Is there anybody here who feels differently? Because if you do, then you shouldn't deliberate with the -- so you -- you took a -- you know, you have a duty to -- to have an open mind and see if the facts fit the law and you    09:29:18 don't get to decide if you like the law or you don't.

I certainly don't get to decide if I like the law or I don't.

And then deliberate and then decide if    09:29:28 those facts fit the law. But if you're telling me now -- and you have a right to say to me, this is the case I just don't like and I just can't do it. If that's true, then tell us now.

2025 10 16 25 GJ 994 ███████ colloquy

Page 10

MR. SKIBA: Yes, sir.

GRAND JUROR: Are you actually presenting any new actual facts or just a different viewpoint on your side?

MS. MECKLENBURG: Okay. I'm feeling the skepticism already. Are you going to be able to listen with an open mind? Tell me the truth.    09:29:52

GRAND JUROR: I -- no.

MS. MECKLENBURG: Okay. Then you have to go --    09:30:04

GRAND JUROR: I heard this case like last week and I thought it was a crock of shit then and I still think it is.

MS. MECKLENBURG: Okay. Thank you for your opinion for everybody.    09:30:12

GRAND JUROR: Uh-huh.

MS. MECKLENBURG: I kind of had that impression from last week, but thank you.

GRAND JUROR: Do you have any evidence other than the (inaudible) --    09:30:17

MS. MECKLENBURG: Have a good evening.

Pardon me?

GRAND JUROR: I'm (inaudible) -- no new evidence?

2025 10 16 25 GJ 994 ████████ colloquy

Page 11

MS. MECKLENBURG: I didn't say there is no new evidence.

(Inaudible.)

If you feel that you can't be -- then excuse yourself. That's fine. There is still 16?    09:30:36

GRAND JURY FOREPERSON: Let's see what we have now.

MS. MECKLENBURG: One, two, three --

GRAND JUROR: 17.

MS. MECKLENBURG: Okay. That's fine.    09:30:44

MR. SKIBA: I'll just wait until --

GRAND JUROR: That's fine.

MS. MECKLENBURG: Now we'll all be doing (Inaudible.)

GRAND JURY FOREPERSON: We have to remember 09:31:11 we're recording as well, so that when the court reporter does this transcript we're not talking over each other.

MS. MECKLENBURG: Yes. Okay. I'm sorry. I'll ask Matt to continue.    09:31:26

And thank you to those of you who are staying with an open mind.

MR. SKIBA: So we're going to -- we're going to just break down some of the more specific

2025 10 16 25 GJ 994 ███████ colloquy

Page 12

language in each of these statutes. So, we're going to start with the felony count, and that's 372 again.

So I went through the elements. I'm going to break it down a little bit more specifically. So 09:31:52 this is what one court said about what Section 372 means.

This court said: 327 is straightforward. It prohibits individuals from conspiring to keep government employees from doing their jobs. 09:32:07

And I think what you -- what we were going to -- what the evidence will show and what you will hear from Agent A is that there was a group of individuals. They conspired to keep him from doing his jobs. His job. Excuse me. 09:32:22

And so the question, one of the questions last week is: What is a conspiracy? And so a conspiracy is an express or implied agreement between two or more persons to commit a crime.

So breaking that down further. An 09:32:42 implied agreement. So you don't need to have people come together and say, I am -- let's form a conspiracy to commit this crime. It could be implied by their conduct.

2025 10 16 25 GJ 994 ████████ colloquy

Page 13

And is what this court -- this is a Third Circuit case. Conspiracy can also be spontaneous, so it doesn't need to be that folks meet ahead of time and that they come to an express agreement. And it could be spontaneous. Plus their overt actions could be enough to establish a conspiracy.

And then once a conspiracy is formed, each person in that conspiracy is accountable for the foreseeable actions of his co-conspirators, his or her co-conspirators.

Yes, ma'am.

GRAND JUROR: So, the act of mirroring someone else doing, impeding without talking and expressly agreeing, we're going to do this together, at the moment, you're saying that constitutes conspiracy?

So I see them pushing, I'm going to push too. That's a conspiracy you're saying?

MR. SKIBA: Yes.

GRAND JUROR: Under the law?

MR. SKIBA: And that's -- yes. And that's based on a couple of things. One, it's an overt action. They -- it's not they are just thinking in their head, I want to be part of this. They took

2025 10 16 25 GJ 994 ████████ colloquy

Page 14

some actions.

They were -- you know, there was a concerted effort to block this, Agent A, from doing his job.

Any other questions about what I have  09:34:22 up here?  I'm going to go now into the force, intimidation, and threat language as well as part of the statute.

Okay.  So next I'm going to put up here the next question:  What is force, intimidation, or  09:34:40 threat?

So this, this case that I have referenced here out of the Western District of Texas is for a comparable statute.  This is a criminal statute that we are charging here, but there is a civil statute  09:34:57 that is more or less the identical language that also has this force, intimidation, or threat language.

Now, this was a case -- and you can see it here -- surrounding a bus with about a hundred  09:35:14 cars in the interstate and attempting to control its movements by physically blocking with their vehicles and driving dangerously, could reasonably constitute force.

2025 10 16 25 GJ 994 █████ colloquy

Page 15

Now, we are not saying that you need to find that it rose to this level of seriousness, but the point is, in this case out of the Western District of Texas, what the court says, the vehicles surrounded another vehicle and physically blocked it    09:35:43 and stopped it from going forward.

That, in that case, constituted force, intimidation, or threat.

What this case also says is, and this a direct quote above:  The most commonly understood    09:35:58 dictionary definition of intimidate is to place a person in fear.

Now, as you're going to hear from Agent A in a little bit, you're going to find out that he was in fear for his own life and safety    09:36:12 because of the actions of the co-conspirators.

Does anybody have any questions about this portion of the statute?  Okay.

And this is just a preview of what's to come and a recap from last week.    09:36:31

So here is what we expect Agent A to further testify to, and here is what we think the facts show:

That there was a conspiracy implied by the

2025 10 16 25 GJ 994 ████ colloquy

Page 16

conduct of the co-conspirators. They surrounded the car. They banged on his car windows. Some of them were scratching the car. There was chants related to his, Agent A's duties as an ICE Officer.

And as -- as the evidence shows as well, 09:37:07 each of these individuals named in the indictment performed actions that constitute force, intimidation, or threat. And I understand some of this is going to be new for some folks, but this is going to be reviewed for others. We're going to 09:37:28 show the --

GRAND JUROR: I have a question. I'm sorry. Will you go over the names real quick?

MS. MECKLENBURG: Yeah. These are the six people in the indictment. And, Matt, you can go 09:37:39 over that with them. And then what we are going to do right after this is show the video again for those who haven't seen it and to remind those who have, and we'll point out each of the people and what they were doing. 09:37:51

Go ahead, Matt.

MR. SKIBA: Okay. So does anybody, any folks who are new, do they -- do we know the names Michael Rabbitt, Kat Abagazala (phonetic spelling),

2025 10 16 25 GJ 994 ██████ colloquy

Page 17

Kat Sharp, Brian Straw, Andre Martin, or Joslyn Walsh?

Does anybody know these individuals?

Okay. Seeing none.

So as I was referencing before, the evidence of -- that we discussed last week, the video, the testimony that from last week and today is going to show that each of these individuals conspired, formed a conspiracy and used force, intimidation, or threats that directly hindered and impeded Agent A from doing his job.

So as the video shows, Michael Rabbitt hung on to the passenger side door -- excuse me -- the passenger side of the car. He pushed and banged on the side of the car.

Kat Abagazala placed herself in the front of the vehicle. She pushed on the front of the vehicle with her hands and body to prevent the car from continuing. And Kat Sharp did the same.

And Brian Straw similarly moved through the crowd to the front of the vehicle and, like Kat Abagazala and Kat Sharp, he pushed up against it with his hands and leveraged his body to prevent it from continuing.

2025 10 16 25 GJ 994 ██████ colloquy

Page 18

MS. MECKLENBURG: Just to remind you, he was the big guy with the orange hat. And when you see the video, I want you to notice he is not at the front of the vehicle at the beginning. He pushes his way through the crowd to get there so that he can continue with the rest of the people to impede him.

Go ahead.

MR. SKIBA: Okay. Yeah. And similarly with Andre Martin, like Kat Abagazala and Kat Sharp, he placed himself in the front of the vehicle. He placed on -- he pushed on the front of the vehicle with his hands and body to prevent the vehicle from continuing.

And finally, Jocelyn Walsh. She was the individual with the guitar. She wrapped her arm around the driver's side mirror and again prevented the vehicle from continuing.

And it's important to note, and as we expect you to hear from Agent A, it's not that these -- like these individuals had no choice but to be in the front of vehicle as his car was going.

Now, each one of them had the opportunity to move out of the way and to let

2025 10 16 25 GJ 994 ████████ colloquy

Page 19

Agent A move forward; but no, this was like a concerted effort by these individuals to prevent Agent A from doing his job which, again, we're talking about what this statute is about.

Here is, again, what the court said. It's 09:41:00 a straightforward statute. It prohibits individuals from conspiring to keep employees from doing their jobs.

Does anybody have any questions? And we'll talk about the statute more, but does 09:41:15 anybody have any initial questions about this statute so far?

GRAND JUROR: That's very helpful. Yeah.

MR. SKIBA: Okay. Seeing no questions about that, I'm going to next turn to the 09:41:30 misdemeanor count, which is 18 United States Code at 111. And this statute is called Assaulting, Resisting or Impeding Certain Officers or Employees.

And again, I won't read this statute verbatim. We have it here. But here is the 09:41:49 elements for this charge:

Well, the first element is that it needs to be forcible, and the actions, assault, resist, opposes, impedes, intimidates or interferes.

2025 10 16 25 GJ 994 ████ colloquy

Page 20

There needs to be a federal officer, and the actions that were -- the forcible assault, resist, oppose, etcetera, those actions were while the officer was engaged in or was on account of the performance of his official duties.

So, one question from last week is, well, this individual was on the way to, on the way to work. Does that matter?

And the answer is no. The first reason that it doesn't matter is the statute required that he be engaged in his official duties, or the incident must be on account of his official duties or because of his official duties.

And as the evidence shows, at a minimum, these conspirators targeted Agent A on account of or because of his official duties related to ICE.

But regardless, as the law shows or the case law shows, if an individual is commuting to work in a government issued automobile, and that automobile is for work-related purposes only, and that individual is duty bound to ensure that nothing bad happens to that automobile, that can qualify as being engaged in his official duties.

2025 10 16 25 GJ 994 ███████ colloquy

Page 21

And as you're going to hear in a little bit from Agent A, this is precisely what was the case here.

This was a government issued SUV. He was not allowed to use it for personal use. And it was his duty to ensure that nothing bad happened to his car.                                                                                  09:43:52

MS. MECKLENBURG: And that, is it fair to say that was the definition that would include that he was engaged in duties --                                                                                  09:44:09

MR. SKIBA: Correct.

MS. MECKLENBURG: -- and on account of duties if they were attacking him because he was a ICE agent, that would be because of his duties.

MR. SKIBA: That's right.                                                                                  09:44:18

MS. MECKLENBURG: So there is two different ways that you can go.

MR. SKIBA: The next question, I believe this was also a question raised last week:

Did Agent A need to be assaulted? And the answer to that is also no.                                                                                  09:44:30

Section 111 applies to those who act forcibly and resist, oppose, impede, and intimidate an officer, again while engaged in or on account of

2025 10 16 25 GJ 994 ████ colloquy

Page 22

his official duties.

And then finally, on this particular statute, what does forcible mean?

Well, here is what the Seventh Circuit -- we are in the Seventh Circuit. Here is what the pattern jury instructions define "forcibly" to mean.

And this is a quote: Forcibly means by use of force. Physical force is sufficient, but actual physical contact is not required.

A person also acts forcibly if he threatens, attempts to inflict bodily harm upon another with a present ability to inflict bodily harm, but also here, direct contact is not required so long as the conduct places the officer in fear for his life or safety.

And again, as you're going to hear in a little bit, Agent A, we expect him to testify that he was in fear for his life and safety.

If nobody has any questions about Section 111, we just identified a few handful of additional questions that came up last week, and we are -- we had some answers for you here.

So the first is: What is the -- what should Agent A have done? Shouldn't he have stopped

09:45:02

09:45:20

09:45:37

09:45:52

2025 10 16 25 GJ 994 ████████ colloquy

Page 23

his car?

And the answer to that is -- there is a couple of different questions to that of no.

So neither statute we are presenting today, that's Section 372 or 111, requires that he had 09:46:25 stopped his vehicle, so that's irrelevant.

It's not a personal injury case where the question is who is at fault. The question is are -- is there probable cause to believe that the elements of 111 and 372 are met. 09:46:42

But here is the more fundamental point. Even if he had stopped his, his car, if he had stopped it completely before reaching the gate, there was still hindering, impeding him from getting to the gate and further doing his job. 09:47:00

And he did not have a duty to retreat. And as you're going to hear, again, you're going to hear from Agent A that what he was concerned about, he had a concern that if he had stopped his car, he would have been a sitting duck. If he had feared 09:47:18 that these individuals that were surrounding his car and stopping him from moving forward were going to pull him -- were going to break his window and were going to pull him out of the car.

Page 24

The next question is: What about some of the other witnesses?

There was a truck driver in the area. There was police.

We believe that the video and the testimony 09:47:41 is plain as day. We only need to establish probable cause, which does not require us and the Grand Jury to present every conceivable witness to this event.

Next question: What about the other individuals who were surrounding the car? 09:48:01

At this stage it's irrelevant. We have named six individuals responsible in the indictment and that's all -- the only question is, is there probable cause to believe that they committed these offenses. 09:48:19

And the final question that came up is, well, this is a -- the 111 charge is a misdemeanor. Can the government charge the misdemeanor to another Grand Jury?

Well, the important point is we are in 09:48:37 this case charging both a felony and a misdemeanor, and because we are seeking a felony, cannot -- it's called bifurcate. We can't pick and choose what we are presenting to the Grand Jury today.

2025 10 16 25 GJ 994 ▮▮▮▮ colloquy

Page 25

And so we're going to ask you to return a true bill on each count including Section 111, misdemeanors.

Again, the question on that is probable cause, that the facts that we presented and will present marry up to the law that we presented.          09:49:02

MS. MECKLENBURG:  Show them the video now.

MR. SKIBA:  Certainly.

MS. MECKLENBURG:  -- (Inaudible)

MR. SKIBA:  Certainly.  Yes.  Thank you.          09:49:22

Folks, just bear with me as I'm working through the technology here.

The video that we're going to present, they are going to be reviewed for the folks who were here last week.  But for others it's going to be          09:49:41 brand new.  So --

MS. MECKLENBURG:  And we'll stop it so you can see each defendant.  And if you need us to go through the identification at the end again of how we identified each defendant, if we have to do          09:49:58 that we will.  I don't know that we'll have time, but we'll do whatever we can, but I definitely want to get Agent A in today.

And I know this is your last week because

2025 10 16 25 GJ 994 ███████ colloquy

Page 26

of the shutdown so --

GRAND JUROR:  We're not sure yet.

MS. MECKLENBURG:  You have a question?

GRAND JUROR:  No.  I don't think I can vote.                                                                09:50:17

MS. MECKLENBURG:  Okay.

Do we still have 16?

GRAND JURY FOREPERSON:  Yes.  We have 16.

MS. MECKLENBURG:  Okay.

MR. SKIBA:  I'm just working on -- on the        09:50:30
videos.

MS. MECKLENBURG:  I'm sorry.  Pardon me?
What's that?

GRAND JUROR:  We do have new evidence?  We
do have new evidence --                                                                                    09:50:44

MS. MECKLENBURG:  Yes, we do.  We have new
evidence.

And when you took your --

GRAND JUROR:  Oath.

MS. MECKLENBURG:  -- oath, that oath didn't   09:50:54
say, do you like the law, do you like the facts?
It's can you be fair?  And that's all we're asking.

MR. SKIBA:  Sheri, a question.

GRAND JUROR:  I noticed -- it is the

2025 10 16 25 GJ 994 ███████ colloquy

Page 27

individuals -- (inaudible) if we decide what five of the six you're like a hundred percent, but not the sixth, can we --

MS. MECKLENBURG: If that's what you decide, yes, you can.                     09:51:24

GRAND JUROR: Okay. So it's not all of them together?

GRAND JUROR: We can do each count individually.

MS. MECKLENBURG: We can do each count     09:51:27 individually.

(Inaudible.)

You were not here last week. Okay.

MR. SKIBA: Sheri, of course I'm having technical difficulties.                     09:51:40

MS. MECKLENBURG: Are you plugged in?

MR. SKIBA: I assume I'm plugged in to the -- the mike --

MS. MECKLENBURG: The drive. Whatever you have -- (inaudible)                     09:52:06

MR. SKIBA: I just had it on.

Folks, just bear with me one moment while I get the technology down.

GRAND JUROR: Don't worry.

2025 10 16 25 GJ 994 ██████ colloquy

Page 28

MS. MECKLENBURG: I will say I'm a little disappointed that there are people who didn't want to hear the agent. Disappointed.

GRAND JURY FOREPERSON: You know, I would say one thing. When the USA (inaudible) -- was here 09:52:50 last week, the one thing he said that made so much sense -- can I say it?

MS. MECKLENBURG: Yes.

GRAND JURY FOREPERSON: This is the accusatory phase, not the guilt-finding phase. 09:52:58

MS. MECKLENBURG: Right.

GRAND JURY FOREPERSON: So those are very different things, and our burden of proof is much lower than if we have a trial we have to prove that these people did something.

GRAND JUROR: To be fair, we only hear one half of the story. We don't hear the other half.

MS. MECKLENBURG: That's true. We can't -- say like when you only hear one half, of course whatever you say is going to sound good because 09:53:19 we're only hearing from you. But -- I mean, absolutely. Yes. But I think that's a great point, and I'm glad that you told me, and I'll remember to say --

Page 29

GRAND JURY FOREPERSON:  Yes.

MS. MECKLENBURG:  Okay.

MR. SKIBA:  All right.  So this is the first video.

MS. MECKLENBURG:  Driver's side.          09:53:40

MR. SKIBA:  Yeah.  This is the driver's side.

GRAND JUROR:  Okay.

MR. SKIBA:  And so I'll play this video. I'm happy to stop or go back at any point.  Just let          09:53:46 me know.

MS. MECKLENBURG:  Stop at each of the defendants.

MR. SKIBA:  Yeah.  Uh-huh.  And I may be -- some of these are quick, so I may be rewinding a          09:53:56 little bit.

Okay.  So, right up off the bat we have three of our defendants right here.  So, this individual right here is Andre Martin.  This individual here is Kat Abagazala.  And this          09:54:13 individual here is Kat Sharp, the redhead.  And I'm going to play this now.

(Footage played.)

MR. SKIBA:  And we have a fourth.  I'm just

2025 10 16 25 GJ 994 ████ colloquy

Page 30

going to rewind a little bit. The girl who's about to get hit with a stuffed animal which is thrown by not the ICE agent, by one of the other individuals, that is Jocelyn Walsh.

MS. MECKLENBURG: And you can see her          09:54:52
guitar in the window. Joslyn Walsh is the guitar lady.

MR. SKIBA: Yeah.

(Footage played.)

MR. SKIBA: Okay. I think --          09:55:09

(Footage played.)

MS. MECKLENBURG: You can see there is a truck behind that they are not bothering at all because he's not a ICE agent. That would be --

MR. SKIBA: Yeah. And as you can hear,          09:55:51
what they are saying is, quit your job. So they -- they know that this is an individual associated with the Broadview facility.

(Footage played.)

So I'm going to go to the next video here.          09:56:10

(Footage played.)

That's a different angle. And here again, you have Kat Abagazala. You have Andre Martin right here.

Page 31

MS. MECKLENBURG: Right behind Kat is --

MR. SKIBA: Yes. Yes. Sticking out right here is Kat Sharp.

(Footage played.)

MS. MECKLENBURG: You can see Brian Sharp 09:56:52 just moved in. Sorry, Matthew.

MR. SKIBA: Brian Rabbit.

MS. MECKLENBURG: Right.

MR. SKIBA: This individual here, if you follow his arm he is placing -- 09:56:59

MS. MECKLENBURG: Michael Rabbit.

MR. SKIBA: I'm sorry?

MS. MECKLENBURG: Michael Rabbit.

MR. SKIBA: Yes. Michael Rabbit.

MS. MECKLENBURG: Mr. Rabbit. 09:57:07

MR. SKIBA: Yes. We'll call him Mr. Rabbit. Thank you.

So he is right here. He's on the side of the vehicle. He has his hand placed -- I believe what the agent said last week is the A-frame. I'm 09:57:19 not a car guy. I'm just going to call that the car. The side of the car.

(Footage played.)

MR. SKIBA: And -- I'm going to go back.

2025 10 16 25 GJ 994 ████████ colloquy

Page 32

This individual right here is Mr. Straw.

MS. MECKLENBURG: Watch his --

(Footage played.)

MS. MECKLENBURG: (Inaudible) If they wanted to --                    09:58:10

MR. SKIBA: And here he is right here again.

MS. MECKLENBURG: Watch.

MR. SKIBA: And here is actually Mr. Rabbit as well.                    09:58:16

(Footage played.)

MS. MECKLENBURG: Ran up to the car.

MR. SKIBA: Yeah. And you could see, I mean look at how much room there is for Mr. Straw to maneuver if he wanted to. But he        09:58:48 intentionally went to the front of the vehicle.

(Footage played.)

MR. SKIBA: So I think -- does anybody need to see any parts of the video again?

GRAND JUROR: Do you bring up later for the    09:59:33 testimony exactly what they're saying? I can't always understand what they are shouting (inaudible).

MS. MECKLENBURG: I think that we can tell

2025 10 16 25 GJ 994 ███████ colloquy

Page 33

you because -- the agent, they are hearing lots of things, so we can tell you because if you hear it, you decide if you can hear what we hear. So you listen to it.

They are screaming -- excuse my language. 09:59:56 I'm just repeating what they are saying. And I'm not supposed to swear in the Grand Jury. Fuck this pig. Over and over. Fuck this pig. Fuck this pig. They are screaming --

MR. SKIBA: Get a real job. 10:00:08

MS. MECKLENBURG: Yes.

MR. SKIBA: Shame.

MS. MECKLENBURG: Shame. And they are screaming something like, down with deportation.

MR. SKIBA: Up with liberation. 10:00:17

MS. MECKLENBURG: Up with liberation.

MR. SKIBA: Yes, ma'am.

GRAND JUROR: They were also clearly saying, I believe that we will win.

MS. MECKLENBURG: Yes. That's right. 10:00:26

MR. SKIBA: Yeah. And through the agent -- I'm sorry.

MS. MECKLENBURG: There is another question.

Veritext Legal Solutions

2025 10 16 25 GJ 994 ████ colloquy

Page 34

GRAND JUROR: Is there a part of the video where someone hanging on to the passenger side mirror?

MS. MECKLENBURG: Yes.

GRAND JUROR: Is that the same guy you 10:00:36 already identified or is that --

MS. MECKLENBURG: Yes. That was Mr. Rabbit. Michael Rabbit.

GRAND JUROR: No, different --

MR. SKIBA: It might be a different 10:00:45 individual.

GRAND JUROR: I don't know if it was one of the eight or not.

MS. MECKLENBURG: It --

GRAND JUROR: It was on the list. It said 10:00:55 she wrapped her arm --

GRAND JUROR: Driver's side.

MR. SKIBA: Do you want me to rewind?

GRAND JUROR: Yes.

MS. MECKLENBURG: I want to make sure 10:01:06 everybody -- (inaudible)

Last time and today we showed you pictures of the damage to the car and the mirror was broken off. Yes. I just want to make sure --

2025 10 16 25 GJ 994 ███████ colloquy

Page 35

MR. SKIBA: Yes.

MS. MECKLENBURG: I know it's hard.

MR. SKIBA: I'll play it from here, and if you want me to pause it at any point let me know.

(Footage played.)                    10:01:30

MR. SKIBA: Yeah. So this is from -- my cursor is on Mr. Rabbit right here.

(Footage played.)

MS. MECKLENBURG: There. The guy with the hood up.                    10:02:16

MR. SKIBA: Okay. So --

MS. MECKLENBURG: That's the one who was grabbing the mirror where the other guy was just holding the car. When you just say just holding --

MR. SKIBA: Yes.                    10:02:25

MS. MECKLENBURG: The difference, grabbing the mirror --

MR. SKIBA: Yes.

MS. MECKLENBURG: It doesn't mean we don't come back if we can identify someone, but we're    10:02:32
being very careful that we have people identified clearly.

And since you weren't here last time, I just want to tell the people who weren't. We went

2025 10 16 25 GJ 994 ████████ colloquy

Page 36

through the identities. We went through that the agent took still shots from the video and they found pictures of people, and many of these people posted this on their own social media. So it wasn't -- it was clear that they put it up. And they compared 10:02:55 the known photos of these six with the stills from the video.

MR. SKIBA: Any other questions either about the videos or the law?

GRAND JUROR: Who took the videos? What's 10:03:12 the source of these videos?

MS. MECKLENBURG: This video is from Ms. Abagazala's social media.

MR. SKIBA: Yeah. So some were like a Twitter, an Instagram. Some were, I believe, You 10:03:25 Tube. This was all civilians taking photos.

MS. MECKLENBURG: Yeah. No law enforcement was out there, so they didn't take any video.

Any questions before I go get who we now know as Agent A and in a minute you're going to know 10:03:49 him as who he is.

GRAND JUROR: Would you be able to show, you know, after Agent A or before, the damage to the car?

2025 10 16 25 GJ 994 ▮▮▮▮ colloquy

Page 37

MS. MECKLENBURG: We're going to go through it with Agent A, and then if you need it again, we will. We'll pull up the pictures. That's what I'll need for that. (Inaudible). Okay.

(Inaudible.)

I'll tell you ▮▮▮▮. ▮▮▮ is the first name. ▮▮▮ is ▮▮▮▮.

GRAND JUROR: Okay.

MS. MECKLENBURG: That's his name.

GRAND JUROR: Okay.                    10:04:25

(Whereupon the witness came in the jury room, and the testimony is not included in this transcript.)

(End of excerpt of 25 GJ 994 ▮▮▮▮.)

2025 10 16 25 GJ 994 ███████ colloquy

Page 38

C E R T I F I C A T E

JEANINE WATKINS, being first duly sworn, on oath says that she is a Certified Shorthand Reporter doing business in the City of Elgin, County of Kane, and the State of Illinois;

That she reported in shorthand the foregoing audio recording of the proceedings of the Federal Grand Jury in the Grand Jury Room in the United States Courthouse in Chicago, Illinois;

That all speakers have been identified within the transcription based on the content of the said audio recording;

And that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid and contains the full content of the said audio recording which was audible and discernible.

*Jeanine Watkins*
JEANINE WATKINS, C.S.R.

C.S.R. License No. 084-001629

2025 10 16 25GJ994 ██████████

Page 1

RE:  GRAND JURY          ) GRAND JURY


INVESTIGATION           ) NO. 25GJ994




BEFORE THE FEDERAL GRAND JURY

(SPECIAL JUNE, 2024 - GRAND JURY)



OCTOBER 16, 2025 - THURSDAY




PRESENT:


THE HONORABLE ANDREW J. BOUTROS,

Acting United States Attorney

219 South Dearborn Street

Chicago, Illinois 60604

BY MS. SHERI H. MECKLENBURG and

MR. MATTHEW SKIBA

Assistant United States Attorneys.

2025 10 16 25GJ994 ▮▮▮▮▮▮

Page 2

I N D E X

WITNESS:   DENNIS ▮▮▮▮▮                                    PAGES

Direct Examination by Ms. Mecklenburg              3 - 17

EXHIBITS:

(No exhibits identified.)

Veritext Legal Solutions

2025 10 16 25GJ994 █████████

Page 3

(The Grand Jury, having reconvened at 2:43 p.m. on the 16th day of October, 2025, pursuant to adjournment, met in closed session and the following proceedings were had herein.)

GRAND JURY FOREPERSON: Good afternoon. You could just stand over there by the chair. And please raise your right hand.

State and spell your name for the record.

THE WITNESS: ████████████. ████████████, ████████████.

GRAND JURY FOREPERSON: Do you solemnly swear or affirm that in the testimony you are about to give before this Grand Jury, to tell the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

GRAND JURY FOREPERSON: Thank you.

(The witness was duly sworn.)

WHEREUPON:

████████████

having been first duly sworn, was examined and

Veritext Legal Solutions

2025 10 16 25GJ994 ███████████

Page 4

testified as follows:

DIRECT EXAMINATION

BY MS. MECKLENBURG:

Q.   Good afternoon, Agent ████████.

You already said your name and spelled it      15:10:44
for us, correct?

A.   Yes, ma'am.

Q.   Okay.  Tell us, what is your current job?

A.   Currently I'm the ████████████████

████████████████████████████ with Immigration    15:10:53
and Customs Enforcement.

Q.   And that's traditionally known as ICE,
right?

A.   Yes, ma'am.

Q.   And you said you were -- tell me your      15:11:39
position again so that I can have it right.

A.   ████████████████████████████

Q.   Okay.  How long have you been with ICE?

A.   I've been with ICE since 2001.  So 24
years.                                           15:12:04

Q.   And how long have you been the Assistant
Field Office Director?

A.   I have been ████████████████████████
for eight years, but just six months in ████████████

2025 10 16 25GJ994 ████████████

Page 5

Q. So you're based in ████████?

A. Yes, ma'am.

Q. Can you describe in general your duties?

A. So, as the ████████████████████████ ████████ I serve as a second-line supervisor for 15:12:44 office. I oversee two offices, in ████████████ ████████████

So I have supervisors that work under me, and then agents that work under, under them. So, I oversee really all the levels of the operation 15:13:15 there.

Q. Okay. Do you oversee intake processing, processing, event space, and transportation coordination to those who are temporarily detained in Broadview? 15:13:57

A. Yes. Currently I'm detailed up here for that role. Yes.

Q. And I'll ask you about that in a minute.

Do you also communicate with upper management and federal partners to manage operations 15:14:12 and ensure that you have the necessary supplies and manpower and proper staffing levels for what's needed?

A. Yes, ma'am.

2025 10 16 25GJ994 ████████████

Page 6

Q. And do you also respond to requests for information both internally and from the public?

A. Yes, ma'am.

Q. Now, you said you're based in ████████. 15:14:51 What was your assignment there on September 26, 2025?

A. I was assigned to assist the permanent AFOD. They are at Broadview. And to report to work there and help him oversee operations there.

Q. Where was the location that you were 15:15:20 directed to report for carrying out the duties that day?

A. The address is 1930 Beach Street in Broadview, Illinois.

Q. That's the Broadview facility that we've 15:15:43 been talking about, right?

A. Yes, ma'am.

Q. What was your first day reporting, well -- so let's turn to September 26 at approximately 7:45 in the morning. 15:16:10

Why were you going to the -- were you going to the Broadview facility at that time?

A. Yes, ma'am.

Q. And why?

2025 10 16 25GJ994 ▮

Page 7

A.   That's the -- my duty assignment, at least for this detail, and I was reporting to work as part as my normal course of duties.

Q.   Did you go -- what were you wearing that day?                                                    15:16:54

A.   I -- I was wearing a polo shirt, similar to this.  Slacks.  And I was wearing a jacket over -- over top of everything.

Q.   Were you wearing any kind of mask, helmet, anything?                                              15:17:25

A.   No, ma'am.

Q.   Did you go directly from where you were staying?  Did they put you up in a hotel or something for you to be in Chicago?

A.   Yes, ma'am.                                                                                        15:17:44

Q.   Okay.  Did you go directly from -- were you going from the hotel to the Broadview facility?

A.   Yes, ma'am.

Q.   And can you describe the car that you were driving?                                                15:18:04

A.   So I was driving a black Ford Expedition.

Q.   Was it -- oh.  I'm sorry.

A.   It's a 2022 Ford Expedition.

Q.   Was it government-owned vehicle?

2025 10 16 25GJ994 ████████████

Page 8

A.   Yes, ma'am.   It's a government-owned vehicle.

Q.   Was it marked as a law enforcement vehicle in any way?

A.   No.   It -- it's -- it's designed to be --   15:18:39
to blend in, I suppose.

Q.   When were you first assigned that car?

A.   In April of 2025.

Q.   Are you permitted to use that car for non-work purposes?   15:19:13

A.   No.

Q.   So if you want to go out to dinner with your family on a Sunday night, are you allowed to use that car?

A.   No.   15:19:27

Q.   What are your duties with regard to that car?

A.   Well, any time that I need to carry out a -- any duties I will -- I will be in my -- my government-furnished vehicle, and including home to   15:19:51
work.   You know, trans --

Q.   I'm sorry.   Let me stop you for a minute.

UNKNOWN SPEAKER:   The battery is died.

THE WITNESS:   Sorry, the --

2025 10 16 25GJ994 ▮▮▮▮▮▮▮▮▮

Page 9

MS. MECKLENBURG: That was just the computer. We'll get it back up when I want to show pictures.

UNKNOWN SPEAKER: Okay. We're have a battery -- 15:20:26

BY MS. MECKLENBURG:

Q. Thank you for keeping me honest.

But I think you misunderstood my question. Do you have any duties with regard to keeping the safety and condition of that car? 15:20:43

A. Yes. I mean that's part of being assigned a government vehicle is to care and maintain that vehicle.

Q. What was the condition of the car prior to September 26, 2025? 15:21:11

A. It was -- I mean it was in great condition.

Q. Did it have any broken parts?

A. No.

Q. Did it have any scratches?

A. No. 15:21:37

Q. How did you -- how do you know that it didn't?

A. Well, because, like I said, part of my job is to care for and maintain that vehicle, and also

2025 10 16 25GJ994 I▮▮▮▮▮▮▮▮▮▮

Page 10

to report any time there is damage, you know, to the vehicle.

So, pretty much daily I walk around it and make sure that it's as it's supposed to be so that I don't have -- so I know if I have anything to report.                                                 15:22:15

Q.   Does the car have tinted windows?

A.   I mean it has factory-tinted windows, so the -- the front is slightly tinted and the sides are tinted darker.                                          15:22:38

Q.   And does it have any law enforcement lights?

A.   It has -- it has law enforcement lights, but they are subdued.  There is a few that maybe are visible on the front grille.                            15:23:02

Q.   And does it have a siren?

A.   It does.

Q.   Did you approach the intersection of 25th and Harvard in Broadview going southbound on 25th Street at about 7:45 that morning?                       15:23:32

A.   Yes, ma'am.

Q.   And when you reached that intersection did you encounter a checkpoint at that intersection?

A.   I did.

2025 10 16 25GJ994 ▮▮▮▮▮▮▮▮▮▮▮

Page 11

Q. What did you do at that checkpoint?

A. So, I pulled out my credentials, and then I rolled down my window, and I showed the officer that was standing in the middle of 25th that -- my credentials and said I was with ICE and then I was 15:24:16 headed into Broadview.

Q. And what did he do?

A. He -- he stepped out of the way and kind of motioned for me to go ahead.

At that point I saw another officer 15:24:34 standing in the intersection or in the center of what would be Harvard Street.

Q. And after you passed through the checkpoint did you go westbound on Harvard then?

A. I took a right turn, yes. 15:25:01

Q. Okay. Once you took the right turn, could you see the Broadway (sic) facility?

A. Off -- off if in the distance. I know it's there but I wouldn't say that I see it.

Q. Okay. About how far away was it at that 15:25:21 point?

A. It's about 200 yards.

Q. And at that point -- well, let's go piece by piece.

Veritext Legal Solutions

2025 10 16 25GJ994 ██████████

Page 12

Tell us what happened next. And I might interrupt you to ask you some questions, but tell us what happened after you started to proceed down Harvard Street.

A. Well, while I was turning onto Harper, I was still in -- in 25th Street. Like I said, there was another officer at -- right at the entrance of Harvard.

He, you know, slowly stepped out of the way as if to motion for me to go in. But, of course, there was a -- a crowd of angry protesters, you know, there in the vicinity and blocking the street.

Q. And then what happened next?

A. Well, I slowly proceeded, you know, into Harvard and I -- I expected, you know, the crowd to move out of the way. Especially with the presence of, you know Broadview Police Department there. But unfortunately, you know, they -- they didn't. Several of them stepped in front of my car. And pounding on the hood, you know, called me, you know, all kinds of names and -- and, you know, were ultimately preventing me from moving forward. So I started --

Q. Let me back you up.

Veritext Legal Solutions

2025 10 16 25GJ994 ███████████

Page 13

A.   Okay.

Q.   Could you feel them pushing against your car?  What were you -- what did you feel?

A.   Yeah.  I could -- I could feel the car rocking back and forth slightly, maybe a little bit less right at the beginning, but definitely as they -- more and more people began to surround my car and bang on it.                                      15:28:22

I could hear the impacts of their fists.  I could hear, you know, like deep tones of, you know, fists hitting the window, hitting the sides of the -- of the car.  And then I could hear higher pitched tones that felt like, you know, something was in their hand or possibly a large ring or something, you know, banging on the windows of the car.                                      15:28:48  15:29:23

Q.   And at some point did the crowd in front of your car grow?

A.   Yes.

Q.   Did it get bigger?                           15:29:40

A.   Oh, yes.  Definitely.

Q.   So more people moved to the front of your car and that point?

A.   Yeah.  Coming -- they -- they were -- they

2025 10 16 25GJ994 ▬▬▬▬▬▬

Page 14

were calling for more people to come and pile in front of the car to keep pushing on it to try and stop me.

Q. You could hear that?

A. Yes.                                                    15:30:14

Q. Thanks. Did you hear them chanting?

A. Yes. I -- I heard them chanting.

Q. And I won't ask you specifically what you heard.

Were you concerned that the windows would      15:30:35
break?

A. Yes. Definitely. I -- I was concerned and -- and surprised that they didn't as hard as they were being struck, and I was concerned that if, you know, one of the windows was breaking I was      15:31:02
probably going to be in a real -- a real dangerous situation.

Q. And why did you think that? What did you think could happen?

A. Well, I mean I -- I thought I was going to      15:31:21
get drug out of the vehicle and, you know, assaulted or beat down.

I mean, you know, just from my experience that I've seen that in the past, you know. In large

2025 10 16 25GJ994 ███████████

Page 15

crowds when people stop, they've got taken out of their vehicle and assaulted.

Q. So is it fair to say that you were in fear for your safety during this incident?

A. Yes. Definitely.                                    15:32:10

Q. What were you looking at this whole time? What was your focus?

A. So, as soon as, you know, I saw that they weren't moving out of the way, that they were -- they were trying to stop me, the first thing I     15:32:33 thought was, well, I can't stop or I'm going to be -- you know, this is going to go from bad to worse.

So I -- I focused on the people that were right in front of the car. Just, you know, to try     15:32:54 and see if any of them were stumbling or anything. And then I was focusing on -- I was glancing back and forth it at my speedometer, which is a digital speedometer, to, you know, to see how fast I was going.                                              15:33:18

Q. And how fast did you go during that time?

A. It was going back and forth between zero miles per hour and one mile per hour. And then, you know, as I progressed down the street, eventually I

2025 10 16 25GJ994 ▮▮▮▮▮▮▮

Page 16

was able to get up to two miles per hour.

Q.   And why were you going so slowly?

A.   Well, because I wanted to continue forward motion, but I was concerned that, you know if someone were to fall in front of my car, that I would be in danger of harming them.

Q.   Did you use your flashing law enforcement lights?

A.   I did not, although I -- I thought that I could.

10:11:18

Q.   Let me stop you.

A.   Okay.

MS. MECKLENBURG:   I need the batteries on the recorder.

(Discussion held

off the record.)

(Whereupon the testimony

was abruptly stopped.)

2025 10 16 25GJ994 ███████████

Page 17

C E R T I F I C A T E

JEANINE WATKINS, being first duly sworn, on oath says that she is a Certified Shorthand Reporter doing business in the City of Elgin, County of Kane, and the State of Illinois;

That she reported in shorthand the foregoing audio recording of the proceedings of the Federal Grand Jury in the Grand Jury Room in the United States Courthouse in Chicago, Illinois;

That all speakers have been identified within the transcription based on the content of the said audio recording;

And that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid and contains the full content of the said audio recording which was audible and discernible.

JEANINE WATKINS, C.S.R.

C.S.R. License No. 084-001629

Veritext Legal Solutions

2025 10 16 25GJ994