IN RE: GRAND JURY      ) GRAND JURY

     INVESTIGATION   ) NO. 25 GJ 994


     BEFORE THE FEDERAL GRAND JURY

     (SPECIAL JUNE 2024 - GRAND JURY)


     October 23rd, 2025 - Thursday

     2:29 P.M.


PRESENT:

     THE HONORABLE ANDREW S. BOUTROS,

     United States Attorney

     219 South Dearborn Street

     Chicago, Illinois  60604

     BY:  MS. SHERI MECKLENBURG (i)

         (Under Seal)

         MR. MATTHEW SKIBA

         Assistant United States Attorneys.

(The Grand Jury, having reconvened at 2:29 p.m. on the 23rd day of September 2025, pursuant to adjournment, met in closed session and the following is an excerpt of the proceedings had herein.)

MS. MECKLENBURG: Good afternoon. Sheri Mecklenburg and Matthew Skiba.

We are back on 25 GJ 994.

THE COURT REPORTER: Is it possible for you to speak in the microphone?

MS. MECKLENBURG: Can I use your --

MADAM FOREPERSON: You sure can.

MS. MECKLENBURG: Okay. And I will sit down in a minute, but I have some things that I want to say first.

25 GJ 994, we are back on that. A couple of things: I want to remind you that we're at the accusatory stage. People will have defense- -- may have defenses to charges, in which case it all comes out at the -- in the district court, not in the Grand Jury.

I'm not going to ask you today if you can keep an open mind and deliberate

fairly and apply the law to these facts. Instead, I'd like you all to stay and hear our evidence and our -- our law and our testimony. I'm bringing back Professor Skiba, who last time did a great job. But we're going to start over, because some people weren't here, and I think it was valuable to learn the law.

So I'm not going to ask you whether you can or can't. What I am going to ask is that you're all here. You all stay. You all listen, and then when your -- it is your time to deliberate, that you be honest with your fellow Grand Jurors. If you still feel like you are operating from feelings that prevent you from deliberating fairly with your fellow Grand Jurors and from applying the facts -- the law to the facts here, then tell your fellow Grand Jurors that you can't deliberate.

So I'm going to leave that to you. Before we start, I have to do a mia culpa,

because I'm the one who knows the rules, and I did something today that I'm not supposed to do. I had conversations with two Grand Jurors outside of the Grand Jury room. So I need to put it on the record.

And for those Grand Jurors, I'm not naming you. You can either confirm, deny, or speak up. I don't care. But I'm just going to tell you, you didn't do anything wrong. I'm the one who knows the rules. But it's very hard when someone talks to you, who you know, to not talk back to them.

So the first one was one of the Grand Jurors and I ran into each other in the elevator. This Grand Juror -- I am going to summarize to the best that I can. The Grand Juror apologized to me from last week, and I told the Grand Juror that I accepted his apology. I wasn't mad. I understand people have feelings. The Grand Juror said at that time that he did have feelings, and he's sure that he's right, but he shouldn't have walked

out the way he did. So that was one conversation.

And then I had another very brief conversation. I was up here and somebody -- one of the Grand Jurors said to me something about last week. And he said, "I'm sorry. I under- -- I can apply the facts to the law. I understand that people have feelings,

but we have to apply the facts to the law."

And I said, "That's true. That's exactly what we're asking you to do," something like that, to the best of my recollection.

So I am -- it's on the record. I won't do that again. If I see you and I don't -- and I just say, "Hello, how's the weather," you will understand it's nothing personal.

And other than that, I'm going to -- we're going to do two things today. We're going to start over with the law with Professor Skiba and then we're going to call in ████

███, and we're going to start over with his testimony so that you can all hear him, see him, assess him. Thank you.

MR. SKIBA: All right. Good afternoon, everybody. For -- for some of you, this is going to be a review from last week. For others, this may be a little new. So part of what we wanted to do after the first session is to spend a little bit more time with the law.

These are complex statutes written by Congress. So one of the things that

we wanted to do -- to do is to break down the -- the two statutes that we are presenting to you today to talk about what are our -- what are elements and what are irrelevant considerations. We also -- based on some of the questioning in the first ses- -- session, we actually wrote down some answers to your questions from the first session, which, again, gets to what is and what is not at issue with the elements that we are talking about.

So I am first going to present

the felony charge, and that is 18 United States Code, Section 372. And this statute is called "conspiracy to impede or injure an officer." And so we have the entire statutory text here. It is pretty lengthy, but I wanted to go through the elements that I have written down here to -- to kind of break it down piece by piece.

So the first element is that -- that two or more people need to conspire. And then to establish probable cause we need to establish one of the following: The first is to prevent by force, intimidation, or threat the officer from discharging his duties. I am going to talk in a little bit about what force,

intimidation, or threat means.

The second alternative is to injure an officer of the United States or his property on account of his lawful discharge of the duties of his office or while engaged in the lawful discharge of his duties.

So I know in the first session there was some question of "Well, Agent A was on

his way to work. Does that matter under these statutes?" So for the 3- -- this 372 charge, the answer is clearly no, because under the second alternative requirement, the injury to the officer or his property must either be on account of or because of the lawful discharge of his duties or while engaged in the lawful discharge of his duties.

So for this -- this alternative here, it's irrelevant whether he was actively working at the time or was -- he was on his way to work. And we'll talk a little bit more about what the Section 111 question, whether it's relevant that he was on his way to work in a little bit. And the last alternative here is -- and again, this is an "or" -- to injure the property of an officer of the United States, so

as to molest, interrupt, hinder, or impede him in the discharge of his official duties.

So as I mentioned, I'm going to break down some of these requirements in further depth, but does anybody have any questions about

these elements under Section 372?

(No response.)

MR. SKIBA:  Okay.

Oh, yes, ma'am.

GRAND JUROR:  Can you talk a little bit about what it means to conspire?

MR. SKIBA:  Absolutely.  You read my mind.

Under this -- the next sheet that I have for you is "What is a conspiracy?" And so it -- and this is coming from the Seventh Circuit's instructions.

A conspiracy is an express --

MS. MECKLENBURG:  And just so you know, we are in the Seventh Circuit.

MR. SKIBA:  Yep.

MS. MECKLENBURG:  That's who g- -- governs our law.

MR. SKIBA:  So a conspiracy -- and this is a direct quote.  "A conspiracy is an

express or implied agreement between two or more persons to commit a crime."

So I underlined here "express and implied."  So an express agreement is you walking up to somebody and say [sic], "Let's do this."  An implied agreement between two or more people does not need an express agreement.

And this next bullet point here I think really gets at another question that you-all had in the first section is, do you need to do any advanced planning?  And the answer is no.  A conspiracy can be based on the spontaneous actions, plus the overt acts of the co-conspirators.  And once there is a conspiracy, then each person is accountable for the foreseeable actions of his co-conspirators.

MS. MECKLENBURG:  Let me just add something.  And that is that when I was doing drug cases, sometimes the co-conspirators didn't even know each other.  They knew there were other people in their conspiracy working on the drug sales, but they didn't necessarily know each other, and they don't have to know each other.

Here it looks like some of the

potential defendants do know each other, but that's not the issue, that they met ahead of time and were all introduced and knew each other and went out and said, "Let's do this."

MR. SKIBA: Does anybody have any other questions about the elements?

(No response.)

MR. SKIBA: Okay. Seeing --

MS. MECKLENBURG: Did that help?

GRAND JUROR: Yes.

MS. MECKLENBURG: Okay.

MR. SKIBA: Seeing none.

And so we went over this last week. But this -- I think this quote from this case in New Jersey, I think, really hits -- it makes a very straightforward point. And this is a -- a direct quote from the case. "Section 372 is straightforward. It prohibits individuals from conspiring to keep government employees from doing their job."

And that's precisely what happened here. As you-all will hear in a little bit from Agent A, Agent A is a government employee. And based on the video footage that we've reviewed a couple of times, it's clear

that the -- the co-conspirators here prohibited -- excuse me. They -- it -- the -- these individuals conspired to keep Agent A from doing his job.

And so un- -- under this case from -- excuse me -- the District of Nevada -- again, it's a straightforward statute -- prohibits individuals from conspiring to keep government employees from doing their jobs.

Another question on the -- the elements is, what is force, intimidation, or threat? Well, you only need to prove one, but we think all three are satisfied here. Now, I -- I pulled a couple of quotes from a case out of the Western District of Texas. This is a civil statute, but it is a civil statute that is mirrored exactly in relevant part like the 372 statute that we're presenting here.

And so a really great quote from this case is -- and, again, quote -- "the most commonly understood dictionary definition of 'intimidate' is to place a person in fear." And as you-all will hear in a little bit, Agent A was placed in fear by the actions of the

co-conspirators here based on the actions of

surrounding his car and preventing him from going forward.

Another quote from this case that I think is pretty telling here is surrounding a bus with about 100 cars in the interstate and attempting to block and control its movements by physically blocking it with their vehicles and driving dangerously could reasonably constitute force.

Now, I want to stop here and tell you that that is not what happened here. We are not saying that 100 cars surrounded Agent A. But the point is -- and the reason why we have this quote up -- is that the co-conspirators here, both the individuals named in the indictment and the other individuals in the video, surrounded and physically blocked Agent A's vehicle and tried to prevent it from going forward and going -- to prevent it from going into the Broadview facility.

Does anybody have any questions

about this sheet of paper?

(No response.)

MR. SKIBA: Okay. Seeing none.

And here is just a summary

of -- again, the question is, is there probable cause that the facts meet the law here? And we'll walk through this, but I think the answer we posit is yes.

So here there was a conspiracy implied by the conduct. The individuals you saw in the video surrounded the car of Agent A. They were banging on his car and windows. Some were scratching his car. Several of them moved to the front of their -- Agent A's car together to try to block it.

And each person we included in the indictment engaged in conduct that they used force and intimidation and threats that directly hindered or impeded Agent A and prevented him from moving his government-issued vehicle towards the Broadview facility.

So Michael Rabbit -- you saw

from the video -- hung onto the passenger's side. He pushed and banged on the side of the vehicle. Again, I'm not a car expert, but I believe -- I believe you heard the testifying agent a couple weeks ago. The thing that he was hanging on was the A-frame of the vehicle. Kat Abughazaleh placed herself in the front of the

vehicle. She pushed on the front of the vehicle with her hands and her body to prevent it from continuing.

Cat Sharp was more or less right next to her. Also placed herself on the front of the vehicle, also pushed on the front of the vehicle with her hands on the body to prevent the -- the car from going forward.

Brian Straw, he moved through the crowd to the front of the vehicle, and he pushed up against the vehicle with his hands and leveraged his body, like the others, to prevent the car from continuing forward.

MS. MECKLENBURG: And just to remind you, Brian Straw is the one who had the orange

hat, and you saw him making his way to the car.

You have a question.

GRAND JUROR: Yeah, just a quick question.

MS. MECKLENBURG: Yeah.

GRAND JUROR: Are you going to show the video again? Because --

MS. MECKLENBURG: Yeah. We will do that, yeah.

GRAND JUROR: Okay. Because the

notes I have written down don't 100 percent match up with that. That's why I just wanted --

MS. MECKLENBURG: Okay. Yeah. No. We will show it to you.

GRAND JUROR: -- an opportunity to view it again --

MS. MECKLENBURG: Absolutely.

MR. SKIBA: Certainly.

GRAND JUROR: -- to make sure I didn't make a mistake.

MR. SKIBA: And then -- so Andre Martin was close to -- close in proximity to Kat

Abughazaleh and Cat Sharp.  He had placed himself in the front of the vehicle.  He pushed on it with his hands and -- hands and his body to prevent the vehicle from continuing.

And, finally, Joselyn Walsh -- excuse me -- Joselyn Walsh wrapped her arm around the driver's side mirror to prevent the vehicle from continuing.  This was the -- the individual who had the guitar in the video.

And then each person -- again named here -- they were pushing on the vehicle to hin- -- hinder and impede it, not to protect themselves from being hit.  And as you will

recall from the video, there were chants surrounding Agent A's duties.

Some were yelling, "Get a real job."  I believe some were yelling, "Fuck this pig."  Pardon my language.  So it's clear that they -- they knew that he was related to ICE, and they had surrounded his vehicle because of his -- his role related to the Broadview facility.

Does anybody have any questions here before I turn to the other statute? And then at the end, there's some other miscellaneous Q & A for both of these statutes that we will go over in just a second.

MS. MECKLENBURG: And then we'll watch the video. Then, we'll have the testimony.

MR. SKIBA: Yeah.

(No response.)

MR. SKIBA: Okay. Seeing none.

About 372, I am going to turn to Section -- this is the misdemeanor count. This is 18 United States Code, Section 111. And this statute is called "assaulting, resisting, or impeding certain officers or employees."

17

This is a shorter statute. In relevant parts, I'll just read it to you.

This applies to whomever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any personnel designated in Section 111- -- excuse me --

1114 [sic] -- that's a law enforcement officer -- of this title while engaged in or on account of the performance of the official duties.

So breaking that -- this down further, first, you need to find that there was a forcible -- so the -- the term "forcible" applies to each of these verbs that follow. So forcibly assaults, resists, opposes, impedes, intimidates, or interferes. And there needs to be a federal officer.

And, finally, again, in relevant part, the actions were done while the officer was engaged in or was on account of the performance of his official duties. So the -- again, the question under this statute -- one of the questions is, does it matter that he was on his way to work?

And the answer to -- under this

statute is no for two reasons. The first reason is just as a legal question, the statute requires that he be either engaged in his

official duties or that the incident be on account of his official duties.

So, again, what that means is he doesn't actually need to be engaged in his official duties so long as the incident was on account of or because of his official duties. But the more fundamental point here is just as a factual matter. As you will hear from Agent A, Agent A was duty-bound to protect his vehicle. It was a government-issued vehicle. He is only able to use it for work-related purposes.

So he can't go to the movies using his government-issued car. He can't go out to dinner with his wife in his government-issued car. No. He is only able to do government -- government-sanctioned activities while in that government-issued vehicle. And as you will also hear is -- he was duty-bound to ensure that nothing bad happened to that vehicle.

Another question that was posed the last few times is, did Agent A need to be

assaulted? And the answer to that question is also no, because Section 111 also applies -- applies to those who forcibly resist, oppose, impede, or intimidate an officer, again, while engaged in or on account of the performance of his official duties. And as the video shows, you know, these -- not only were these verbs met, but Agent A was both engaged in his official duties, and this incident was on account of the performance of his official duties.

And, finally, the last question under this statute that we have down -- and, again, we will have a few other questions and answers for you in just a minute -- what does the term "forcible" mean? And, again, this is also from the Seventh Circuit's pattern jury instructions. We are in the Seventh Circuit.

"Forcible" means by use of force. Physical force is sufficient, but actual physical contact is not required. So a person also acts forcibly if he threatens, attempts to inflict bodily harm upon another with a present ability to inflict bodily harm.

And, again, this is a -- a

quote from the comments. "Direct contact is not required so long as the conduct places the officer in fear for his life or safety." And as you will hear in a little bit, Agent A was in fear for his life or -- excuse me -- his life or safety.

Does anybody have any questions about Section 111?

(No response.)

MR. SKIBA: Okay. Seeing none.

And, finally, just on the law piece, we will -- we'll conclude with some just -- these are just miscellaneous questions that -- that a few of you asked related to both statutes.

So the first question is, what is Agent A's duty? Shouldn't he have stopped his vehicle?

And so the answer to that is -- there is several-fold answers to that. So neither statute we are presenting today requires that he have stopped his vehicle. So it's an irrelevant question. This is not a personal injury case where the question is who is more at fault.

But the -- the more fundamental point is even if he had stopped his vehicle entirely, they still -- the co-conspirators still would have been hindering and impeding him from driving forward. He also did not -- and this is true for both statutes. He didn't have a duty to retreat once these individuals surrounded his car and were preventing him from going forward.

You will also hear from -- from Agent A -- and he had mentioned this last week. I am sure he will mention it today. The thing that was going through his head is he was scared to be a sitting duck at that point. He was worried that if he had stopped his -- his car entirely, he was going to be pulled out of his vehicle. The glass would have been broken, and he would have been subject to more harm if he had just stopped entirely.

And so that's why -- again, in the interest of not hitting anybody -- to try to inch forward as slowly as he could -- as slowly

but as surely as he could so that he can get to safety at the Broadview -- Broadview facility.

Another question is, what about

the other witnesses? There is a -- a truck driver. There was local police in the area. Why aren't we hearing from them?

The -- the answer to that is this is a probable cause determination. The video itself is as plain as day on whether the -- there is probable cause to establish that the evidence marries up to the law here. So we don't need to in the Grand Jury present every conceivable witness that may have been there that day.

Another question was, what about the other individuals surrounding the car? Again, that's also irrelevant to the task today, which is just to determine whether there is probable cause to charge the six individuals that we had named in the indictment.

And then, finally -- and then I will get to the video in just a moment -- can

the government charge the misdemeanors without the Grand Jury?

And the answer to that is we are seeking a felony and so we cannot charge the Section 111 misdemeanor -- if we are seeking a felony on the 372 charge, we can't bifurcate

that. So we ask that you return a true bill on each count, including the Section 111 misdemeanor count.

And so you have to consider the evidence and whether there is probable cause, considering the elements for each charge.

Yes, sir.

GRAND JUROR: That -- I am confused a little bit by that. I was under the impression or my understanding that you don't need to seek an indictment for a misdemeanor.

And am I completely mistaken on that?

MS. MECKLENBURG: If you are only charging that misdemeanor. But you can't have two cases against people. You can't seek a

felony charge and then separately bring -- you can't bring misdemeanors and seek a felony charge. So you can't have two cases.

GRAND JUROR: Right. But then --

MS. MECKLENBURG: Given that the government has chosen to seek a felony, they also have to ask you for the misdemeanor. We also have to ask you for the misdemeanor, so --

GRAND JUROR: But in this case, the

24

felony is conspiracy.

And then the misdemeanor, isn't that a different charge?

MS. MECKLENBURG: Always. Yeah. They are different charges.

GRAND JUROR: Yeah.

MS. MECKLENBURG: But you can't bring them separately. You can't have two cases against somebody. That wouldn't be fair to them, to defend themselves in two courtrooms.

Am I not answering your question?

GRAND JUROR: Yeah. I guess I'm --

MS. MECKLENBURG: Okay.

GRAND JUROR: -- I'm still a little bit -- understanding if he -- for the moment, if you were to not charge a felony conspiracy charge, could you -- couldn't you still charge that with a misdemeanor charge?

MS. MECKLENBURG: Could we charge the conspiracy with the misdemeanor?

GRAND JUROR: No, not the --

MS. MECKLENBURG: Could we charge the 111 misdemeanors --

GRAND JUROR: Yeah.

25

MS. MECKLENBURG: -- if we decided strategically that we were not going to bring any felony?

We have the authority under the law to bring misdemeanors without a Grand Jury, but that should not affect your decision as to whether we have proven probable cause for each of these.

GRAND JUROR: Yeah.

MS. MECKLENBURG: You still have to

consider each. We have chosen to present this to you with a felony, and so you still have to consider each of these. You can't say, "You can do it without."

GRAND JUROR: Okay.

MS. MECKLENBURG: Does that answer your question a little better? You still look like you are not so sure.

Matt, do you want to give it a shot? Maybe you --

MR. SKIBA: Yeah. I was going to say, so, again, the question for these charges is probable cause.

GRAND JUROR: Yeah.

MR. SKIBA: So the question of, you

know, which charges we -- you know, again to Sheri's point -- we are strategically considering bringing, that's sort of outside the purview or outside the scope of the question of probable cause.

Because we are presenting both a felony and a misdemeanor, we have to present

both to you today.  So I think what you are asking about is if you were only bringing a misdemeanor, can't you just do that on your own? I think that the point is, that's not what we are doing.  We are presenting both a felony and a misdemeanor.  And we can't, like, pick and choose what we are going to do.  We can't only present the felony to you and then try to charge it as a misdemeanor ourselves.

We are presenting both to you. And, again, the question is --

GRAND JUROR:  Yeah.  I think I get that, that you -- the fact that you intend to do it all, but --

MS. MECKLENBURG:  Whether we can do it on our -- we can do misdemeanors on our own should not affect your decision as to whether there is probable cause for each of these

27

counts.

Does that make any sense to you?

GRAND JUROR:  Yeah, I think so.

Well, it's just the one conspiracy count. I mean, the misdemeanor --

MS. MECKLENBURG: We want you to also consider each of the misdemeanors with it.

GRAND JUROR: Right. Okay.

MS. MECKLENBURG: Yeah. We're presenting it all to you.

GRAND JUROR: Yeah. I get that, but the --

MS. MECKLENBURG: Yes.

GRAND JUROR: Okay.

MS. MECKLENBURG: Your consideration should not be in assessing a -- an indictment, "Well, they could bring this charge without us. So we don't need to consider probable cause on that." That shouldn't be one of your considerations.

GRAND JUROR: Yeah, I understand that.

MR. SKIBA: Just said differently, if you as a Grand Jury were to find probable cause

for both a 372 felony and the Section 111

misdemeanor, it's not -- it's no answer to say like, "Well, we don't need to" -- we could just let them do the misdemeanor. If there is probable cause, there is probable cause no matter how the case is charged.

Any other questions about the law before we turn back to the video?

(No response.)

MR. SKIBA: Okay. Seeing none.

Just bear with me on the technology.

MS. MECKLENBURG: Matt, do you feel comfortable doing the video?

MR. SKIBA: Yeah, I do.

MS. MECKLENBURG: Okay. I'm just here to help you.

MR. SKIBA: No worries.

MS. MECKLENBURG: You're the boss.

MR. SKIBA: Unless you want to do it.

MS. MECKLENBURG: No, no. You do it.

MR. SKIBA: All right. So --

MS. MECKLENBURG: But stop it, if you can, for --

MR. SKIBA: Yeah.

MS. MECKLENBURG:  -- each one of them so that they can get an idea.

MR. SKIBA:  So just as a reminder -- so there is two videos here.  I am happy to play it.  I am happy to pause, and I will -- I will try to point out each of these individuals.  It may require that I rewind a little bit.  So bear with me there.

So here is the first video.

MS. MECKLENBURG:  Is this the driver's side?

MR. SKIBA:  This is driver's side front, yep.

MS. MECKLENBURG:  Okay.

MR. SKIBA:  Okay.  So there is going to be a few people right off the bat.  So I am probably just going to pause it right off the bat, but they we'll -- I am just going to play the whole video in its entirety just to remind folks what happened here.  Okay.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA:  So we have three individuals already here.  This woman in

front -- she is blonde in pigtails -- is Kat Abughazaleh. Standing right next to her right to her right is Andre Martin. And the red-headed woman who is just behind Kat Abughazaleh -- this is on her -- to her left is Catherine Sharp.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA: And right here who just got hit with what looks like Skooby Doo is Jocelyn Walsh. She is the woman who is wearing a leather jacket. She's got a guitar, and it looks like she's hanging off the -- the driver's side mirror here. And I'm going to -- just going to play this.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA: And just to pause one -- one second here.

As you could hear in the video, what they're saying is "Down, down with

deportation." So it's clear that these individuals know that Agent A is affiliated with

ICE.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA: They are also saying -- you could hear a -- "Quit your job."

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA: Okay. Does anybody need to see this video? Do you want me to rewind?

MADAM FOREPERSON: Can you just play it one time without --

MR. SKIBA: Sure.

MS. MECKLENBURG: Without stopping?

MR. SKIBA: Yep.

MADAM FOREPERSON: Thank you.

GRAND JUROR: Yeah. Could you let it go --

MR. SKIBA: I'm sorry?

GRAND JUROR:  Could you led it go all the way to the end?

MR. SKIBA:  Yeah, absolutely.

GRAND JUROR:  Thank you.

MR. SKIBA:  Okay.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA:  Okay.

MS. MECKLENBURG:  And one thing I hope you were able to notice was that they weren't trapped there where they couldn't get away.  There was plenty of room to move off to the sides and get out of the way.

MR. SKIBA:  We will play the other video in a second, but does anybody have any initial questions before I play it?

Do you have a --

GRAND JUROR:  No.

MR. SKIBA:  Oh, sorry.

Okay.  I am going to pull up the second video.  Just bear with me one moment.

MS. MECKLENBURG: Let'S do it with stopping, and then we'll play it all the way through.

MR. SKIBA: Yeah. I will do that.

MS. MECKLENBURG: Thank you.

MR. SKIBA: Okay. In fact, right here let me just point out, again, you can see Kat Abughazaleh before I even play the video.

And this is Andre Martin, again, right next to her.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MS. MECKLENBURG: And Cat Sharp also --

MR. SKIBA: Yeah.

MS. MECKLENBURG: -- right back there.

MR. SKIBA: The red-headed woman right behind Kat Abughazaleh.

(Whereupon, a video was played on the screen for the Grand

Jurors.)

MS. MECKLENBURG: There is -- yeah.

MR. SKIBA: Yeah.

And here -- I am going to make sure I get his first name correct. But I am just going to call him Mr. Rabbitt. He is the individual -- he has got these sunglasses on his head. They're -- it looks like they are blue tinted. He has got this -- it looks like a black sleeve, and he is hanging onto what the agent a few weeks ago called the A-frame.

34

(Whereupon, a video was played on the screen for the Grand Jurors.)

MS. MECKLENBURG: And he moved up to the car in this video. You can see that he moved through and up.

THE COURT REPORTER: Sorry? I didn't hear what you said. I'm sorry.

MS. MECKLENBURG: He moved up to the car.

(Whereupon, a video was played

on the screen for the Grand Jurors.)

MR. SKIBA:  And here's another individual.  This is -- and, again, I'm just going to call him by his last name, Mr. Straw.  He is -- it looks like an orange hat, black sunglasses, and with a beard here.  And there is going to be a better shot of him in a moment.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA:  And, again, here is Mr. Rabbitt.  He has got like a -- again, black sleeves but a gray shirt here and sunglasses.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA:  Yes, sir.

GRAND JUROR:  I'm just trying to sort of like -- I can see Straw in the red hat.

MS. MECKLENBURG:  Keep your eyes on him for a few seconds --

GRAND JUROR: Yeah. But --

MS. MECKLENBURG: -- and then we'll stop it when he gets to the car.

GRAND JUROR: -- Michael Rabbitt no longer appears in the frame. And neither Kat -- or either Kat appears to be anywhere near the front of the truck again. I'm just wondering about that. So I don't -- I'm struggling to locate them.

MS. MECKLENBURG: You -- they don't have -- they can step away. You can do it that -- you can impede for some time, and then you can decide that you're going to stop. That doesn't change the fact that you have impeded for some time. And they could be going -- and we don't know where they are here. They could be going and doing something else to the car or

something else. We just don't know.

GRAND JUROR: Okay.

MS. MECKLENBURG: So I -- what's -- the probable cause comes from when you do see them on the video, not from when you don't.

GRAND JUROR: Uh-huh.

MS. MECKLENBURG: But keep your eye on Mr. Straw now with the orange cap and see what he does.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA: As you can see on Mr. Straw, there is a pretty wide berth that he has, that he could step through this way. He could step through this way. So he is not trapped, by any means.

MS. MECKLENBURG: And you can see he pushed his way up and to the car.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MS. MECKLENBURG: Because he wasn't on the car.

(Whereupon, a video was played on the screen for the Grand

Jurors.)

MS. MECKLENBURG: Just for the record --

MR. SKIBA: Yeah. Just for the record, they are saying, "Get to the front. Get to the front."

(Whereupon, a video was played on the screen for the Grand Jurors.)

MS. MECKLENBURG: And here again is Kat Abughazaleh right here walking back.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA: Okay. So I'm happy to start from the top and just -- I will just play this without interrupting.

But does anybody -- does anybody have any questions before I do that?

MADAM FOREPERSON: So this video is right after the first video you showed us?

So that -- which one took place -- the first one that you showed us took

place --

MS. MECKLENBURG:  Same time.

MR. SKIBA:  Yeah.  So this is just a different angle.

MADAM FOREPERSON:  Okay.

MR. SKIBA:  Yeah.

MS. MECKLENBURG:  The first side is the driver's side, and the second side is the passenger's side.

MADAM FOREPERSON:  Passenger's side.

MS. MECKLENBURG:  So it's happening at the same time.  But keep in mind, people are moving in and out --

MADAM FOREPERSON:  Yeah.

MS. MECKLENBURG:  -- which is part of the conspiracy.

MADAM FOREPERSON:  Right.

MR. SKIBA:  Okay.  Seeing no other questions --

I'm sorry, ma'am.  Did you have a -- Okay.

I'm just going to rewind to the start.  I won't interrupt it unless you-all want me to.

(Whereupon, a video was played on the screen for the Grand Jurors.)

MR. SKIBA: Okay. Does anybody have any questions about this video?

MS. MECKLENBURG: Can we bring in Agent A? And those of you who were here last week know his real name, and those of you who weren't will hear his real name.

(Whereupon, was had the testimony of ▋▋▋▋▋▋▋ which is included under separate cover.)

GRAND JUROR: I have a real quick question.

MS. MECKLENBURG: Yes.

GRAND JUROR: You showed two pictures of the side mirror?

MS. MECKLENBURG: Yes.

GRAND JUROR: From looking at those right here, are there any pictures other than from their direction?

MS. MECKLENBURG: I don't -- I did not see any.

GRAND JUROR: Okay.

MS. MECKLENBURG: Yeah. I didn't see any. But I think they took those pictures to show where it was actually broken.

GRAND JUROR: Yeah, I know.

MS. MECKLENBURG: Yeah.

GRAND JUROR: My concern is that -- the paint balls that they -- the pepper balls that --

THE COURT REPORTER: Sorry. "My concern was that" -- I didn't hear you.

GRAND JUROR: The pepper --

GRAND JUROR: That's why I was just wondering if there was any in this particular side of --

THE COURT REPORTER: Sorry. It's -- sorry. I can't hear you.

MS. MECKLENBURG: I think that --

GRAND JUROR: I'm sorry. I was -- I was asking if there are any images -- any pictures of the side mirror from the other side, not just the side that shows the -- the window

gone, but the other that shows whether it could possibly have impacted --

THE COURT REPORTER: I'm sorry. I still can't hear you. I'm sorry.

GRAND JUROR: I was simply asking if there are any pictures of the side mirror from the other viewpoint, not just showing the same window but -- or the missing mirror but if there are any from the other side potentially showing if there is any impact on it. That was all.

MS. MECKLENBURG: Okay. So I am not going to do the IDs again, because most of you were here when we did the IDs and there didn't seem to be a lot of questions. And, frankly, if I do that, you might be here for a while longer.

So these were the six people who we identified: Michael Rabbitt, Katherine Marie Abughazaleh, Andre Martin, Catherine Sharp, Brian Straw, Joselyn Walsh. And the indictment says that Agent A was a law enforcement officer, which is required by the statute, and that on or about he was de- -- and

that on or about September 23rd, he was detailed to serve on assignment for ICE, that he was in -- that Broadview was an ICE facility, and that each of these six people are people in -- who were residing or found in the Northern District of Illinois.

And I have that Andre Martin

was an individual found in the Northern District of Illinois because that's where he was that day. On or about September 26th at approximately 7:45 a.m., Agent A was wearing civilian clothes. He was in a government-owned vehicle, and he was reporting for official duties -- in his official duties. And then he told you that these were -- this included his official duties. I will leave you a copy of this if you want to look at that. I won't read it to you.

And that on that date, September 26th, they conspired with one another -- and that's under the meaning of "conspiracy" as we explained it, because that's

the law -- to prevent by force, intimidation, and threat Agent A -- the United States law enforcement officer -- from discharging the duties of his office, and to injure him in his person or property on account of his lawful discharge of the duties of his office and while engaged in the lawful duties and to injure his property so as to interrupt, hinder, and impede him in the discharge of his official duties.

So that's the crux of this, is

a conspiracy with the interruption, hindering, and impeding. It was part of the conspiracy that as he drove there, these six people were among the people -- a group of individuals, including these six people surrounded his car with the intent to hinder and impede the car -- to hinder and impede Agent A from dis- -- from proceeding and discharging the duties of his office.

It was part of the conspiracy that while surrounding the car, these six people with others, among other things, banged

aggressively on the car and the back windows, the hood, and other vehicle body parts, crowded together in front of -- in the front and side of the government vehicle and pushed against the vehicle to hinder and impede its movement, scratch the body of the vehicle, including etch -- etching a message into the body of the vehicle -- specifically the word "pig" -- broke one of the government vehicle's side mirrors, and broke a rear windshield wiper off the government vehicle.

And it was part of this conspiracy that each of these six people

physically hindered and impeded Agent A in the government vehicle such that he was forced to drive at an extremely slow rate of speed to avoid injuring any of these people, and in doing so slowly progressed toward the building so that he could discharge his duties.

Then for each of these people we say what -- something that they did. So we picked out -- and I told you this both of the

last two times.  We didn't pick out people who were just walking alongside.  We identified people who were actually doing something.  Mr. Rabbitt was the one with the orange hat.  He was one of the people surrounding the vehicle, bracing his --

GRAND JUROR:  That's not right.

MS. MECKLENBURG:  Oh.  Mr. -- I keep getting those two mixed up.  Mr. Rabbitt was the one on the side of the vehicle.

GRAND JUROR:  That's right.

MS. MECKLENBURG:  And he was the one with the gray shirt and the black sleeves.

So I apologize again.

He was -- surrounded the vehicle from the side, bracing his hands and

45

body against the vehicle, and hitting the windows.

Then came Ms. Abughazaleh.  She joined the crowd at the front of the car with her hands on the hood, bracing her body and hands against the vehicle, while remaining

directly in the path of the vehicle.

Mr. Martin did the same thing. He pressed -- also pressed his shoulder against the vehicle while remaining in the path of the vehicle.

Ms. Sharp joined the crowd at the front with her hands on the hood and braced her body and hands against the vehicle while remaining in the path of the vehicle.

And Mr. Straw joined the crowd at the front of the vehicle. He is the one in the orange hat and with his hands on the hood and braced his body and hands against the vehicle while remaining directly in the path of the vehicle.

And Mr. Walsh joined the -- Ms. Walsh, she was the one with the guitar. She joined the crowd near the front driver's side window of the government vehicle and wrapped her

arms around the driver's side mirror as she pushed against the vehicle. All of these were hinder- -- movements were hindering and impeding

Agent A and the vehicle from proceeding to the Broadview building, and all in violation of Title 18, United States Code, Section 372.

Then we have count -- one count for each of the defendants under 111 -- Section 111(a)(1) and (2). (2) just says that they either -- they also assisted -- or basically aided and assisted. So very often we'll include (2) in there along with that.

So, for instance, on that date, Michael Rabbitt forcibly impeded, intimidated, and interfered with an officer of the United States, namely Agent A, while engaged in or on account of the performance of his official duties in violation of these sections. And for each person, that is the language that we used. They're all the same, just the different names: Andre Martin, Catherine Sharp, Brian Straw, Jocelyn Walsh.

Do you have any questions for us?

GRAND JUROR: So all of the -- the

second -- I mean, the counts, those are the misdemeanors?

MS. MECKLENBURG: Yes.

GRAND JUROR: And so the misdemeanors -- you are charging the same actions as a felony and -- and as a misdemeanor?

MS. MECKLENBURG: Yes. And you --

GRAND JUROR: Is that right?

MS. MECKLENBURG: Yes. And that is permissible charging. You can do that. You can charge the same actions under different statutes. Well, it's actually a little bit different, because one is a conspiracy.

GRAND JUROR: Okay.

MS. MECKLENBURG: And the misdemeanors are what they did individually, which is why they each have a separate count. So they're not the exact same thing.

For instance, if just Mr. Straw had been out there, we would -- could charge him with the 111, but we wouldn't charge him with the conspiracy.

GRAND JUROR: Okay. And then the list of -- I think of one to seven -- I'm not sure how many there were -- does there have to

be agreeance on all seven of those?

MS. MECKLENBURG: You mean the counts?

GRAND JUROR: Not the count.

MR. SKIBA: The individuals?

GRAND JUROR: No. The -- in the first count, there were several things that you described.

MS. MECKLENBURG: You have to -- you have to pick one of the things that they did, and you have to say it threatened, intimidated, hindered, or impeded.

GRAND JUROR: Okay.

THE COURT REPORTER: Sorry. I have to --

MS. MECKLENBURG: You can go ahead. Let's turn on the recorder at this point.

(Whereupon, a short break was taken and the testimony was recorded via audio recorder and transcribed.)

MS. MECKLENBURG: I think what you are asking -- is it in paragraph 5?

GRAND JUROR: Yes.

MS. MECKLENBURG: Whether each of

these people had to do each of these things.

Is that what you are asking?

GRAND JUROR: Or if we have to agree that each of those four or five, six, whatever are true.

MS. MECKLENBURG: Here is what it says, though, that they each and others among other things. So remember you learned the law, in a conspiracy, that you are responsible for other things that people do. So they don't -- they don't have to actually scratch the car. You don't have to know that they're the ones who scratched the car.

The people who surrounded scratched the car, and they are part of that bigger conspiracy. That was the law that we were talking about.

GRAND JUROR: Okay.

MS. MECKLENBURG: I know. It's a -- it's a hard one. I agree. I have been doing this for a long time, and even when I look at it, I have to think about it a lot. So I

appreciate your questions.  I think they're insightful.

GRAND JUROR:  I kind of have a

hypothetical -- hypothetical, but kind of not.

MS. MECKLENBURG:  Okay.  We'll try.

GRAND JUROR:  So are -- is it basically arguing that pretty much anybody who walked in front of that car could be charged with a conspiracy even if they weren't actually touching the car and somehow impeding it, even if they were just walking along with it?

MS. MECKLENBURG:  That is not what we charged.  And I don't want to answer hypotheticals.  We charged only people who were actually doing things.

GRAND JUROR:  I --

MS. MECKLENBURG:  So if you are going to talk about could we charge this person or that person, it's not relevant to the probable cause against these people.

GRAND JUROR:  Right.  Except that what I'm getting to is I watched that video

again.  And specifically with regards to Cat Sharp --

MS. MECKLENBURG:  Mm-hmm.

GRAND JUROR:  -- maybe I completely missed it, but at no point did I ever see her touching the car.  Or she looked in that video

51

to me to be more walking behind two people in close proximity but not actually touching it. And so I -- that's where I'm kind of -- that's how I feel.  If somebody is there walking in -- in front but not actually engaging the car, are they somehow still part of this conspiracy? Because --

MS. MECKLENBURG:  Well, okay.  I'm not going to -- I'm going to let you figure out your facts as to what you saw on the video, and in deliberation you can talk about that. Whether you saw her reaching forward as well or pushing on other people to hold off the car, you decide what you saw.  I -- I showed you the video, gave you the testimony, and you draw your conclusions.

I will tell you that if somebody is also in front of the vehicle in the crowd preventing the car from -- standing in front of the car from it going, then they can be part of the conspiracy.

GRAND JUROR: There is a question over here.

MS. MECKLENBURG: Yes.

GRAND JUROR: Can you leave the

videos for us to look at if we -- while we deliberate or not?

MS. MECKLENBURG: Yeah. There is a password on the --

GRAND JUROR: Or can you at least play the first one again?

GRAND JUROR: Yeah.

MS. MECKLENBURG: Sure.

GRAND JUROR: Or at least the first one, unless you want to see the second one.

MS. MECKLENBURG: Yeah, yeah. No --

GRAND JUROR: You don't even have to play it all the way to the end. Just --

MS. MECKLENBURG: Sure, sure. Let's do that.

GRAND JUROR: Yeah. The first one is the one I think --

GRAND JUROR: Huh?

GRAND JUROR: I know my question -- the first one.

GRAND JUROR: The first one, yeah.

GRAND JUROR: I mean, the second one, I don't even see her.

GRAND JUROR: Yeah.

MS. MECKLENBURG: You can see from

53

across the car, but -- and we can play the first one.

MR. SKIBA: Oh, wait. That's just -- that's why I couldn't find it. There we go. Just one moment.

(Whereupon, a video was played on the screen.)

GRAND JUROR: Yeah, yeah.

MS. MECKLENBURG: It's a fast one, I know.

GRAND JUROR:  Yeah.

GRAND JUROR:  You can see her hand.

GRAND JUROR:  Yeah.

GRAND JUROR:  You can see her hand.

GRAND JUROR:  And then she pulls it away, yeah.

GRAND JUROR:  The redhead?

GRAND JUROR:  Yeah.

(Whereupon, a video was played on the screen.)

GRAND JUROR:  Okay.  Play it again.

GRAND JUROR:  I am not seeing what you guys are seeing.

GRAND JUROR:  Play it again.

MS. MECKLENBURG:  Hold on.

54

(Whereupon, a video was played on the screen.)

GRAND JUROR:  Her hand is right there.

GRAND JUROR:  That?

GRAND JUROR:  This is it, and then you will see her go in and then a little bit

out, but she is right in front of this guy's arm. So this is her. Yeah. She is, like, under his arm.

GRAND JUROR: Yeah.

MS. MECKLENBURG: She is reaching.

GRAND JUROR: Yeah. Watch. Just watch.

GRAND JUROR: Can you go slower? Can you slow it down?

MR. SKIBA: I don't believe I am able to go slow with this. Let me see if there is a mechanism for that. I don't think there is, unfortunately.

GRAND JUROR: It's okay.

GRAND JUROR: Yeah. She is, like, behind him, but her arm is under his.

GRAND JUROR: Yeah. I guess this is why I don't hunt.

GRAND JUROR: I am going to --

GRAND JUROR: Yeah. Sorry if I'm --

MR. SKIBA: No, you are fine.

GRAND JUROR: -- in your space.

MR. SKIBA: You are good.

GRAND JUROR: No. You -- you're fine.

GRAND JUROR: Could you hit "play"?

MR. SKIBA: Yeah. From the -- from the start or from here?

GRAND JUROR: Right here.

GRAND JUROR: Back up just a hair.

MR. SKIBA: Okay.

(Whereupon, a video was played on the screen.)

MS. MECKLENBURG: So here is what I am going to --

GRAND JUROR: I did not see that before. That is --

MS. MECKLENBURG: I'm glad you asked that. I really am. I'm going to just ask you -- remind you to --

GRAND JUROR: Do you need to see anything else on there?

MS. MECKLENBURG: Oh, I'm sorry.

GRAND JUROR: No.

GRAND JUROR:  Did you want to see the second one, ████?

GRAND JUROR:  No.  That's okay.

MR. SKIBA:  We can play it more if you want.

MS. MECKLENBURG:  Do you want more?

GRAND JUROR:  No.

MS. MECKLENBURG:  Okay.

GRAND JUROR:  For me it was the --

MS. MECKLENBURG:  It's getting late, I know.

I ask that you deliberate with each other in good faith.  If anybody still feels that you can't, then you have to be honest with your fellow Grand Jurors and tell them that your feelings about this are too strong, that they will not allow you to apply the fact -- the law to these facts.

That's your duty.  That's the oath you took.  So if that's how you feel, then you have to tell your fellow Grand Jurors that you can't deliberate with them.  I'm not going to ask you if you can or can't.

We will be outside if you have

questions like that, the -- like the good question we were just asked. Come out and ask us so that we can help you get to yes or no. Don't just decide without -- if you have questions that prevent you from finding what happened.

Thank you, everyone, for your attention and for being here today. We really appreciate it.

GRAND JUROR: Thank you.

(Whereupon, there being no questions by the Grand Jurors, the Grand Jurors were left to deliberate.)

CERTIFICATE

Kari Wiedenhaupt, being first duly sworn, on oath says that she is a Certified Shorthand Reporter doing business in the City of Chicago, County of Cook, and the State of Illinois;

That she reported in shorthand the foregoing audio recording of the proceedings of the Federal Grand Jury in the Grand Jury Room in the United States Courthouse in Chicago, Illinois;

That all speakers have been identified within the transcription based on the content of the said audio recording;

And that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid and contains the full content of the said audio recording which was audible and discernible.

_____

Kari Wiedenhaupt, CSR.

IN RE: GRAND JURY    ) GRAND JURY

INVESTIGATION  ) NO. 25 GJ 994


BEFORE THE FEDERAL GRAND JURY

(SPECIAL JUNE 2024 – GRAND JURY)


October 23rd, 2025 – Thursday

3:15 P.M.


PRESENT:

THE HONORABLE ANDREW S. BOUTROS,

United States Attorney

219 South Dearborn Street

Chicago, Illinois  60604

BY:  MS. SHERI MECKLENBURG (i)

(Under Seal)

MR. MATTHEW SKIBA

Assistant United States Attorneys.

I N D E X

WITNESS: ███████████ PAGES

Direct Examination by Ms. Mecklenburg.....4 - 35
Examination by the Grand Jurors..........35 - 41

E X H I B I T S

Presented for
Identification

Grand Jury Exhibit 1, Photo 13............    25
Grand Jury Exhibit 1, Photo 15............    25
Grand Jury Exhibit 1, Photo 16............    26
Grand Jury Exhibit 1, Photo 17............    28
Grand Jury Exhibit 1, Photo 18............    28
Grand Jury Exhibit 1, Photo 36............    29
Grand Jury Exhibit 1, Photo 41............    30
Grand Jury Exhibit 1, Photo 42............    30
Grand Jury Exhibit 1, Photo 48............    31
Grand Jury Exhibit 1, Photo 49............    32
Grand Jury Exhibit 1, Photo 38............    32
Grand Jury Exhibit 1, Photo 39............    33
Grand Jury Exhibit 1, Photo 44............    34

(**Marked exhibits retained by the attorney.)

(The Grand Jury, having reconvened at 3:16 p.m. on the 23rd day of September 2025, pursuant to adjournment, met in closed session and the following proceedings were had herein.)

MADAM FOREPERSON: Good afternoon. Please raise your right hand.

(Witness complied.)

MADAM FOREPERSON: State and spell your name for the record.

THE WITNESS: ██████████;

██████████████████.

MADAM FOREPERSON: Do you solemnly swear or affirm that in the testimony you're about to give before this Grand Jury to tell the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

MADAM FOREPERSON: Thank you.

WHEREUPON:

███████████████████████

called as a witness herein, having been first duly sworn, deposeth and saith as follows:

DIRECT EXAMINATION

by Ms. Mecklenburg

Q.    Good afternoon, Mr. ████████.

Can you hear me?

A.    Yes.

Q.    Okay.  And we're going to ask you some -- I'm going to start with some of the same questions you've answered, but there's new people -- not new people, but there's different people today in the Grand Jury.  So we are going to tell -- we are going to start from the very beginning again.

A.    Okay.

Q.    Can you tell us, what is your current job?

A.    I'm the ████████████████████████ for Immigration and Customs Enforcement in ████████████████.

Q.    And is that -- Immigration and Customs Enforcement what a lot of people know as ICE?

A.    Yes, ma'am.

Q. And how long have you been with ICE?

A. Twenty-four years.

Q. How long have you been the ████████ ██████████████████?

A. Since June of this year in ████████ and since 2017.

Q. Somewhere else?

A. Yes.

Q. Okay. And when you say in ████████ -- and we'll ask you about your duties in a minute. Why do you say ██████████?

Is that where you are actually based and where you perform your duties usually?

A. Yes, ma'am. That's my -- that's my permanent duty station.

Q. What -- what were you doing -- were you at some point reassigned to Chicago?

A. Yes, ma'am. I am assigned here on temporary duty.

Q. Can you describe in general your duties as ████████████████████████?

A. I --

Q. And do they differ -- I should ask you, do they differ from -- your duties in ████████ versus what you were supposed to do in Chicago?

A.    No, ma'am.

Q.    Okay.  Then go ahead.  Go ahead and describe them, please.

A.    So as the ████████████████████████ ██████, I am the second line manager for the office in ██████████ and then I also oversee an office in ████████████████████

So I oversee all of the operations of my supervisors that report directly to me and then their subordinates that report to them for both offices.  So I pretty much oversee all of the operations within those two offices, and then I report to my leadership, which is here in Chicago.

Q.    So for -- you -- at some point, you said you were assigned to Chicago temporarily.

And when was that?

A.    On the 22nd of September was my first day.

Q.    Let me ask you about some of your specific duties in Chicago.

Did you have the duties of overseeing or supervising logistics, such as intake, processing, bed space, and transportation coordination for those

temporarily detained in Broad- -- in the Broadview facility?

A.   Yes, ma'am.   I was there to assist the -- AFOD that -- that is permanently there.

THE COURT REPORTER:   Sorry?   The --

BY THE WITNESS:

A.   AFOD, the assistant field office director.   That's the acronym that we use. Sorry.

BY MS. MECKLENBURG:

Q.   The government is full of acronyms.   We all know that.

We -- and what about -- was it part of your duties to communicate with upper management and federal partners to manage operations and ensure necessary supplies and proper staffing levels?

A.   Yes, ma'am.

Q.   Did you also have the duties of responding to requests for information both internally and from the public?

A.   Yes, ma'am.

Q.   So when you were temporarily assigned to Chicago, were you given a place to report for carrying out your duties?

A.    Yes, ma'am.

Q.    Where was that?

A.    The Broadview Service Staging Area, which is 1930 Beach Street in Broadview, Illinois.

Q.    And you said that that -- Your first day at Broadview was September 22nd?

A.    Yeah.  I -- I may have misspoke.  My travel day here was the 22nd.  My first day was the 23rd.

Q.    So you had been to Broadview starting on the 23rd?

A.    Yes, ma'am.

Q.    Were you staying -- Where were you staying while -- at that time when you first started this temporary assignment?

Were you staying in a hotel or --

A.    Yes, ma'am.  I was staying in a hotel in Westchester.

Q.    Okay.  Let's go -- turn to September 26th, 2025, at approximately 7:45 a.m.

Where were you -- Were you going somewhere at that time?

A.    Yes, ma'am.  I was -- left my hotel and

was on my way to work there in Broadview.

Q. And why were you going there?

A. That's where I report daily -- or reported daily to -- to conduct my duties.

Q. What were you wearing that day?

A. Well, I was probably dressed very similar to this. Since I live out of a suitcase, I just -- I have a polo and, you know, my normal work pants. I had this jacket on probably. Anytime that I -- I go out in public, I -- I cover up with a jacket.

Q. And did you have on a mask or -- did you have a mask on?

A. No, ma'am.

Q. Can you describe the car that you were driving?

A. So my government-owned vehicle that is furnished to me is a 2022 Ford Expedition. It's black in color. It has four doors. Yeah, black.

Q. Is it marked as a law enforcement car in any way?

A. No, ma'am. It's -- it's an unmarked vehicle, but it has, you know, some subtle lights on the front that, you know, may --

may -- you know, if you know what you're looking for, you might know it as a vehicle for law enforcement.

Q. When were you first assigned that car?

A. In about April of 2025.

Q. Are you permitted to use that car for non-work purposes?

A. No.

Q. So can you use that car, for instance, to go to dinner with your wife or go to the movies with your family?

A. Absolutely not.

Q. What is your duty with regard to your government-issued car?

A. Well, my duty with -- with regard to that is basically to care and maintain for it -- maintain it, to file reports of mileage usage, you know, fuel usage, and any damage that occurs to it.

Q. What was the general condition of the car prior to September 26, 2025?

A. It was in -- it was in great condition.

Q. And how do you know that?

A. Well, as part of my duties, I -- every day I get in and I -- I do a walkaround. I

observe, you know, any new damage. You know, I'm aware of any new damage because I -- I would have to report that, and it would be my job to maintain a professional looking vehicle.

Q. And as of the morning of September 26th before the incident we're going to talk about, had you reported any damage to that car?

A. I had a rock chip in the windshield that Safelite repaired once.

Q. And you reported that?

A. Yes.

Q. On September 26th, was anyone else in the car with you when you were driving to work?

A. No, ma'am.

Q. Did the car have tinted windows?

A. My particular car does not have -- It has factory tints on the back windows and, you know, regular windows on the -- on the passenger and driver window.

Q. You said that it has lights that could be recognized as law enforcement.

Does it have a siren?

A. It does.

Q. What about a horn?

A. Yes.

Q. Did you approach -- that morning at around 7:45, did you approach the intersection of 25th and Harvard in Broadview going southbound on 25th Street?

A. Yes, ma'am.

Q. And when you reached that intersection, did you encounter a checkpoint at that point -- at that time?

A. Yes, ma'am. There was a -- an officer standing in the middle of the street, in the middle of 25th Street and then, you know, another officer right at the intersection of Harvard and 25th.

Q. But tell us what happened when you reached that checkpoint.

A. Well, I could see there was a commotion. You know, obviously, I knew that there was going to be protesting in the area, and I approached the officer in -- in the middle of 25th, rolled down my window, and showed him my credentials. And I told him I was with ICE, and he moved out of the way and just motioned for me to -- to go into Harvard Street there from 25th.

When I -- when I did that, the

officer that was standing there at -- in the center of 25th and -- or in the center of Harvard on the edge of 25th, he -- he moved out of the way so  I could proceed.

Q.    When you turned onto Harvard, about how far away were you from the Broadview facility?

A.    About -- probably about 200 yards.

Q.    So if nobody had impeded you on your way there, about how long -- from your experience on the prior days when you went to Broadview, about how long would it have taken you to get to the Broadview facility from where you turned?

A.    Probably 20 seconds, maybe 30 seconds.

Q.    When you turned, what did you see?

A.    So as I turned, obviously, I had already noticed that there was a crowd, you know, blocking 25th.  I had already caught their attention, obviously, because the officers had let me through.

So, you know, they were yelling and, you know, screaming at me.  And I saw that they were, you know, really just in the middle of the street, on the side of the street, you know, all over there.  And so I just approached

as the officer kind of motioned me. And, you know, I expected them to kind of, you know, separate so I could make a passage through there.

Q. And what happened next?

A. Well, there were a couple of people that initially, you know, got in front of my vehicle, put their hands on -- on -- on the front of my vehicle and basically, you know, was screaming, telling me to stop, you know, calling me all kinds of vulgar names and -- and things of that nature.

And, you know, I felt like I -- I couldn't stop because of -- of the press. And so as I began to enter, you know, everyone surrounded my vehicle. They were banging on the windows, banging on the hood, you know --

Q. Let me stop you for a minute. You started with saying a couple of people, and then you said everyone.

So did the crowd around -- surrounding your car increase at --

A. Oh.

Q. -- at some point?

A. Yes, definitely.

Q.    So once they surrounded your car, what did you actually -- tell us what you heard and what you saw.

A.    Okay.  Well, like I said, I could -- I could hear them, you know, calling me names, you know, talking about, you know, the size of my penis, you know, calling me a Nazi, you know, telling me to quit my job, you know, and things of that -- and -- you know, but I also could hear them banging on -- on the windows particularly.

You know, I could hear, you know, deep sounds like a fist banging on the window.  I could hear, you know, high-pitched sounds of, you know, like, something was in their hand or on their hand like a ring or a piece of wood or something.

You know, I could feel the car shaking.  And, you know, I was -- at that point, you know, I just -- I had it in my mind to just stay focused on the people that were right in front of the vehicle, you know, to make sure that I, you know, could see if someone stumbled or something in front of my vehicle.

And I kept glancing down to

see, you know, how fast, you know, I was going.

Q.    Let me stop you for a minute.

A.    Okay.

Q.    Could you feel the car rocking?  Could you feel the people pushing up against the car?

Could you feel rocking at all, or did you --

A.    Yes, definitely.  It was -- it was -- it was rocking side to side.  Probably not so much back and forth, but, you know, I -- I could see them, you know, applying pressure and pushing on the front of the car, but I could feel it, you know, side to side.

Q.    And were you concerned at all at that point that the windows would break?

A.    Oh, yeah.  Definitely.  I -- I thought for sure that I was going to have a broken window.

Q.    And did you fear at the -- did you fear for your safety at that point?

A.    Yeah.  I mean, I definitely felt like if I stopped and if my windows, in fact, broke out, that I would probably be drug out of the car based on everything that they were saying and just the -- the sheer anger of the crowd,

and it was all focused on me.

Q.   And were you -- were you -- did you feel -- did you fear for your safety if you were taken out of the car, that you would be hurt?

A.   Yes.

Q.   When you say -- and I'll go back to now when you were talking about what you were focused on, what you were looking at.

Can you pick up from there? Why were you -- you said you were focused on the people at the front.

Can you tell us why?

A.   Yes.  So I -- I immediately -- you know, out of my peripheral, I could see some people, but I was focused on the people in front of my car because, you know, I -- I was stuck between I -- I don't want to hurt anyone, but I also, you know, feel like if I stop, then I -- I'm going to be hurt.

So I just kept focused on those people, and I just kept creeping forward slowly. I would glance down at my -- my speedometer, which is a -- a digital speedometer.  So I was able to see that I was going, you know, between 0 and 1 mile per hour as -- as the crowd was

pressing up against me.

I saw, you know, debris being thrown up on the hood. I saw -- I don't know -- it looked like a -- like a Starbucks coffee splattered all over my windshield and, you know, I could just hear the chanting that they were doing and the -- you know, just the screaming and yelling that they were doing.

Q. Why didn't you call for help?

A. Well, again, I -- you know, I was -- I was focused on, you know, the -- the front of my vehicle to make sure that I didn't, you know, run over anyone or anyone stepped -- but I knew that, you know, the -- the security forces that were on the -- at the gate there in Broadview would eventually help if I could get close to there.

But I really didn't -- I really didn't think about calling out -- honestly, what went through my mind was, "Wow. You know, this is what my colleagues have been -- you know, been experiencing this whole time, and" --

Q. Well, let me --

A. And the --

Q. I don't want to talk about other

incidents with your colleagues today.

A.   Okay.

Q.   But -- well, actually, it would be fair.

Did that add to your fear?

A.   Oh, yeah.

Q.   Okay.

A.   Yeah.  I mean, you know, just two days earlier, you know, there was a shooting in Dallas at an ICE facility.  All of that stuff was, you know, going through my mind when -- when this was happening, so --

Q.   Did you -- yeah.  Did you -- go ahead. I didn't mean to interrupt you.

A.   Yeah.  So, ultimately, that's -- that's what I was -- was hyperfocused on was making sure that, you know, I -- I kept eyes on the people in front of me for their safety and to keep -- keep progressing forward just to -- to keep from stopping in the middle of the crowd.

Q.   And did you believe that once you got to the gate of the facility, you would be safe then?

A.   Yes.

Q.   And why was that?

A.    Well, I mean, number one, just from the distance, you know, I thought that, you know, they would eventually let me go through.  I mean -- I mean, the police waved me in.  So I -- you know, I didn't have any reason to believe that -- that they wouldn't eventually let me through, but -- you know, they didn't, but I knew that there were security forces, you know, there on -- on the other side of -- of the gate and -- and that ultimately they would come out and -- and try and make sure that I had a safe passage.

Q.    Did you use your siren at all?

A.    No, I did not.

Q.    Why not?

A.    Well, it was obvious to me that they knew that I was law enforcement because of the things that they were screaming at me, right?  And they were obviously angry.  So I just -- I felt like that could agitate the si- -- the situation worse.  And then the other thing was, you know, I -- I would have to reach down, you know, find the -- you know, find the controller and then activate them.

And so I just -- really just

kept my hand on the wheel and my -- my eyes to the -- to the -- to the front.

Q. Did you honk the horn?

A. No, I did not.

Q. Why not?

A. Well, again, I -- I -- I guess in my mind I -- I knew that they knew I was there, right? So I didn't need to alert them to my presence by honking the horn. I -- I felt like at that point, it just probably would have made things worse.

Q. Did you eventually make it to the gate of the Broadview facility?

A. I did. As I -- as I -- again, slowly move forward. I kept moving forward closer and closer to the gate. By that time, I could see there were a few people that had, you know, separated from the front of the vehicle. Well, actually, there -- there was a point where they called everyone to the front of the vehicle to try and, you know, get more people in front.

But at that point, the security folks had started engaging them with -- with pepper balls, and the crowd started to -- to kind of separate out, which I'd expected long

before that. And then I was able to proceed -- proceed forward.

Q. What did you do -- once you got to the building -- once you got past the gate, what did you do first -- what did you do?

A. Well, the gate is automated, so I had to wait for the gate to open. And then a few of the SRT members came out. And, you know, one of them was wrestling with something underneath my car. And it turned out it was a skateboard that had been lodged in the front fender wheel of the driver's wheel.

I -- I -- I gathered it in an effort to stop the vehicle and -- and get me to stop there. You know, once he cleared that out, someone else grabbed, you know, the -- I think it was a stuffed animal that was up on the -- the hood of the car and threw that off to the side, and then I proceeded through the gate and went over and found a parking spot.

Q. Do you know what happened to the skateboard?

A. I mean, I believe, he -- you know, after he got it free, he just tossed it over to the side. I don't know what ultimately ended up

happening with it.

Q. Okay. Once you got into the building, what did you do?

A. Well, once I got parked, I -- I went into the building. You know, I -- I set down my -- my computer equipment and all of that stuff and took a couple deep breaths and, you know, kind of realized that I was out of -- out of harm's way at that point and then went back out to see if, you know, there was anything else I could do as far as, you know, helping secure the area, and then I went to my vehicle and -- and, you know, kind of did a walkaround to assess the damage.

Q. Okay. And we'll go into that in a minute, too.

Were you -- were you rattled at that time?

A. Oh, yeah, yeah. I mean, I -- I'm surprised how rattled I was. You know, I mean, I kept -- I -- over and over I kept hearing, you know, the chants and the yelling. You know, it's just like it was kind of burned into my mind. Particularly the chant. You know how you can remember a song from, you know, 1972? You

know, the song still kind of sticks in my mind.

Q.    Did you -- did you change your hotel after that?

A.    I did.  I did.  There were --

Q.    Why did you change your hotel?

A.    Well, there were reports of officers being doxed and, you know, protesters showing up at hotels, and because, you know, my vehicle had appeared, you know, on social media and all of that, you know, my leadership thought it would be a -- a good idea for me to park that vehicle and then also to change hotels.

Q.    So you changed cars and hotels?

A.    Yes, ma'am.

Q.    Now, when -- how soon after you got in -- through the gate did you actually examine your car?

You started to tell us that.

A.    I mean, I would say it was probably within 10 minutes.

Q.    Okay.

A.    I mean, after I walked inside, came back, and walked around the vehicle.

Q.    I'm just pulling up some pictures.

A.    Yes, ma'am.

MS. MECKLENBURG: Thanks, Matt.

BY MS. MECKLENBURG:

Q. When you first examined your car after this incident, did you see dents in the hood?

A. Yes.

Q. I'm showing you what has been marked as Photo 15, and then I'm going to show you Photo 13, and ask you -- First of all, 13, is that your car that we're looking at?

(Grand Jury Exhibit 1, Photo 13, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A. Yes, ma'am.

BY MS. MECKLENBURG:

Q. And then does that photo accurately depict what your car looked like after this incident you just described?

A. Yes.

Q. And Photo 15, does that photo accurately depict a dent in your car after this incident?

(Grand Jury Exhibit 1, Photo 15 displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    Yes, ma'am.

BY MS. MECKLENBURG:

Q.    And that -- was that dent there before you drove to work that day?

A.    No, ma'am.

Q.    When you examined the car after the incident, did you see scratches on the car?

A.    I did.

Q.    I'm going to show you some photos.

And is that -- does that Photo No. 6 -- I'm showing you Photo 16 -- what's been marked as photo 16.

And these photos are part of Grand Jury Exhibit 1, which is the disk -- the stick that I showed you two weeks ago.

Are these photo -- does this Photo 16 accurately depict the scratches that you saw in your car after the incident?

(Grand Jury Exhibit 1, Photo 16, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    Yes, ma'am.  This is about where the skateboard was jammed into the -- the front

there.

BY MS. MECKLENBURG:

Q.    So we see some scratches right in front of the wheel?

A.    Yes.

Q.    That's where I'm looking.  Okay.

A.    Yeah.  Right in front of the wheel and also the edge there on the -- on the bumper cover is scratched there from the -- the skateboard, I believe.

Q.    Got it.

A.    And there's also an example of the lights -- they're subtle -- there in the grill that you were asking about earlier.

Q.    Okay.  And these are the lights you're talking about, right?

A.    No, ma'am.  Just -- just -- just below the Ford symbol there's two little lights that, you know, might be a subtle indicator that it's a law enforcement vehicle.

Q.    Around this Ford symbol?

A.    Yep, below it.

Q.    Below it.

      Oh, these two?

A.    Yes, ma'am.

Q.    Okay.  Thank you.  They are subtle.

Do you -- let me show you Photo Exhibit 17.

And do you see the scratches on the car there?

(Grand Jury Exhibit 1, Photo 17, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    Yes, ma'am.

BY MS. MECKLENBURG:

Q.    Does this photo actual -- accurately depict what your car looked like after the incident?

A.    Yes, ma'am.

Q.    I will show you 18.

Do you -- the -- see scratches in Photo 18?

(Grand Jury Exhibit 1, Photo 18, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    Yes, ma'am.

BY MS. MECKLENBURG:

Q.    And does that Photo 18 accurately

depict what your car looked like before the incident?

    A.    Yes, ma'am.

           GRAND JUROR:  Before the incident?

BY MS. MECKLENBURG:

    Q.    I'm sorry.  After the incident.

    A.    Yes.  Yes, ma'am.  Sorry.  It --

    Q.    Both of us.

           And I will ask you at the end of all these scratches if they were there before the incident, but let me get through a few more.

           This is Photo 36.

           Do you see scratches in that photo?

           (Grand Jury Exhibit 1, Photo 36, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

    A.    Yes, ma'am.

BY MS. MECKLENBURG:

    Q.    Does that photo accurately depict what your car looked like after the incident?

    A.    Yes, ma'am.

           MS. MECKLENBURG:  By the way, it's nice to know you're paying attention.

BY MS. MECKLENBURG:

Q.    Again, I'm showing you Photo 41.

Do you see a scratch there?

(Grand Jury Exhibit 1, Photo 41, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    Yes, ma'am.

BY MS. MECKLENBURG:

Q.    And does that accurately depict -- does that photo accurately depict a scratch that was on your car after the incident?

A.    Yes, ma'am.

Q.    And, finally, I'm going to show you Photo 42 and ask you if you see a scratch there.

(Grand Jury Exhibit 1, Photo 42, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    I do.

BY MS. MECKLENBURG:

Q.    And does that photo accurately depict the scratch that was on your car after the incident?

A.    Yes, ma'am.

Q.    Were -- any of the scratches that I just showed you in all of those photos: 16, 17, 18, 36, 41, 42, were any of those scratches on the car before the incident when the crowd surrounded your car?

A.    No, ma'am.

Q.    When you examined the car after the incident, did you see that the passenger side mirror was broken?

A.    Yes, ma'am.

Q.    I'm showing you what has been marked as Exhibit -- as Photo 48, and then I am going to show you 49.

So I will give you a minute to take a look at 48.

(Grand Jury Exhibit 1, Photo 48, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    Okay.

BY MS. MECKLENBURG:

Q.    And 49.

Do you see that this -- do these photos accurately depict the passenger side mirror after the incident?

(Grand Jury Exhibit 1, Photo 49, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    Yes, ma'am.

BY MS. MECKLENBURG:

Q.    And was that mirror broken, in that condition, before the incident?

A.    No.

Q.    When you examined the car after the incident, did you see that the rear windshield wiper was broken off?

A.    I did.

Q.    I'm going to show you two photos.  Let me get these.

And does that -- is that photo an accurate depiction of your car from the rear after the incident?

(Grand Jury Exhibit 1, Photo 38, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.    Yes, ma'am.

BY MS. MECKLENBURG:

Q.    And do you see -- was -- does that show

the broken rear wipe- -- windshield wiper?

BY THE WITNESS:

A.    Yes, ma'am.

BY MS. MECKLENBURG:

Q.    I am going to show you 39.

Is -- does 39 -- does the photo marked 39 also accurately depict what the back of your car looked like after the incident?

(Grand Jury Exhibit 1, Photo 39,
displayed on the monitor screen
for the Grand Jurors.)

BY THE WITNESS:

A.    Yes, ma'am.

BY MS. MECKLENBURG:

Q.    Was the rear windshield wiper broken before the incident when the crowd surrounded your car?

A.    No.

Q.    Did you see the word "pig" etched into the side of your car?

A.    I did.

Q.    And was that on the passenger side?

A.    Yes, ma'am, on the passenger side rear door.

Q.    Okay.  I am going to show you three

photos. So let's look at each one first. That's it. That's one. I'm showing you 45 -- 44, 45, and 46. I'm going to show you 46 next. For the record, it's 44, 45, and 46.

Do those photos accurately depict where you saw the word "pig" etched into your car after the incident?

(Grand Jury Exhibit 1, Photo 44, 45, 46, displayed on the monitor screen for the Grand Jurors.)

BY THE WITNESS:

A.   Yes, ma'am.

BY MS. MECKLENBURG:

Q.   And was the word "pig" etched into the side of your car before the incident when the crowd surrounded your car?

A.   No.

Q.   Did any of the damage that you observed after the incident exist before the incident?

A.   No, ma'am.

Q.   When the crowd surrounded your car and the people were banging on the car and banging on the windows and pushing against the car and chanting, did you feel intimidated?

A.   Yes, ma'am.  I felt like they were trying to keep me from getting to work to do my job.

Q.   And did you feel -- when that was happening, did you feel threatened?

A.   I did.

MS. MECKLENBURG:  I have no further questions.

If you would like to ask Mr. ▆▆▆▆ any questions.

GRAND JUROR:  I --

MS. MECKLENBURG:  Let's go there, and then I'll come to you, sir.

GRAND JUROR:  Were -- were you armed in your car?

THE WITNESS:  Yes, ma'am.  I'm -- I'm authorized to carry off duty and on duty.

GRAND JUROR:  Okay.

MS. MECKLENBURG:  Did you use your firearm at all during the incident?

THE WITNESS:  No.

GRAND JUROR:  When the -- when you first rolled down your window and talked to the officer, did either he mention or did you notice at any time the -- all of -- because in the

video, there's -- you see a bunch of what --
news -- what appeared to be news cameras.

Did you notice any of those, or
did he mention to you that there is news people
out there filming or anything like that?

THE WITNESS: I -- I don't know that
I recognized any news outlets. But, you know, I
did notice that a lot of people were videoing,
you know, which is kind of a normal tactic.
They try and capture a picture of our face, and
we were -- we were alerted to that kind of thing
when we first got here. But I -- I didn't
notice any, you know, specific news outlets, no.

MS. MECKLENBURG: And the police
officer didn't say anything to you about that?
That was the first part of the question.

THE WITNESS: No, no.

MS. MECKLENBURG: Okay.

THE WITNESS: He -- he didn't say
anything about -- he didn't say anything to me
other than just kind of gesture for me to, you
know, proceed.

GRAND JUROR: Thank you.

THE WITNESS: Yeah. I'm curious.
Did -- do you have any idea why the local

Bridgeview police didn't try to disperse that crowd from enclosing in on you like that?

MS. MECKLENBURG: If you don't know, you can say you don't know.

GRAND JUROR: Yeah. I mean --

THE WITNESS: I mean, I -- I would say I don't want to --

MS. MECKLENBURG: Don't speculate.

THE WITNESS: I don't want to -- I don't want to put thoughts into those officers' minds, but I know politically, you know, we've -- we've struggled with getting them to help.

MS. MECKLENBURG: Am I missing --

GRAND JUROR: You mentioned -- this happened on September 26th, right?

THE WITNESS: Yes, ma'am. It was --

GRAND JUROR: And then you mentioned an incident --

THE WITNESS: Right.

GRAND JUROR: On September 24th.

Were you referring to the incident in Dallas where a gunman opened fire on an ICE facility, and three people were killed?

THE WITNESS: Yes, ma'am. We -- we

received, you know, alerts about that stuff through our normal communication, and that -- that was -- that was what I was referring to.

MS. MECKLENBURG: And I ask that you consider that testimony only for whether this officer was in fear or felt threatened or intimidated, but not for that incident itself.

MS. MECKLENBURG: Yes.

THE WITNESS: Yes, ma'am.

GRAND JUROR: Have you been in any situations similar to this prior to this event?

THE WITNESS: No. I would say this is -- this is the first time that I ever had a -- you know, an event like this occur.

MS. MECKLENBURG: Any other questions?

GRAND JUROR: Yeah.

MS. MECKLENBURG: Oh, one more. Oh, over here.

GRAND JUROR: Go ahead.

MS. MECKLENBURG: We will go down there.

GRAND JUROR: You were away from your car like ten minutes before you did a walkaround?

THE WITNESS: Yes. I went inside to put in -- put my gear at my desk and then came back outside.

MS. MECKLENBURG: You don't think anybody else caused that damage to make it look more --

THE WITNESS: I don't -- I don't believe so.

MS. MECKLENBURG: Let me ask you, during that time, was your car in a secure area?

THE WITNESS: Yes, ma'am, behind the gate at 1930 Beach. We call it the G4 gate. You know, it is secured parking for our vehicles.

MS. MECKLENBURG: And are there cameras there?

THE WITNESS: Yes.

MS. MECKLENBURG: Do you have any evidence at all that other agents came along and did all that so that we could do all this today?

THE WITNESS: No. I -- I -- I don't have any evidence of that.

MS. MECKLENBURG: Okay. Thank you.

I saw another question, I think.

GRAND JUROR: Yeah. I have to think about how I want to phrase it.

In your ICE training, did they train you for this sort of scenario? Have you had any special training for something like this?

THE WITNESS: No. I -- I would say for this specific instance, they don't, you know, give you training on how to, you know, handle a situation of, you know, a crowd that's, you know, angry and, you know, surrounding you. So, no, I -- I would say no.

MS. MECKLENBURG: In the end, though, nobody was hurt, right?

THE WITNESS: Correct.

MS. MECKLENBURG: Any other questions?

(No response.)

MS. MECKLENBURG: Thank you, Mr. ██████

If you will wait outside, we'll come out.

MADAM FOREPERSON: Thank you.

GRAND JUROR: Thank you.

THE WITNESS: Thank you, everyone.

(Whereupon, there being no questions by the Grand Jurors, the witness was excused.)

CERTIFICATE

I, KARI WIEDENHAUPT, a Shorthand Reporter, do hereby certify that I reported the proceedings before the Federal Grand Jury in the Grand Jury Room in the United States Courthouse in Chicago, Illinois and that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the testimony given by the foregoing witness.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

_Kari Wiedenhaupt_

Kari Wiedenhaupt, CSR.

C.S.R. NO. 084-004725