**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | No. 25 CR 693 |
| | ) | Judge April M. Perry |
| MICHAEL RABBITT, | ) | |
| KATHERINE MARIE ABUGHAZALEH, | ) | |
| ANDRE MARTIN, BRIAN STRAW, and | ) | |
| CATHERINE SHARP, | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANTS' MOTION TO DESIGNATE A SPECIAL COUNSEL TO
INVESTIGATE AND, IF WARRANTED BY THE FACTS,
<u>PROSECUTE RESPONSIBLE PERSONS FOR CRIMINAL CONTEMPT</u>**

Pursuant to Federal Rule of Criminal Procedure 42, Defendants Michael Rabbitt, Katherine Marie Abughazaleh, Andre Martin, Brian Straw and Catherine Sharp ("Defendants"), by and through undersigned counsel, respectfully request this Court appoint special counsel to investigate the misconduct of certain individuals from the U.S. Attorney's Office for the Northern District of Illinois and, if the evidence supports it, prosecute such individuals for criminal contempt. Those who should be investigated for their conduct during the grand jury proceedings and the ensuing cover-up before this Court begin with the line Assistant United States Attorneys assigned to prosecute this case and further includes unidentified supervisory and advisory employees of the United States Attorney's Office, and the Front Office, which includes Andrew Boutros, the United States Attorney as well as his supervisors in Washington, D.C.

Indeed, these steps must be taken in large part because of what appears to be a determined effort to blame a single prosecutor when the misconduct now known – particularly in this case – runs much deeper and indeed to the highest levels of the Chicago U.S. Attorney's Office and likely to the Department of Justice in Washington D.C.[1] To not appoint a special prosecutor here would enable the government's strategy to lay all that has happened on a single scapegoat, a convenient outcome for those who are eager to turn the page. The Court has the authority, and we think the obligation, to ensure that those responsible for this unique and sorry chapter—a chapter which has dramatically impacted the lives of multiple Defendants and enduringly sullied the reputation of the U.S. Attorney's Office earned over decades—are held to account.

In support of this Motion, Defendants state as follows:

**INTRODUCTION**

The government's gross misconduct before the grand jury shocks the conscience, and its extraordinary efforts to conceal such misconduct are even worse. Unredacted transcripts from the three grand jury proceedings it took to finally cajole a true bill reveal astonishing wrongdoing in each, including inappropriate vouching, *ex parte* communications with grand jurors, and the targeted and public (before the other grand jurors) dismissal of grand jurors who voiced objections to the proposed charges. Even with all of this misconduct, the U.S. Attorney himself decided to

---

[1] Additionally, much of the misconduct at issue took place after one of the initially assigned AUSAs left the U.S. Attorney's Office for a special detail in Washington, D.C. Thus, the attempt to assign all blame to her is misplaced and inconsistent with the timeline of even more egregious misconduct that took place *after* her departure.

2

intervene personally and make an appearance before the grand jury on the morning of the third presentment of this troubled proposed indictment. Even more troubling, the U.S. Attorney's Office then engaged in more than six months of concerted efforts to hide the misconduct from this Court and Defendants. Despite multiple requests beginning in December 2025, the government steadfastly refused to provide Defendants with transcripts of the proceedings, all the while vehemently (and falsely) denying any irregularities in the grand jury process. When faced with an order to submit the transcripts to the Court, the government willfully hid the misconduct from the Court by submitting redacted and incomplete transcripts. When again directed by the Court to produce unredacted transcripts, the government continued its orchestrated (and ongoing) effort to hide the scope and breadth of the misconduct by dismissing the indictment and arguing the dismissal mooted the need to review the transcripts, staying silent about the serious, serial misconduct it always knew lay beneath the redactions.

Throughout this time, including even in the hearing in which the Court finally asked the government to submit unredacted transcripts despite the dropped felony, the government knowingly misled this Court by failing to correct its misunderstanding that the redactions were few and immaterial, likely the product of an IT or technological glitch – a misunderstanding stated on the record and in front of the very same prosecutors who had both engaged in and covered up the misconduct.

The evidence of prosecutorial misconduct and the ensuing cover-up would be sufficient on its own to warrant an independent investigation and potential charges

3

against the individuals directly involved in this prosecution. But following dismissal of the charges, additional information has come to light indicating the scope and participants in the misconduct and cover-up in this case are wider than just the line prosecutors in Chicago.

First, evidence has emerged regarding U.S. Attorney Boutros's direct involvement and interest in this case. Mr. Boutros admitted to this Court that he was aware in real time, back in October 2025, of the improper expulsion of grand jurors who objected to returning an indictment, and he was aware of the impermissible vouching and *ex parte* communications not later than April 27 or 28, 2026 – four weeks before this Court's outing of the misconduct compelled him to dismiss the case. Moreover, while knowing about the improper expulsion of grand jurors from the second grand jury session – indeed, seemingly ***because*** of the vociferous objections by multiple grand jurors to this case – Mr. Boutros made the highly unusual decision to personally speak to that same grand jury right before the government's third attempt to secure a true bill on October 23, 2025, and to pointedly ask the grand jurors to self-identify if they "struggle" with immigration-related cases. Specifically, Mr. Boutros told the grand jury, in part, as follows:

> . . . ***If there's anyone here who is struggling with a certain type of cases, such as the immigration cases*** or other cases where they do not believe that they can set aside their personal, their personal emotions, that they cannot listen and deliberate honestly and objectively, I would ask that you raise your hand and identify yourself, ***because we have a different procedure for that*** . . . Anyone who thinks they can't do it, please raise your hand.

Special Report, p. 4 (emphasis added). Shortly after Mr. Boutros's personal appearance and pointed comments clearly directed at this case that had now been twice presented to that panel unsuccessfully, the now chastened grand jury finally acquiesced and returned an indictment that day.

Equally troubling to his personal appearance and plea to the grand jury, is Mr. Boutros's continuing and unqualified support for the prosecutors in this case – except for the chosen scapegoat, Ms. Mecklenburg – without any inquiry or investigation into the misconduct. Indeed, on the very day this Court addressed the broad misconduct revealed by the unredacted transcript and Mr. Boutros was forced to personally dismiss all charges with prejudice, Mr. Boutros voiced his unqualified support of the prosecution team involved, stating, "It is my very sincere belief, Your Honor, that no prosecutor acted intentionally in misleading you, and that there was no desire to mislead the Court and no deliberate misconduct on the part of the prosecutors." (Tr. May 21, 2026 at 50); *id*. at 50-51 ("I do not believe that whatever errors were done specifically as it relates to the redactions, were done intentionally or with a desire to mislead the Court."). That not being enough, to confirm he remained in league with the wrongdoers (except Ms. Mecklenburg, of course), in an office-wide email sent later that day, Mr. Boutros again publicly heaped praise on the prosecutors, describing them as "courageous," and "having fought for the rule of law." (Boutros office-wide email dated May 21, 2026).

Had Mr. Boutros truly just learned of the redactions made by his underlings to cover up the grave prosecutorial misconduct revealed by the transcripts, one would

think he would be outraged – or at least inquisitive. Instead, he went out of his way to **commend** the very prosecutors who engaged in misconduct before this Court, and shirked his responsibility to refer such individuals to the Office of Professional Responsibility. His unqualified support without any such referral to an investigation begs the question of the extent of Mr. Boutros's knowledge of, or involvement in, the underlying misconduct and/or subsequent cover up – to include vindictive or political motives behind that conduct originating in Washington D.C.

Notwithstanding the government's efforts to lay everything at the foot of a single convenient scapegoat, what occurred over the course of this deeply flawed prosecution clearly goes well beyond the mistake of any single Assistant United States Attorney. The calculated and sprawling nature of this misconduct, which occurred both outside and before the Court, casts serious doubt on the government's representations regarding a lack of outside influence from administration officials in Washington D.C. in bringing these charges—another topic that Defendants have asked the government to disclose since December 2025, only to be roadblocked by the exact same blanket denials they received to their requests for grand jury transcripts. This is doubly so when considered in light of these additional facts:

1. No less than the **White House Press Office** issued a statement on September 19, 2025 (a week before the incident at issue in the indictment), specifically about Defendant Kat Abughazaleh and her protest activities at the Broadview ICE facility stating, "Obstructing law enforcement (which is

what you just posted a video of yourself doing) isn't a First Amendment right. It's a crime."[2];

2. Acting Attorney General Todd Blanche issued a statement in the press release announcing the charges against these Defendants[3];

3. In the immediate aftermath of this Court's public outing of the misconduct relating to the Grand Jury and subsequent dishonesty to the Court that led to the dismissal of this case, Acting Attorney General Blanche posted to social media that "This Department fully supports U.S. Attorney Boutros" who "has steadfastly advanced President Trump's mission to make Chicago and Northern Illinois safe for the American people" and "look[s] forward to more great work from his office."[4];

4. As set forth in more detail in Defendants' Motion for the Court to Conduct a Hearing on the Prosecutorial Misconduct and for Targeted Discovery In Advance Thereof, there is now good reason to suspect that a high-ranking attorney at the Department of Justice, Mr. Aakash Singh, had involvement with the decision to pursue this case, including potentially how to deal with grand jurors who opposed returning true bills in these types of cases. Indeed, publicly available reporting indicates that Mr. Singh has played a central role in guiding the prosecution of "top administration targets such

---

[2] https://x.com/ATJackson47/status/1969062022466744425 (last visited June 16, 2026).

[3] https://www.justice.gov/usao-ndil/pr/federal-grand-jury-chicago-indicts-six-individuals-charges-impeding-federal-agent (last visited June 16, 2026).

[4] https://x.com/DAGToddBlanche/status/2062615440195776884 (last visited June 16, 2026).

as Kilmar Abrego Garcia, James Comey, and Don Lemon" and, of particular note here, ***in seeking "to dismiss [grand] jurors who presented hurdles" when "grand juries refused to indict . . . following mass street arrests."*** Ben Penn, In-Your-Face DOJ Aide Rides Prosecutors for 'Chief Client' Trump, Bloomberg Law, Feb. 19, 2026, https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump (emphasis added). In addition, a recent court opinion copiously documented the fact that Mr. Singh engaged in numerous substantive communications directly with the local U.S. Attorney's prosecution team in the Abrego-Garcia case. *See* Ex. A, Court Order in Case No. 25-cr-115, M.D. Tenn. (Dkt. #312) (identifying numerous specific communications to and from Mr. Singh and the assigned prosecutor related to that prosecution, as well as Mr. Singh's involvement, oversight, and direction to the prosecution team, at pp. 7, 8, 9, 10, 11, 12, 14, 18, 19, 20, 21, 24, 25, 26, 27, 28, 29, 31, and 32).

There can be little doubt that a reasonable possibility of misconduct exists to investigate further.

Accordingly, for all these reasons and those detailed below, this Court should appoint independent a special counsel from outside the Department of Justice to investigate the misconduct in initiating and prosecuting this case, and the subsequent cover-up, and if the evidence supports it, to prosecute the individuals involved for criminal contempt.

8

## BRIEF FACTUAL BACKGROUND

This Court is well aware of the sequence of events underlying this Motion, which were acknowledged by this Court during the May 21, 2026 hearing (May 21 Hearing Tr., pp. 22–25) and outlined in Defendants' previously filed Motion for Fees Pursuant to the Hyde Amendment (Dkt. 201, pp. 2–13.) Defendants therefore provide the following abbreviated version of the important facts necessitating the appointment of independent special counsel in this case:

**I.      For more than six months, the government attempted to conceal from Defendants and this Court its misconduct during the grand jury proceedings.**

For more than six months, from the grand jury proceedings in October 2025 until the transcripts of such proceedings were finally submitted in unredacted form in May 2026, the government attempted to conceal from this Court and Defendants its extensive misconduct in those proceedings.

On December 3, 2025, Defendants first sought the grand jury transcripts from the proceedings in this case. (*See* Dkt. 201, p. 5; Dkt. 201 Ex. A, Requests 9 and 10.) Despite Defendants' repeated requests for this information, the government staunchly refused to turn over the materials. Indeed, AUSA Mecklenburg refused to turn over the materials in large part because, in her view, no evidence pointed to any improper conduct during the proceedings. (*See* Dkt. 201 pp. 5–6; Dkt. 201 Ex. B.) The government reiterated its refusal to turn over these materials in January 2026, writing that Defendants "failed to raise evidence that we have acted with improper motive or that an external agency prevailed on us to seek an improper indictment, because neither is true." (Dkt. 201 p. 6; Dkt. 201 Ex. C at 2, 5).) The prosecutor—who

had to have known of the now-public misconduct that occurred before the Grand Jury because she was directly involved in it—stated that "a motion for discovery based on a claim of selective prosecution in this case borders on frivolous." (Dkt. 201 p. 6; Dkt. 201 Ex. C at 5–7.)

On April 8, 2026, Defendants filed a Supplemental Motion to Compel Disclosure of Grand Jury Transcripts. (Dkt. 118.) After securing additional time to present the Court with the transcripts (Dkts. 121 & 123), the government ultimately submitted only portions of redacted grand jury transcripts in camera to the Court. This Court then ordered the government to submit "fully un-redacted versions of the transcripts it has filed under seal . . . ." (Dkt. 130).

Rather than producing unredacted grand jury transcripts, on April 29, 2026, the government dismissed the felony charge in the indictment, arguing that such dismissal moots the need to see the transcripts. (April 29, 2026 Hearing Tr., pp. 3–5; Dkt. 142.) At the time, as Mr. Boutros admits, the government knew at least about the improper vouching revealed in the grand jury transcripts. (*See* May 21, 2026 Hearing Tr. p. 51.)

Suspicious of the government's decision to dismiss the lone felony count—after six months of vigorously defending it—to avoid having to show the unredacted grand jury transcripts and believing that the misdemeanor counts were tainted by what may have occurred in the grand jury, Defendants renewed their request for the transcripts' disclosure. (Dkt. 143, May 4, 2026 Motion.) In response to this request, rather than turn over the transcripts, the government formally dismissed with

prejudice the felony charge in the indictment (the dismissal of which previously had been announced but not yet formally dismissed). (Dkt. 147 at 4.) Seemingly desperate to keep the transcripts secret, the government argued that the formal dismissal mooted the Defendants' renewed request for the transcripts' disclosure. When the Defendants disagreed and asked the government to bring the unredacted transcripts to an upcoming hearing, AUSA Hogan staunchly responded, "No." (Dkt. 191.)

At the following pre-trial conference on May 18, 2026, and in response to Defendants' renewed request for the transcripts' disclosure, this Court asked the Government to turn over the unredacted transcripts, and the government finally agreed. Even in doing so, however, the government misled the Court by failing to correct the Court's stated misunderstanding that that there were only "like 15 lines redacted" and "it seems like those were probably related to IT issues playing the video, but [the Court] couldn't tell." (May 18, 2026 Hearing Tr. at 63.) This was not the first occasion that the government failed to correct this Court's misunderstandings about the redactions in order to avoid drawing attention to the redactions' true purpose. (*See also, e.g.*, May 7, 2026 Hearing Tr. pp. 8–10 (in which the government fails to correct this Court's statements that it had seen "about 99 percent of the transcripts" and that "there were probably less than 20 or 30 lines out of the three transcripts that were redacted . . .").) In reality, the transcripts had more than 215 lines redacted. These redactions, as we now know, were not the inconsequential redactions or removals related to IT issues playing the video, as the Court surmised. The government knew the extent and content of the missing

11

information in the transcripts yet did not correct this Court's stated misunderstanding in an obvious effort to avoid drawing attention to the misconduct that the redactions and removed pages were obviously meant to hide from this Court.

II. **Unredacted grand jury transcripts submitted days before trial suggest widespread prosecutorial misconduct during grand jury proceedings.**

Once finally turned over, the unredacted transcripts of the grand jury proceedings in this case revealed wide-ranging prosecutorial misconduct touching each of the three grand jury proceedings. At a hearing on May 21, 2026, this Court briefly summarized the extensive misconduct uncovered by the unredacted transcripts—misconduct that "shocked" this Court, which had "never seen the types of prosecutorial behavior before a grand jury that [the Court] saw in those transcripts." (May 21, 2026 Hearing Tr., at 11.)

First, during the initial appearance before the grand jury in this case on October 9, 2025, the prosecutor engaged in what this Court has described as "improper prosecutorial vouching to the grand jurors, with the AUSA putting her personal credibility and trustworthiness on the line in support of the charges." (May 21, 2026 Hearing Tr., pp. 22, 34; *see also, e.g., Oct. 9, 2025 Grand Jury Tr. at 3:19-4:1.*) The Grand Jury returned a "No Bill" that day.

Next, on October 16, 2025, AUSAs Mecklenburg and Skiba again presented this case to the Grand Jury. After some grand jurors expressed their opposition to the government's case, however, the prosecutors told those grand jurors – in front of all the other grand jurors – to leave the room because they could not be fair. (May 21 Hearing Tr., p. 23 ("the prosecutor excus[ed] grand jurors who disagreed with the

government's case from the deliberations process."); *see also see also, e.g.*, Oct. 16. 2025 Grand Jury Tr. at 8:14-11:5.) As noted below, U.S. Attorney Boutros admits to having been aware of this misconduct "in real-time" and directing that the grand jury session be immediately terminated for the day because of that improper expulsion of grand jurors. (*Id.* p. 51.)

The following week, on October 23, 2025, the government presented this case to the same grand jury for a third time. As disclosed in a "Special Report of the United States Attorney's Office for the Northern District of Illinois Regarding Grand Jury Appearances," U.S. Attorney Boutros appeared in front of the grand jury on this date with the apparent purpose of again singling out individual grand jurors who would not return a bill of indictment. After introducing himself as "the U.S. Attorney" whose name they "may be familiar with" because of his position, Mr. Boutros pointedly told the grand jury: "***If there's anyone here who is struggling with a certain type of cases, such as the immigration cases*** or other cases where they do not believe that they can set aside their personal, their personal emotions, that they cannot listen and deliberate honestly and objectively, I would ask that you raise your hand and identify yourself, ***because we have a different procedure for that***… Anyone who thinks they can't do it, please raise your hand." U.S. Attorney's Special Report, p. 4 (emphasis added). Mr. Boutros did not specify what the "different procedure" was for any grand jurors who might have been inclined to raise their hands. Shortly after Mr. Boutros's personal appearance and pointed comments clearly directed at this case that had now been twice presented to that panel unsuccessfully, the now chastened

grand jury finally acquiesced and returned an indictment that day. Mr. Boutros made these statements being well aware that there had been a grossly improper dismissal of grand jurors *from this very same grand jury the week before*, as to this very "immigration" case – facts which are nowhere to be found in his statement to these Grand Jurors. (*See* May 21, 2026 Hearing Tr. p. 51.)

During the third grand jury session, which occurred just a few hours after Mr. Boutros's appearance, AUSA Mecklenburg acknowledged engaging in inappropriate *ex parte* contact with one or more grand jurors – *notably including that she had accepted apologies from the grand jurors whom she had improperly expelled from the room the week prior, rather than the apologies going from her to them*. (*See* May 21 Hearing Tr. at 53; *see also* Grand Jury Tr. Oct. 23, 2026 at 3-5)). This underscores the fact that Mr. Boutros's statement to the grand jurors earlier that day was understood as a reprimand that they were acting improperly by not returning the indictment sought in this case. Only after this third attempt, and after U.S. Attorney Boutros delivered his comments quoted above, the Grand Jury returned an indictment requested by the prosecutors.

Each of the above listed acts of prosecutorial misconduct were deliberately and meticulously redacted from the transcripts of grand jury proceedings provided to this Court by the prosecutors.

**III. Despite evidence of prosecutorial misconduct during the grand jury proceedings and attempts to conceal such misconduct from this Court, the government continues to give its unqualified support for the individuals involved in prosecuting this case.**

14

During the May 21 hearing in which the government dismissed the Superseding Information, U.S. Attorney Boutros made several statements admitting his awareness of the misconduct from the grand jury proceedings. For example, he admitted that he knew about "the excusing the grand jurors . . . in realtime" during the initial grand jury proceedings, that he learned about the "vouching that took place in the grand jury . . . on either April 27 or the 28th[,]" and that he learned about the *ex parte* communications around the same time "before we dismissed the indictment." (May 21 Hearing Tr. pp. 51–52.)

Confoundingly, despite his awareness of the repeated instances of misconduct during the grand jury proceedings, Mr. Boutros made several statements at the May 21 hearing in unqualified support of the prosecutors in this case. He stated, without any commitment to investigation, "It is my very sincere belief, Your Honor, that no prosecutor acted intentionally in misleading you, and that there was no desire to mislead the Court and no deliberate misconduct on the part of the prosecutors. . . . I do not believe that whatever errors were done specifically as it relates to the redactions, were done intentionally or with a desire to mislead the Court." (*Id.* p. 50.) He later reiterated his unqualified support for the prosecutors who had redacted the transcripts to hide the misconduct, including stating his belief, without investigation, that any misconduct should be excused because two of the prosecutors involved were busy with other matters at the time they meticulously and painstakingly redacted and excised all evidence of the misconduct in the transcripts they provided to the Court:

15

> *I did want to emphasize that I truly do believe that all of these prosecutors here, no one acted with the intent to mislead Your Honor*; and I think that they were following your order to give the law, and they provided the law. And in the case of two of the prosecutors, I believe they were either in the middle of trial when they were trying to prepare this stuff, literally in the middle of trial, or on the verge of being in trial and they were moving very quickly.

*Id.* p. 54 (emphasis added).

Following the May 21 hearing, Mr. Boutros doubled down in his support for the prosecutors involved in this case by circulating an email to the U.S. Attorney's Office describing the prosecutors in this case as "courageous" and having "fought for the rule of law." (U.S. Atty Boutros Office-wide email of May 21, 2026).

Acting Attorney General Todd Blanche who, according to his public statements, has been aware of the case since its inception, has also issued statements in support of the charges and of Mr. Boutros. He first issued a statement in the press release announcing charges against Defendants.[5] More recently in response to calls for Mr. Boutros's resignation as the United States Attorney, he said in a social media post on X that "This Department fully supports U.S. Attorney Boutros . . . ."[6]

## LEGAL STANDARD

The U.S. Criminal Code and Federal Rules of Criminal Procedure arm federal courts with discretionary power to appoint special counsel to investigate criminal contempt and to punish individuals and parties who engage in such misconduct. In

---

[5] https://www.justice.gov/usao-ndil/pr/federal-grand-jury-chicago-indicts-six-individuals-charges-impeding-federal-agent (last visited June 16, 2026).

[6] https://x.com/DAGToddBlanche/status/2062615440195776884 (last visited June 16, 2026).

16

particular, Rule 42 of the Rules of Criminal Procedure specifically grants a court the ability—after providing notice in open court or via an order to show cause—to appoint a special prosecutor to investigate and, if the facts warrant it, prosecute criminal contempt, including any "misbehavior" that obstructs the administration of justice and any misconduct by an officer of the court when conducting his or her official duties. *See* FED. R. CRIM. P. 42; *see also* 18 U.S.C. § 401(1)-(2) (defining criminal contempt as including the "Misbehavior of any person in [the court's] presence or so near thereto as to obstruct the administration of justice" and/or "Misbehavior of any of [the court's] officers in their official transactions"). Rule 42 provides, in relevant part:

> (a) **Disposition After Notice**. Any person who commits criminal contempt may be punished for that contempt after prosecution on notice.
>
> (1) **Notice**. The court must give the person notice in open court, in an order to show cause, or in an arrest order. The notice must:
>
> (A) state the time and place of the trial;
> (B) allow the defendant a reasonable time to prepare a defense; and
> (C) state the essential facts constituting the charged criminal contempt and describe it as such.
>
> (2) **Appointing a Prosecutor**. The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. [. . . ]

FED. R. CRIM P. 42. If criminal contempt is substantiated after the investigation and prosecution, the court "must" impose a punishment, *id.* at 42(a)(3); *see also* 18 U.S.C.

17

§ 401 ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority . . . ").

## ARGUMENT

### 1. An investigation into criminal contempt is appropriate and necessary.

The prosecutorial misconduct during the grand jury proceedings in this case, and the subsequent six months of efforts to conceal such misconduct from this Court, necessitate an investigation by independent special counsel into whether such conduct constitutes criminal contempt. As an initial matter, courts have long enjoyed the power under Rule 42 to initiate an investigation into criminal contempt. *See* Fed. R. Crim. P. 42. Indeed, this longstanding judicial power is essential to securing the authority, dignity, independence, and self-preservation of the courts and the judicial branch. As the Supreme Court stated in *Young v. U.S. ex rel. Vuitton et Fils S.A.*, ***"The ability to appoint a private attorney to prosecute a contempt action satisfies the need for an independent means of self-protection, without which courts would be 'mere boards of arbitration whose judgments and decrees would be only advisory.'"*** 481 U.S. 787, 796 (1987) (quoting *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450 (1911) (emphasis added)).

Relying on this discretionary power, federal courts in circumstances significantly less egregious than those here have appointed independent special counsel to investigate criminal contempt. For example, in *In re Special Proc.,* 373 F.3d 37 (1st Cir. 2004), the court appointed independent special counsel under Rule 42 where, as here, evidence revealed a party's possible acts of contempt, which "could threaten the rights of all parties to a fair trial" in addition to violating a protective

18

order and principles protecting grand jury proceedings. *See In re Special*, 373 F.3d at 40–41. Accordingly—and because federal prosecutors were involved in the underlying case and possibly responsible for the misconduct—the court there appointed a "special prosecutor to investigate the disclosure and prosecute for criminal contempt anyone against whom adequate evidence was uncovered." *Id.* Similarly, in *Musidor, B. V. v. Great Am. Screen*, 658 F.2d 60 (2d Cir. 1981), the court initiated an investigation into criminal contempt by appointing an independent special prosecutor under Rule 42 to investigate and prosecute the possible violation of a court order. The same result should follow here.

Indeed, far beyond the misconduct of the parties in *In re Special* and *Musidor*, the evidence here points to prosecutorial misconduct, the abuse of grand jury proceedings, persistent attempts by multiple prosecutors to hide the misconduct from this Court, and possible involvement of multiple people from Main Justice. This shocking and wide-spread misbehavior undoubtedly warrant investigation and prosecution for violations of 18 U.S.C. § 401, which defines criminal contempt as including misbehavior that (1) operates to "obstruct the administration of justice" or (2) is committed by the court's "officers in their official transactions." The government's misconduct here falls in both buckets.

Beginning with obstruction of justice in violation of § 401(1), the limited evidence uncovered so far from the unredacted grand jury transcripts reveals at least two layers of misconduct that obstruct justice in this case. The first layer is the misconduct that occurred in the confined of the grand jury proceedings. In what

19

appears to be a desperate attempt to obtain an indictment at any cost, prosecutors involved in the grand jury proceedings interfered with the normal bounds of that process by engaging in inappropriate vouching, dismissing grand jurors who indicated they would not return a bill of indictment, asking the grand jurors to identify themselves if they could not be objective based on the immigration-related subject matter of the proposed charges, and engaging in inappropriate *ex parte* communications with the grand jurors. In the words of this Court, these acts raise concerns of "vindictive prosecution[,] prosecutorial misconduct and . . . potential ethical violations." (May 21, 2026 Hearing Tr. p. 25.) Indeed, the Court stated it has "read hundreds if not thousands of grand jury transcripts involving prosecutors who are the most junior of prosecutors to several U.S. Attorneys who appeared before the grand jury" and yet the Court has "never seen the types of prosecutorial behavior before a grand jury that [it] saw in those transcripts." (*Id*. p. 22.) This behavior undoubtedly obstructed justice by distorting the grand jury process to obtain a true bill at any cost.[7]

But even more concerning than the misconduct during the grand jury proceeding is the lengths to which the government went to *conceal* the misconduct from this Court and Defendants. The government objected repeatedly for over six months to turning over the grand jury transcripts which contained evidence of the above-described misconduct, vociferously ridiculing Defendants for even suggesting

---

[7] These comments made by the Court were before any information regarding the extraordinary appearance of the United States Attorney himself before the grand jury on the same day on which an indictment against the Broadview Six was ultimately returned.

that there might have been something amiss in its presentation to the grand jury here. When finally required to submit the transcripts only to this Court for *in camera* review, the government carefully redacted all portions of the transcripts documenting the serious misconduct in an effort to keep the Court in the dark about the goings on during the grand jury proceedings. When later directed to produce unredacted transcripts, the government sought to sidestep disclosure again, this time by dismissing with prejudice the felony count of the indictment, and then claiming that dismissal mooted the need to provide the transcripts to anyone, including the Court. The cover-up was in full force.

Despite knowing the lengths of misconduct revealed in the transcripts, the government pressed forward with the non-felony charges against the Defendants knowing that they were similarly tainted. The government finally was forced to provide the unredacted transcripts just a few days before trial and only because it was backed into a corner and ordered to do so by this Court. These repeated and overt acts of willful concealment, as this Court previously stated, are "most problematic." (*Id.* at 23.) Only once the unredacted transcripts were revealed and the government chastised by this Court did the government dismiss all charges in this case.

These facts are certainly strong evidence that the government obstructed the administration of justice in this case in purposefully concealing the misconduct by refusing to turn over the grand jury transcripts for more than six months, including hiding the misconduct even from an *in camera, ex parte* submission to the Court. The government knew the contents of the transcripts and the likely result of their

21

disclosure (*i.e.,* dismissal of the charges and possible investigation of misconduct before the grand jury). But instead of accepting that consequence, they dug the hole deeper, engaging in a cover-up that is worse than the crime. And that is only what is known to date. It almost goes without saying that such misconduct, if proven, constitutes criminal contempt in violation of section 401(1). Clearly, these matters demand to be further investigated and, if the facts warrant it, prosecuted. *See* 18 U.S.C. § 401(1) (criminal contempt includes acts in or near the court that obstruct the administration of justice).

Additionally, as this Court noted in the May 21 hearing, attorneys before a court, and especially attorneys representing the Department of Justice, are considered officers of the court. (*See* May 21, 2026 Hearing Tr., at 23 ("I treat every attorney who appears before me as an officer of the court. But . . . I put even more reliance on Department of Justice attorneys. Your sole goal is to do justice. Your client is justice itself.").) Thus, the government's deliberate and considered decisions to actively conceal from this Court the prosecutorial misconduct underlying the charges in this case constitutes misconduct by an officer of the court in its official duties. This, too, is a reason to suspect criminal contempt and to appoint an independent counsel to investigate it. *See* 18 U.S.C. § 401(2) (defining contempt as including misbehavior by one of the court's officers in conducting official duties).

Importantly, this Court's power to initiate an investigation into criminal contempt in violation of section 401 does not require certainty that criminal contempt or prosecutorial misconduct occurred. Rather, the Court's initiation of an

22

investigation into matters of contempt is appropriate when there is a "*reasonable possibility* of criminal contempt; certainty is not required." *In re Special*, 373 F.3d at 44 (emphasis added). The First Circuit explicitly addressed this issue in *In re Special*. The court there noted that although "there is no firm proof" that any party had committed contempt (there, by leaking a confidential video to the press), this lack of certainty "does not matter" because "there is certainly a *reasonable possibility* that counsel, or someone in league with counsel" engaged in the misconduct qualifying as criminal contempt. *Id.* (emphasis added). Accordingly, the special prosecutor appointed by the court "is entitled to investigate the reasonable possibility of criminal contempt; certainty is not required." *Id.* This standard is surely met here.

In sum, this Court need not decide whether the government's actions in this case certainly constitute criminal contempt at this point, or whether there is "certainty" as to how far into the Department of Justice the misconduct reached. Rather, the Court should initiate an investigation into criminal contempt based on the "reasonable possibility" of criminally contemptuous acts which is plainly apparent from the current record.

**2. The interest of justice requires the appointment of an outside special counsel to investigate and, if warranted by the facts, prosecute the wrongdoers.**

Although criminal contempt is ordinarily something a court would ask the Department of Justice to investigate and, if warranted by the facts, prosecute, here the interest of justice requires the appointment of an outside special prosecutor. In laying out the procedure for appointing special counsel to investigate contempt, Rule

23

42 requires that a court request that an attorney for the government investigate contempt "*unless the interest of justice requires the appointment of another attorney*." FED. R. CRIM P. 42(a)(2); *see also in re Special Proc.*, 373 F.3d 42 (recognizing that Rule 42 does not require asking the government to handle contempt prosecutions when "the interest of justice requires the appointment of another attorney"). Justice so requires the appointment of outside counsel when the government itself may have been involved in the misconduct investigated, or when the government's investigation of its own misconduct could lead to even a *perception* of a conflict of interest.

For example, in *In re Special Proc.*, the court affirmed the appointment of an outside (*i.e.*, non-governmental) special prosecutor to investigate criminal contempt. The court pointed to "multiple reasons for concern about having the government handle the matter" including that the underlying case in which the possible contempt occurred was "the subject of much public attention", "the prosecution was . . . a possible source of [criminal contempt]" and therefore, "some might think that the government could not be fully trusted to pursue its own lawyers." *Id.* at 43. The court was careful to observe that even though "the Department of Justice has procedures that would allow government prosecutors from outside [the relevant Office] to take over if that were needed . . . , this solution would not necessarily have banished the public impression of a conflict in this case." *Id.* The decision of whether to appoint independent counsel is "importantly concerned with the public impression left by the choice of prosecutor." *Id.*

24

Such is the case here. Because the government is being investigated for contempt and misconduct – including people from high positions in the Department of Justice – appointing anyone employed by a U.S. Attorney's Office or the Department of Justice would, by definition, present unavoidable conflicts of interest, and surely the appearance of impropriety and unfairness. Obviously, no one can credibly investigate themselves. *Id.* (recognizing that even the perception of a conflict of interest is enough reason to appoint an outside special counsel).[8]

Additionally, like *In re Special*, this case—including the prosecutors' conduct and the publication of the grand jury transcripts—has garnered widespread public media attention. Thus, the public will watch closely how any investigation into prosecutorial misconduct here is conducted. For this reason, too, an independent special counsel to investigate the possible misconduct here is absolutely critical to ensuring the public impression of a neutral and trustworthy investigation – something essential to begin restoring the public's faith and trust in the prosecutorial function which has been grievously harmed by the misconduct here. *See id.*

Appointing an independent counsel in this circumstance is also supported by 28 CFR § 600.1, which provides guidance about when appointment of special counsel

---

[8] Importantly, this Court may appoint outside special counsel without first appointing the government to investigate and waiting for the government to decline such investigation due to the conflict of interest. Although the Supreme Court decision in *Young* advises that "a court ordinarily should first request the appropriate prosecuting authority to prosecute contempt actions, and should appoint a private prosecutor only if that request is denied", this guidance predates changes to Rule 47, which require going to the government attorney "unless the interest of justice requires appointment of another attorney." *Compare Young v. U.S. ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 801 (1987) *with* FED. R. CIV. P. 42. As recognized in *In re Special*, in light of the changes to Rule 42, this initial step of going to the government before appointing outside counsel is no longer required when, as here, justice so requires.

outside the Department of Justice may be necessary. Although this guidance is technically regarding special counsel appointed by an attorney general rather than a court, the guidance provides persuasive support for the common-sense standard that special counsel outside the Department of Justice should be appointed whenever the Department itself is being investigated or is otherwise conflicted. *See* 28 CFR § 600.1 (advising that special counsel should be appointed when "a United States Attorney's Office or litigating Division of the Department of Justice would present a conflict of interest for the Department").

For all of these reasons, justice, fairness, and public confidence require the appointment of a special counsel to conduct the investigation of the misconduct involved in the initiation and prosecution of this case.

## CONCLUSION

Accordingly, Defendants respectfully request that this Honorable Court grant Defendants' motion and appoint special counsel to investigate and, if warranted by the facts, prosecute for criminal contempt any individual(s) who were involved with, or oversaw this prosecution and engaged in contemptuous misconduct, and grant such other relief as this Court deems appropriate and just.

Dated: June 16, 2026                                   Respectfully submitted,

**/s/ Nancy L. DePodesta**                             **/s/ Joshua G. Herman**
**/s/ Carly Alana Chocron**                            Law Office of Joshua G. Herman
Taft Stettinius & Hollister LLP                        53 W. Jackson, Blvd., Suite 404
111 E Wacker Dr, Suite 2900                            Chicago, IL 60604
Chicago, IL 60601                                      312-909-0434
312-836-5884                                           jherman@joshhermanlaw.com
ndepodesta@taftlaw.com
cchocron@taftlaw.com                                   **/s/ Molly Armour**
*Attorneys for Michael Rabbitt*                        Law Office of Molly Armour
                                                       53 W. Jackson Blvd., Suite 1424
                                                       Chicago, IL 60604
**/s/ Terence H. Campbell**                            773-746-4849
**/s/ Valerie Ann Davenport**                          armourdefender@gmail.com
Cotsirilos, Poulos & Campbell, Ltd.                    *Attorneys for Katherine Marie*
55 E. Monroe Street, Suite 3250                        *Abughazaleh*
Chicago, IL 60603
312-263-0345
tcampbell@cotsiriloslaw.com                            **s/ Christopher Parente**
vdavenport@cotsiriloslaw.com                           **/s/ Damon M Cheronis**
*Attorneys for Andre Martin*                           Cheronis & Parente
                                                       140 S. Dearborn, Suite 404
                                                       Chicago, IL 60603
                                                       773-458-4899
                                                       cparente@cheronislaw.com
                                                       damon@cheronislaw.com
                                                       *Attorneys for Brian Straw*

                                                       **/s/ Cynthia Giacchetti**
                                                       Law Office of Cynthia Giacchetti
                                                       53 W. Jackson Boulevard
                                                       Suite 1035
                                                       Chicago, Illinois 60604
                                                       (312) 939-6440
                                                       cg@cgdefense.com
                                                       *Attorney for Catherine Sharp*

27