# EXHIBIT A

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 10

MADAM FOREPERSON: Thanks.

(Whereupon, the witness was sworn.)

D I R E C T    E X A M I N A T I O N

BY MS. MECKLENBURG:

Q.    Good afternoon, Agent Hylton.

A.    Good afternoon.

Q.    Can you tell us what is your current job?

A.    I am a special agent with the FBI.

Q.    And how long have you been a special agent with the FBI?

A.    A little over four years.

Q.    Can you describe in general your duties?

A.    I generally work violent crimes to include bank robberies, fugitives, kidnappings.

Q.    Are you familiar with an investigation into an incident at a facility in Broadview that occurred on September 26, 2025, at approximately 7:45 in the morning?

A.    Yes.

Q.    How are you familiar with that investigation?

A.    This was brought to me by my

Page 11

supervisor.

Q.     Have you participated in that investigation?

A.     Yes, I have.

Q.     Okay.  Did that incident involve a crowd of individuals surrounding a car driven by an ICE agent?

A.     Yes, it did.

Q.     Before you tell us about the investigation, let me ask you some preliminary questions so that the grand jurors understand the basis of your testimony.

Do you understand that you're testifying here today in front of the grand jurors to establish probable cause for charging each of the named defendants with violations of federal law?

A.     Yes.

Q.     Because you're testifying about probable cause for charging, you are not testifying about everything you know about this investigation, are you?

A.     That is correct.

Q.     And, in fact, you would agree that there is much more to this investigation than we

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 12

are going -- you anticipate we will talk about today, right?

A.      Yes.

Q.      And are you testifying based upon your own knowledge of the investigation, information you've learned from other law enforcement agents and information you've learned from reviewing and reading documents and reports?

A.      Yes.

Q.      Let's go to the -- now, let's talk about the actual incident.

Are you familiar with a facility in Broadview, Illinois located on Beach Street that is --

MADAM FOREPERSON:  Sorry.  I hate to interrupt.

Do we want to see if anybody knows any of the six people?

MS. MECKLENBURG:  That's great.

GRAND JURY:  Same question.

MS. MECKLENBURG:  That's a great question.  You're absolutely right.  Michael Rabbit, Katherine Abughazaleh, Andre Martin, Catherine Sharp, Brian Straw, Joselyn Walsh. Okay.  Thank you.  Good catch.

Page 13

BY MS. MECKLENBURG:

Q.    Are you familiar with the facility in Broadview, Illinois located on Beach Street that is being used currently as an ICE facility?

A.    Yes.

Q.    And have you been to that facility?

A.    I have.

Q.    How many times have you been there?

A.    Numerous.  At least five or ten times.

Q.    Okay.  Are you aware that the facility is currently being used to process individuals apprehended for being unlawfully in the United States?

A.    Yes.

Q.    And are you aware of that from your experience in working cases that involve that facility?

A.    Yes.

Q.    Have you viewed the videos that had been marked as Incident -- that have been marked as Government -- Grand Jury Exhibit Video Passenger Side and Front And Grand Jury Exhibit Video Driver's Side and Front?

A.    Yes.

Page 14

Q.    And do those -- well, let me back you up.

You and I have gone over the exhibits for today, correct?

A.    That is correct.

Q.    And those exhibits have been put on a stick that we're using that has been marked as Grand Jury Exhibit 1, right?

(Document marked as Grand Jury Exhibit No. 1 for identification.)

BY THE WITNESS:

A.    Yes.

BY MS. MECKLENBURG:

Q.    And are those exhibits -- were you able to see that those exhibits were just carried right over from evidence that was provided by the FBI?

A.    Yes.

Q.    So let's start with the -- with the two videos that you said you've seen.

Do those two videos appear to be, at least in part, a depiction of the September 26, 2025, incident at Broadview that you are investigating?

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 15

A.    Yes.

Q.    Based on your visit to the Broadview facility, are these videos consistent with being taken at the Broadview facility?

A.    Yes.

Q.    Are these videos consistent with an incident that occurred -- with what you have learned about an incident that occurred on Harvard Street in front of the Broadview facility on September 26?

A.    Yes.

Q.    And does that street lead to a gate at the facility?

A.    It does.

Q.    Are these videos -- are these videos that law enforcement obtained from public sources?

A.    Yes, they are.

Q.    So, in other words, people posted these videos and that's how law enforcement was able to get them, right?

A.    That is correct.

Q.    Were they posted and/or tagged by people who have identified themselves or law enforcement has identified as being present during the September 26 incident?

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 16

A. Yes.

Q. And by other people as well?

A. Yes.

Q. Have you talked to the ICE agent who was driving the car at the center of this incident?

A. I have.

Q. Are these videos consistent with the victim's description of where and when this incident occurred?

A. Yes.

MS. MECKLENBURG: So I'm going to play these straight through. One is pretty short and the other is a little longer, but I want you first to see what happened. Then we'll go through when we identify people slow and snip bits, and I will point them out. So I will just play it for you.

At least I hope I am. It's not going to work. I didn't think so. If this doesn't play, I'll have you pull up your computer and do it. Let's not fool around. We're running out of time. Can you play the two videos for us? Because it's on the E drive and not my computer.

I'm sorry. Hang on. Don't play it

Page 17

yet. It's my fault. It's on the E drive. It's on the stick. I forgot. I don't have a mouse here. So it's taking me a little bit. There we go. This should do it. Okay.

(Whereupon, a video was played.)

MS. MECKLENBURG: I'm going to play the second video, which is passenger side and front.

(Whereupon, a video was played.)

MS. MECKLENBURG: Just so you understand, this case has nothing to do with First Amendment rights. There is nobody in here who is saying that people don't have a right to protest.

BY MS. MECKLENBURG:

Q. So let's talk about the driver of the car. Let's call him Agent A.

How many times -- has law enforcement had an opportunity to interview Agent A?

A. Yes.

Q. How many times?

A. Twice.

Q. Was the first interview of Agent A on September 30, 2025?

A. Yes.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 18

Q. And was that in person or by phone?

A. By phone.

Q. Who was on the phone with him?

A. Special Agent Daniel Rockamin with the FBI.

Q. During the call, did law enforcement send a clip of what we have seen as passenger side front video to Agent A by mail? That's the passenger side of it.

A. Yes.

Q. And did Agent A confirm that that was the incident he was involved in as the driver of the car?

A. Yes.

Q. Did he say that he was alone in the car at the time?

A. Yes.

Q. Did he say that when he entered the intersection of Harvard Street and 25th Street in Broadview a crowd surrounded his car?

A. Yes.

Q. Did he say that the people in the crowd were beating on the windows of his car?

A. Yes.

Q. Did he say that he was concerned

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 19

that the windows would break?

A.      Yes.

Q.      Did he say he was in fear for his safety during the incident?

A.      Yes.

Q.      Did he say that he was hyper-focused on the people in front of his car because he was concerned about injuring them?

A.      Yes.

Q.      Did he say that he was concerned that one of those people could stumble and fall beneath the car where he would no longer be able to see them?

A.      Yes.

Q.      Did law enforcement interview Agent A in person again the next day?

A.      Yes.

Q.      So this is October 1, 2025, right?

A.      Correct.

Q.      Did that interview take place in person?

A.      Yes.

Q.      And was that at the ICE facility in Broadview?

A.      Yes, it was.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 20

Q.    Did Agent A tell law enforcement the following:  He has been an ICE agent for 24 years?

A.    Yes.

Q.    He is now ████████████████████████

██████?

A.    Yes.

Q.    And I'm going to go off of the interview for a second and ask if in a subsequent -- in an email subsequent to the interview, did Agent A describe his duties as including supervising logistics such as intake, processing, bed space and transportation coordinator for those temporarily detained in Broadview, communicating with upper management and federal partners to manage operations and ensure necessary supplies and proper staffing levels and responding to requests for information both internally and from the public?

A.    Yes.

Q.    Back to the in-person interview now.
      Did Agent A tell law enforcement that he is based outside of Illinois?

A.    Yes.

Q.    Did he tell you that he was on a temporary assignment to this area?

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 21

A.    Yes.

Q.    And that he had only recently been assigned to this area?

A.    Yes.

Q.    Did he tell you he was assigned to report to the Broadview facility in order to carry out his official duties?

A.    Yes.

Q.    Did he tell you that the car he was driving on that day was a government-owned vehicle?

A.    Yes.

Q.    Did he tell you that he was driving his government car that day to the Broadview facility?

A.    Yes.

Q.    And that it was an unmarked car?

A.    Yes.

Q.    Did he tell you he had been assigned that car by his -- by the government in April 2025, just last April?

A.    Yes.

Q.    And did he describe it as in like-new condition that day?

A.    He did.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 22

Q.    Did he tell you he was traveling southbound on 25th Street and made a right-hand turn, which was westbound onto Harvard Street, when he first noticed a large group of protesters near the intersection?

A.    Yes.

Q.    Did he tell you that he had to stop at that intersection and provide his credentials to Broadview Police stationed at the intersection before he could proceed down Harvard Street to the ICE facility?

A.    Yes.

Q.    And did he tell you that as soon as he began to proceed to drive down Harvard Street, the protesters surrounded his car and began banging on all sides of the vehicle?

A.    Yes.

Q.    Did he say they were striking his windows?

A.    Yes.

Q.    Did he say he could hear sharp cracks on the window, which he assumed -- he assumes were rings that people were wearing as they banged on his windows?

A.    Yes.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 23

Q.      Did he say he was in fear for his life during this incident?

A.      Yes.

Q.      Did he say that he did not believe he could stop the car because he was in fear that the crowd would break the windows and he would be dragged out of the car and hurt?

A.      Yes.

Q.      Did Agent A say that a large number of protesters stood in front of his car and were physically pushing against the front end?

A.      Yes.

Q.      Did Agent A say he was concerned about harming the people standing directly in front of his car?

A.      Yes.

Q.      Did he say that in an effort to make sure that he did not hurt any of the people standing in front of the car, he monitored his speed carefully and drove at only one to two miles per hour?

A.      Yes.

Q.      Did he say that although he was in fear for his own safety, his priority was not to injure anybody?

Page 24

A.    Yes.

Q.    And did he say that eventually he got to the gate at the end of Harvard Street and was able to enter the facility?

A.    Yes.

Q.    Did he say that only then was he able to get into the facility safely?

A.    Yes.

Q.    Did he say he now has a heightened sense of stress and fear since the incident?

A.    Yes.

Q.    And that his -- he has a heightened stress and fear particularly in going to work?

A.    Yes.

Q.    Did he change the car he drives?

A.    He did.

Q.    And did he change his hotel?

A.    He has.

Q.    Let's talk about the car.  Were law enforcement agents able to examine the car that Agent A was driving that day?

A.    Yes.

Q.    In fact, did you personally examine it?

A.    I did.

Page 25

Q.    Did you examine it the same day you interviewed Agent A, which was -- in person which was October 1?

A.    Yes.

Q.    And where was that?

A.    It was at the Broadview ICE facility.

Q.    Did you take photos?

A.    I did.

Q.    Did you observe the following?  Did you observe dents on the hood?

A.    Yes.

Q.    And I should have pulled these up earlier because these take a long time to pull up. I'm sorry.  There's, like, 50 something photos, but I've only selected ten or fewer.  I did it from my computer again.  What is that, Matt? This?  Oh, it came up.  Matt has the magic touch.

Okay.  So you said that -- just to make sure that I asked you.

Did you observe dents on the hood?

A.    Yes.

Q.    So let's go to photo number 13.  Can you tell me if this accurately depicts what the car looked like on October 1st, the day that you

Page 26

observed the car?

A.    Yes.

Q.    And does this show dents on the hood?

A.    Yes.

Q.    Let's go to 15.  And can you tell me if this photo also accurately depicts the way -- what you observed on the car on October 1?

A.    It does.

Q.    Were there -- did you observe scratches all over the car?

A.    Yes.

Q.    Let's look at photo number 16. Aren't you glad I'm not going to make you look at 51 photos and let me ask you if -- did you take these pictures?  Was it you who took them, by the way?

A.    Yes, I did.

Q.    Okay.  And does this photo accurately show some of the scratches that were on the car that day?

A.    Yes.

Q.    We'll go through a few of these. And is this -- does this -- is this picture a picture that you took of the car that day?

A.    Yes, this is a closer of the photo you just saw.

Q.    Does this picture accurately reflect what the car looked like that day with these scratches?

A.    Yes.

Q.    I think I'm going to do all these one after another and ask you about each.  So we don't have to do each one separately.  That was photo 18 for the record.

Photo 36 for the record.  Photo 41 for the record.  And Photo 42 for the record.

Now, in each of those photos that I have just shown you, do those photos accurately depict what you observed on the car that day?

A.    Yes.

Q.    And are those photos representative of some, but not all of the scratches that you saw on the car that day?

A.    Correct.

Q.    Did you also observe on the car that day that the passenger side mirror was broken?

A.    Correct.

Q.    Let's go to photo 48.  And is that a picture -- does that photo accurately depict the

Page 28

way the passenger side mirror looked on the car the day that you saw it?

A.     Yes.

Q.     And do we see that the mirror is broken out of the housing?

A.     That is correct.

Q.     Forty-nine.  And is this a close-up of the same photo that we just saw?

A.     Yes.

Q.     And does this also accurately depict the way the side mirror looked on the day you saw the car?

A.     Yes.

Q.     Was the windshield wiper on the rear broken off the car?

A.     Yes.

Q.     And is this a photo that you took of the rear of the car on October 1?

A.     Yes.

Q.     And does it accurately depict what the car looked like that day?

A.     Yes.

Q.     And does it show that the windshield wiper had been broken off?

A.     Correct.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 29

Q.     And now I'm going to go to photo 39. And is this a picture -- does this picture accurately depict what the back of the car looked like on the day that you saw it?

A.     Yes.

Q.     Was the -- when you saw the car, was the word "Pig" etched into the side of -- the passenger side of the car?

A.     Yes.

Q.     And did you -- let's see.  Let's look at photo 45.  And is this -- does photo 45 accurately depict what was etched into the side of the car the day you saw it?

A.     Yes.

Q.     Let's look at 44, which is a further away view.  Here, we have the same view, just further away.

You can see the three letters.  Does this photo accurately depict the way the car looked on the day you saw it?

A.     Yes.

Q.     And finally photo number 46.  And does this photo 46 accurately depict what you saw etched into the car the day you saw it?

A.     Yes.

Q.    Did Agent A tell you that the damage that you observed to the car occurred from the incident on September 26?

A.    Yes.

Q.    And that none of that damage existed before the incident?

A.    Correct.

Q.    So that he wasn't driving around with all of that damage, was he?

A.    He was not.

Q.    Let's talk about -- now we're going to turn to identifications of people who were there from the videos.

Were law enforcement agents able to identify any of the people in the videos who participated in the incident?

A.    Yes.

Q.    Did law enforcement agents do so by, in part, searching the internet for references to people who were in the incident?

A.    Yes.

Q.    Did law enforcement agents find known photos of people in the video from open sources on the internet?

A.    Yes.

Page 31

Q.     And did law enforcement agents find some of those photos on social media run by people who talked about being at the incident and part of it?

A.     Yes.

Q.     Were law enforcement agents able to compare these known photos with people in the video and see if they recognized them?

A.     Yes.

Q.     So let's start with defendant -- one of the defendants who is Katherine Marie Abughazaleh.  And you'll see the names when I do the indictment.  Usually I put something up for you, but I have the videos so I don't want to do that.

So let's go to -- in searching the internet, did law enforcement find that an individual using the name Kat Abughazaleh --

MS. MECKLENBURG:  And I'll give you the spelling, court reporter, before I go.

BY MS. MECKLENBURG:

Q.     -- had posted a video of the incident on her social media?

A.     Yes.

Q.     And when you looked further at this

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 32

individual's social media, did law enforcement discover that she had posted a different video from the Broadview facility the morning of the incident before it started?

A.    Yes.

Q.    Was that posted on her own social media, in fact, her Instagram channel?

A.    Yes.

Q.    Did her name appear on the Instagram account as Kat Abughazaleh?

A.    Yes.

Q.    Were you able to observe in the video that she posted earlier, was she identified who she was by the clothing she was wearing that morning?

A.    Yes.

Q.    Were you able to observe her hairstyle?

A.    Yes.

Q.    And were you able to observe her face?

A.    Yes.

Q.    Did she say where she was that morning?

A.    She did.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 33

Q. Where did she say she was?

A. She was at 25th and Harvard Street.

Q. And where was that in relation to the incident that occurred with Agent A?

A. That is the intersection where this all started. That's pretty much the beginning.

Q. Sorry. I didn't mean to start that when you were speaking.

That's where the incident occurred, right?

A. Yes.

Q. Okay. Let's take a look -- is this the video that law enforcement observed of Kat Abughazaleh on her Instagram account?

A. Yes.

Q. And did that -- is that the video where she said she was at 25th and Harvard?

A. Yes.

Q. And is this an accurate picture that you know of of Kat Abughazaleh?

A. Yes.

Q. I'll play it. It's only a few seconds.

(Whereupon, a video was played.)

BY MS. MECKLENBURG:

Q.      Did law enforcement find additional known videos of Kat Abughazaleh?

A.      Yes.

Q.      I'm going to go to page 45.  And I am showing you what is on page -- I'm looking at what is the comparison photos, page 4, and then I'm going to show you one on page 5, which is from the video, and ask you if those are known photos of Kat Abughazaleh?

A.      Yes.

Q.      Did law enforcement recognize Kat Abughazaleh as an individual who appeared in the video of the incident?

A.      Yes.

Q.      Did law enforcement then post stills of Ms. Abughazaleh from her video?

A.      Yes.

Q.      I'm sorry.  Let me back up.  From the video of the incident?

A.      That is correct.

BY MS. MECKLENBURG:

Q.      Okay.  Now, I'm going to tell you something.  Some of the stills are pretty clear, but this all happened so fast that as we go along,

some of the stills of people are not clear.

I'm not showing you the stills for the identification necessarily. I'll play the video again and point out where they are. I'm showing you the stills so that you know what you will be looking for when I play the video for you again. It just makes it easier for you to see it.

BY MS. MECKLENBURG:

Q. And is this a still of Kat Abughazaleh from the video?

A. Yes, it is.

Q. And I'm also showing you page -- I believe this is page -- why do I not have this -- and do we recognize -- is this a still of Ms. Abughazaleh at the car during the incident?

A. Yes.

Q. Did law enforcement -- did Ms. Abughazaleh also post on her social media that she was part of the incident on September 26, 2025?

A. She did.

Q. And I'm going to show you now a posting. This was found on her social media -- oops. Sorry.

On her own social media, correct?

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 36

A.      Yes.

Q.      And this is -- these are pictures of her at Broadview against the car during the incident that she posted, right?

A.      Yes.

Q.      Let's go to the video and we'll go -- it's going to be tricky because I'm going to go back and forth.  So let's hope it works.  Now, this one -- okay.  This is going to be very fast. Take a look.  There she is right there in the white.

MS. MECKLENBURG:  Does anybody need to see that again?  Were you able to see her? It's fast.

GRAND JURY:  Can you do it again?

MS. MECKLENBURG:  Of course.  She is against the car in the front and to the left.

GRAND JURY:  Driver's side?

MS. MECKLENBURG:  So look for her with her white shirt on.  She had taken her black jacket off, her braids and she is all the way to the left of the front of the car, and I wish I had a pointer that was working.  I'm going to try to stop it.  Right there where my pointer is.  I will play it again.  Right there.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 37

(Whereupon, a video was played.)

MS. MECKLENBURG: Was everybody able to see that?

GRAND JURY: Yes.

MS. MECKLENBURG: Okay.

BY MS. MECKLENBURG:

Q. Maybe this will work better than I thought. And then I have the passenger side of the video where you can also see her.

I'll stop. You can see her right where my pointer is.

MS. MECKLENBURG: Okay. Does everybody see that or do you need me to play this again?

BY MS. MECKLENBURG:

Q. Okay. So, now, let's go back to -- and did law enforcement identify Kat Abughazaleh as Katherine Marie Abughazaleh?

A. Yes.

Q. Let's talk about Catherine Sharp. Did law enforcement find a similar video of the incident on the social media Instagram account of a third-party who I will refer to as Individual A?

A. Yes.

Q. Did Kat Abughazaleh indicate a like

of the post of the video on Individual A's Instagram account?

A.      Yes.

Q.      Did Individual A's post then also tag someone named Cat Sharp?

A.      Yes.

Q.      Did law enforcement pull known photos of Cat Sharp?

A.      Yes.

Q.      And I am showing you photos on pages 1 and 2 of the comparison slides and ask you if these are known photos pulled by law enforcement of Cat Sharp?

A.      Yes.

GRAND JURY:  Can you make it bigger? Down on the bottom right corner.

MADAM SECRETARY:  It's a hundred percent down there.

MS. MECKLENBURG:  Yes, I will. Sorry.  Okay.  I'm also showing you a third one. That's too big.

BY MS. MECKLENBURG:

Q.      And is this also a known photo of Cat Sharp?

A.      Yes.

Q. Did law enforcement recognize Cat Sharp as an individual who appeared in the video of the incident?

A. Yes.

Q. Did law enforcement pull stills of Cat Sharp from the video?

A. Yes.

Q. I'm going to show you these stills and then I will play the video for you so you can see, but you'll know where to look at least.

So is this Cat Sharp from the actual video and do we see her in the video where I'm pointing? In the still where I'm pointing, do we see her standing right near Katherine -- Kat Abughazaleh?

A. Yes.

Q. And in the photo that I'm pointing to now, do we see her slightly behind Kat Abughazaleh?

A. Yes, she has the red hair with a black shirt on.

Q. And then is this a picture of her face from -- the one that I'm pointing to from this still that I'm pointing to now?

A. Yes, those are zoomed in from that

photo.

Q.    And are these photos that I'm pointing to now, are those also pictures from that date to show what she was wearing and what she looked like that day?

A.    Yes, she was wearing a Nike, black shirt.

MS. MECKLENBURG:  Now, I'm going to go back to the video and show you.  If I ever do this again, I'm bringing a mouse.  We want the driver's side.  And this is going to be fast.  So I'm going to try to stop it as quickly as can. Keep going.

(Whereupon, a video was played.)

BY MS. MECKLENBURG:

Q.    Is where my pointer is right now is that Cat Sharp?

A.    Yes, it is.

MS. MECKLENBURG:  Okay.  Is that also -- I kind of mis-stopped it, but I think you were all able to see it.

Is there anyone who needs me to play it again or are you able to see it?

BY MS. MECKLENBURG:

Q.    Okay.  Did law enforcement identify

Page 41

Cat Sharp as Catherine Sharp?

A.    Yes.

Q.    Okay.  Let's move onto number three, Michael Rabbit.

Did a photo of Michael Rabbit appear on Cat Sharp's social media?

A.    Yes.

Q.    Did law enforcement recognize Michael Rabbit as an individual who appeared in the video of the incident?

A.    Yes.

Q.    Did law enforcement then pull known photos of Michael Rabbit?

A.    Yes.

Q.    Let's go to those photos so we can see what he looks like.

MADAM SECRETARY:  You can search his name.

BY MS. MECKLENBURG:

Q.    There we go.  Is what I'm showing you now, which is on page -- is that a picture of a known photo of Michael Rabbit?

A.    Yes.

Q.    So you can all see what he looks like.  So let's go to the next photo.

Page 42

Is this a picture of Michael Rabbit with Cat Sharp on her social media?

A.     Yes.

Q.     Did law enforcement take stills -- make stills of Mr. Rabbit from the video of the incident?

A.     Yes.

Q.     I'm going to show you those.  And what I'm showing you now, is that a still from the video that shows Michael Rabbit where there's a circle.

MADAM SECRETARY:  His name is Michael, right?

MS. MECKLENBURG:  Did I say -- yeah, Michael Rabbit.

MADAM SECRETARY:  The screen says, "Brian Rabbit."

MS. MECKLENBURG:  What did I do?

MADAM SECRETARY:  You're okay.  I mean, it's just the document has the wrong name.

MS. MECKLENBURG:  I know -- is it Michael Rabbit?  Let me make sure.  This is my fault.  It's Michael Rabbit.  Sorry.  It's just the document.  I was typing it late last night. Ignore that.

Do not let that affect you in any way.

BY MS. MECKLENBURG:

Q. So let's go back to Michael Rabbit. Is that circle a -- does that depict Michael Rabbit at the scene?

A. Yes.

Q. And now I'm showing you another still, and I'm going to point out where my pointer is. Is that also -- has that also been identified by law enforcement as Michael Rabbit at the scene of the incident?

A. Yes.

Q. Now, let's play the video. So now you'll know about where to find him. We're going to play the passenger side. I'm going to take it to 18 minutes and 18 seconds.

(Whereupon, a video was played.)

BY MS. MECKLENBURG:

Q. At 18, I'm going to stop it and point him out.

And where my -- where my pointer is, is that Michael Rabbit at the scene?

A. Correct.

Q. Now, let's watch and see what he

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 44

does for the next, like, 20 seconds.

(Whereupon, a video was played.)

BY MS. MECKLENBURG:

Q. And does he get up to the car and does he have his hand on the car?

A. He does. He has it on the A-frame pillar.

Q. And he is walking -- is he walking on the car and pulling on the car?

A. It appears so.

Q. Does he appear to be banging on the car?

A. He does.

Q. I seem to have lost my cursor. So we will have to stay and watch this all day.

Okay. Next person is Brian Straw. That's where I got the Brian. Sorry.

Did law enforcement find social media of an individual named Brian Straw?

A. Yes.

Q. Did law enforcement pull known photos of Brian Straw?

A. Yes.

Q. Brian Straw is on page 13. So it's taking me a few seconds because I don't want to

miss it.  Thirteen.  Much better.  There we go.

Brian Shaw -- Straw -- it should say -- again, ignore my typing.

Okay.  Is this a known photo of Brian Straw?

A.     Yes.

Q.     Did law enforcement -- did Brian Straw speak at a press conference about the incident just a few days after it occurred?

A.     Yes.

Q.     And did he say that during the press conference that he was part of the incident?

A.     He did.

Q.     Did law enforcement recognize Brian Straw as an individual who appeared in the video of the incident?

A.     Yes.

Q.     And did law enforcement pull stills from the video of the individual whom they recognized as Brian Straw?

A.     Yes.

Q.     I'm showing you pictures.  Are these stills from the video?

A.     Yes.

Q.     And is the person who I'm pointing

Page 46

at, this man here with the orange cap, were those stills of Brian Straw in the video?

A. Yes.

Q. And is that a side view of Brian Straw there?

A. That is.

MS. MECKLENBURG: And now I'm going to play the video for you. So now you know to look for the man with the orange cap. That's why I wanted you to see these. So let's see. It is -- which one? Passenger side minute 1:04. Passenger side minute 1:04.

(Whereupon, a video was played.)

BY MS. MECKLENBURG:

Q. I'll play it from there. Okay. And is this Mr. Straw here in the video that we see?

A. Yes.

Q. Now, let's watch what he does next.

(Whereupon, a video was played.)

BY MS. MECKLENBURG:

Q. Mr. Straw goes right up to the car, right?

A. He does.

Q. And he is pushing against the car bracing himself against the car, right?

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 47

A.      Yes.

Q.      And he is staying up there for a while?

A.      Yes.

MS. MECKLENBURG:   I don't want to say a while.   I don't want to mischaracterize it. He is staying up there.

(Whereupon, a video was played.)

BY MS. MECKLENBURG:

Q.      And then he moves off the car, correct?

A.      Yes.

Q.      Did everybody see that?   Okay.   I have two more for you.   Andre Martin.

Did law enforcement find a social media page of an individual who posted that he worked for Kat Abughazaleh?

A.      Yes.

Q.      Was that individual named Andre Martin?

A.      Yes.

Q.      Was law enforcement able to obtain photos of Andre Martin from social media?

A.      Yes.

Q.      And I'm going to show you.   Is this

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 48

a known photo of Andre Martin that I'm showing you now from his own social media?

A.   Yes.

Q.   And is this -- I'm also showing you another photo of Andre Martin.

Was that also obtained from social media and a known photo of him?

A.   Yes.

Q.   And is this a photo -- let me show you this one.  A full facial photo of Andre Martin taken -- the person recognized as Andre Martin taken on a different day of the protests at Broadview?

A.   Yes.

Q.   And let me just tell you I included that so you could actually see his face, but that wasn't from the day of the incident?

A.   No.

Q.   Okay.  And is he wearing the same thing on that day that he was wearing on the day of the incident?

A.   It appears that he wears this gray hoodie on both incidents -- or both days, to include the incident.

Q.   Now, let's go to still photos.

Veritext Legal Solutions

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 49

Did law enforcement make -- capture some still photos of Andre Martin from the video?

A.    Yes.

Q.    And I'm showing you still photos. Are these still photos -- I'm showing you some photos.

Are these still photos of Andre Martin on the date -- at the time of the incident?

A.    Yes.

Q.    And is the person who I'm pointing to Andre Martin?

A.    Yes.

Q.    And, as you see, is he right next to Kat Abughazaleh?

A.    Yes.

Q.    And is this another still photo from the video of Andre Martin?

A.    Yes.

Q.    So you'll know to look for the person with the gray -- and is this another photo -- still from the video of Andre Martin?

A.    Yes.

Q.    And is he in the video next to Kat Abughazaleh?

A.    Yes.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 50

MS. MECKLENBURG: Let's go to the video. Thank you. I'm trying to minimize this and go to the driver's side video. It's going to be the very beginning. I'm going to play it for you a couple of times because it's hard -- this will come back.

(Whereupon, a video was played.)

BY MS. MECKLENBURG:

Q. Let's go back. Okay. Let's show -- and is where I'm pointing to on the video, has that been the person identified as Andre Martin?

A. Yes.

Q. Okay. Let's show -- let's go to the passenger side video.

And is the person who I'm pointing to there across the car, is that Andre Martin?

A. Yes.

Q. And is he right next to Kat Abughazaleh?

A. He is.

Q. And is he holding onto the car and pushing against it?

A. Yes, I believe so.

MR. SKIBA: Are you going back to the document?

Page 51

MS. MECKLENBURG: Pardon?

MR. SKIBA: Are you going back to the document?

MS. MECKLENBURG: I am going back to the document.

Do you want to work it?

MR. SKIBA: Sure.

MS. MECKLENBURG: Matt has agreed to work the document for me to make this go faster. I appreciate your patience.

BY MS. MECKLENBURG:

Q.    Did law enforcement observe a girl with a guitar in the video of the incident?

A.    Yes.

Q.    Did law enforcement Google "guitar girl Broadview ICE"?

A.    Yes.

Q.    And did that bring law enforcement to a post by a third-party who I will call Individual B?

A.    Yes, it did.

Q.    Did that post identify a girl with a guitar at the incident on September 26 as named Joselyn Walsh?

A.    Yes.

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 52

Q.    Did law enforcement then obtain known photos of Joselyn Walsh?

A.    Yes.

Q.    And I'm showing you a picture which is on page 12 -- 13 of the comparison slide.

Is that a known photo of Joselyn Walsh?

A.    It is.

Q.    And I'm going to show you photos from a post of Joselyn Walsh -- of a woman with her guitar.

Are those known photos of Joselyn Walsh?

A.    Yes.

Q.    And is that what she was wearing also the day -- she was recognized -- did law enforcement recognize Jocelyn Welsh in the video?

A.    Yes.

Q.    And is she wearing the same clothes that we see in this known photo of her?

A.    Yes.

Q.    Did law enforcement pull stills from the video --

A.    Yes.

Q.    -- of Joselyn Walsh?

2025 10 09 25 GJ 994 Evan Hylton - Expeditied

Page 53

A.      Yes.

Q.      And are these stills of Joselyn Walsh with her guitar during the incident?

A.      Yes.

Q.      Let's go to this one.  Can you tell us what is Joselyn Walsh doing there?  What is her arm around?

A.      It is around the driver's side mirror.

Q.      And is she pulling on that mirror?

A.      It appears so.

MS. MECKLENBURG:  Let me now go to the video.  Again, it's going to be very quick at the beginning of the driver's side wheel.  You can see her right there with her guitar.

(Whereupon, a video was played.)

MS. MECKLENBURG:  I'm going to do it again.  You see her guitar right there.  Okay.  Does anybody need me to play it again?

At this time, I would like to present the law to you.  Does anybody have any questions for our agent before he -- before I allow -- ask him to step out while we talk about the law?  Yes.

GRAND JURY:  When that agent was in