UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 25 CR 693 |
| MICHAEL RABBITT, KATHERINE MARIE ABUGHAZALEH, ANDRE MARTIN, BRIAN STRAW, and CATHERINE SHARP | Hon. April M. Perry |

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO FORMER
DEFENDANTS' MOTIONS (R. 225, 226, 227)**

ANDREW S. BOUTROS
United States Attorney

By:  s/ *Andrew S. Boutros*
ANDREW S. BOUTROS
United States Attorney
219 S. Dearborn St., Rm. 500
Chicago, IL 60604
(312) 353-5300

s/ *Nathaniel L. Whalen*
NATHANIEL L. WHALEN
Assistant United States Attorney
219 S. Dearborn St., Rm. 500
Chicago, IL 60604
(312) 353-5300

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 1

II. RELEVANT FACTS AND PROCEDURAL BACKGROUND ........................................ 2

   A. September 26, 2025: Incident with Agent A at Broadview Facility .................................. 2

   B. October 4, 2025, Joint Statement of U.S. Attorney and Federal Law Enforcement Leadership in Chicago on Ongoing Criminal Immigration Enforcement Operations ......................................................................................................................................... 3

   C. October 9, 2025, Grand Jury ........................................................................................... 4

   D. October 16, 2025, Grand Jury ......................................................................................... 6

   E. October 16-22, 2025 ....................................................................................................... 7

   F. October 23, 2025, morning .............................................................................................. 8

   G. October 23, 2025, afternoon ............................................................................................ 9

   H. Other relevant proceedings ........................................................................................... 10

III. ANALYSIS ..................................................................................................................... 17

   A. There is no *prima facie* showing of contempt or conduct that merits this Court's exercising its inherent authority ..................................................................................... 17

      1. This is not a case involving civil contempt .............................................................. 17

      2. Criminal contempt and inherent authority ............................................................... 17

      3. There is no *prima facie* showing of criminal contempt under §§ 401(2) or (3). .......... 20

      4. There is no *prima facie* showing of contempt under § 401(1) or any conduct that requires exercising inherent authority. ................................................................. 22

         a. Grand Jury proceedings ...................................................................................... 23

            i. October 9 ...................................................................................................... 24

            ii. October 16 ................................................................................................... 26

            iii. October 23 morning .................................................................................... 27

            iv. October 23 afternoon .................................................................................. 30

         b. Grand jury proceedings in total .......................................................................... 31

         c. Redactions and related discussions ..................................................................... 32

         d. No vindictive or selective prosecution ................................................................ 34

   B. Former Defendants are not entitled to discovery. ........................................................... 39

IV. CHANGES GOING FORWARD .................................................................................... 41

V. CONCLUSION ................................................................................................................ 45

i

**TABLE OF AUTHORITIES**

**Cases**

*Al-Adahi v. Obama*, 672 F. Supp. 2d 114 (D.D.C. 2009) ............................................................. 44

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988)...................................................... 23

*Barnhill v. United States*, 11 F.3d 1360 (7th Cir. 1993).................................................... 33

*Barry v. United States*, 865 F.2d 1317 (D.C. Cir. 1989) ........................................................ 40

*Berger v. United States*, 295 U.S. 78 (1935) ............................................................................. 1

*Bloom v. Illinois*, 391 U.S. 194 (1968) ...................................................................................... 19

*Cammer v. United States*, 350 U.S. 399 (1956)......................................................................... 20

*Chambers v. NASCO*, 501 U.S. 32 (1991)............................................................................ 19, 23

*Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779 (7th Cir. 1981)................. 17

*Costello v. United States*, 350 U.S. 359 (1956) ......................................................................... 26

*Denver-Greeley Valley Water Users Assoc. v. McNeil*, 131 F.2d 67 (10th Cir. 1942) ................ 21

*Donziger v. United States*, 143 S. Ct. 868 (2023)....................................................................... 18

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) ......................... 19, 21, 40

*Gompers v. Buck's Stove and Range Co.*, 221 U.S. 418 (1911).................................................. 18

*Illinois v. Trump*, 155 F.4th 929 (7th Cir. 2025)......................................................................... *4*

*In re Betts*, 927 F.2d 983 (7th Cir. 1991)............................................................................. 21, 22

*In re Dellinger*, 461 F.2d 389 (7th Cir. 1972) ........................................................................... 23

*In re Michael*, 326 U.S. 224 (1945)........................................................................................... 23

*In re Res. Tech. Corp.*, 624 F.3d 376 (7th Cir. 2010)................................................................. 20

*In re Special Proceedings*, 373 F.3d 37 (1st Cir. 2004) ............................................................ 21

*In re United States*, 345 F.3d 450 (7th Cir. 2003) ..................................................................... 37

*In re United States*, 398 F.3d 615 (7th Cir. 2005) ............................................................... *passim*

*In re United States*, 441 F.3d 44 (1st Cir. 2006)........................................................................ 20

*Jean v. Nelson*, 863 F.2d 759 (11th Cir. 1988)..................................................................... 40

*Kienle v. Jewel Tea Co.*, 222 F.2d 98 (7th Cir. 1955) ........................................................... 40

*Mathews-Sheets v. Astrue*, 653 F.3d 560 (7th Cir. 2011) ..................................................... 40

*Musidor v. Great Am. Screen*, 658 F.2d 60 (2d Cir. 1981).................................................... 21

*Pierce v. Underwood*, 487 U.S. 552 (1988).......................................................................... 40

*Pollgreen v. Morris*, 911 F.2d 527 (11th Cir. 1990)............................................................. 40

*Ramos Colon v. United States*, 576 F.2d 1 (1st Cir. 1978)..................................................... 40

*Schmude v. Sheahan*, 420 F.3d 645 (7th Cir. 2005) ............................................................. 23

*Socialist Workers Party v. Attorney General*, 596 F.2d 58 (2d Cir. 1979)............................. 19, 32

*Tollett v. Henderson*, 411 U.S. 258 (1973) .......................................................................... 46

*Trump v. Slaughter*, 609 U.S. ----, 2026 WL 1855612 (2026) ............................................. 18

*Trump v. United States*, 603 U.S. 593 (2024)....................................................................... 41

*United States v. Aisenberg*, 358 F.3d 1327 (11th Cir. 2004)................................................. 41

*United States v. Anderson*, 61 F.3d 1290 (7th Cir. 1995)...................................................... 24, 25

*United States v. Armstrong*, 517 U.S. 456 (1996) ................................................................ 38

*United States v. Baldwin*, 68 F.4th 1070 (7th Cir. 2023)....................................................... 35

*United States v. Benson*, 941 F.2d 598 (7th Cir. 1991) ........................................................ 38

*United States v. Blitch*, 622 F.3d 658 (7th Cir. 2010)........................................................... 30

*United States v. Cederquist*, 641 F.2d 1347 (9th Cir. 1981) ................................................. 24

*United States v. Concord Mgmt. & Consulting LLC*, 2019 WL 7758635 (D.D.C. 2019)............ 19

*United States v. Cornett*, 232 F.3d 570 (7th Cir. 2000)......................................................... 24, 25

*United States v. Donzinger*, 38 F.4th 290 (2d Cir. 2022) ...................................................... 18

*United States v. Dowell*, 257 F.3d 694 (7th Cir. 2001).......................................................... 17

*United States v. Fisher*, 225 F. Supp. 3d 151 (W.D.N.Y. 2016) ............................................ 28

*United States v. Fokker Services B.V.*, 818 F.3d 733 (D.C. Cir. 2016) ................................... 37

iii

*United States v. Gervasi*, 562 F. Supp. 632 (N.D. Ill. 1983) ........................................................ 34

*United States v. Gibson*, 480 F. Supp. 339 (S.D. Ohio 1979)...................................................... 26

*United States v. Gjieli*, 717 F.2d 968 (6th Cir. 1983) ................................................................. 44

*United States v. Griffin*, 84 F.3d 820 (7th Cir. 1996) ....................................................... 18, 20, 23

*United States v. Hasting*, 461 U.S. 499 (1983) ...................................................................... 42, 43

*United States v. Heffington*, 682 F.2d 1075 (5th Cir. 1982) ...................................................... 24, 25

*United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983) ................................................................. 24

*United States v. Horn*, 29 F.3d 754 (1st Cir. 1994) ..................................................................... 42

*United States v. Jarrett*, 447 F.3d 520 (7th Cir. 2006) ................................................................. 35

*United States v. Johnson*, 327 F.3d 554 (7th Cir. 2003)............................................................... 19

*United States v. Jones*, 620 F. Supp. 2d 163 (D. Mass 2009).................................................. 42, 43

*United States v. Joyce*, 498 F.2d 592 (7th Cir. 1974) ............................................................. 20, 21

*United States v. Koubriti*, 305 F. Supp. 2d. 723 (E.D. Mich. 2003).................................... *passim*

*United States v. Lamantia*, 59 F.3d 705 (7th Cir. 1995)............................................................... 32

*United States v. Maine Lobster Co.*, 160 F. Supp. 122 (D. Maine 1957) .................................... 26

*United States v. McKenzie*, 678 F.2d 629 (5th Cir. 1982) ............................................... 25, 26, 31

*United States v. Monsoor*, 77 F.3d 1031 (7th Cir. 1996)......................................................... 35, 38

*United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir. 2005).............................................. 29

*United States v. Ott*, 489 F.2d 872 (7th Cir. 1973) ...................................................................... 33

*United States v. Philpot*, 733 F.3d 734 (7th Cir. 2013) ................................................................ 46

*United States v. Sanders*, 962 F.2d 660 (7th Cir. 1992) ............................................................... 29

*United States v. Seale*, 461 F.2d 345 (7th Cir. 1972)........................................................... *passim*

*United States v. Segal*, 495 F.3d 826 (7th Cir. 2007) ............................................................. 37, 38

*United States v. Sells Engineering, Inc.*, 463 U.S. 418 (1983) ................................................... 28

*United States v. Serubo*, 604 F.2d 807 (3d Cir. 1979) ................................................................. 32

*United States v. Sigma, Int'l*, 244 F.3d 841 (11th Cir. 2001) ......................................................... 31

*United States v. Streett*, 437 F. Supp. 3d 940 (D.N.M. 2020) ....................................................... 21

*United States v. Terzakis*, 854 F.3d 951 (7th Cir. 2017)................................................................ 1

*United States v. Trudeau*, 812 F.3d 578 (7th Cir. 2016)............................................................... 21

*United States v. Udziela*, 671 F.2d 995 (7th Cir. 1982)................................................... 28, 30, 33

*United States v. Venegas*, 800 F.2d 868 (9th Cir. 1986)...................................................... 25, 30

*United States v. Vetere*, 663 F. Supp. 381 (S.D.N.Y. 1987).......................................................... 31

*United States v. Vincent*, 416 F.3d 593 (7th Cir. 2005)....................................................... 30, 31, 33

*United States v. Wilkinson*, 513 F.2d 227 (7th Cir. 1975) ............................................................. 44

*United States v. Williams*, 504 U.S. 36 (1992) ............................................................................. 28

*United States v. Zingsheim*, 384 F.3d 867 (7th Cir. 2004)...................................................... 19, 39

**Constitutional Provisions**

U.S. Const. art. II, § 3.......................................................................................................... 37, 40

**Statutes**

18 U.S.C. § 111......................................................................................................... 3, 10, 36

18 U.S.C. § 372......................................................................................................... *passim*

18 U.S.C. § 401......................................................................................................... *passim*

28 U.S.C. § 547............................................................................................................... 1

28 U.S.C. § 1866(c)(2)................................................................................................... 26

**Rules**

Fed. R. Crim. P. 6(h).................................................................................................... 26

Fed. R. Crim. P. 42 ...................................................................................................... *passim*

**Regulations**

28 C.F.R. § 0.39(c)(c) ................................................................................................... 43

28 C.F.R. § 45.12.................................................................................................... 17, 43

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully requests this Court deny former Defendants'[1] motions for this Court to order discovery, conduct a hearing, or appoint "another attorney" to investigate allegedly contemptuous conduct. R. 225, 226, 227.[2]

I.      INTRODUCTION

The United States Attorney is the top law enforcement officer in the Northern District of Illinois, and it is his job, along with that of his Office, to both enforce the laws of the United States and also ensure "that justice shall be done." 28 U.S.C. § 547; *Berger v. United States*, 295 U.S. 78, 88 (1935). There can be no doubt that mistakes were made in the prosecution of this case. That is why the United States Attorney's Office has dismissed all charges and is not contesting former Defendants' entitlement to attorneys' fees. *See* R. 238. It is also why the United States Attorney has implemented substantial root-cause reforms as part of a remediation plan that has included: (1) a new, office-wide policy requiring AUSAs to (a) not oppose defense requests for the court to conduct *in camera* review of grand jury minutes,[3] (b) produce all grand jury transcripts of witness testimony to the defense irrespective of whether the witness will testify at trial, with limited exceptions, and (c) produce grand jury transcripts early in discovery, unless there are witness tampering or safety issues or other similar concerns; (2) the now completed comprehensive training to the Office's Criminal Division on grand jury practices from out-of-district Department

---

[1] Post-dismissal individuals seeking attorneys' fees are often referred to as "Defendant"—even where indictments were dismissed, *see, e.g.*, *United States v. Terzakis*, 854 F.3d 951 (7th Cir. 2017)—but the Government refers to "former Defendants" to ensure it is clear there are no charges pending.

[2] Citations to this Court's docket are designated as "R." followed by the PDF number, even if internal pagination is different. If, for example, a grand jury transcript has internal pagination saying it is page 30 but it is page 25 of the PDF docket entry, this response will refer to page 25.

[3] Grand jury "minutes" are those portions of a grand jury session where the United States Attorney, or an Assistant U.S. Attorney, as the legal advisors to the grand jury, speaks to grand jurors without a witness on the witness stand either about general subject matters or in the case of a particular matter.

of Justice experts; (3) the ongoing review of grand jury minutes from what is expected to be not less than 600 and potentially more than 1,000 grand jury matters from pending and past criminal cases charged by indictment in this District; (4) the review of grand jury minutes going back to 2007 for one prosecutor involved in this matter; (5) the now completed review of grand jury presentations for the junior prosecutor who had been assigned to this matter; (6) the potential review of additional minutes for additional prosecutors (not assigned to this matter) if the current review process identifies a high error rate or other irregularities for any particular AUSA; and (7) a policy barring AUSAs from redacting any transcripts provided to the Court.

Although the mistakes in this case are regrettable, this is not one of the "rare situations when a *prima facie* case of criminal contempt has been made out," and so this Court should reject former Defendants' request for a hearing on these matters or to appoint another attorney to investigate alleged misconduct. *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005).

## II.    RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A.  September 26, 2025: Incident with Agent A at Broadview Facility

Agent A told the grand jury that on the morning of September 26, 2025, he drove towards the ICE immigration processing facility in Broadview, Illinois, in his government-owned car. R. 221 at 73-74. There was a crowd protesting at the facility, some of whom ended up in front of and touching and/or banging on his car. *Id.* at 78-80. The parties disagreed about the legal significance and constitutional implications of their actions, but former Defendants have never contested that each of them at least touched the Agent's car, and the Court has confirmed as much. R. 142 at 7-9. Agent A testified in the grand jury that he feared for his safety and was worried about being forcibly removed from his car. R. 221 at 81-82. By the time he reached the facility, Agent A's car had scratches, a broken mirror, and the word "pig" etched into it. *Id*. at 96-99.  The incident lasted for roughly four minutes and was captured on a publicly available video.

2

Some of the former Defendants went on social media or gave a press conference and said they had been at the Broadview facility during the incident. R. 110 at 6-9. Others were identified based on clear images and clothing or were tagged on social media. *Id*. The Office decided to charge former Defendants with felony conspiracy under 18 U.S.C. § 372 and misdemeanors for assaulting a federal law enforcement officer under 18 U.S.C. § 111. R. 1. Despite various law enforcement efforts, the FBI was unable to identify many other individuals on scene. R. 110 at 4-5, 9-10; R. 131-3 at 4-5.

Once the United States Attorney made the local decision to charge, and because some of the former Defendants were elected officials or candidates for public office, the United States Attorney followed Department of Justice policy and the spirit of that policy and reported that charging decision to Main Justice shortly before the first grand jury presentation in this case. R. 110 at 4, n.2; Justice Manual 9-85.500. In the subsequent announcement of charges, the Office requested help identifying others who had been present at Broadview in the video. R. 110 at 10 ("If you recognize other individuals in the video who may be impeding law enforcement, you are encouraged to contact the FBI Chicago Field Office by logging on to https://tips.fbi.gov/home.").

**B. October 4, 2025, Joint Statement of U.S. Attorney and Federal Law Enforcement Leadership in Chicago on Ongoing Criminal Immigration Enforcement Operations**

On October 4, 2025, the United States Attorney and Chicago's Federal Law Enforcement Leadership issued a rare joint statement regarding criminal immigration enforcement operations.[4]

---

[4] *U.S. Attorney's Office, Northern District of Illinois,* (*available at* https://www.justice.gov/usao-ndil/pr/statement-united-states-attorney-andrew-s-boutros-and-federal-law-enforcement) (last visited August 3 or 4, 2026, as were all other websites in this response). That the United States Attorney and seven federal law enforcement leaders in Chicago issued a joint statement about protecting federal officials, property, and interests was reflective of the unusual times in which federal law enforcement was operating in Chicagoland in and around the Fall of 2025. Indeed, those unusual times created by Operation Midway Blitz led to other measures that would not be normal under other circumstances. Those included, for example, (1) increasing the amount of law enforcement throughout the City, *Illinois v. Trump*, 155 F.4th

The United States Attorney stated in relevant part that the United States Attorney's Office "will enforce all federal criminal laws and protect our federal employees and property," and more specifically "take swift action as needed when criminal offenders assault, obstruct, or impede law enforcement personnel or destroy federal property." In the same joint press statement, leaders from seven federal law enforcement agencies in Chicago stated: "We speak with one voice when we say that we expect any protest or assembly in Chicago to remain peaceful. There is no place for violence against law enforcement officers, obstruction of justice, or destruction of federal property."[5] Their statement continued in relevant part, "[a]ny criminal actions taken against the brave men and women in uniform will be met with swift criminal prosecution."

### C. October 9, 2025, Grand Jury

Less than two weeks after Agent A's experience at Broadview, Experienced AUSA 1 (who joined the Office in 2007) and Junior AUSA (with less than three months at the Office) presented the case to the Special June 2024 Grand Jury. R. 219.

---

929, 934-35 (7th Cir. 2025); (2) setting up protective fencing around the courthouse as a precaution, *see, e.g.*, "Security Fencing at Chicago's federal courthouse an early sign of Trump Immigration push," by Jason Meisner, Chicago Tribune, September 5, 2025 (*available at* *https://www.chicagotribune.com/2025/09/05/security-fencing-chicago-federal-court/*); (3) putting entire sections of prosecutors "on duty" to review charges because of the volume of law enforcement referrals, with backup sections on standby to handle overflow reactive matters, R. 110 at 18, n.5; as well as (4) fencing at the Broadview facility, where damage to occupied DHS vehicles included slashed tires, s*ee* Dec. of Field Office Director Russell Holt. *Village of Broadview v. DHS,* No. 25-CV-12164 (N.D. Ill.) Dkt. 26, Ex. A, ¶¶ 8, 10.

[5] Those federal law enforcement leaders were: (1) Douglas S. DePodesta, Special Agent-in-Charge of the Chicago Field Office of the FBI; (2) Matthew J. Scarpino, Special Agent-in-Charge of U.S. Immigration and Customs Enforcement's Homeland Security Investigations in Chicago; (3) Russell Hott, Field Office Director of U.S. Immigration and Customs Enforcement's Enforcement and Removal Operations in Chicago; (4) LaFonda Sutton-Burke, Director of the Chicago Field Office of U.S. Customs and Border Protection; (5) Christopher Amon, Special Agent-in-Charge of the Chicago Field Division of the U.S. Bureau of Alcohol, Tobacco, Firearms & Explosives; (6) Shane Catone, Special Agent-in-Charge of the DEA Chicago Field Division; and (7) LaDon A. Reynolds, United States Marshal for the Northern District of Illinois.

The presentation began with an FBI investigative agent, referred to here as "Case Agent"—not Agent A (the agent with firsthand knowledge of the incident)—on the stand. R. 219 at 3. During her introductory comments with the witness on the stand, Experienced AUSA 1 said, "I purposely asked if I could wait for the Thursday grand jury. I did . . . I said I want to go in front of the Thursday grand jury because I know you and I trust you and you know me and you trust me, and I would never ask you to charge somebody if I didn't think there was probable cause and you know you've asked me before 'Well, what about this person?' And I said 'I don't charge people unless I'm absolutely sure.'" *Id.* at 3-4.

However, Experienced AUSA 1 also instructed the grand jurors to "put aside any personal feelings," including "sympathy, prejudice, fear or public opinion," not "consider the wisdom of Congress for making something a crime," and instead "follow the facts and the law and if there is probable cause to charge, then that's what I ask you to do." *Id.* at 4-5. She gave her "summary"—which she reiterated was "not evidence" or "testimony"—before facing technical issues. *Id.* at 5-9.

In addition to the Case Agent testifying, the prosecutors played two videos showing different angles of the incident from September 26, 2025. *Id.* at 14-16. After Case Agent's testimony, the grand jurors asked factual questions about, for example, Agent A's interview and his thought process, whether Agent A could have stopped the vehicle, and whether other cars were around. *Id.* at 11-19. The Case Agent could not answer all those questions because he did not experience it firsthand. *Id.* at 17. The grand jurors asked the AUSAs about, among other things, whether conspiracy required forethought (*id.* at 22), if actions alone could show a conspiratorial agreement (*id.* at 23), "how far does" the scope of the conspiracy "go" (*id.*), and whether it was

5

against the law to touch a law enforcement car (*id.* at 24-25, 30-31). The grand jury declined to indict and returned a no-bill. R. 187 at 31-32.

### D.  October 16, 2025, Grand Jury

On October 16, 2025, Experienced AUSA 1 and Junior AUSA again presented to the Thursday grand jury. R. 220. Rather than present again the testimony of the Case Agent, the AUSAs took a different approach and presented the testimony of Agent A, who had firsthand knowledge of the events of September 26, 2025, could speak personally as to what happened on that day, and could answer the grand jurors' questions about the incident from his personal perspective. R. 220 at 50. Experienced AUSA 1 explained they would present more law and then they ran into technical issues. R. *Id.* at 2-3. Junior AUSA presented on the legal elements with Experienced AUSA 1 interjecting at times. *Id.* at 4-8.

A grand juror[6] asked whether the Government could "keep coming back as many times you want*?*" *Id*. at 8. Experienced AUSA 1 said she hoped "you don't have your mind made up already that I'm going to need more tries.*"* *Id*. at 8-9. Experienced AUSA 1 took a grand juror's response as "like, well, maybe I do" and asked if they had their mind made up. *Id.* at 9. The grand juror responded, "I mean I'll listen." *Id*. Experienced AUSA 1 confirmed that the grand juror had "an open mind for deliberation and returning a verdict if the facts meet the law," then asked whether there was "anybody here who feels differently" because they should not deliberate "if you do." *Id*.

One grand juror asked if the AUSAs were presenting "any new actual facts or just a different viewpoint." *Id.* at 10. Experienced AUSA 1 stated she was "feeling the skepticism

---

[6] The grand jury transcripts do not reflect who is speaking but refer to any member of the Grand Jury as "Grand Juror." To stay consistent with the transcript, this response refers to grand juror (singular).

already" and asked if the grand juror could listen with an open mind. *Id.* The grand juror said "no." *Id.* Experienced AUSA 1 said "Then you have to go—." *Id.* A grand juror said, "I heard this case like last week and I thought it was a crock of s[---] then and I still think it is." *Id.* Experienced AUSA 1 said, "Thank you for your opinion for everybody," and "I kind of had that impression from last week, but thank you." *Id.* Experienced AUSA 1 said, "I didn't say there is no new evidence" and, after an inaudible comment, "If you feel that you can't be—then excuse yourself. That's fine. There is still 16?" *Id.* at 11 ("16" refers to the quorum of grand jurors needed to hear and deliberate on the matter). The Foreperson confirmed they had a quorum. *Id.*

Junior AUSA continued to explain the law. *Id.* at 11-25. There were again technical issues. *Id.* at 25. A grand juror said, "I don't think I can vote," and Experienced AUSA 1 confirmed with the Foreperson that they still had a quorum. *Id.* at 26.

The prosecutors played two videos of the incident. *Id.* at 29-32. Agent A gave his testimony. *Id.* at 40-54. After another technical issue, the transcript reveals there was off-the-record discussion and "the testimony was abruptly stopped." *Id.* at 54. The grand jury was not asked to return an indictment that day. *Id.*; R. 187 at 32. Rather, when Experienced AUSA 1 contacted members of the Front Office[7] in "realtime" regarding the "excusing of grand jurors," the grand jury session was "immediately called off." R. 187 at 51.

### E. October 16-22, 2025

The United States Attorney reached out to the Chief Judge in her role as grand jury supervisor to alert her to tensions in the various grand juries. R. 187 at 51; N.D. Ill. Local Crim. Rule 6.1 (Chief Judge supervises grand jury). The Chief Judge prepared a letter that would be read

---

[7] Unless otherwise noted, references to the "Front Office" are to the United States Attorney, the First Assistant United States Attorney, and the Chief of the Criminal Division.

to all the grand juries—not just the Thursday grand jury—about their obligations. *U.S. Attorney's Office, Northern District of Illinois*, Special Report of the United States Attorney's Office for the Northern District of Illinois Regarding Grand Jury Appearances, at 4 (*available at https://www.justice.gov/usao-ndil/media/1443716/dl?inline*). The United States Attorney informed the Chief Judge that he intended to address each grand jury and remind them of the same. *Id.* at 3-4. Ultimately, the United States Attorney appeared before the Monday, Wednesday, and Thursday grand juries in general session, rather than on any particular case. *Id.* at 3. He did not appear in front of the Tuesday grand jury because it did not sit on October 21 and it was set to expire the next week. *Id.*

### F. October 23, 2025, morning

On the morning of October 23, 2025, the United States Attorney appeared in general session in front of the Thursday grand jury prior to the presentation of evidence in any case and spoke for roughly four minutes. *Id.* at 4. After referencing that a letter from the Chief Judge had just been read to the grand jury, he stated in relevant part:

> [T]his is a really important function that you all play as grand jurors and it's constitutional. And part of the key to what you all do is to, in addition to obviously being the conscience of the community, is that you are listening to the evidence, listening to the facts, listening to the law and doing, applying those facts to the law to determine if there's probable cause without fear or favor. And setting aside your emotions, setting aside your personal views, beliefs and biases. And just simply as I like to say, calling balls and strikes. You're the umpire and you can't come in and be an umpire in favor of particular team. You gotta call balls and strikes and that's all we ask.

*Id.* He then asked, similar to what he did with the other grand juries, if there was "anyone here who is struggling with a certain type of cases"—including "immigration," "child exploitation," or others—who "do not believe that they can set aside their personal . . . emotions [and] listen and deliberate honestly and objectively." *Id.* at 5. He asked them to raise their hand because "we have

8

a different procedure for that," similar to "if we were actually in a jury and we were picking a jury." *Id.* No one raised their hand, and the United States Attorney thanked them for their service, and then left the grand jury room. *Id.*

### G. October 23, 2025, afternoon

That afternoon, Experienced AUSA 1 and Junior AUSA appeared in front of the Thursday grand jury to present evidence in 25 GJ 994. R. 221. Before presenting evidence or argument, Experienced AUSA 1 delivered a "mia [*sic*] culpa" because she "did something today that I'm not supposed to do. I had conversations with two Grand Jurors outside of the Grand Jury room" and needed "to put it on the record." R. 221 at 3-4. She gave a summary of the interactions: one where she said a "Grand Juror apologized to me from last week, and I told the Grand Juror that I accepted his apology." R. 221 at 4. Experienced AUSA 1 said the grand juror relayed that he "did have feelings, and he's sure that he's right, but he shouldn't have walked out the way he did.*" Id.* at 4-5. Experienced AUSA 1 said the second exchange was a "very brief conversation" with another grand juror who "said to me something about last week. And he said, 'I'm sorry. I under – I can apply the facts to the law. I understand that people have feelings, but we have to apply the facts to the law.'" *Id.* at 5. Experienced AUSA 1 said she told the grand juror: "'That's true. That's exactly what we're asking you to do,' something like that, to the best of my recollection." *Id.*

The prosecutors once again played the two videos of the incident. *Id.* at 32-42. Agent A also testified as to his firsthand account of the events of September 26, 2025, namely, that he was surrounded by a group of people, calling him names, banging on the windows, and shaking his car. *Id.* at 79-80. He feared for his safety and felt that had he stopped, the crowd would have broken his windows and "probably [dragged him] out of the car." *Id.* at 81-82. After Agent A testified, the grand jurors had questions about whether he was armed, had ever been involved in similar

9

incidents, or believed someone else caused the car damage. *Id*. at 100-105. The grand jurors also engaged in a lengthy discussion about the facts while viewing the videos. *Id*. at 57-62. The grand jurors also asked questions about the law, including: the necessity of them weighing in on a misdemeanor *(id*. at 51-52, 25-31), and if "basically . . . anybody who walked in front of that car could be charged with a conspiracy even if they weren't actually touching the car and somehow impeding it." *Id.* at 55; *see also id.* at 9, 16, 52-54 (other questions).

The grand jury returned the indictment, alleging in Count 1 that, in violation of 18 U.S.C. § 372, former Defendants feloniously conspired to (1) prevent Agent A from discharging the duties of his office by force, intimidation, and threat; (2) injure Agent A in his person or property on account of his lawful discharge of the duties of his office or while engaged in the lawful discharge thereof; and (3) injure Agent A's property so as to interrupt, hinder, and impede him in the discharge of his official duties. R. 1 at 1-5. The indictment also alleged that each former Defendant committed misdemeanor assault against a federal law enforcement officer in violation of 18 U.S.C. § 111(a)(1). R. 1 at 6-11.

## H. Other relevant proceedings

On January 23, 2026, former Defendants moved for clarification about which of the three means in § 372 they were alleged to have violated. R. 61. Around that time, Experienced AUSA 1 left the Office for a temporary detail in another branch of Government. R. 83, 86. On February 2, 2026, Experienced AUSA 2—who has been with the Office for roughly 40 years—entered his appearance. R. 73. A third prosecutor, AUSA 3, filed his appearance on February 13, 2026. R. 85. The Government filed a motion saying it would only proceed on the "force and intimidation" prong of § 372 and thereby narrowed Count 1 (the felony charge). R. 96. Around that time, the Government moved to dismiss two of the former Defendants with prejudice. R. 91.

The remaining former Defendants sought discovery relating to vindictive or selective prosecution. R. 94. This Court denied the motion. R. 117. In an oral ruling denying the request, the Court noted that former Defendants had not identified "any people who were differently situated from these defendants who were present at the scene doing anything remotely like what these defendants are alleged to have done." R. 131-3 at 8. To the extent former Defendants' "theory is they were charged because of their political beliefs, everyone on the scene seems to have had the same political beliefs" and were exercising "the same political opinions and same type of speech." *Id.* To the extent individuals were charged because they were political figures, it is "the bread and butter of the U.S. Attorney's Office" to charge "[p]ublic officials of every political" stripe. *Id*. at 9. It is "always considered a plus factor both because public officials are believed to be good deterrent effects on the rest of the people who might commit crimes and because we believe that public officials should be upholding the law rather than violating it." *Id*.

The next day, on April 8, 2026, former Defendants made a "narrow" request to see "Grand Jury transcripts pertaining to how the 18 U.S.C. § 372 conspiracy charge was explained to the Grand Jury" and "any related exchanges." R. 118 at 1. Former Defendants wanted to ensure the grand jury had been instructed on all the relevant § 372 means now that the Government was proceeding on only one. *Id*. at 1-2, 4. Alternatively, they asked this Court to conduct an *in camera* review "and order disclosure of those portions of the transcripts the Court determines are necessary to allow Defendants an opportunity to develop this issue further." *Id*. at 1, 12.

This Court entered a minute order directing the Government to respond to former Defendants' motion, or "[t]o the extent the Government does not object to an *ex parte in camera* review of the transcripts, the relevant portions of the transcripts as outlined in the motion may be provided to the Court." R. 119. Experienced AUSA 2 and Junior AUSA had a trial scheduled

11

around that date and, more importantly, not all the transcripts had been completed yet, so the trial team requested additional time to obtain all the relevant transcripts. R. 121; R. 131-3 at 13. This Court granted the motion and gave the Government until April 23 to submit the "relevant grand jury transcripts requested by Defendants." R. 123.

On April 23, the Government submitted to the Court for *in camera* review those portions of the transcripts "detailing the presentment of the law on the 18 U.S.C. § 372 conspiracy charge and any related exchanges." R. 128; R. 129 (Exs. A, B, and C). The transcripts the Government tendered to the Court also contained black redactions clearly marking what was not produced and page numbers showing that the first transcript omitted all pages between 4 and 61; the second transcript omitted pages 3, 9-10, and 30-36; and the third transcript omitted pages 4, 29-40, and a few pages at the end. R. 129 (Exs. A, B, and C). These omitted pages totaled more than 80.[8] As he later stated in court, Experienced AUSA 2 took responsibility for the redactions. R. 187 at 30.

In a subsequent minute entry, this Court "asked" the Government "to bring to [the April 29 status] hearing fully un-redacted versions of the transcripts it has filed under seal (which currently contain redactions within the colloquy portions) as well as a copy of any presentation(s) or document(s) shown to the grand jurors summarizing the law." R. 130.

During that hearing on April 29, this Court asked if the Government objected to turning the transcripts over to former Defendants. R. 142 at 3. Experienced AUSA 2 responded that might be "moot" since the Government was going to dismiss the felony with prejudice and proceed via superseding Information on the misdemeanors. *Id*. at 3-4. Experienced AUSA 2 offered that "we

---

[8] In addition to the 80 omitted pages, the transcripts contained additional pages that were not provided to the Court because they included witness testimony and portions other than the § 372 law and related colloquies. *See* R. 219 (Oct. 9, 2025, transcript consisted of 76 total pages); R. 220 (Oct. 16, 2025, transcript consisted of 53 total pages); R. 221 (Oct. 23, 2025, transcript consisted of 98 total pages). All three transcripts consisted of a combined 227 pages.

have brought you, in compliance with your order, the unredacted versions." *Id.* at 4. This Court asked if former Defendants agreed that the dismissal mooted the request; defense counsel understood it "could negate everything like that," but asked to "put a pin on having a final decision on whether or not that is moot until we see what the superseding information is." *Id*. at 4-5. Experienced AUSA 2 asked: "Do you still want us to furnish [the Court] the unredacted versions or should we wait?" *Id*. at 5. This Court said, "Let's wait." *Id*.

The Government then filed a superseding Information charging former Defendants with misdemeanor assault, R. 140, and later a motion to dismiss the conspiracy charge with prejudice, going beyond its usual practice of dismissing the original charging document only after trial. R. 147 (collecting cases).

On May 7, 2026, defense counsel renewed their request to review the unredacted transcripts. R. 197 at 3-4. The Court noted during the hearing that the Government did not need to present a misdemeanor to the grand jury and so the transcripts might be unnecessary once the indictment was dismissed. *Id*. at 6-7. In discussion with former Defendants' counsel, the Court said, "to be clear I have seen about 99 percent of the transcripts. There were several lines in the middle of things that were redacted, and I do not know what those were. But I have seen most of it." *Id*. at 7-8. The Court then asked, even assuming that defense counsel were right and there was "something going on that [the Government was] trying to keep away from the Court and" from counsel, "why would [the Government] not be able [to] then dismiss and void out everything that happened before the grand jury and move forward just with the misdemeanor counts, which they would have been able to do at the beginning, middle, or end at any point." *Id.* at 9. The Court again stated in its discussion with defense counsel that "there are probably less than 20 or 30 lines out of the three transcripts that were redacted." *Id.* at 10.

13

At the May 18, 2026, pretrial conference, the Court granted the Government's motion to dismiss the indictment with prejudice. R. 185 at 9. The Government did not oppose counsel's renewed request that the Court review the unredacted portion of the grand jury transcripts. *Id.* at 63. The Court stated that "I want to say there were like 15 lines redacted. If I had to guess, it seems like those were probably related to IT issues playing the video, but I couldn't tell and that's why I asked for it." *Id.* The Government did not object to turning over the unredacted transcripts and specifically noted that "[w]e offered that weeks ago." *Id.* The Government then gave the Court the unredacted transcripts, which the Court accepted.

Two days later, on May 20, 2026, this Court ordered a hearing for the next day and the attendance of "[a]ny AUSA who participated in the decision to redact portions of the grand jury transcripts, whether on the trial team or at the supervisory level." R. 181.

At that May 21 morning hearing, the Court recapped the history of the proceedings and reiterated the "narrow" request in former Defendants' initial disclosure motion, namely "the presentment of the law and the conspiracy charge given to the grand jury and related exchanges." R. 187 at 19-20. The Court had asked the Government to bring the unredacted transcripts to an April hearing, then agreed that any need to see the transcripts was mooted by the dismissal of the felony charge because "any missteps with respect to the legal instructions" on the misdemeanor would be "irrelevant" given no grand jury presentment was necessary. *Id.* at 20-21. It also noted the Government did not object on May 18 to turning over the unredacted transcripts. *Id.* at 21.

The Court sought to confirm that the three AUSAs in attendance—namely, Experienced AUSA 2, AUSA 3, and Junior AUSA—were "everyone from the U.S. Attorney's Office who participated in the redaction process." *Id.* at 21-22; *see also id.* at 29. Junior AUSA clarified that he was only at the hearing because he was a "member of the trial team" and "also present in the

14

grand jury." *Id.* at 29. He was not involved in the redactions and "was out of town" when the redactions were made. *Id.* Experienced AUSA 2 confirmed he and AUSA 3 were the only two prosecutors involved in the redaction process. *Id.* at 30. Specifically, when the Court asked, "it is you two [Experienced AUSA 2 and AUSA 3] who looked at the transcripts and made a decision about what would be redacted and only you two," Experienced AUSA 2 said "Yes, mostly me.*"* *Id.* at 30. He took responsibility for the redactions. *Id.*

The Court noted in its review of the unredacted transcripts that it had "never seen the types of prosecutorial behavior before the grand jury." *Id.* at 22. What "jumped out" first was at the October 9, 2025, presentation, "prosecutorial vouching to the grand jurors, with the AUSA putting her personal credibility and trustworthiness on the line in support of the charges." *Id.* Second, at the October 23, 2025, presentation, "improper prosecutorial communications of a substantive nature with the grand jurors outside of the grand jury room." *Id.* at 23. And, third, at the October 16, 2025, presentation "the prosecutor excusing grand jurors who disagreed with the government's case from the deliberations process." *Id.* The Court noted "problem Number 4, which is the fact that all of this was redacted out of the versions of the transcripts that I got." *Id.* The Court was "not sure" former Defendants would be entitled to dismissal with prejudice of the misdemeanors "given that there was no need for the grand jury at all." *Id.* at 24. But the Court said that "trust has been broken" and these "were very clearly not" regular grand jury proceedings. *Id.* at 23, 25. The Court stated it might consider "sanctions for prosecutorial misconduct and for potential ethical violations, including lack of candor to the Court." *Id.* at 25.

Following a recess, and after the United States Attorney learned the Court was "understandably quite upset," he appeared before this Court in the afternoon session without any prior planning with the three AUSAs. *Id.* at. 45, 50. He moved to dismiss all the remaining

15

misdemeanor charges with prejudice. *Id.* at 49-50. He said he was aware of the grand juror departures in real time and that was why he and the Front Office immediately called off that grand jury session. *Id.* at 51. The United States Attorney "reached out to the chief judge," and they "established a protocol" for how to deal with grand jurors deliberating with such tension. *Id.* at 51-52. Rather than being "perceived as forum shopping, unwilling to respect the decision of the grand jury," the United States Attorney had decided to bring the case back to the same grand jury. *Id.* at 52. As to the other grand jury issues, the United States Attorney informed the Court that he first learned of the "vouching" and *ex parte* conversations in late April 2026.[9] *Id.* at 51-53. The United States Attorney noted that he moved to dismiss the indictment based on his discovery of the vouching and *ex parte* communications because "we wanted to moot whatever had taken place in the grand jury." *Id.* at 51-53, 57-58.

Since that time, the AUSAs on the trial team as well as Experienced AUSA 1 have self-reported this Court's comments—and the entirety of this matter—to the Department of Justice's Office of Professional Responsibility ("OPR"), which is the component of the Department responsible for conducting an independent review of allegations of misconduct. 28 C.F.R. § 45.12; Justice Manual § 1-4.200, *et. seq*. Moreover, as discussed in detail below, the United States Attorney conducted a root cause analysis of the underlying issues giving rise to the dismissal of the indictment and information in this case and has taken numerous remedial steps to help ensure that the missteps that occurred here do not happen again.

---

[9] The United States Attorney was emailed a copy of the transcript from the October 9, 2025, grand jury presentation on October 14, 2025, but has no recollection of reviewing the transcript at that time, and is quite certain he did not review the transcript at that time. The United States Attorney did not receive a copy of the October 16 or October 23, 2025, transcripts until late April 2026, shortly before the Government moved to dismiss the indictment. At that time (late April 2026), the United States Attorney reviewed relevant portions of all three transcripts. Irrespective, no one ever brought the vouching or *ex parte* issues to the United States Attorney's attention until late April 2026, nor was the United States Attorney aware of the vouching or *ex parte* issues until late April 2026.

16

### III.    ANALYSIS

Former Defendants ask this Court to hold a hearing on alleged misconduct and appoint another attorney to investigate what they believe was contempt or actionable wrongdoing. R. 226, 227 (citing Federal Rule of Criminal Procedure 42(a)(2) ("The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney.")). They also seek discovery on these points. *Id.*; R. 225. This Court should deny all those motions.

#### A.    There is no *prima facie* showing of contempt or conduct that merits this Court's exercising its inherent authority

There are two types of contempt—civil and criminal—and this Court should not initiate any proceedings unless there is a *prima facie* showing of either. *In re United States*, 398 F.3d at 618.

##### 1.    This is not a case involving civil contempt

Civil contempt is designed to either compel performance with an order or compensate a party for the opposing party's noncompliance with that order. *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001); *Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 785 (7th Cir. 1981). There are no orders currently pending that the Government has not complied with; former Defendants have rightfully not identified any order the Government failed to comply with, as further discussed below. They instead rely exclusively on the Criminal Rules of Procedure, (*see e.g.*, R. 227 at 1, 16-17), suggesting they understand civil contempt is not applicable here. This is not a case of civil contempt.

##### 2.    Criminal contempt and inherent authority

This Court has the authority to summarily punish criminal contempt committed in its presence. Fed. R. Crim. P. 42(b). Alternatively, it has the power to initiate contempt proceedings

for conduct not done in its presence (subject to various procedural safeguards) by appointing an

"attorney for the government" to investigate. Fed. R. Crim. P. 42(a)(2).[10]

But contempt is "an extraordinary power which must be exercised with appropriate

discretion." *United States v. Griffin*, 84 F.3d 820, 822 (7th Cir. 1996). There is a "command never

to exert it where it is not necessary or proper." *United States v. Seale*, 461 F.2d 345, 353 (7th Cir.

1972) (citing *Gompers v. Buck's Stove and Range Co.*, 221 U.S. 418, 451 (1911)). Even then, such

proceedings should use "only the least possible power adequate to the end proposed." *Young v.*

*United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (alteration adopted, quotation

omitted). It is, after all, "a crime in the ordinary sense." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968).

Those admonitions are especially applicable when this Court is asked to initiate what

amounts to criminal proceedings against federal prosecutors. Certainly "no person is above the

law," but contempt proceedings take on "greater public importance" when they are initiated against

federal prosecutors in their official capacities. *United States v. Koubriti*, 305 F. Supp. 2d. 723, 754

---

[10] For the reasons discussed throughout, there is no *prima facie* showing of contempt. Should this Court disagree, Rule 42 instructs the contempt be investigated by an attorney for the Government. Fed. R. Crim. P. 42(a)(2). The Second Circuit has found it might permissible for another attorney to fill that role if that attorney is supervised by the Attorney General. *United States v. Donzinger*, 38 F.4th 290, 294 (2d Cir. 2022). To extent the Rule contemplates "another attorney" could be appointed to handle what is otherwise an exclusively Executive Branch function and report to another branch of Government, this raises separation of power concerns. *See, e.g.*, *Trump v. Slaughter*, 609 U.S. ----, 2026 WL 1855612, at *18 (2026) (holding that head of the FTC is subject to removal by the President at will, because the FTC "unquestionably exercises executive power"); *see also Donziger v. United States*, 143 S. Ct. 868, 869–70 (2023) (Gorsuch, J.) (dissenting from denial of certiorari) (discussing separation of powers concerns with appointing "another attorney" under Rule 42, noting: "By interpreting Rule 42 as authorizing courts to make their own decision to initiate a prosecution—and even to override a contrary decision by the Executive Branch—the Second Circuit's opinion not only arrogated a power to the Judiciary that belongs elsewhere. It allowed the district court to assume 'dual position as accuser and decisionmaker'—a combination that violates the due process rights of the accused" [cleaned up]). Any such appointment would also raise myriad structural and fundamental concerns: which branch of Government pays for the other attorney and how much; would that attorney be able to use the Grand Jury; who would supervise that attorney's work; and so on. The Government respectfully requests an opportunity to brief this critical issue and also address the constitutionality of the Court appointing "another attorney," if it is contemplating doing so, especially in light of *Slaughter*.

(E.D. Mich. 2003) (quoting *Socialist Workers Party v. Attorney General*, 596 F.2d 58, 64 (2d Cir. 1979) and discussing contempt against Attorney General); *United States v. Concord Mgmt. & Consulting LLC*, 2019 WL 7758635 at \*\*5-10 (D.D.C. 2019) (unpublished) (declining to hold Special Counsel and Attorney General in contempt or use inherent disciplinary authority based on the nature of the single violation, lack of willfulness on the record, and inclination to "adopt a policy of progressive discipline"). Such proceedings undermine the Constitutional separation of powers "between executive and judicial roles" and can be expected to implicate "intra-office conversations and memoranda," legal advice and work product, and inter-agency communications that are "covered by multiple privileges" such as the deliberative process and pre-decisional privilege, *In re United States*, 398 F.3d at 618, as well as inter-agency and attorney-client privileges, among others. *United States v. Zingsheim*, 384 F.3d 867, 871-72 (7th Cir. 2004) (discussing various Government privileges).

Separately, though not expressly granted by statute like contempt, a court has inherent powers to "manage [its] own affairs;" but as with contempt, such inherent powers "must be exercised with restraint and discretion" due to their "potency." *United States v. Johnson*, 327 F.3d 554, 559-60 (7th Cir. 2003) (quoting *Chambers v. NASCO*, 501 U.S. 32, 43-44 (1991)). This Court has inherent power to sanction for conduct that obstructs justice, but cannot conduct an investigation pursuant to its inherent authority into, for example, any deliberations or pre-decisional considerations within the United States Attorney's Office. *See, e.g.*, *In re United States*, 398 F.3d at 618 ("The intra-office conversations and memoranda that the judge wants to see are covered by multiple privileges" and as such, "federal judges may not insist that prosecutors reveal deliberative or pre-decisional materials"). There is also a "broader constitutional principle of the

separation of powers" to consider when the court investigates matters happening before the grand jury. *In re United States*, 441 F.3d 44, 56-63 (1st Cir. 2006).

### 3. There is no *prima facie* showing of criminal contempt under §§ 401(2) or (3)

Criminal contempt applies in three contexts, two of which are clearly inapplicable. 18 U.S.C. § 401.[11] Prosecutors are not this Court's "officers," and therefore contempt is not appropriate under § 401(2). *See Griffin*, 84 F.3d at 832 n.8 (citing *Cammer v. United States*, 350 U.S. 399, 404-05 (1956) and noting "attorneys are not officers of the court" under § 401(2)).

Nor is this an instance where any of the prosecutors engaged in "[d]isobedience or resistance to [this Court's] lawful" order or command. 18 U.S.C. § 401(3). An individual commits contempt under that prong when they fail to comply with an order despite the fact that the "action is clearly, specifically, and unequivocally commanded by that order." *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974); *see also In re Res. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir. 2010) (contempt for violating order requires it to be an "express and unequivocal" order). The violation also must be "willful," meaning a "volitational act done by one who knows . . . that his conduct is wrongful," or was "conscious of a substantial risk" that he was violating the Court's order but "disregard[ed]" that risk. *United States v. Trudeau*, 812 F.3d 578, 588 (7th Cir. 2016) (quotations omitted). A Court's order that is "ambiguous" "precludes the essential finding in a criminal

---

[11] Section 401 states:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> **(1)** Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> **(2)** Misbehavior of any of its officers in their official transactions;
>
> **(3)** Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

20

contempt proceeding of willful and contumacious resistance to the court's authority." *In re Betts*, 927 F.2d 983, 987 (7th Cir. 1991) (quotation omitted). This is the prong at issue in most of the cases former Defendants cite. R. 227 (citing *In re Special Proceedings*, 373 F.3d 37 (1st Cir. 2004) (protective order); *Musidor v. Great Am. Screen*, 658 F.2d 60 (2d Cir. 1981) (injunction); *Young*, 481 U.S. at 790 (injunction/settlement)).

The only potentially applicable order in this case is this Court's order regarding the grand jury transcripts. Yet former Defendants made a very "narrow" request for only those portions of the grand jury transcripts "pertaining to how the 18 U.S.C. § 372 conspiracy charge was explained to the Grand Jury" and any "related exchanges." R. 118 at 1. This Court ordered the Government to provide *in camera* "the relevant portions of the transcripts as outlined in the motion." R. 119. The Government undisputedly provided all those portions in the redacted transcripts. Whether the Government should have provided additional portions not requested, former Defendants have never argued the Government failed to comply with this Court's order. *United States v. Streett*, 437 F. Supp. 3d 940, 952 (D.N.M. 2020) (defendant's attempts to convince someone else to get picture of his child abuse victims and cover it up was not contemptuous because it did not violate Court's order prohibiting him from contacting or attempting to contact victims); *see also, e.g.*, *Denver-Greeley Valley Water Users Assoc. v. McNeil*, 131 F.2d 67, 70 (10th Cir. 1942) ("literal compliance" is not contempt).

Nor did the Government violate the Court's order to turn over "any related exchanges" to the § 372 legal explanation. R. 118 at 1. "Related exchanges" do not "clearly" (*Joyce*, 498 F.2d at 596) include: Experienced AUSA 1's preamble containing "vouching" (Oct. 9), statements suggesting jurors who could not deliberate without bias should leave (Oct. 16), or references to *ex parte* communications unrelated to the law (Oct. 23). At a minimum, the order is "ambiguous" as

to those discussions, and any failure to turn those portions over was not contemptuous. *In re Betts*, 927 F.2d at 987. Furthermore, moving forward, the Government's new Office-wide reforms (discussed below) will ensure more materials are provided to the Court and the defense in the future, but former Defendants rightly do not contend the AUSAs violated this Court's order.

### 4. There is no *prima facie* showing of contempt under § 401(1) or any conduct that requires exercising inherent authority.

Former Defendants must be proceeding under a theory that the Government engaged in "[m]isbehavior" in the Court's "presence or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 401(1); *see also* Fed. R. Crim. P. 42. They suggest that this Court should investigate everyone from the line AUSAs who prosecuted the case, to their supervisors, the Front Office, and Department of Justice officials in Washington, D.C. R. 227 at 1. This Court should reject such request to exercise its extraordinary power and open a broad ranging criminal proceeding into another branch of Government because there is no *prima facie* showing of criminal contempt and the Office is addressing issues going forward via new policies and procedures, extensive training (which has already occurred), and a comprehensive review of grand jury minutes. In addition, this matter has been referred to OPR for investigation.

A party violates § 401(1) when: (1) it engages in "conduct inappropriate to the particular role of the actor, be [they] judge, juror, party, witness, counsel, or spectator"; (2) that misbehavior "rise[s] to the level of" a material "obstruction of the administration of justice"; (3) the conduct took place "in the court's presence or so proximate that it obstructs the administration of justice"; and (4) there was intent to obstruct. *Seale*, 461 F.2d at 366-67, 369 (alterations omitted). The statute requires both a "subjective and objective" intent to obstruct and actual obstruction. *Griffin*, 84 F.3d at 833. As a matter of law, there is significant daylight between the first (misbehavior) and second (material obstruction) elements, since even misbehavior "at war with justice" is not

22

contempt unless it also actually obstructs justice. *In re Michael*, 326 U.S. 224, 227-28 (1945) (perjury is not contempt without there also being obstruction). As to the fourth element, an intent to obstruct means "a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful." *Seale*, 461 F.2d at 368. An "attorney possesses the requisite intent only if he knows or reasonably should be aware in view of all the circumstances, especially the heat of controversy, that he is exceeding the outermost limits of his proper role and hindering rather than facilitating the search for truth." *In re Dellinger*, 461 F.2d 389, 400 (7th Cir. 1972).

Just as with the contempt analysis, this Court's inherent powers should be used only to punish willful behavior, meaning conduct done in "bad faith, vexatiously," or "wantonly." *Chambers*, 501 U.S. at 45-46 (quotation omitted); *see also Schmude v. Sheahan*, 420 F.3d 645, 649-52 (7th Cir. 2005) (conduct must be "willful" and in "bad faith"). That is not the case here.

### a. Grand Jury proceedings

The Government has now dismissed all charges with prejudice, and so this Court need not engage in any harmlessness analysis regarding any grand jury misconduct. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988). But whether Experienced AUSA 1's conduct in the grand jury constituted "contempt" requires asking whether it resulted in a "material" obstruction of justice. *Seale*, 461 F.2d at 369. The Supreme Court has noted that conduct that would otherwise result in dismissal of an indictment with prejudice—but for harmless error— might reach the level of a material obstruction of justice. *Nova Scotia*, 487 U.S. at 263. So, a useful analysis is whether Experienced AUSA 1's conduct at issue "'substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence' of the violation." *United States v. Anderson*, 61 F.3d 1290, 1296 (7th Cir. 1995) (*quoting Nova Scotia*, 487 U.S. at 256). Here, the answer is no, especially given that (1) the

23

grand jury returned a "no bill" after Experienced AUSA 1's vouching on October 9, 2025, (2) the grand jury was not asked to return an indictment on October 16, 2025, after grand jurors left the session, and (3) the *ex parte* communications on October 23, 2025, were placed on the record and centered around grand jurors apologizing to Experienced AUSA 1 for tensions in the prior grand jury session.

### i. October 9

First, Experienced AUSA 1 said she wanted to bring the case to the Thursday grand jury because "you know me and you trust me, and I would never ask you to charge somebody if I didn't think there was probable cause," and other similar comments. R. 219 at 3.

A statement relying on the AUSA's title and reputation runs the risk of making them an unsworn witness and raises concerns that the jury will act based on something other than the evidence. *United States v. Cornett*, 232 F.3d 570, 575-76 (7th Cir. 2000) (discussing vouching in context of trial jury). At the same time, a subsequent statement that the grand jurors should vote "on your own conscience from what you've heard" can mitigate that potential bias. *United States v. Heffington*, 682 F.2d 1075, 1080 & n.3 (5th Cir. 1982); *United States v. Cederquist*, 641 F.2d 1347, 1353 (9th Cir. 1981) ("Grand jurors, as a practical matter . . . are aware that a case is being presented to them because the prosecutor feels that an indictment is warranted. Thus, the fact that a prosecutor conveys such an impression to the grand jury does not require dismissal of the indictment."); *compare with United States v. Hogan*, 712 F.2d 757, 760-62 (2d Cir. 1983) (dismissing indictment with prejudice, prior to *Nova Scotia*'s harmless error holding, based on AUSA's grand jury statements "[m]aking himself an unsworn witness," introduction of false testimony, improper characterization of target, improper speculative hearsay, references to irrelevant conduct, imploring grand jury to indict "as a matter of equity," and other misconduct).

Here, although Experienced AUSA 1 expressed mutual "trust" between her and the grand jurors, she simultaneously told the grand jurors her opinions were "not evidence" and they should "follow the facts and the law and if there is probable cause to charge, then that's what I ask you to do." R. 219 at 4-5. *Heffington*, 682 F.2d at 1080; *Cf. Cornett*, 232 F.3d at 576 (noting further instructions, in trial jury context, can render vouching harmless).[12]

The grand jury's actions further show that the vouching did not rise to the level of a willful, material obstruction. After the Case Agent testified, the grand jurors asked pages of questions relating to probable cause and the validity of the indictment. "[A]n active, independent, and questioning grand jury" can "demonstrate that the grand jury definitely exercised its own independent will and was not overborne by the prosecution." *United States v. McKenzie*, 678 F.2d 629, 632-33 (5th Cir. 1982) (looking at transcript and noting grand jury did not return fully requested indictment). The grand jurors' actions show they "carefully and conscientiously carried out their duties, retaining a critical perspective on the investigation," in spite of Experienced AUSA 1's statements. *United States v. Venegas*, 800 F.2d 868, 870 (9th Cir. 1986).

The grand jury's independence is also shown by its decision not to return an indictment when asked to do so at the conclusion of the session. Experienced AUSA's conduct could not have "substantially influenced the grand jury's decision to indict" since the grand jury did not return an indictment. *Anderson*, 61 F.3d at 1296.

---

[12] The Federal Benchbook suggests instructing grand jurors that they "must depend on your own independent judgment, never becoming an arm of the United States Attorney's Office. The government attorneys are prosecutors. You are not. If the facts suggest that you should not indict, then you should not do so, even in the face of the opposition or statements of the government attorney." Benchbook for United States District Courts (Fed. Judicial Center, Feb. 2026, 7th ed.) at 352 (Instruction No. 31) (*available at* www.fjc.gov/sites/default/files/materials/04/Benchbook-US-District-Courts-2026.pdf). Although the United States Attorney's Office does not have a copy of the verbatim instructions the Chief Judge reads to the Grand Jury in this District, it would expect they adhere closely to these pattern instructions.

### ii.    October 16

On the second day, Experienced AUSA 1 instructed the grand jurors to deliberate with an open mind. Those who said they could not do so were either excused or excused themselves, although precisely what happened is less than clear from the transcript. R. 220 at 8-11. Either way, the grand jury presentation was terminated, and the grand jury was not asked to return an indictment that day, and so there was no material obstruction.

The Fifth Amendment's Grand Jury clause requires an "indictment [be] returned by a legally constituted and unbiased grand jury." *Costello v. United States*, 350 U.S. 359, 363 (1956). Thus, the grand jurors' typical oath requires them to swear they will "not [ ] present or indict any person through hatred, malice, or ill will." Benchbook at 347 (oath); *see also* Handbook for Federal Grand Jurors, Administrative Office of the U.S. Courts (2012 ed.) at 11 (*available at* https://www.uscourts.gov/sites/default/files/grand-handbook.pdf).

A grand juror can be dismissed for "good cause," Fed. R. Crim. P. 6(h), which can include anyone who "may be unable to render impartial jury service or [whose] service as a juror would be likely to disrupt the proceedings." 28 U.S.C. § 1866(c)(2); *see, e.g.*, *United States v. Gibson*, 480 F. Supp. 339, 342-43 (S.D. Ohio 1979) (Court excluding those who could not serve impartially); *United States v. Maine Lobster Co.*, 160 F. Supp. 122, 125-26 (D. Maine 1957) (same). Although there is a dearth of case law about dismissing grand jurors for lack of impartiality, Rule 6 states that it is the Court who should dismiss grand jurors. Fed. R. Crim. P. 6(h).

Here, there was no material obstruction because even after some grand jurors left the room, the remaining grand jurors showed they were not materially affected. They continued to deliberate and ask questions, while testing the Government's theories. *McKenzie*, 678 F.2d at 632-33.

26

Moreover, they were not asked to return an indictment that day. Rather, the Office immediately terminated the proceeding upon learning about the grand juror departures. The Office's decision to promptly call off the proceedings, reach out to the Chief Judge, and not seek an indictment, demonstrates both a lack of willful misconduct and lack of an actual, material obstruction. In fact, these actions show an Office acting out of an abundance of caution to ensure fair and just proceedings upon learning that grand jurors had departed the grand jury room.

### iii.    October 23 morning

Former Defendants suggest wrongdoing in the United States Attorney's appearance in the morning of the third day. However, nothing they point to shows improper or wrongful conduct, much less contemptuous conduct. The United States Attorney appeared before this grand jury and two others at a time of high tension in the District because of Operation Midway Blitz. He reminded the grand juries of the essential function they play in our constitutional system. The United States Attorney's appearance before this grand jury and the others was entirely appropriate.

Specifically, after giving notice to the Chief Judge that he would appear before the grand juries—and pursuant to his understanding that the Chief Judge would write a letter that would be read to each of the grand juries—the United States Attorney appeared in the general session in front of the Monday, Wednesday, and Thursday grand juries (the Tuesday grand jury was set to expire) and addressed the important constitutional function of the grand jury and the need to be fair and impartial and decide the case based on the facts and the law. The United States Attorney appeared in multiple grand juries in general session before any specific case or evidence was presented on those days. These facts cut against any obstruction or intent to obstruct.

Moreover, here, there was nothing wrong with the United States Attorney appearing in front of the grand jury or his comments to the grand jury, where he accurately instructed them on

27

the law. Although the grand jury belongs to no branch of the Government and is a "constitutional fixture in its own right," *United States v. Williams*, 504 U.S. 36, 47 (1992) (quotation omitted), the "grand jury and the United States Attorney have a unique relationship." *United States v. Fisher*, 225 F. Supp. 3d 151, 162 (W.D.N.Y. 2016). The "grand jury cannot function without the U.S. Attorney, who serves both as the grand jury's legal advisor and as the conduit through which the grand jury obtains evidence." *Id.* So much so that it is the United States Attorney and his Assistants who "advise [ ] the lay jury on the applicable law." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 430 (1983). The Seventh Circuit has similarly stated that "the modern grand jury is greatly dependent on the United States Attorney 'to present to it such evidence as it needs for its performance of its function and to furnish it with controlling legal principles.'" *United States v. Udziela*, 671 F.2d 995, 998 (7th Cir. 1982) (collecting sources).

Thus, when a grand jury is empaneled, the Federal Benchbook states that it is the United States Attorney and his Assistants who will provide grand jurors with an "important service in helping you to find your way when confronted with complex legal matters. It is entirely proper that you should receive this assistance." Benchbook at 352 (Instruction 31). And, as noted above, the grand jury's instructions and legal obligations include the need to be impartial and deliberate without bias, which is what the United States Attorney stated here. Even more, the United States Attorney affirmed that grand jurors were the "conscience of the community." In comparison, the Ninth Circuit sitting *en banc* has gone so far as to state that whenever a grand jury returns a no bill despite the facts and law supporting probable cause—in effect, nullifying the crime—that would be an "invitation to lawlessness and something less than the equal protection of the laws" by a body that does not have a check (unlike the courts via appeals and the Executive Branch via

28

elections and court review). *United States v. Navarro-Vargas*, 408 F.3d 1184, 1200-04 (9th Cir. 2005) (*en banc*) (affirming use of grand juror instructions).

The United States Attorney appeared before the grand jury on October 23 and reminded them—as their *de facto* legal advisor—about their constitutional duty. He reinforced what they had already been instructed on, namely, that they were the "conscience of the community" and that they had to be fair and impartial and decide all cases based on whether the facts supported probable cause. This is similar to how a judge might give an *Allen/Silvern* instruction to a deadlocked jury—it is no more than reiterating what has already been said. *See, e.g.*, *United States v. Sanders*, 962 F.2d 660, 676-77 (7th Cir. 1992) (even reading instruction twice in two days to trial jury was not unduly coercive). Here, the United States Attorney asked the grand jurors to confirm they could comply with their oath, just as the instructor of law might do when an issue arises mid-trial that calls into question the jury's ability to fairly and effectively deliberate. Nothing about that suggests misbehavior, obstructive conduct, or an intent to obstruct. *Seale*, 461 F.2d at 366-67, 369.

Former Defendants note the United States Attorney asked the grand jurors to raise their hands if they could not comply with the instruction. Given that in the immediately prior grand jury sitting on October 16 there was tension in the grand jury room between prosecutors and grand jurors, and given further his role as Chief Legal Advisor to the grand juries, his doing so was an effort to inquire if there was "good cause" that needed to be reported to the Chief Judge. The Chief Judge would then conduct a private colloquy with any grand juror to discuss any potential concerns or issues and determine whether the grand juror should be excused from the grand jury altogether, excused from a particular matter or type of case, not excused but just admonished and reminded of their obligation, or whatever action the Chief Judge would deem appropriate. Even in the context

29

of a trial where there is a question about the jury's potential bias, "individualized voir dire" is not always required. *United States v. Blitch*, 622 F.3d 658, 665 (7th Cir. 2010). The fact that the United States Attorney, after consulting with the Chief Judge, went to advise the grand juries, including the Thursday group, about their constitutional duty was not improper, wrongful, or contemptuous. It was entirely appropriate.

### iv. October 23 afternoon

When the third presentation began, Experienced AUSA 1 apologized and revealed that she had conversations with two grand jurors off the record regarding the tensions in the grand jury from the prior session. She acknowledged that she should not have engaged in *ex parte* conversations but also made clear that she wanted to put the content of those discussions on the record so that conversations would be memorialized.

This did not amount to harmful or contemptuous conduct for at least two reasons. First, Experienced AUSA 1 went into the grand jury room and put the *ex parte* conversations on the record. *Cf. Venegas*, 800 F.2d at 870-71 (no error for off-the-record comments when prosecutor "summarized the contents of their discussions on the record"). Second, the nature of the *ex parte* conversations was to describe apologies from two grand jurors as opposed to any substantive discussions about the case or other comments designed to cause prejudice *Cf. United States v. Vincent*, 416 F.3d 593, 602 (7th Cir. 2005) (quoting *Udziela*, 671 F.2d at 1001, and noting that even perjured testimony is not enough to dismiss an indictment if other, sufficient evidence exists that the "grand jury may have indicted without giving any weight to the perjured testimony"). The off-the-record conversations certainly do not evince a willfully contemptuous act, especially given that Experienced AUSA 1 acknowledged that she should not have had the *ex parte* conversation, stating: "I'm the one who knows the rules, and I did something today that I'm not supposed to do

30

. . . [The grand jurors] didn't do anything wrong. I'm the one who knows the rules." R. 221 at 4. Were Experienced AUSA 1 truly intending to obstruct justice or act contemptuously, she could have kept any *ex parte* discussion out of the transcripts rather than immediately memorializing the conduct for the record.

### b. Grand jury proceedings in total

Taken individually, none of the above conduct constitutes a *prima facie* showing of obstruction or contempt. Nor do the acts collectively rise to those "rare situations" in which this Court needs to wield its extraordinary power. *In re United States*, 398 F.3d at 618. The fact that the grand jurors returned a no bill after the first sitting shows a break in the chain of causation between Experienced AUSA 1's vouching and the grand jury's vote. Thereafter, the grand jurors asked numerous questions, then continued to press the prosecutors on the facts and the law throughout the second and third days, thereby showing "an active, independent, and questioning grand jury." *McKenzie*, 678 F.2d at 632-33. The AUSAs did not mislead the grand jurors when the grand jurors asked questions or otherwise present prejudicial or inflammatory evidence. *Compare with United States v. Vetere*, 663 F. Supp. 381, 383 (S.D.N.Y. 1987) (AUSA relied mostly on hearsay, provided factual errors about offense, introduced "non-relevant, highly prejudicial, and erroneous information about [defendant's] criminal record," and gave misleading or erroneous instructions of law); *United States v. Sigma, Int'l*, 244 F.3d 841, 856 (11th Cir. 2001) (dismissing indictment where record shows "deliberations were so overborne by a prosecutor or judge that the indictment was, in effect, the prosecutor's . . . handiwork").

The Seventh Circuit has held that the bar for dismissing an indictment due to misconduct is so high that even perjurious testimony presented to the grand jury, *Vincent*, 416 F.3d at 602, or "corruption" in the form of grand jurors selling secret materials to outside sources is not, without

31

more, enough to warrant dismissal. *United States v. Lamantia*, 59 F.3d 705, 706-10 (7th Cir. 1995). Even when there is "extreme" and "unsavory" misconduct involving "graphic and misleading" statements by prosecutors to the grand jurors, Courts have found it more appropriate to let internal review take place rather than initiating contempt proceedings. *United States v. Serubo*, 604 F.2d 807, 817-19 (3d Cir. 1979) (ordering matter referred to Department of Justice officials). This is not an instance where it is "necessary or proper" to hold criminal contempt proceedings. *Seale*, 461 F.2d at 353.

### c. Redactions and related discussions

The Government's handling of the redactions in this case falls into three categories, all of which likely could have been handled differently, but none of which requires this Court to exercise its "awesome" power and initiate criminal contempt proceedings. *Koubriti*, 305 F. Supp. 2d at 756 (citing *Socialist Workers Party*, 596 F.2d at 65).

First, consistent with the Office's new directive to only submit unredacted transcripts to the Court, the better course would have been to submit unredacted transcripts, notwithstanding the former Defendants' request for the Government only to provide the § 372 law and related colloquies to the Court. To be sure, providing the redacted transcripts was in strict literal compliance with this Court's order, but the Government did not have to redact the transcripts.

Next, the Government did offer the unredacted versions to the Court for its review upon request on April 29 and did not oppose providing the unredacted version at the May 18 pretrial conference. Still, the Government appreciates that rather than waiting for the Court to ask for the unredacted transcripts, it could have provided them on its own.

Finally, to the extent this Court later expressed a belief that the redacted material was insignificant (rather than simply non-responsive) and contained, for example, discussions only of

32

IT issues, the Government should have corrected that impression. An AUSA could have requested an *ex parte* hearing (due to Rule 6(e) grand jury secrecy concerns) to make clear that: (1) the Government had only produced those pages that were responsive to this Court's order and, as evidenced by the page numbers, other pages were not included; (2) the redactions included technical issues but also more than that; and, again, (3) the Government could make the unredacted transcripts available to the Court.

Ultimately, the Government made the decision to dismiss the indictment and proceed on the misdemeanors because of the grand jury improprieties. The United States Attorney went to Court and personally stated as much. R. 187 at 51-53, 57-58. Even in cases involving the more egregious conduct of presenting perjurious testimony to the grand jury, the Government can legally remedy any taint by either withdrawing the tainted charging document and proceeding on an untainted instrument, "or … appearing with defense counsel before the district court for an in camera inspection of the grand jury transcripts." *Vincent*, 416 F.3d at 602 (quoting *Udziela*, 671 F.2d at 1001). This remedy is all the more applicable in the case of grand jury irregularities such as these and is not contemptuous.

While disclosure of the irregularities in the redacted portions of the transcripts may not have been required by the Court's literal order or any specific legal rule, the Government understands that the better practice would have been to disclose more. *United States v. Ott*, 489 F.2d 872, 873-75 & ns. 2-8 (7th Cir. 1973) (reversing conviction and noting duty of candor to the Court at every stage of proceeding); *see also Barnhill v. United States*, 11 F.3d 1360, 1369-71 (7th Cir. 1993) (AUSAs who were not "untruthful in any of their responses to questions from the bench" but should have disclosed more, did not act "contumacious[ly]"). Ultimately, as discussed

33

below, OPR will conduct internal investigations into what happened here and what disciplinary actions may be warranted.

To the extent contempt proceedings are geared towards making sure this Court's message is received and errors are not repeated, the Court's message has been clearly heard and there is no need to do more. The Office has not taken lightly this Court's statement about losing trust. It prompted the United States Attorney to personally address the Court. It also was a significant reason for why the Government has taken all the remedial steps that are described in this response. The Government's various actions are a sincere effort to endeavor to restore the judiciary's, defense bar's, and public's confidence in the Office's grand jury and other practices and proceedings.

### d. No vindictive or selective prosecution

Finally, former Defendants suggest this Court should use its inherent power to determine if there was selective or vindictive prosecution. Any claims about vindictive or selective prosecution are moot since former Defendants have already received the legal remedy available under the law—that is, dismissal. *See United States v. Gervasi*, 562 F. Supp. 632, 642 (N.D. Ill. 1983) ("[T]he remedy for a proven case of vindictive prosecution is a dismissal of the indictment."). In addition, the Government is not contesting former Defendants' entitlement to attorneys' fees. *See* R. 238. But, because this Court brought up those allegations during the May 21, 2026, morning hearing—albeit before the charges were dismissed with prejudice—the Government addresses them here to allay any such potential concerns. R. 187 at 25. For the reasons discussed, the grand jury irregularities and redactions do not show any evidence of vindictive or selective prosecution and certainly do not show that defendants were charged "solely" for those

reasons. This Court's statements in denying former Defendants' motion (*see* R. 117) are equally true now as they were then.

There was no bad faith or vindictiveness/selectiveness in the initiation of this prosecution. *See United States v. Baldwin*, 68 F.4th 1070, 1073 (7th Cir. 2023) (setting out showing required to prove such a claim). Although the grand jury proceedings show irregularities and the redactions could have been handled differently, those actions do not show "objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *Id.* (quotation omitted); *see also United States v. Monsoor*, 77 F.3d 1031, 1034 (7th Cir. 1996) (vindictive prosecution based on exercise of constitutional right requires showing prosecutor "harbored genuine animus"). Those actions do not demonstrate wrongful charging decisions or that former Defendants "would not have been prosecuted **but for** the government's animus or desire to penalize" them. *United States v. Jarrett*, 447 F.3d 520, 525 (7th Cir. 2006) (emphasis added).

As the Government previously detailed in its Response to former Defendants' Motion to Compel, the Government elected not to charge various people involved in the incident because it was basing its charging decisions on factors other than vindictiveness or selective prosecution. R. 110 at 9-10. Indeed, as this Court noted, it would be a fair inference that likely everyone protesting at Broadview shared similar views regarding Operation Midway Blitz. That these other individuals were not charged underscores the lack of vindictiveness or selectivity in the charging decisions.

In addition, the "vouching" by Experienced AUSA 1 does not demonstrate animus on the prosecutor's part, that is, the prosecutor did not have any animus as to any of the former Defendants—a requirement for vindictive prosecution under *Baldwin* and *Monsoor*. There is no

35

evidence—nor inference from the vouching—that Experienced AUSA 1 nor anyone else in the United States Attorney's Office had some kind of personal animus against the former Defendants. Moreover, on both October 16 and 23 (the latter being the day the grand jury returned an indictment), the grand jury heard from, and was able to evaluate, Agent A, who testified as to his firsthand account of the events of September 26, 2025. The grand jury also saw videos of the incident during all three presentations. Thus, through Agent A's testimony as well as repeated review of the videos, the grand jury was able to independently evaluate the evidence to reach its own conclusion whether to return an indictment in this case. Stated differently, the grand jury had sufficient evidence upon which to base its decision to indict apart from any personal views Experienced AUSA 1 may have shared with the grand jurors.

Furthermore, whatever one's views about the filing of charges in this case, the United States Attorney appeared in Court and offered his detailed rationale for authorizing the charges, including his legal thinking on enforcement of § 111 in this and future cases, including where other federal officials and employees might be victims. R. 187 at 57-58.[13] The United States Attorney's public position on vigorously prosecuting those who seek to obstruct or impede federal employees and property was well established when charges were filed, as evidenced by the many criminal cases the U.S. Attorney's Office has brought involving those federal interests, and where applicable, his public comments in connection with those cases, and in particular, his October 4,

---

[13] The United States Attorney's Office has charged—both before and after former Defendants' case—numerous instances of alleged harm to federal law enforcement officers and employees, federal property, and other federal interests. *See, e.g.*, *United States v. Brzowski*, No. 1:25-cr-589 (N.D. Ill. Sept. 18, 2025) (forging judges' signatures); *United States v. Santoyo*, No. 1:25-cr-422 (N.D. Ill. July 25, 2025) (dangerous weapon possession after standoff in federal courthouse); *United States v. Lake*, No. 1:26-cr-221 (N.D. Ill. May 11, 2026) (felon in possession of firearm in Dirksen building); *United States v. Reyes*, No. 1:26-cr-248 (N.D. Ill. May 20, 2026) (running car into federal agent's car); *United States v. Gomez*, No. 1:25-cr-735 (N.D. Ill. Nov. 13, 2025) (unlawfully possessing a firearm and shooting it near federal law enforcement officer).

2025, statement. That view was shared by seven federal law enforcement leaders, including the then-Special Agent in Charge of the FBI, the leading investigative agency on this prosecution, all of whom joined the United States Attorney in issuing the October 4 statement.

The United States Attorney's detailed and in-court reasoning for prosecuting this specific case—reasoning fully consistent with his public statements about enforcing federal law and protecting federal employees and officials, property, and interests—rebuts claims of selective/vindictive prosecution especially because the legal standard for scrutinizing the charging decision is whether charges were filed "solely" for reasons of selective and vindicative prosecution. *United States v. Segal*, 495 F.3d 826, 832 (7th Cir. 2007) ("The Constitution prohibits initiating a prosecution based *solely* on vindictiveness.") (emphasis added); *cf. In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) (explaining that as a matter of separation of powers, "[t]he Constitution's 'take Care' clause (art. II, § 3) places the power to prosecute in the executive branch, just as Article I places the power to legislate in Congress. A judge could not properly refuse to enforce a statute because he thought the legislators were acting in bad faith or that the statute disserved the public interest; it is hard to see, therefore, how he could properly refuse to dismiss a prosecution merely because he was convinced that the prosecutor was acting in bad faith or contrary to the public interest."); *United States v. Fokker Services B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (collecting cases and noting "'[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.'").

Moreover, the above-described issues involving the grand jury irregularities and redactions do not support or even remotely point to evidence that the prosecution was initiated "solely" based

37

on vindictiveness or selectivity. *Segal*, 495 F.3d at 832; *United States v. Benson*, 941 F.2d 598, 612 (7th Cir. 1991) (even if United States Attorney threatened defendant and called him a "common criminal," no selective prosecution without evidence "that he would not have been prosecuted absent that motive"). Former Defendants have never disputed their presence on the scene—which was captured on publicly available video—and even agreed they touched Agent A's car (also captured on video). Agent A testified in the grand jury as to his firsthand account of the fear he felt and what he experienced going through that incident. R. 221 at 76-83. Specifically, he feared for his safety and felt that had he stopped, the crowd would have broken his windows and "probably [dragged him] out of the car." R. 221 at 81-82. At the time the Government announced charges, it even asked for the public's help in identifying anyone else involved in the incident and included a link to the relevant video.

As this Court noted in denying former Defendants' motion based on alleged vindictive or selective prosecution, former Defendants have not identified any similarly situated individuals who were treated differently based on their political beliefs. R. 131-3 at 8; *see also Monsoor*, 77 F.3d at 1034; *United States v. Armstrong*, 517 U.S. 456, 465-66 (1996). That is equally true now as it was when the Court made those statements. Nothing about the grand jury transcripts or redactions has changed that calculus.

Finally, the grand jury irregularities the Government discovered in Experienced AUSA 1's ***prior*** grand jury presentation in at least one ***unrelated*** case with ***no connection*** to Operation Midway Blitz, *see United States v. Ishkirat et al.,* No. 25 CR 562 (N.D. Ill. June 22, 2026) (R. 65) (Government dismissed indictment with prejudice following its discovery of grand jury

irregularities) further demonstrates that the grand jury irregularities that occurred in this case were not the product of vindictive or selective prosecution.

### B. Former Defendants Are Not Entitled to Discovery.

To the extent former Defendants request this Court compel the Government to give them materials as part of a contempt proceeding, that should be denied since there is no *prima facie* showing of contempt. Furthermore, much of the discovery that former Defendants seek is protected from disclosure pursuant to various privileges, including privileges unique to the Government. *See supra* p. 19; *Zingsheim*, 384 F.3d at 871-72 (discussing various Government privileges).

In addition, former Defendants are not entitled to discovery because they do not have any role in any contempt proceedings. They are no longer facing charges. They have not shown any civil contempt or a pending order involving them. The Government is not contesting their entitlement to attorneys' fees. To the extent they played a role in bringing any alleged contempt to this Court's attention, that ends their involvement in the matter. Any contempt proceeding "no longer involves the original litigants as the parties of interest" and would be between this Court and the party subject to contempt. *Ramos Colon v. United States*, 576 F.2d 1, 5 (1st Cir. 1978) (rejecting former Defendant's argument that he could be involved in proceedings after indictment was dismissed with prejudice); *see also, e.g.*, *Kienle v. Jewel Tea Co.*, 222 F.2d 98, 100 (7th Cir. 1955) ("[A] private person, as informant, is not a proper party to a criminal contempt proceeding."); *Barry v. United States*, 865 F.2d 1317, 1327 (D.C. Cir. 1989) (once contempt is reported, the "complaining 'target' is no more a party to the proceeding than a victim witness in any other criminal case"). Finally, to the extent former Defendants intimate they would be "uniquely positioned to assist in such proceedings," R. 225 at 1 n.1, they could not act as "another

39

attorney" since they are interested parties and have clear conflicts of interest. *Young*, 481 U.S. at 793-809.[14]

Separately, as the Supreme Court recently held, "[i]nvestigative and prosecutorial decisionmaking is 'the special province of the Executive Branch,'" and so even the "President may discuss potential investigations and prosecutions with his Attorney General and other Justice Department officials to carry out his constitutional duty to 'take Care that the Laws be faithfully executed." *Trump v. United States*, 603 U.S. 593, 620 (2024) (quotations and citations omitted). Thus, members of the Executive Branch are constitutionally required to "take Care that the Laws be faithfully executed," and it is entirely appropriate for them to "decide which crimes to investigate and prosecute." *Id.* (quoting U.S. Const. Art. II, § 3). Although the Supreme Court in 2024 made clear that the law permits such interactions, as already noted and consistent with Department policy, in this matter, the United States Attorney reported the Office's charging decision to Main Justice shortly before the first grand jury presentation in this case. R. 110 at 4, n.2.[15] Former Defendants are not entitled to any communications relating to charging decisions or

---

[14] To the extent counsel is suggesting any unique experience might entitle them to additional attorneys' fees, the Supreme Court has rejected such claims in the highly analogous Equal Access to Justice Act ("EAJA") context. For example, the Supreme Court has stated that additional attorney's fees are reserved for situations in which an attorney has an "identifiable practice specialty such as patent law, or knowledge of foreign law or language." *Pierce v. Underwood*, 487 U.S. 552, 571-72 (1988). The extraordinary situations do not include things like "novelty and difficulty of issues . . . work and ability of counsel and the results obtained." *Id.* (quotations and punctuation removed). Nor is something like "undue litigiousness by the government" a special factor since that would "usually . . . just increase the number of hours" an opposing counsel had to work. *Mathews-Sheets v. Astrue*, 653 F.3d 560, 564 (7th Cir. 2011) *overruled on other grounds by Sprinkle v. Colvin*, 777 F.3d 421, 423 (7th Cir. 2015) (distinguishing *Jean v. Nelson*, 863 F.2d 759, 776 (11th Cir. 1988)); *see also Pollgreen v. Morris*, 911 F.2d 527, 537-38 (11th Cir. 1990) (that the "government litigated a position that lacked substantial justification is not a permissible special factor because any litigation eligible for EAJA fees, by definition, involves the government's pursuit of an unjustified position"). Indeed, the Hyde Amendment analysis presumes the petitioners have already shown eligibility—or, in this case, their eligibility for fees is not being contested—for the fees in the first place under the governing standard. *United States v. Aisenberg*, 358 F.3d 1327, 1343-44 (11th Cir. 2004) (same in Hyde Amendment context).

[15] On July 15, 2026, counsel for one of the former Defendants sent an email to the U.S. Attorney's Office asking whether the Office "still stands" behind its assertion that there were "**no** communications" "with

any other intra-agency or interagency communications, including those with other individuals in Main Justice or federal law enforcement, because the law disallows their access to such communications both as a matter of separation of powers and privilege.

## IV.     CHANGES GOING FORWARD

There is a presumption against contempt and a mandate that this Court use only the minimal amount of power "necessary or proper" to ensure the administration of justice. *Seale*, 461 F.2d at 353. Courts have suggested that the "least severe and punitive" contempt power can be analyzed by looking at the effectiveness of "progressive discipline." *Koubriti*, 305 F. Supp. 2d at 761. Meaningful training as well as self-imposed changes to policies, procedures, and practices as a result of this case demonstrate the seriousness with which the Office has taken these issues. The thoroughness and promptness with which those changes were implemented—and the fact that the Government has proactively decided to review grand jury minutes in other matters to ensure that similar issues do not exist in those cases—further demonstrate that there is no need for the Court to compel such change.

---

**anyone** outside the USAO" regarding "who and what to charge" or its "investigatory or charging *decisions*." R. 110 at 3 (bold in original, italics added). The Front Office is not aware of any communications in which it took direction from anyone outside the U.S. Attorney's Office regarding its decisions as to what investigatory steps the local prosecution team would take or who the local prosecution team would charge when prosecutors went into the grand jury to indict this case. Out of an abundance of caution, the Office notes there was a virtual meeting on September 27, 2025, among Main Justice lawyers, the Chicago U.S. Attorney's Office, lawyers from at least one other U.S. Attorney's Office on the West Coast, and many federal law enforcement agencies where the September 26 "Broadview" incident was mentioned (and a public video played) as part of a broader discussion of incidents and conduct against ICE during that time. To the Front Office's knowledge, the virtual meeting did not mention the identity or political affiliation of any person.  It was only later when Chicago FBI agents assigned to the case began investigating the matter that the Office learned the identity of some of the people involved in the incident. Moreover, as would be expected in the normal course, there were discussions between the Office and Main Justice regarding such things as case updates, especially given the publicity the case generated after it had been charged. These privileged discussions are not only permitted but are contemplated. *See supra* 19; *In re United States*, 398 F.3d at 618 ("How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate. The Judicial Branch is limited to assessing counsel's public deeds.").

41

Here, the matter has caught "the Justice Department's attention." *United States v. Horn*, 29 F.3d 754, 766-67 (1st Cir. 1994) (listing ways in which Court can sanction purported misconduct); *see also United States v. Jones*, 620 F. Supp. 2d 163, 175 (D. Mass. 2009) (same). Individual AUSAs have been publicly identified in these proceedings and have self-reported to OPR, which is independently reviewing this matter and the related issues. *Cf. United States v. Hasting*, 461 U.S. 499, 506 n.5 (1983) (narrow means to deter objectionable prosecutorial conduct include threats of discipline, OPR referral, public statement). The former Defendants' repeated concerns that the United States Attorney will not objectively review these matters are irrelevant.[16] *See*, *e.g.,* R. 226 at 3. That is because OPR—not the United States Attorney or the U.S. Attorney's Office (which might in the ordinary course be perceived as partial)—is the longstanding independent entity in charge of investigating "allegations of misconduct" involving Department attorneys. 28 C.F.R. § 45.12; Justice Manual §§ 1-4.200, *et. seq.*; 28 C.F.R. § 0.39(c)(c) (heads of offices "shall provide information and assistance" to OPR in connection with its inquiries). If OPR determines that there was actionable misconduct after conducting its investigation, OPR will make a professional misconduct finding that triggers various effects. *See, e.g.*, *https://www.justice.gov/opr/professional-misconduct* (discussion of OPR role and authority); *see also https://www.justice.gov/opr/investigative-summaries* (summary of OPR investigations and referrals). In that way, an independent investigator is already reviewing the actions of Department

---

[16] Although former Defendants selectively quote from an email the U.S. Attorney sent to the Office on May 21, 2026, portions of which were published in a *Chicago Tribune* article, not referenced in their brief are additional statements from that email where the U.S. Attorney acknowledged that this case was "beset with a number of challenges" and that the Court's inquiry into the grand jury irregularities and redactions was an example of a "strong and independent federal judiciary that wants to ensure itself and the public that our prosecutors and Office acted properly" since "at the end of the day, our job is not to convict at all costs or even to just convict, but instead to do Justice and to do so while following the rules and respecting the rights of our defendants." *See* "Fallout begins in 'Broadview Six' case meltdown as prosecutor loses Washington post," by Jason Meisner, Chicago Tribune, May 22, 2026 (*available at* https://www.chicagotribune.com/2026/05/22/fallout-from-broadview-six-case/).

42

attorneys in this matter, irrespective of any decision this Court makes on former Defendants' motions. That ongoing investigation is an effective and time-tested means of "deter[ring]" any conduct this Court deems objectionable. *Hasting*, 461 U.S. at 506 & n. 5.

This Court's comments about "trust" being broken also have prompted reflection and change in the Office. Recognizing that missteps occurred in this case, the Office has studied the root-cause issues giving rise to these errors and has implemented substantially new policies, procedures, practices, and trainings to try to avoid repeating what happened here. *Cf. Jones*, 620 F. Supp. 2d at 183 (declining to issue contempt order, despite a lengthy compendium of cases involving *Brady* violations, in part based on steps office took to address issues); *Al-Adahi v. Obama*, 672 F. Supp. 2d 114, 118-19 (D.D.C. 2009) (part of penalty for contempt is "detailed explanation of all steps it has taken to ensure that such errors shall not occur in the future"); *United States v. Gjieli*, 717 F.2d 968, 979 (6th Cir. 1983) (no contempt for AUSA who knowingly submitted false *writ* to Court in part because "prosecutor understood what he had done was wrong").

These reforms are not superficial. They are deeply curative, structural, and designed to ensure that the same errors that occurred in this and/or other cases do not happen again. Specifically:

The Office has mandated that each AUSA, paralegal, and legal assistant in the Criminal Division attend four trainings given by national experts on matters such as grand jury irregularities, ethical considerations with grand jury materials, and the like. Those trainings are complete and were recorded for any AUSA who was not able to attend in person.

In addition, the United States Attorney instituted various new policies relating to grand jury transcripts as part of a Remediation Plan. **First**, for all active cases, AUSAs are not to oppose

43

defense requests that grand jury minutes be given to the Court for *in camera* review.[17] **Second**, AUSAs will produce to opposing counsel all grand jury witness transcripts, regardless of whether a particular witness will testify at later proceedings.[18] *Compare with United States v. Wilkinson*, 513 F.2d 227, 232-33 (7th Cir. 1975) (production not required by law unless grand jury witness later testifies). **Third**, AUSAs are required to turn over those materials as soon as practicable while giving due weight to safety or tampering concerns. **Fourth**, for current active cases that are post-trial but pre-judgment (meaning, the case is at or approaching the sentencing phase), if the defense made a motion for grand jury minutes that the Government opposed, AUSAs will notify the defense that if the defense wants the Court to review those minutes *in camera* even post-trial, the Government will not oppose the defense's request. **Fifth**, as an additional measure, when the Government does submit transcripts to the Court, AUSAs are not permitted to redact any portion of the transcripts, although they are permitted to highlight relevant portions for the Court.

Finally, as part of the Remediation Plan that is currently underway, the United States Attorney's Office in coordination with the Executive Office of United States Attorneys is working to review the minutes in all active pre-guilt phase cases pending before the District Court as well as certain additional minutes.[19] It intends to further review Experienced AUSA 1's grand jury presentations going back to 2007 to the extent available, a process that is already underway. In

---

[17] The new policy would have altered Experienced AUSA 1's response (R. 94-5 at 3) to counsel's *pro forma* request for such materials (R. 94-2 at 3). Though the transcripts do not reveal evidence of selective or vindictive prosecution, the Government would have nevertheless provided them to the Court under the new policy.

[18] In this case, this policy would have required the production of the October 9, 2025, transcript containing the vouching, which occurred while the Case Agent was on the witness stand.

[19] For example, the Office discovered grand jury irregularities in at least one other case handled by Experienced AUSA 1 that was pending before the Court and moved to dismiss all those defendants. *See United States v. Ishkirat et al.,* No. 25 CR 562 (N.D. Ill. June 22, 2026) (R. 65). For active cases in which there was no evidence of irregularities, the Government is not opposing defense motions seeking *in camera* review of minutes from Experienced AUSA 1's grand jury presentations.

addition, the Office has separately reviewed those minutes involving any of Junior AUSA's presentations to the grand jury and no defendants or indictments were dismissed as a result of that review.

The total grand jury minutes that will be reviewed are expected to be no less than 600 and potentially more than 1,000. Although post-conviction cases involving Experienced AUSA 1 and others would not generally be subject to relief since those cases have resulted in a finding of guilt, they are being reviewed out of an abundance of caution and in an effort to restore the judiciary's, defense bar's, and public's confidence in the Office's grand jury and other practices and proceedings. *See, e.g.*, *Tollett v. Henderson*, 411 U.S. 258, 267 (1973) (guilty plea is generally a break of chain that prohibits claims of pre-plea misconduct); *United States v. Philpot*, 733 F.3d 734, 741 (7th Cir. 2013) (petit jury conviction "render[s] harmless any possible error in the grand jury proceedings" (quotation omitted)); *see also In re United States*, 398 F.3d at 620 ("A swift end to this contretemps will allow calmer reflection and . . . a restoration of the cordial and mutually respectful relations between bench and prosecutor that are vital to the administration of justice").

## V.    CONCLUSION

This case involved irregularities during a time of immense pressure, upheaval, and emotion in the District because of Operation Midway Blitz. Former Defendants have had all charges dismissed and will recover attorneys' fees under the Hyde Amendment. This Court has already issued a public rebuke in this case that has garnered widespread attention. *Koubriti*, 305 F. Supp. 2d at 761 ("lecture from the court" may be enough to respond to a transgression). The AUSAs involved have been under public and private scrutiny, including being subject to OPR's investigation into this matter. Moreover, robust root-cause changes have been implemented at the United States Attorney's Office.  Those reforms are designed to prevent the very issues that arose here. In addition, many hundreds, if not more than 1,000 grand jury minutes will be reviewed to

determine that similar errors do not exist in other cases. Given all of this, the Government respectfully requests that this Court reject former Defendants' request to do more, specifically opening up criminal contempt proceedings, ordering discovery, holding a hearing, or appointing another attorney to investigate this matter. As such, the Government respectfully requests that the Court deny former Defendants' motions.

Respectfully submitted.

ANDREW S. BOUTROS
United States Attorney

By: s/ *Andrew S. Boutros*
ANDREW S. BOUTROS
United States Attorney
219 S. Dearborn St., Rm. 500
Chicago, IL 60604
(312) 353-5300


s/ *Nathaniel L. Whalen*
NATHANIEL L. WHALEN
Assistant United States Attorney
219 S. Dearborn St., Rm. 500
Chicago, IL 60604
(312) 353-5300