**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | No. 25 CR 693 |
| | ) | |
| MICHAEL RABBITT, | ) | Judge April M. Perry |
| KATHERINE MARIE ABUGHAZALEH, | ) | |
| ANDRE MARTIN, BRIAN STRAW, | ) | |
| and CATHERINE SHARP | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANTS' REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS FOR DISCOVERY (DKT. 225), A HEARING ON PROSECUTORIAL MISCONDUCT (DKT. 226), AND TO DESIGNATE SPECIAL COUNSEL (DKT. 227)**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................ 1

BACKGROUND .......................................................................................... 4

ARGUMENT ............................................................................................ 11

I. NEW FACTS REVEALED IN THE GOVERNMENT'S RESPONSE REQUIRE FURTHER INQUIRY ........................................ 11

A. October 14, 2025: U.S. Attorney Boutros Personally Received the October 9, 2025, Grand Jury Transcript. ................................. 11

B. October 16, 2025: U.S. Attorney Boutros Purportedly Terminates the Grand Jury in "Real Time." ................................................ 13

C. October 23, 2025: U.S. Attorney Boutros Makes Unusual Appearance in Grand Jury on Day Case Re-Presented for Indictment......... 15

D. Repeated Requests for Communications with Main Justice and Administration Officials and Evasive Non-Responsive Answers.................. 16

E. Submission of Transcripts to the Court with Missing Legal Instructions ........................................................................ 20

F. Misrepresentations to Defense Counsel ................................................... 25

G. The Government's Failure to Correct the Court's Obvious Misunderstanding Regarding the Grand Jury Transcripts ........................... 26

H. "Mistakes" and "Missteps" ........................................................................ 26

II. FURTHER INQUIRY BY THE COURT IS BOTH NECESSARY AND FULLY JUSTIFIED UNDER THE LAW ............................................. 27

A. The Government's Arguments Improperly Limit the Court's Inherent Authority to Investigate and Prosecute Contempt .......................... 29

1. Conclusively Finding a Prima Facie Case of Contempt is Not a Precondition for the Court to Exercise its Inherent Authority to Investigate Contempt .......................................................................... 29

2. The Court's Exercise of its Inherent Authority Would Not Violate the Separation of Powers. ............................................................. 32

3. The Government's Response Demonstrates Why Further Investigation is Required to Develop the Record Fully Prior to Making a Complete Finding on the Issues of Contempt and Sanctions.. 38

B. There is a Reasonable Basis to Investigate Contempt Based on Misconduct before the Court and Outside the Court....................... 42

1. Misconduct Before the Grand Jury and the Deliberate Steps to Cover-Up that Misconduct Justifies Contempt Finding under §401(1) and (3).............. 42

2. Vindictive and Selective Prosecution Requires Further Investigation Beyond what is Already of Record .......... 47

III. THIS COURT SHOULD NOT ACCEPT THE GOVERNMENT'S CLAIM THAT OPR CAN OR WILL ADEQUATELY INVESTIGATE ADMITTED MISCONDUCT BY MULTIPLE AUSAS IN THIS CASE. .......... 50

A. The U.S. Attorney Has Demonstrated He Is Unable to Fairly Investigate and Address the Misconduct That Occurred. .......... 51

IV. THE COURT SHOULD ORDER DISCOVERY FOR THE PENDING HYDE AMENDMENT PETITIONS. .......... 53

CONCLUSION .......... 55

# TABLE OF AUTHORITIES

## Cases


*De Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578 (7th Cir. 2008) . 4

*Edmond v. United States*, 520 U.S. 651 (1997) .................................................. 37

*Ex parte Robinson*, 86 U.S. (19 Wall.) 505 (1873) ............................................. 31

*Ex parte Terry*, 128 U.S. 289, 302-03, 9 S. Ct. 77 (1888) .................................. 31

*Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418 (1911) ............................. 31, 35

*In re Special Proc.*, 373 F.3d 37 (1st Cir. 2004) .............................................. 5, 30

*In re United States*, 398 F.3d 615 (7th Cir. 2005) .................................... 29, 30, 41

*Int'l Union v. Bagwell*, 512 U.S. 821 (1994) ...................................................... 31

*Nelson v. Steiner*, 279 F.2d 944 (7th Cir. 1960) ................................................ 32

*SEC v. Simpson*, 885 F.2d 390 (7th Cir. 1989) ................................................. 30

*Trump v. Slaughter*, 609 U.S. __, 146 S. Ct. 2283,
2026 WL 1855612 (2026) ........................................................................ 36, 37, 38

*Trump v. United States* ..................................................................................... 54

*Trump v. United States*, 603 U.S. 593 (2025) .................................................... 54

*United States v. Abrego Garcia*, Case No. 25-cr-115, M.D. Tenn., May 22, 2026 ....... 8

*United States v. Agajanian*, 852 F.2d 56 (2d Cir. 1988) ..................................... 43

*United States v. Arpaio*, 906 F.3d 800 (9th Cir. 2018) ................................. 10, 33, 34

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) .............................................. 37

*United States v. Boyd*, 1993 U.S. Dist. LEXIS 12042,
Case No. 89CR908, Aug. 25, 1993 (Aspen, J.) ..................................................... 10

*United States v. Boyd*, 833 F. Supp. 1277 (N.D. Ill. 1993) ............................... 10, 28

*United States v. Brown*, No. 403CR001,
2008 U.S. Dist. LEXIS 55213, at *10 (S.D. Ga. July 21, 2008) ............................. 30

*United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022) ....................................... 32

*United States v. Hudson, 7 Cranch*, 32 ............................................................... 31

*United States v. Meyer*, 810 F.2d 1242 (D.C. Cir. 1987) ..................................... 47

*United States v. Monsoor*, 77 F.3d 1031 (7th Cir. 1996) ..................................... 47

*United States v. United Mine Workers of America*, 330 U.S. 258 (1947) ................ 32

*Young v. United States ex rel. Vuitton Et Fils S. A.*, 481 U.S. 787 (1987) ..... 32, 33, 34

**Statutes**

15 U.S.C. §41 .......... 37

18 U.S.C. §401 .......... passim

**Rules**

Federal Rule of Criminal Procedure 42 .......... passim

**Other Sources**

Aditya Bamzai and Samuel L. Bray, *Prosecuting Contempt*, 94 U. Chi. L. Rev. (forthcoming 2027) .......... 35

Andrew Goudsward and Brad Heath, *At Trump's DOJ, Watchdogs Gutted as Misconduct Complaints Soar*, U.S. News by Reuters, Aug. 6, 2026 .......... 50

Glenn Thrush, Prosecutors Examined Firm With Tie to Judge in Trump Hush-Money Trial, N.Y. Times, Aug. 15, 2026 .......... 2

Marty Lederman, *The Continuing Saga of Chief Judge Boasberg's Contempt of Court Inquiry Involving Todd Blanche and Emil Bove*, Just Security, June 15, 2026 .......... 35

U.S. Dep't of Just., Criminal Resource Manual § 763 .......... 30

U.S. DOJ, Justice Manual, Power of a Grand Jury Limited by its Function, JM9-11-120: .......... 53

Zachary S. Price, *Even if the President is Immune, His Subordinates are Not*, Yale Journal on Regulation, July 11, 2024 .......... 55

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .......... 37

## INTRODUCTION

The roots of this prosecution of Defendants were poisoned from the start. They infected every aspect of the case: from the initial targeted selection of Defendants, to the gross and serial misconduct before the grand jury, and to the material omissions and outright falsehoods made directly to this Court and to defense counsel when the government attempted to conceal, redact, and bury its now admitted misconduct. In responding to Defendants' motions that seek merely to have the Court expose those roots and what may be yet further overt misrepresentations to this Court, the government begs the Court to simply look the other way and trust the Department of Justice to police its own wrongs because "there is no need to do more." (Dkt. 247, p. 34).

The government's claim that it has already addressed what it repeatedly minimizes as unintentional "mistakes" is a tone-deaf description of what certainly appears to have been premeditated and deliberate misconduct. The government offers cosmetic going-forward "reforms" that do nothing to redress the misconduct that already occurred in this case, much of which happened outside of the grand jury context. It notes that there has been a referral to the DOJ's Office of Professional Responsibility (OPR), which for reasons described below is an ineffectual proposed remedy under this current Administration. And it even attempts to offer up the "Experienced AUSA 1" as the sole bad actor and insulate others who actively engaged

in the misconduct – that which is currently known and, perhaps more importantly, that which is still being hidden from the Court's view.[1]

Similarly, in its latest effort to draw a curtain around this unfortunate episode, the government argues that defendants' quest for answers to that question raises separation-of-powers concerns. That argument would carry more force if the conduct at issue had not spilled into the courtroom and fatally infected the prosecution of six individuals—a prosecution the government dismissed only after all other efforts at obfuscation had failed. Under Federal Rule of Criminal Procedure 42 and as a matter of its inherent authority, this Court has the discretion, and compelling reason, to inquire further into the circumstances surrounding the government's dereliction of its duty to pursue justice with candor to the Court.

The self-evident truth is that the government is still contorting itself to avoid the very transparency that it claims to embrace while opposing any further judicial inquiry into what transpired here. The government shattered the presumption of regularity and engaged deceitfully with the Court and the defendants. In so doing, it demonstrated an inability to police itself or adhere to due process norms with liberty on the line. The fact that there is more yet to be uncovered here becomes obvious when one looks at the government's verbally contorted responses to the simple question that is yet to be answered here: "Were there communications between DOJ

---

[1] Notably, it has been publicly reported that this "Junior AUSA" and "Experienced AUSA 2," were also assigned by the U.S. Attorney here to another high-profile investigation directed at a Democratic fundraising firm that had ties to the New York state court judge who presided over President Trump's 2024 trial resulting in his conviction. Glenn Thrush, *Prosecutors Examined Firm With Tie to Judge in Trump Hush-Money Trial*, N.Y. TIMES, Aug. 15, 2026, available at: https://tinyurl.com/yxk9xj6m (last visited Sept. 7, 2026).

officials and this U.S. Attorney's Office about this prosecution beyond the sole video conference the government (belatedly) disclosed in its Response brief?"[2] In response to that very simple question, a well-respected AUSA who filed an appearance in the case subsequent to the case's implosion in late May that she was now *the* lead attorney on this case. yet when asked about details regarding certain representations made by the government, particularly regarding communications with Main Justice, her default answer was to consult the Front Office. This includes questions about the government's carefully crafted and potentially misleading statement in its Response brief that

"The Front Office is not aware of any communications *in which it took direction* from anyone outside the U.S. Attorney's Office regarding it decisions as to what investigatory steps the local prosecution team would take or who the local prosecution team would charge when prosecutors went into the grand jury to indict this case." Dkt. 247, p. 41, footnote 15 (emphasis added). The insertion of the word "direction," seems intended to provide a clever, subjective escape hatch from the candor and transparency promised by the U.S. Attorney and desperately needed to identify and address the scope of false or misleading statements that have been made to the Court in this case.

[2] In its Response brief, the government disclosed *for the first time* that on September 27, 2025—the day after Agent A drove his SUV into Defendants and other protestors—there was, in fact, a meeting involving the Chicago U.S. Attorney's Office and others, including Main Justice lawyers, where this case was discussed and a video of the incident was shown.

In short, in light of the facts known to date, this Court has the inherent power to inquire whether there were additional misrepresentations to it (the Court), whether those, too, are now being covered up; the inherent authority to act on its findings; and, respectfully, a responsibility to do so.

## BACKGROUND

The main issues before the Court is whether it has the authority to conduct further inquiry into the misconduct before the Court and whether it should exercise that authority. The answer to each of those questions is an unequivocal "yes." In seeking discovery (Dkt. 225), a hearing (Dkt. 226), and the appointment of an independent attorney to investigate (Dkt. 227), Defendants recognized that the Court should take reasonable steps to seek transparency and investigate the misconduct that occurred before it prior to reaching any conclusions. *See* Dkt. 227, pp. 22-23 (noting the Court's inherent authority to investigate matters of potential contempt). Such investigation is required to determine whether contempt or another disciplinary sanction is appropriate. *De Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 591 (7th Cir. 2008) (citation omitted) ("As we have already noted, courts retain inherent power to punish the full range of litigation abuses. … This power is distinct from the contempt power."); *see also* Dkt. 226, p. 3 (seeking appointment of independent counsel "to allow the Court to vindicate its interests in either or both a criminal contempt and sanctions proceeding").

Apart from some minor objections on separation of powers grounds, the government does not seriously dispute that the Court has the inherent authority to

investigate the misconduct that occurred in this case, and particularly any misconduct occurring directly before the Court. It just tells the Court not to do so because, based on its lengthy retelling of the proceedings, there was no contempt under 18 U.S.C. §401. In fact, there is ample basis to find a "reasonable possibility" of contempt to justify an investigation simply based on the government's redactions and omissions of both grand jury misconduct and conspiracy law discussions that the Court specifically ordered the government to provide (*see* Dkt. 119). *See In re Special Proc.*, 373 F.3d 37 (1st Cir. 2004).

Moreover, at this point, the Court should not absolve the government based on its claimed version of the facts—especially when it is still actively evading disclosure of the truth about Main Justice's role in the case and when its Response raises brand new questions that cast serious doubt on the veracity of the government's prior representations to the Court and therefore require further inquiry. The Response provides no answer as to key questions at issue: why redactions were made in the first place, and why government attorneys allowed a false impression to remain with the Court and counsel throughout many discussions about the grand jury. Smoke does not always mean fire, but it *is* always a reason to look further.

In addition to the unanswered question about Main Justice's involvement in this prosecution, the government's Response also *raises* questions about when U.S. Attorney Andrew Boutros knew of the misconduct that occurred before the Grand Jury, given the newly disclosed information that he personally received an expedited copy of the troubling October 9, 2025 grand jury transcript on October 14, 2025, just

five days after the no-bill and blatant vouching. As set forth herein, the government attempts to obfuscate critical new facts in footnotes, but they deserve and demand the Court's attention. (Dkt. 247, p. 16, footnote 9; p. 41, footnote 15).

Further, the fact that there was a meeting on September 27, 2025—the day after Agent A drove his SUV into Defendants and other protestors—involving the Chicago U.S. Attorney's Office, Main Justice lawyers, and others is significant. The defense has repeatedly asked, point blank, for any communications with anyone from Main Justice about the decision to bring this case. Those questions remain unanswered, and now even more arise. Thus, in the footnote in which it discloses this September 27, 2025, meeting with Main Justice, the government still maintains that there are no "communications in which it *took direction* from anyone outside the U.S. Attorney's Office" about investigatory steps and who to charge. But without further inquiry, this hair-splitting response is incomplete at best, and continued evasion before the Court at worst.

Defendants continue to have a good faith basis that the September 26, 2025, incident at the Broadview Facility and the identity of at least Kat Abughazaleh were well-known to those in Main Justice at the time. Those within the White House and others closely aligned with Main Justice officials demanded her prosecution, including for the very incident that this Office charged, as seen in the screenshot from a social media post below:



Mike Davis
@mrddmia · Follow

Dear Chicago U.S. Attorney Andrew Boutros:

Where are the arrests of @KatAbughazaleh--a Democrat congressional candidate--and her co-conspirators?

Assault/obstruction of law enforcement, 18 U.S.C. § 111

Harboring illegals, 8 U.S.C. § 1324

Conspiracy, 18 U.S.C. § 371

@NDILnews

Kat Abughazaleh @KatAbughazaleh
At the Broadview ICE facility, an ICE agent tried to run dozens of protesters over with an SUV as we walked on a public crosswalk.

He kept driving for about a full football field until ICE barraged us with pepper balls.

5:53 PM · Sep 26, 2025

5.6K Reply Copy link to post

Read 250 replies

The author of that post, Mike Davis, is a close supporter and sponsor of high-ranking DOJ attorney Aakash Singh, whom Defendants have previously highlighted as a key figure in multiple politically motivated prosecutions, and about whom Defendants have sought limited discovery. *See*, *e.g.*, Dkt. 225, pp. 7-8.[3]

[3] Mike Davis is not a peripheral figure. He has close ties to those who continue to be within the current DOJ's inner circle, including his protégé Aakash Singh and as well as with now Attorney General Todd Blanche. Davis has also demonstrated a strange obsession with Ms. Abughazaleh on social media going back years. *See* https://x.com/mrddmia/status/1585392434477158400 (Oct. 26, 2022, post); https://x.com/mrddmia/status/1640078088120995840?s=20 (March 26, 2023 post); https://x.com/mrddmia/status/1726762861332934705 (Nov. 20, 2023, post). He has also

Evidence of communications with Main Justice about this case is precisely what Defendants sought since the outset of the case, and which the government told this Court did not exist. Now, months after the case was dismissed, we learn that there was a meeting on September 27, 2025, during which a video, presumably of the incident underlying the charges here, was played. Defendants continue to believe, with good cause, that this outside influence helps explain the wide-spread misconduct in this case, including:

- the repeated misconduct before the grand jury that went well beyond just the vouching;
- the government's decision to present the case on two more occasions to obtain an indictment following the initial no-bill;
- the extraordinary personal appearance and plea to the Grand Jury by the sitting U.S. Attorney;
- the government's decision to redact the grand jury transcripts intended for the Court's *in camera* review to conceal the misconduct; and
- the U.S. Attorney's steadfast refusal to answer the simple question about other communications it had with DOJ and administration officials about this case.

---

closely followed and commented on the Broadview 6 case, whether it was writing "Nobody is above the law" in response to news of the indictment and Ms. Abughazaleh's statement in response to the charges (*see* https://x.com/mrddmia/status/1983619010114843045 (Oct. 29, 2025, post); https://x.com/mrddmia/status/1983852507958014272 (Oct. 30, 2025, post), or even *responding to Defense discovery requests* by justifying Aakash Singh's active involvement guiding the day-to-day conduct of local federal prosecutors on specific politically-charged cases. *See* https://x.com/mrddmia/status/2062660383756681267 (June 4, 2026, post). Davis has continued to laud Singh, including his role in the Kilmar Abrego Garcia case that was dismissed for selective prosecution largely based on Mr. Singh's communications with the local U.S. Attorney in that case (*United States v. Abrego Garcia*, Case No. 25-cr-115, M.D. Tenn., May 22, 2026, Dkt. 312); *see* (https://x.com/mrddmia/status/2021320383773741340) (Feb. 10, 2026, post) ("Very proud of Aakash Singh, a former Senate colleague and friend, who I strongly recommend for a top Trump Justice Department job. Aakash is bold and fearless. And he's holding accountable rogue judicial saboteurs.").

It is not enough for the U.S. Attorney's Office to say we made "mistakes" and we fixed them. Misleading the Court and defense counsel grossly undermines our system of justice and the administration of a fair proceeding. The government had every intention of taking this case to trial and went to great lengths to salvage a case and prosecute defendants that was deeply flawed from its inception. It was not until they were ultimately required to turn over the unredacted transcripts (after a battle for disclosure) that their wrongdoing was finally revealed and all charges were dismissed. The U.S. Attorney's Office wields tremendous power over the people's personal liberty through its enforcement of our criminal statutes. The continues to act as if those same laws they enforce do not apply to it when it knowingly makes false statements and representations in a legal proceeding. Its arguments suggest the operation of two different justice systems—one for me, but not for thee.

It is incumbent upon this Court to inquire further, or to assign an independent attorney to do so, to ensure the integrity of the Court and the required candor to it by those entrusted with the solemn duty to enforce the law and seek justice. This is critically important and has ramifications beyond this case as these same individuals continue to act on behalf of the United States in overseeing investigations, advising this District's grand jurors, and directing prosecutions throughout this District and elsewhere. In addition to vindicating the Court's interests, there is a clear public interest in investigating the misconduct that occurred here, as public trust in our institutions requires transparency and accountability.

To do so, Defendants propose very modest requests that are well within the Court's authority:

- Require the government to produce to the Court, *in camera*, any communications among/between anyone in the Chicago U.S. Attorney's Office and anyone from Main Justice, to include emails, text messages, phone logs and calendar invites.

- Appoint a special counsel to conduct an investigation of the facts pursuant to Federal Rule of Criminal Procedure 42.[4]

- Order limited discovery in connection with Defendants' *Hyde* Amendment petitions.

The Court may also appoint an *amicus curiae* to assist it with fact-finding and factual development. Indeed, there is precedent in this District for doing exactly that. In the aftermath of the El Rukn prosecution, Judge Marvin Aspen appointed Thomas Sullivan, a former federal prosecutor, as *amicus curiae* to "aid the court in an impartial and learned marshalling of evidence." *United States v. Boyd*, 833 F. Supp. 1277, 1289 (N.D. Ill. 1993).[5] Among other things, Mr. Sullivan interviewed federal prosecutors, identified witnesses, obtained documents, conducted examinations, and

---

[4] A preliminary step under Rule 42(a)(2) would be to first ask the government if it were willing to investigate and prosecute contempt. However, the Court should see the government's pre-determined and entrenched position that no contempt occurred as tantamount to a declination of any such request and appoint a disinterested private attorney as a special counsel to investigate the facts, which is squarely within the Court's inherent authority. *See* appoint *United States v. Arpaio*, 906 F.3d 800, 802-803 (9th Cir. 2018) (discussing district court's inherent authority to appoint special prosecutor).

[5] In those proceedings, the government cooperated with the court's *amicus* and was even permitted to provide submissions regarding their good faith during the prosecution. *See United States v. Boyd*, 1993 U.S. Dist. LEXIS 12042, Case No. 89CR908, Aug. 25, 1993 (Aspen, J.).

then provided the Court with a summary of the evidence. *Id*. The Court would be both well-served and well in its authority to do the same here.

Each of these suggestions do not assume guilt, impose undue burden, or overstep any boundary; they would simply allow the Court to have the relevant *facts* before rendering any judgment.

## ARGUMENT

### I. NEW FACTS REVEALED IN THE GOVERNMENT'S RESPONSE REQUIRE FURTHER INQUIRY

There are certain significant events over the course of this case which are notably absent from the government's section on "Relevant Facts and Procedural Background." (Dkt. 247, pp. 2-17). We need not address all of those here, but a few particular items—the most significant of which the government discretely placed in footnotes—require the Court's attention and further factual inquiry.

#### A. October 14, 2025: U.S. Attorney Boutros Personally Received the October 9, 2025, Grand Jury Transcript.

Footnote 9 of the government's Response reveals for the first time that "[t]he United States Attorney was emailed a copy of the transcript from the October 9, 2025, grand jury presentation on October 14, 2025, but has no recollection of reviewing the transcript at that time, and is quite certain he did not review the transcript at that time." Dkt 247, p. 16. The fairly stunning disclosure that the U.S. Attorney himself was directly sent a presumably expedited copy of the October 9, 2025, grand jury transcript, coupled with the questionable hearsay assertion that he does not think he read it, cry out for further inquiry.

On October 9, 2025, in a high-priority prosecution for this District, the grand jury returned a No-Bill. U.S. Attorney Boutros had repeatedly boasted about the Office's tough stance on prosecuting individuals who purportedly assault law enforcement officers and declared these cases to be of great significance. And yet when the grand jury failed to return an indictment against Defendants, after which the Justice Manual requires that the U.S. Attorney personally approve prosecutors returning to the grand jury to seek an indictment, the government wants this Court to believe that he did not review the very transcript of the proceeding where the No-Bill was obtained. Notably, this was not a transcript that is routinely obtained in the normal course of proceedings before the grand jury, and was prepared on an expedited schedule. Indeed, the appearance before the grand jury and No-Bill was on October 9, 2025 and by October 14, 2025, the transcript was in Mr. Boutros's inbox. This sequence of events raises further questions:

- What prompted ordering of the transcript? At whose direction was this done?
- Who sent the grand jury transcript to Mr. Boutros and what was their reason for doing so?
- What was the message on the email in which the transcript was forwarded to Mr. Boutros?
- Did Mr. Boutros specifically request the grand jury transcript?
- What other supervisory or front office employees were copied on the email or otherwise received a copy of the transcript?
- What other supervisory or front office employees read the transcript of what occurred in the grand jury and when?

- Was that October 9, 2025 transcript forwarded to anyone outside the U.S. Attorney's Office for the Northern District of Illinois?
- Did Mr. Boutros read the transcript of the grand jury proceeding before consulting with Chief Judge Kendall and seeking her assistance in addressing issues with the grand jurors who voiced strong disagreement with the government's case?
- How could Mr. Boutros credibly claim not reading the transcript of the initial proceeding before making an important informed decision about whether to overrule the initial decision of the grand jury who listened to the evidence presented?

These basic questions go to the very heart of who knew what occurred in the grand jury and when they knew it. Importantly, prior representations to the Court now seem to conflict with this new disclosure. If there have been additional misrepresentations to the Court which remain undisclosed—or worse, covered up—this Court has a duty to inquire. If the government has nothing to hide about its representations to the Court, it should welcome such an inquiry so it can be vindicated publicly and based on facts, rather than bald and somewhat implausible assertions dropped in footnotes to an advocate's brief.

**B. October 16, 2025: U.S. Attorney Boutros Purportedly Terminates the Grand Jury in "Real Time."**

Mr. Boutros would also have this Court and others believe that he stopped the grand jury proceedings "in real time" when he learned that the prosecutors had dismissed members of the grand jury who rejected the government's proposed indictment. Per Mr. Boutros, "[w]ith respect to the excusing of grand jurors that took place, which was the second time the prosecutor sought to return an indictment, that I was aware of in real time. And once I became aware of it, I immediately called off

the grand jury session." This statement, when viewed alongside the grand jury audio recording and transcripts from October 16, 2025, raises further questions about representations made to the Court and should not be readily accepted.

A review of the grand jury transcripts from October 16, 2025, shows that "Experienced AUSA 1" dismissed the first grand juror at or about 9:30:04 during the initial portion of the proceeding that day. Dkt. 220, p. 10. The second transcript reflects that there was a break between proceedings on October 16, 2025. According to the time stamp depicted on the transcript of the second portion of the proceeding, Agent A's last answer was at 10:11:18. Dkt. 220, p. 54. The audio recording reflects that Agent A testified for approximately twelve minutes before there was a break in his testimony to replace batteries in the recorder. According to the audio recording, after several minutes passed, the "Experienced AUSA" told members of the Grand Jury that one of their bosses just showed up and they needed to continue their presentation another day. According to the time stamp on the audio recording, this was at 1:01:18. This sequence of events raises further questions:

- Who notified a supervisor that the "Experienced AUSA 1" and "Junior AUSA" excused members of the grand jury from the proceeding?[6] How and when was such notification made?
- Was this reported directly to the Front Office? By whom?
- And who specifically informed Mr. Boutros?

[6] "Junior AUSA" told the Court on May 21, 2026 that the Criminal Chief was notified and "the Criminal Chief said we need to call this off for the day to gather, understand the right protocol." 5/21/2026 Tr. at 32.

- Did the "Experienced AUSA 1" and "Junior AUSA", in fact, continue in the grand jury after having reported this misconduct in "real time?"

- Who was the supervisor that appeared outside the grand jury and instructed the "Experienced AUSA 1" and "Junior AUSA" to discontinue the proceeding that day?

- Did Mr. Boutros accurately report to the Court that he terminated the grand jury session in real time?

### C. October 23, 2025: U.S. Attorney Boutros Makes Unusual Appearance in Grand Jury on Day Case Re-Presented for Indictment

The government would like to downplay Mr. Boutros's extraordinary appearance before the grand jury on October 23, 2025—the same day that the indictment was ultimately returned in this case. The suggestion that Mr. Boutros's appearance before the grand jury was unrelated to the case against defendants belies credibility. The government quotes from Mr. Boutros's statement[7] as if his comments were generic in nature and applicable to all types of cases. But, the quotes are misplaced thus hide the true thrust of his surprising appearance. Mr. Boutros's comments were targeted and intended to facilitate a true bill (and arguably eliminate members of the grand jury) when prosecutors returned to the grand jury on this case for the third week in a row later that same day. Instead of rearranging the words to minimize their impact, we provide the actual context. The following, a clear reference to Operation Midway

[7] According to the Government's Response, "He then asked, similar to what he did with the other grand juries, if there was 'anyone here who is struggling with a certain type of cases'-including 'immigration,' 'child exploitation,' or others-who do not believe that they can set aside their personal…emotions [and] listen and deliberate honestly and objectively[.]"

Blitz, then plaguing Chicagoland and the local airways, begins on the audio recording at 1:46:

> But we also recognize that these are trying times, emotional times, can't help but turn on the news, read the newspapers, those of you who use Tik Tok and Instagram, there is stuff in there all the time. So my question to you is, and again I am going to do this in all the grand juries…
>
> ***
>
> [2:08] If there is anyone here who is struggling with a certain type of cases such as immigration or other types of cases, where they do not believe they cannot set aside their personal emotions, they cannot listen and deliberate honestly and objectively…I would ask that you raise your hand and identify yourself…

It is not until 3:02 that Boutros references child exploitation and it is sandwiched between two references to immigration:

> …on any case immigration or other, child exploitation, immigration, whatever it is. Anyone who thinks they can't do it please raise your hand…

To suggest or undermine Mr. Boutros's appearance before the grand jury as separate from the indictment in this case is inconsistent with his very remarks.

### D. Repeated Requests for Communications with Main Justice and Administration Officials and Evasive Non-Responsive Answers

Defense counsel made repeated requests to government counsel and in court filings for communications with individuals outside the United States Attorney's Office for the Northern District of Illinois, including Main Justice and the White House. The government cites in its Response the Court's denial of defendants' Motion to Compel, and quotes select comments made by the Court at the time this Motion was denied. Noticeably absent from this portion of the government's brief, however, are the representations made to the Court by the government upon which the Court relied as the basis for its ruling.

Defense counsel specifically requested "records and communications relating to any improper influence exerted upon the U.S. Attorney's Office in Northern District of Illinois[.]" Dkt. 94 at 1. In response, the government lambasted defense counsel for making such a request and unequivocally stated that "there are no communications of any nature from, to, or with anyone outside the USAO (other than the local FBI investigators assigned to the case) regarding any investigatory or charging decisions. ***To be crystal clear, this specifically includes anyone in the White House and all components and offices of Main Justice***." Dkt. 110, pp. 3-4 (bold and italics added).

The Court, without any correction from the government, summarized the government's position at hearing on April 7, 2026 and specifically relied on the government's representation in denying Defendants' motion:

> The defendants have expressly predicated their theory of vindictive and selective prosecution on external forces having some type of impact on the Chicago-based prosecutors....To [that] end, the prosecutors agreed to provide evidence of external forces communicating with the Chicago U.S. Attorney's Office about this case, *and they have now said there is no such evidence. There are no White House communications, there are no Main Justice communications, and I quote, "there are no communications in any nature from, to, or with anyone outside of the U.S. Attorney's Office*[.]

4/7/2026 Tr., p. 6. (emphasis added). This quoted representation from the government now seems to be in serious doubt. Indeed, it is flatly inconsistent with the revelation in the government's Response that there was, in fact, at least one meeting with DOJ officials about this case and the video evidence. In addition, despite multiple prior representations to the contrary, the government in its Response now adds for the first

time, "as would be expected in the normal course, there were discussions between the Office and Main Justice regarding such things as case updates, especially given the publicity the case generated after it had been charged." Dkt. 247, p. 41.[8]

And now the government has scrupulously refused to provide an answer to whether there were any other communications with DOJ or administration officials about this case – instead, asserting there weren't any other communications during which DOJ gave "direction" to it about this case. (Dkt. 247, pp.40-41 fn.15). Thus, in the aftermath of the dismissal of this case, defense counsel followed up with the newly assigned AUSA to ask whether the government still stands behind the factual assertions quoted above from its March 30, 2026 filing, specifically that "there are no communications of any nature from, to, or with anyone outside the USAO (other than the local FBI investigators assigned to the case) regarding any investigatory or charging decisions. To be crystal clear, this specifically includes anyone in the White House and all components of Main Justice." (Exhibit A, email string between defense counsel and the AUSA, beginning July 15, 2026). In follow-up to that email, the AUSA called defense counsel and defense counsel told the AUSA what the defense believed existed and what we were asking to test the quoted representation. (Exhibit A, July

[8] Defendants do not suggest that there is anything inherently wrong had the USAO conferred with Main Justice on this case (or any other matter). Here, this information was requested for a very specific purpose, *i.e.*, to obtain necessary evidence to establish a vindictive prosecution and/or claim of improper influence regarding the charges. Instead of candidly stating that there were, in fact, communications, the government repeatedly and adamantly represented to the Court that "there are no communications of any nature from, to, or with anyone outside the USAO" about this case. (Dkt. 110, pp. 3-4).

27, 2026 email from defense counsel). The AUSA responded by email on August 11, 2026, writing,

> Thank you for this follow-up email. I gave copies of your earlier emails (the July 15, 2026 and July 27, 2026 emails set forth below) to the Front Office in my office. The Front Office's response to the emails is set forth in the Government's Consolidated Opposition to Former Defendants' Motions (R. 225, 226, 227 (R.247) at 40 n.15.

(Exhibit A, email dated Aug. 11, 2026). Thus, the AUSA directed defense counsel to Footnote 15, which provides in part, "The Front Office is not aware of any communications in which it took direction from anyone outside the U.S. Attorney's Office regarding it decisions as to what investigatory steps the local prosecution team would take or who the local prosecution team would charge when prosecutors went into the grand jury to indict this case." Dkt. 247, p. 41, footnote 15. But the question was not whether the Front Office took "direction" regarding particular conduct. Instead, the very simple question was whether there were any communications or records of communications with individuals outside of the U.S. Attorney's Office for the Northern District of Illinois related to this matter.

Reading the government's response as curiously worded and not addressing the question asked, defense counsel again followed up, writing to clarify whether the use of "direction" signaled that there were "communications" that were not considered to be "direction." (Exhibit A, August 11, 2026, email from defense counsel). The AUSA's response, like the prior one, deflected and said that the Front Office says "there is one communication described in FN 15, a virtual meeting that took place on

September 27, 2025, but the Front Office does not consider that virtual meeting to be a direction." (Exhibit A, Aug. 14, 2026 email from AUSA).

Again, this response did not provide a direct answer to the direct question asked. Even if one read this is a denial (we do not, given its parsed wording), given that no search of emails, calendars, etc. has been conducted, it is difficult to rely merely on the recollection of the "Front Office", rather than objective and readily ascertainable records that would provide the Court with a clear answer to that question. If the Court directs the government to conduct that simple search of email, text and calendar records, it will know one way or the other whether the government made yet another material misrepresentation to it. If the government has been candid with the Court, it will be publicly vindicated, which is clearly in its, and the public's interest. If not, the Court can decide if any other action is warranted. Either way, the cost and effort to know the basic facts that were relevant to the fair administration of justice is minimal.

### E. Submission of Transcripts to the Court with Missing Legal Instructions

In its Response, the government claims that, on April 23, 2026, it submitted to the Court for *in camera* review those portions of the transcripts "detailing the presentment of the law on the 18 U.S.C. § 372 conspiracy charge and any related exchanges," in purported compliance with the Court's order at Dkt. 119. Dkt. 247, p. 12. The government further asserts that the transcripts tendered to the Court contained redactions clearly marking what was not produced and page numbers reflecting the omitted pages (totaling more than 80). *Id.*

The Court could have no way of knowing (even with these so-called clearly-marked redactions) what was, in fact, behind the missing records. Contrary to the government's assertion that it "undisputedly provided" portions of the grand jury transcripts "pertaining to how the 18 U.S.C. 372 conspiracy charge was explained to the Grand Jury" and any "related exchanges," Dkt. 247, p. 21, a comparison of the redacted transcripts and omitted pages reflects a failure to comply with the Court's order.

With respect to the October 16, 2025 transcript, there are pages omitted in addition to significant redactions. *See* Dkt. 129-2 (10/16/25 redacted transcript). At the very beginning of the hearing on October 16, 2025, the AUSAs announce that they are "here again on case 25 GJ 994," but references to a no-bill and then redacted. *Compare id.* at 3, *with* Dkt. 220 (10/16/25 unredacted transcript). And while redacted, the government proceeds with a discussion of their intention to explain the law again and its intent to identify what are relevant and irrelevant questions. Such a discussion is, at a minimum, related to instructions on the law.

After providing some instructions regarding the law, the government redacted page 8 of the transcript, omitted pages 9 and 10, and inserted page 11 but with redactions. The missing portions include a question by a grand juror as to whether the government has "unlimited tries" in seeking an indictment and the need to decide if the "facts fit the law" regardless of whether one likes the law. The missing portions further include the dismissal of a grand juror and a grand juror expressing their opinion that the case was a "crock of shit."

After these glaring omissions and redactions from the 10/16/2025 transcript, the next series of redactions begin at page 25 and continue through page 26. Dkt. 129-2, pp. 25-26. Noticeably redacted from this portion was a grand juror expressing "I don't think I can vote," and the dismissal of the grand juror. The "Experienced AUSA 1" also told the grand jurors that there was new evidence and reminded them of their oath, which "didn't say, do you like the law? Do you like the facts? It's can you be fair? And that's all we're asking." Dkt. 220, p. 26.

A short time later, Dkt. 129-2, p. 27, the "Junior AUSA" reports having technical difficulties. Immediately following, the government makes additional redactions (presumably why the Court believed that the redactions may have been related to technical issues). This redacted portion conceals the "Experienced AUSA 1" expressing her disappointment that there are people who didn't want to hear the agent. Dkt. 220, p. 28. After this statement, the redactions temporarily cease until page 29. Pages 30 through 36 of the transcripts were omitted in their entirety. Dkt. 129-2, pp. 27-28. During this portion of the concealed transcripts, the prosecutors provide their interpretations of the evidence and otherwise misstate the evidence. For example, the "Junior AUSA" tells members of the grand jury, "And you could see, I mean look at how much room there is for Mr. Straw to maneuver if he wanted to. But he intentionally went to the front of the vehicle…" Dkt. 220 at 32. In response to a question from a grand juror regarding the source of the videos, the "Junior AUSA" offers that "This was all civilians taking photos." The "Experienced AUSA 1" inaccurately states, "No law enforcement was out there, so they didn't take any

video." Dkt. 220 at 36. In fact, as the government well knew, officers from the Broadview Police Department were present throughout the morning of September 26, 2025 and wore body cameras. Shortly thereafter, the government ceased further redactions for the remaining portion of the proceeding (page 37). Dkt. 129-2 at 28; Dkt. 220 at 36-37.

With respect to the October 23, 2025 proceeding, among other omitted pages, there is a gap between pages 28 and 41 and 52 through 57 of the grand jury transcript. Dkt. 129-3 at 34-35. In the initial redactions, beginning on page 3, with page 4 omitted, and redactions continuing on page 5, "Experienced AUSA 1" after a discussion concerning applying the facts to the law, does a "mea culpa," in which she referenced conversations with two grand jurors outside of the grand jury. In one discussion, the grand juror purportedly apologized and told "Experienced AUSA 1" that he could "apply the facts to the law." Dkt. 221 at 5.Dkt. 129-3 at 34.

No further redactions are made until page 28 after Junior AUSA is asked whether he feels comfortable doing the video, at which time redactions resume after which the entire page is redacted. The next page number depicted is page 41. During this omitted portion, a grand juror observes that Rabbitt and Kat no longer appear in the frame. "Experienced AUSA 1" instructs as follows: "You—they don't have—they can step away. You can do it that—you can impede for some time, and then you can decide that you're going to stop. That doesn't change the fact that you have impeded for some time. [Speculating about non-existent evidence], "Experienced AUSA 1" added "And they could be going—and we don't know where they are here. They could

be going and doing something else to the car or something else." Dkt. 221 at 39. She continues to instruct, "the probable cause comes from when you do see them on the video, not from when you don't." *Id.*

Further omitted from this section are other instructions on the law and related events. Specifically, "Experienced AUSA 1" instructs the grand jury, "So it's happening at the same time. But keep in mind, people are moving in and out—which is part of the conspiracy." Dkt. 221, p. 42.

Perhaps less notable, because page number 57 (the number itself) was redacted and the last page number before it indicated page 52, the government also omitted and otherwise redacted the transcript between pages 52 and 57. Significantly, the following instructions to the grand jury, which are consistent with Mr. Boutros's statements to the grand jury, were also redacted:

> I ask that you deliberate with each other in good faith. If anybody still feels thatyou can't then you have to be honest with your fellow Grand Jurors and tell them that your feelings about this are too strong, that they will not allow you to apply the fact—the law to these facts.
>
> That's your duty. That's the oath you took. So if that's how you feel, then you have to tell your fellow Grand Jurors that you can't deliberate with them. I'm not going to ask you if you can or can't.
>
> We will be outside if you have questions like that, the—like the good question we were just asked. Come out and ask us so that we can help you get to yes or no. Don't just decide without—if you have questions that prevent you from finding what happened.

Dkt. 221 at 62-63, Dkt. 129-3 at 50. Redacted portions of the October 16, 2025, and October 23, 2025, transcripts containing discussions related to the conspiracy law are attached hereto as Exhibits B and C.

### F. Misrepresentations to Defense Counsel

There is further evidence of misconduct that was intended to affect the proceedings before this Court which should be inquired into by the Court. From the very outset of this case, defense counsel asked the government to produce copies of the grand jury transcripts in order to evaluate whether there had been any improper conduct in obtaining the indictment that would undermine the validity of the indictment, and potentially provide a basis for a motion to dismiss before this Court. This request was first rejected in a letter dated December 18, 2025, signed by the "Experienced AUSA 1" and "Junior AUSA":

> This is a relatively simple, straightforward indictment, that presents no exceptional circumstances, and you have not cited any in your letter or in any discussions with us. Since the case was filed, various defense counsel has stated repeatedly only that they are "interested" in how we presented this case to the grand jury. Your curiosity is not an "exceptional circumstance." You all know the law, or can research the law, and have no reason to believe that we presented anything other than the law. If you have a basis to argue otherwise, please let me know.

Dkt. 94-5, p. 3.

These highly misleading, if not false, representations were made to defense counsel by the very prosecutor who had engaged in serious and serial misconduct before the grand jury. More importantly, these false representations were clearly designed and intended to mislead the defendants, evade the production of clearly relevant materials, and scuttle a fair hearing on the issue to be raised and litigated ***before the Court*** about whether there was an improper motive behind this prosecution. This, too, should be the subject of further inquiry by the Court under its inherent powers (discussed in detail below).

### G. The Government's Failure to Correct the Court's Obvious Misunderstanding Regarding the Grand Jury Transcripts

In its Response, the government repeatedly cites to statements made by the Court as a basis to not require the government to produce the grand jury transcripts. Dkt. 247, pp. 13-14. Notably, the government well knew at the time of the cited statements by the Court that the Court had a severely inaccurate perception of what was contained in the portions of the transcripts that had been redacted but nevertheless allowed that misconception to persist. The government remained silent and failed to correct the Court when it stated – at two separate Court hearings – a clearly inaccurate understanding of what was contained in the redacted portions of the transcripts – a misunderstanding based on what the government had led the Court to believe. And it now audaciously cites those very quotes from the Court under "other relevant proceedings" to justify its reason for not having timely produced the unredacted transcripts. This episode, too, requires further inquiry to vindicate the Court's interests in ensuring the integrity of the judicial process.

### H. "Mistakes" and "Missteps"

Throughout its Response the government refers to "mistakes" in the prosecution of this case. Dkt. 241 at 1. While there were undoubtedly grave mistakes, there was also very intentional and deliberate conduct to conceal prosecutorial misconduct and proceed to trial with a deeply flawed prosecution. To be clear, redacting transcripts to conceal gross prosecutorial misconduct is **not** a mistake; failing to correct the Court on multiple occasions when it expressed a misunderstanding related to the redacted portions of the transcripts is **not** a mistake;

berating defense counsel in written pleadings and correspondence when it raised legitimate concerns about what had occurred before the grand jury (when knowing full well the scope of the misconduct that occurred) is **not** a mistake; the intentional effort to moot the request for the grand jury transcripts by dismissing the felony count and seeking a superseding information when misdemeanor charges had already been returned by the grand jury is **not** a mistake. These are all deliberate acts in furtherance of a coordinated effort to conceal prosecutorial misconduct and to salvage a desperately desired prosecution of these defendants.

## II. FURTHER INQUIRY BY THE COURT IS BOTH NECESSARY AND FULLY JUSTIFIED UNDER THE LAW

The government's opposition to any judicial inquiry is premised on both a stunted view of the Court's inherent authority to investigate and redress misconduct and an expansive view of the Executive's authority and immunity to judicial inquiry. Both positions are misguided. The Court has the inherent authority to appoint a special prosecutor or other independent attorney to investigate the wrongdoing that occurred before and outside the Court related to the case, and, more importantly, the reasons that motivated such shocking misconduct that cannot be written off as mere "mistakes."

As part of that process, in light of the new disclosure by the government, the Court should order that matters related to the selection of Defendants and decision to prosecute them must be brought to light, particularly the influence of Main Justice attorneys, including Aakash Singh, who has already been found by a federal district court as being instrumental in a criminal prosecution that was impermissibly

selective and vindictive in violation of a defendant's constitutional rights. Disclosures of Singh's emails made pursuant to Court order revealed substantial communications with local prosecutors that factored into the selective prosecution finding and dismissal of the case.

The Court should not accept the government's invitation to summarily conclude – before the relevant facts are elicited – that no contemptuous conduct occurred simply based on its untested version of the facts. This is especially when, as noted above, the government's Response raises several new and highly material factual questions that cast serious doubt on the veracity of prior representations it has made directly to this Court, and to defense counsel. In light of these open questions, the Court should order an independent inquiry to make a record—whether by itself, pursuant to Rule 42(a)(2), or with the assistance of *amicus* counsel, as was done by the Court in *United States v. Boyd*, 833 F. Supp. 1277, 1289 (N.D. Ill. 1993).

Should the Court conclude, with the benefit of a basic factual investigation of the issues outlined above, that the conduct does not rise to the level of contempt, so be it. But that decision must be made with knowledge of the basic underlying facts at issue. At this time, the Court clearly does not have before it the relevant facts relating to (1) U.S. Attorney Boutros's receipt and handling of the October 9, 2025 Grand Jury transcript he personally received on October 14, 2025; (2) the communications between this U.S. Attorney's Office and representatives of the DOJ or other administration officials relating to this case; and (3) the material facts underlying the other misstatements and omissions set forth above.

Regardless of the ultimate outcome, the integrity of the Court and the public's faith in the system requires facts to precede rulings. In light of what is currently known, absent the fairly modest requests for additional factual inquiry outlined above, the questions will linger indefinitely which is to no one's benefit, least of all the institution of the United States Attorney's Office for the Northern District of Illinois.

### A. The Government's Arguments Improperly Limit the Court's Inherent Authority to Investigate and Prosecute Contempt

#### 1. Conclusively Finding a Prima Facie Case of Contempt is Not a Precondition for the Court to Exercise its Inherent Authority to Investigate Contempt

The government's argument hinges on the assertion that the Court cannot exercise its inherent authority to initiate contempt proceedings unless there is first a showing of contempt. (Dkt. 247, p. 17, heading A "There is no *prima facie* showing of contempt or conduct that merits this Court's exercising its inherent authority."). To establish that *prima facie* standard, the government relies only on *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) ("In the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge must turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch."). But in that case the Seventh Circuit made only passing reference to the "prima facie" language. It did not establish a black-letter standard whereby a court must make a concrete finding that contempt occurred prior to engaging in an investigation. If anything, the Seventh Circuit's discussion in *In re*

*United States* emphasizes the importance of federal judges turning to independent prosecutors to assume an inquisitorial role, as the federal judge did which triggered *mandamus* in *In re United States*.[9] Defendants previously discussed *In re Special Proc.*, 373 F.3d 37, which held that only "reasonable possibility" and not "certainty" was required to investigate contempt. The government does not substantively address that case, and instead urges the Court to effectively make a substantive finding on the issue of contempt, all without a developed factual record.

Thus, the Court should reject the government's attempt to limit its inherent authority to initiate contempt proceedings only in cases where a showing of contempt has already been made, as opposed to there being good cause to investigate.[10] Indeed, that limitation would be contrary to the Court's broad inherent authority, which is reinforced through well-settled Supreme Court decisions and undergird the independence of the Judiciary.

That inherent authority, which is substantively embodied in 18 U.S.C. §401 and procedurally guided by Fed. R. Crim. P. 42,[11] reflects the fundamental tenet that

---

[9] Likewise, the statute does not require a "probable cause" standard to begin a contempt proceeding under §401. The DOJ's internal manual comments how "[i]t is unclear whether probable cause that a willful violation has occurred is a condition precedent to the commencement of a criminal contempt action." U.S. Dep't of Just., Criminal Resource Manual § 763, https://tinyurl.com/3rwah72x (last visited Sept. 13, 2026).

[10] Again, Defendants believe the record supports a *prima facie* showing of contempt (*See* §II.B *infra*), but do not see the law requiring that as a precondition to *investigate* contempt, especially where the record requires further development for a fully informed decision on the issue.

[11] *See United States v. Brown*, No. 403CR001, 2008 U.S. Dist. LEXIS 55213, at *10 (S.D. Ga. July 21, 2008) (emphasis in original) ("Rule 42 is a *procedural* rule, while the substantive offense of criminal contempt in this context is governed by 18 U.S.C. § 401."); *SEC v. Simpson*, 885 F.2d 390, 395-96 (7th Cir. 1989) ("Rule 42 of the Federal Rules of Criminal Procedure

federal courts are empowered to protect themselves to ensure that their orders are followed, which is "necessary to the due administration of law and the protection of the rights of suitors." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450 (1911). Without that authority, "what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Id.* This inherent authority is deeply rooted in the Judiciary Act of 1789, as manifest in Justice Field's opening sentence in *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1873): "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice."[12] *See also Ex parte Terry*, 128 U.S. 289, 302-03, 9 S. Ct. 77, 79 (1888) ("Nor can there be any dispute as to the power of a Circuit Court of the United States to punish contempts of its authority. In *United States v. Hudson, 7 Cranch*, 32, it was held that the courts of the United States, from the very nature of their institution, possess the power to fine for contempt, imprison for contumacy, enforce the observance of order, etc."); *Int'l Union v. Bagwell*, 512 U.S. 821, 831 (1994) ("Courts thus have embraced an inherent contempt authority").

governs the procedures to be used in imposing the criminal contempt sanctions authorized by 18 U.S.C. § 401.").

[12] Justice Field continued to discuss the 1831 act that focused the lower federal courts' contempt powers to the grounds currently enumerated in 18 U.S.C. §401. *See Ex parte Robinson*, 86 U.S. (19 Wall.) at 511 ("As thus seen the power of these courts in the punishments of contempts can only be exercised to insure order and decorum in their presence, to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes.").

To exercise that inherent authority, pursuant to Rule 42 federal courts must appoint independent counsel to investigate wrongdoing when the government declines or is unwilling to do so. The Supreme Court has underscored that the rationale for this "appointment authority is necessity" because if "the Judiciary were completely dependent on the Executive Branch to redress direct affronts to its authority, it would be powerless to protect itself if that Branch declined prosecution." *Young v. United States ex rel. Vuitton Et Fils S. A.*, 481 U.S. 787, 801 (1987).

**2. The Court's Exercise of its Inherent Authority Would Not Violate the Separation of Powers.**

At several points in its Response, the government suggests that the Court would violate the separation of powers doctrine by exercising its inherent authority to initiate contempt proceedings. That argument is misplaced. To the contrary, because the "judicial authority to prosecute contempt is meant to protect the independence of the courts from the other branches, it should be strongest when the executive branch opposes the contempt prosecution." *United States v. Donziger*, 38 F.4th 290, 312 (2d Cir. 2022) (Menashi, J., dissenting). The executive branch "has no right to treat with impunity the valid orders of the judicial branch" especially because the "'greater the power that defies law the less tolerant can this Court be of defiance.'" *Nelson v. Steiner*, 279 F.2d 944, 948 (7th Cir. 1960) (quoting *United States v. United Mine Workers of America*, 330 U.S. 258, 293 (1947)).

If anything, Rule 42(a)(2) helps protect separation of powers issues by instructing federal courts to appoint a separate prosecutor to advance contempt proceedings. The subsection reads as follows:

> (2) *Appointing a Prosecutor*. The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.

The structure of that paragraph strikes a careful balance. First, the courts must ask the Executive branch to prosecute a contempt. However, Congress recognized that resorting to the Executive would be ineffective—when "the interest of justice requires" and when "the government declines the request" to prosecute contempt. By doing so, Congress expressly declined to give the Executive veto power over whether to investigate and prosecute contempt proceedings. The committee notes from the 2002 amendment to Rule 42 confirm as much as it acknowledges how the Rule adopted the language from *Young v. United States ex rel Vuitton*, 481 U.S. 787, and thus "envisions that a disinterested counsel should be appointed to prosecute the contempt."

Importantly, Rule 42(a)(2) "is not itself the source of a federal court's authority to appoint a private attorney as a special prosecutor to perform the role of a government attorney in prosecuting a criminal contempt of court. Rather, it is an implementation of a court's pre-existing inherent authority to appoint a special prosecutor when the government declines to prosecute." *Arpaio*, 906 F.3d at 802. *See id.*, at 803 ("Rule 42 is rooted in the longstanding inherent power of the judiciary to appoint disinterested private attorneys as special prosecutors to pursue criminal contempt proceedings in federal court when government prosecutors are unwilling or unable to perform that function.").

The government warns that this procedure raises significant separation of powers concerns. Dkt. 247, p. 18, footnote 10. However, it is the government's version that poses the separation of powers problems. By effectively seeking executive immunity from contempt proceedings, the government derogates the power of both Congress, which defined the process set forth in Rule 42, and the Courts, which would be stripped of the ability to exercise their inherent authority to remedy serious misconduct whenever the government declined to accept an invitation to investigate and prosecute contempt.

Moreover, contempt proceedings are inherently a judicial function, not an executive one. Contempt proceedings are "vindications of judicial power, and the use of private attorneys as special prosecutors is part of the judicial function." *Arpaio*, 906 F.3d at 803 (quoting *Young*, 481 U.S. at 795) ("[Rule 42's] assumption that private attorneys may be used to prosecute contempt actions reflects the longstanding acknowledgment that the initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function."). Indeed, as recognized in a forthcoming University of Chicago law review article, courts have the inherent authority to appoint prosecutors outside of the Executive branch to vindicate their inherent judicial authority:

> Thus, while we understand the pull of extending the Supreme Court's recent decisions insisting that all of the executive power be under the control of the executive branch the relevant history, recounted above, tends to cut in the other direction. Contempt is *sui generis*. If courts may investigate contempt on their own initiative, then nothing should stop them from enlisting the help of aides to do the same. And if aides may be used, nothing should change based on the relabeling of

> those officials as "prosecutors." As elsewhere, the functions, not the labels, should determine the constitutional treatment of the matter.
>
> This historical through-line has its own constitutional logic. Each branch must have the power to protect itself. And a critical method of self-protection for the judicial branch, as well as for the legislative branch, is the punishment of contempt. To punish interference with the administration of justice and noncompliance with judicial orders is inherent in what it means to be a court that administers justice and issues orders. As the Supreme Court wisely noted in *Gompers*, the contempt power should be "sparingly . . . used." Even so, the Court continued, "the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory."[13]

Thus, contempt proceedings are a *judicial* function designed to protect the *judiciary's* inherent authority. The authority is deeply established (*see*, *e.g.*, *Gompers*, 221 U.S. 418) and cannot be overridden by the Executive's desire to act with impunity and be insulated from investigation and potential wrongdoing for acts of contempt done in matters *pending before a Court*. An independent attorney appointed under Rule 42 does not exercise executive power, but is instead "assisting the court in the exercise of the Article III judicial power**,** as the Supreme Court has recognized in many cases over the course of more than 200 years."[14] Accordingly, it is the government's efforts

---

[13] Aditya Bamzai and Samuel L. Bray, *Prosecuting Contempt*, 94 U. Chi. L. Rev. (forthcoming 2027), pp. 59-60 of pdf, which is available for download at: https://tinyurl.com/a43c8adt (last viewed Sept. 7, 2026) (footnotes omitted).

[14] Marty Lederman, *The Continuing Saga of Chief Judge Boasberg's Contempt of Court Inquiry Involving Todd Blanche and Emil Bove*, Just Security, June 15, 2026, available at: https://tinyurl.com/mu26r8ad (last visited Sept. 13, 2026)

to immunize the Executive from scrutiny and investigation for contempt that risks damage to separation of powers interests.

Even more unavailing is the government's blanket and hypothetical invocation of various privileges to block any inquiry for contempt under the guise of a "separation of powers" argument. Dkt. 247, pp. 19-20. To the extent that any such privileges are of actual concern, the time and place to raise them is during the course of an investigation conducted by an independent attorney, not pre-emptively to block that investigation and effectively curtail the Court's inherent authority.

Also unpersuasive is the government's reliance on *Trump v. Slaughter*, 609 U.S. __, 146 S. Ct. 2283, 2026 WL 1855612 (2026), which the government cites in a footnote to suggest that Rule 42 itself is invalid "to the extent" that it "contemplates 'another attorney' could be appointed to handle what is otherwise an exclusively Executive Branch function and report to another branch of Government." (Dkt. 247, p. 18, fn. 10). In light of these "concerns," the government requests "an opportunity to brief this critical issue and also address the constitutionality of appointing 'another attorney'" in light of *Slaughter*. But Defendants have already squarely requested the appointment of an independent attorney pursuant to Rule 42 (*see*, *e.g.*, Dkt. 227, p. 24). Their reliance on that Rule to seek appointment of an independent attorney is not a surprise that requires further briefing. Moreover, the government's citation to *Trump v. Slaughter* does not even remotely suggest that there are grounds to invalidate Rule 42's authorization to appoint an independent attorney—which is the meritless argument that the government foreshadows.

In *Trump v. Slaughter* the Supreme Court invalidated on separation powers grounds a statutory restriction (15 U.S.C. §41) that limited the President's ability to remove commissioners of the Federal Trade Commission (FTC) only for cause. As such, Congress cannot limit the President's authority to remove "principal" officers that exercised substantial executive authority and fell within the executive branch.[15] The Supreme Court did not reach the question of removing inferior officers because that issue was not before the Court. *Trump v. Slaughter*, 146 S. Ct. at 2306 ("Nor do we determine the fate of officials not before us."). *See also id.* at 2311 (Gorsuch, J., concurring) ("To fulfill his constitutional duty to ensure the laws are faithfully executed, the Court holds, the President must have the ability to remove principal officers who exercise executive power in his name."). While defining the scope of this executive authority to remove principal officers, the Supreme Court also emphasized that the "President is not all powerful—not by any means." *Id.* at 2310.

The implications of the government's overly ambitious interpretation of *Slaughter* goes too far. The government apparently seeks to extend the Supreme Court's core holding that the President has the power to remove "principal officers" to all inferior officers and protected civil-service employees. This reading is a stretch beyond what the law allows. In short, the government's reference to *Trump v.*

---

[15] Pursuant to the Appointments Clause, a "principal officer" is "appointed by the President with the advice and consent of the Senate" and exercises significant authority under the laws of the United States. *Edmond v. United States*, 520 U.S. 651, 653 (1997). In contrast, an "inferior officer" is one who exercises authority but is supervised by a principal officer. *Id.* at 662-63; *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021). Inferior officers may be appointed by the President, the "Courts of Law," or the "Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

*Slaughter* is further support for this Court to find the need for an independent investigation of the facts in this case, including any direction from Main Justice and the White House to prosecute Defendants. Indeed, it is the *government's* position, underscored by its citation to *Trump v. Slaughter*, that would create substantial separation of powers concerns by overriding the will of Congress that is embodied in Rule 42's plain language as well as the ability of the Judiciary to protect and vindicate its own authority and interests.

**3. The Government's Response Demonstrates Why Further Investigation is Required to Develop the Record Fully Prior to Making a Complete Finding on the Issues of Contempt and Sanctions.**

The particular and unique circumstances of this case reinforce why the Court should not be obligated to first find contempt but should instead enlist an independent attorney to investigate and hold a hearing on the issue of contempt. While the record before the Court reveals misconduct that merits contempt proceedings, that record is still incomplete and requires further development in several key areas, specifically: (1) when the Front Office found about the misconduct in the October 9, 2025, grand jury that resulted in a no-true-bill; (2) when the Front Office learned about the misconduct in the second grand jury appearance and the decision to terminate proceedings in the October 16, 2025, grand jury proceeding; (3) the decision to redact portions of the grand jury transcripts that revealed this misconduct; (4) the decision to not inform the Court of the misconduct concealed by the redactions; (5) the decision to dismiss Count One in an apparent attempt to prevent the unredacted transcripts from being shown to the Court; and, (6) the

targeted selection of Defendants for prosecution and the involvement of Main Justice attorneys, specifically Aakash Singh.

As noted above, the government's Response only highlights the need for further inquiry into the many questions, both new and outstanding, that must be addressed before making a final conclusion about whether the government violated the provisions of 18 U.S.C. §401, or more generally engaged in conduct sanctionable by the Court under its inherent powers.

For example, the government's disclosure of the fact that a transcript of the October 9, 2025, first grand jury proceeding—during which the prosecutor's improper vouching was patently obvious—was emailed to the U.S. Attorney shortly after the grand jury rejected the charges must be investigated prior to reaching the issue of contempt. The U.S. Attorney disclaims having read his email, which, if to be believed, still raises questions about who else saw that email and read the transcript, much less why the transcript was ordered on an expedited basis in the first place. Any government attorney who saw the highly improper vouching should have immediately taken steps to remove both AUSAs from the case. Instead, both AUSAs went before the grand jury on October 16, 2025, where it was they who *removed* grand jurors who expressed concern about the government's evidence, including by calling it a "crock of shit." At a bare minimum, further inquiry is required to investigate how and why the transcript of the October 9, 2025, grand jury proceeding landed in his inbox and—according to him—was apparently unread. Such an inquiry could very well reveal additional misrepresentations made to the Court, specifically in reference

to the U.S. Attorney's May 21, 2026, comments about finding about the misconduct in late April.

As noted above, the government's Response also reveals that on September 27, 2025, a meeting was held that included Main Justice lawyers, the Chicago U.S. Attorney's Office, lawyers from one other U.S. Attorney's Office on the West Coast, and many federal law enforcement agencies where, as the government describes, "the September 26 'Broadview' incident was mentioned (and a public video played) as part of a broader discussion of incidents and conduct against ICE during that time." Dkt. 247, p. 41, footnote 15. The government writes that "to the Front Office's knowledge, the virtual meeting did not mention the identity or political affiliation of any person." *Id*. The government also notes that, "the Front Office is not aware of any communications in which it took *direction* from anyone outside the U.S. Attorney's Office regarding decisions as to" investigatory steps and who to charge. *Id*. (emphasis added). Notwithstanding its carefully couched disclaimers, the disclosure that the incident that gave rise to Defendants' prosecutions was, in fact, discussed with Main Justice lawyers on September 27, 2025, deserves further inquiry based on the government's prior disclosures that there were no such communications.

As noted above, the mere fact that the Chicago U.S. Attorney's Office would coordinate with Main Justice lawyers is not in and of itself reason for concern. However, the fact that the government here would not previously disclose that meeting when Defendants repeatedly asked for communications in the context of their selective prosecution claims is extremely concerning. Moreover, the fact that the

government still has not disclosed the identities of those Main Justice lawyers and, in particular, whether Aakash Singh was amongst them is of even greater concern given specific requests from defendants and that another federal District Court has found that Singh's communications with local federal prosecutors was indicative of selective and vindictive prosecution.[16] These are reasons showing why the Court is not bound to first find *prima facie* contempt before initiating investigative and/or contempt proceedings. Rather, the Court has the inherent authority to investigate further though an independent attorney so it can make a fully informed decision based on a developed record. That approach would be consistent with the judicial restraint and fully informed investigation called for by these troubling circumstances.

[16] The government cites *In re United States* in an apparent effort to block any further inquiry into this September 27, 2025, meeting with Main Justice lawyers. (Dkt. 247, p. 41, footnote 15). However, the invocation of deliberate process privileges does not insulate the government from scrutiny when defendants make a valid assertion of selective or vindictive prosecution. Here, Defendants have consistently asserted that Main Justice lawyers and the White House had a vested interest in pursuing politically motivated charges against protestors and those who were most vocally opposed to the administration, even in the most flimsy and bogus instances. This case fits the bill, as the individuals whom an ICE agent drove into while exercising their First Amendment rights were prosecuted for conspiracy and assault on that SUV. Kat Abughazaleh was known to officials in and associated with the administration. If the video shown at the September 27, 2025, meeting with Main Justice showed Ms. Abughazaleh—particularly if it was the same video that Mike Davis reposted *see supra*—there is no doubt that Main Justice lawyers such as Aakash Singh knew exactly who she was and the significance of bringing federal charges against her.

### B. There is a Reasonable Basis to Investigate Contempt Based on Misconduct before the Court and Outside the Court

#### 1. Misconduct Before the Grand Jury and the Deliberate Steps to Cover-Up that Misconduct Justifies Contempt Finding under §401(1) and (3)

Section U.S.C. §401(1) and (3) authorize the Court to punish by fine, imprisonment, or both, contempt of its authority amounting to (1) "misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice and (3) "disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

The government argues there is no *prima facie* showing of criminal contempt because the government did not "disobey" or "resist" a court order. (Dkt. 247, p. 20). But as demonstrated herein, the meager evidence of record to date seems to show government failed to comply with this Court's Order to produce grand jury transcripts regarding how the grand jury was instructed on the law regarding the conspiracy count. This, on April 8, 2026, after months of failed private negotiations with the government, the defendants filed a motion seeking disclosure of the grand jury transcripts in this case, including specifically those portions "reciting how the law was explained and presented to the Grand Jury concerning the §372 conspiracy charge and any related exchanges." Dkt. 118, p. 12.

The Court issued an order giving the government two options: (1) respond to the defendants' motion in writing or (2) "the relevant portions of the transcripts as outlined in the motion may be provided to the Court by 4/20/2026 in lieu of a written response." Dkt. 119. In deciding which route to take the government presumably

reviewed the transcripts at issue, realized that their own attorneys engaged in gross misconduct, and needed to decide what to do.

Only the government currently knows what happened during this discernment period of how to respond to the Court's Order, but what is clear is that the government came up with its own third option: produce heavily redacted transcripts in an attempt to facially comply with the Court's Order yet hide their own misdeeds in those very same transcripts. Actively hiding such misconduct from the defense and the Court cannot be characterized as anything other than "misbehavior" that mislead in a manner to obstruct the administration of justice. *United States v. Agajanian*, 852 F.2d 56, 59 (2d Cir. 1988) (finding "incomplete and misleading statements to the court" sufficient to sustain conviction under §401(1)).

Second, even accepting the government's technical "only the law part of the transcripts" premise at face value, it still falls on the wrong side of the equation because in their eagerness to hide all misconduct from the Court they redacted portions of the transcripts that were undoubtedly instructions on the law regarding conspiracy and thus required to be produced in unredacted form, even under the government's technical reading of the Court's Order (and absent consideration of its failure to correct the Court's obvious misunderstanding of the true facts hidden by the redactions). The exchange below, which is from the *omitted* portion of the October 23, 2025, and is attached hereto as Exhibit B, most certainly qualifies as an exchange related to the presentment of the conspiracy law as it was explained to the grand

jury, yet it was withheld entirely—not just redacted—to keep the truth from the Court's in camera review, directly flouting its clear order:

> GRAND JUROR: Yeah. But --
>
> MS. MECKLENBURG: -- and then we'll stop it when he gets to the car.
>
> GRAND JUROR: -- Michael Rabbitt no longer appears in the frame. And neither Kat -- or either Kat appears to be anywhere near the front of the truck again. I'm just wondering about that. So I don't -- I'm struggling to locate them.
>
> MS. MECKLENBURG: You -- they don't have -- they can step away. You can do it that -- you can impede for some time, and then you can decide that you're going to stop. That doesn't change the fact that you have impeded for some time. And they could be going -- and we don't know where they are here. They could be going and doing something else to the car or
>
> 36
>
> something else. We just don't know.
>
> GRAND JUROR: Okay.
>
> MS. MECKLENBURG: So I -- what's -- the probable cause comes from when you do see them on the video, not from when you don't.

....

MS. MECKLENBURG: So it's happening at the same time. But keep in mind, people are moving in and out --

MADAM FOREPERSON: Yeah.

MS. MECKLENBURG: -- which is part of the conspiracy.

(Dkt. 221, pp. 39, 42).

This exchange between the "Experienced AUSA 1" and a grand juror is undoubtedly an instruction of how conspiracy law was (wrongly) explained to the grand jury by the government and yet the government not only failed to disclose it to the Court as required, but reviewed it and knowingly decided to redact it from the Court. Thus, the defendants have indeed established a *prima facie* showing that the government disobeyed this Court's order to produce the grand jury transcripts in which the law regarding the conspiracy count was explained to the grand jury. Instead of producing discussions relevant to the instructions and discussion of the law, *the government omitted* numerous pages where both the "Experienced AUSA 1" and "Junior AUSA" discussed the law of conspiracy in response to the grand juror's questions. And when the Court noted that only a certain number of lines of transcript were missing, "Experienced AUSA 1," "Experienced AUSA 2," and "Junior AUSA" sat by silently—not alerting the Court that it was mistaken and wholesale chunks of transcript including discussions of the law had been removed. It is even more noteworthy that these transcript portions contain numerous other problems, such as the prosecutors giving their personal opinions about what was displayed on the videos, narrating what they believed to be shown in the videos, and outright lying

when "Experienced AUSA 1" told the grand jurors, "No law enforcement was out there, so they didn't take any video" when there clearly was body camera footage. (Exhibit B, Dkt. #220, p. 36, lines 17-18).[17]

Contrary to the government's spin (Dkt. 247, pp. 31-32), these omitted transcript portions do show the prosecutors misleading the grand jurors and effectively making themselves unsworn witnesses by telling grand jurors that the Defendants (as a group) had room to move out of the SUV's way and otherwise expressing opinions about their conduct while watching the videos. These falsehoods and injection of improper opinions by the prosecutors remained with the grand jurors who had *not* been excluded by "Experienced AUSA 1" and who returned the next week to be lectured by the U.S. Attorney before returned the indictment.

The government simply tried to make these pages disappear—which is at least *prima facie* evidence of obstruction of the administration of justice and disobedience of the Court's order to produce transcripts concerning the presentment of the law on the conspiracy charge and related exchanges. (R. 119). Further factual inquiry may justify, mitigate, or aggravate, these facts – which is why such inquiry is essential.

[17] Contrary to the "Experienced AUSAs" statement, there were multiple Broadview police officers present at the scene on September 26, 2025, for hours and many were equipped with Body Cameras that resulted in footage produced in discovery. That footage was, as Defendants have described, highly exculpatory, as it showed how throughout the morning Broadview police officers would part the crowd of protestors during the Jericho Walk to allow vehicles to part. As Defendants also previously noted, in one Broadview officer's video, Ms. Abughazaleh can be seen running back *away* from the Agent's SUV as it drove through the crowd, grabbing a megaphone and telling others to "come back," and then telling the same officer (who the AUSA told the grand jurors did not exist), "you just let him run us over!... He literally just ran over my foot!" (*See* Dkt. 87, p. 6).

### 2. Vindictive and Selective Prosecution Requires Further Investigation Beyond what is Already of Record

As discussed above, many serious questions remain about the selective and vindictive nature of the prosecution against Defendants. The government's recent disclosure of a September 27, 2025, meeting with Main Justice attorneys where the incident that gave rise to the charges was discussed only adds further cause for an inquiry. As do the still-open questions regarding the involvement of specific actors in Main Justice, such as Aakash Singh, whose involvement in another case has already been found to warrant dismissal of criminal charges. The record already shows that those within the Trump Administration and those closely aligned with it, including to Mr. Singh himself, specifically called for the prosecution of Ms. Abughazaleh for her involvement in protesting ICE at Broadview. Most certainly, being targeted for prosecution by the Administration for exercising First Amendment rights in opposition of the Administration's policies falls under selective prosecution.

The question is simply not whether the "Experienced AUSA 1" harbored animus toward these Defendants, but whether "ill will, whoever its bearer, actually motivated this prosecution. *United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir. 1996); *United States v. Meyer*, 810 F.2d 1242, 1248 (D.C. Cir. 1987) ("The Supreme Court's decisions concerning vindictive prosecution have focused on the conduct of the government as a whole, rather than on the conduct or retributive sentiments of a single prosecutor."). Thus, at this stage there is certainly sufficient evidence to show ill will, at least toward Ms. Abughazaleh, to justify further inquiry given the

government's prior representations that there were no outside communications related to this prosecution.

Indeed, neither the dismissal of the charges nor the government's agreement to pay Defendants' legal fees extinguish the Court's interest in investigating the issue of selective and vindictive prosecution as part of its overall inquiry into the government's misconduct. It was the government that made specific representations and denials to the Court about the complete lack of communications with Main Justice about this case. Those representations now appear to be untrue simply based on the newly disclosed September 27, 2025, meeting with Main Justice attorneys where this case was discussed and specific evidence was reviewed. The core issue about which the Court does not have a factual record before it is whether the government and U.S. Attorney have misrepresented to the Court the role Main Justice played in the decision to bring these charges against these Defendants and the conduct of the case once indicted.[18]

The government's reference to an unrelated case that was dismissed due to the "Experienced AUSA 1's" grand jury presentation also does not preclude the need for an inquiry in this case. (Dkt. 247, p. 38). Unlike that case, here there are statements by administration officials and their cronies targeting at least one Defendant for

[18] The government cites cases it has brought involving harm to federal law enforcement officers, property, and other federal interests. *See* Dkt. 247, p. 36, footnote 13. These are irrelevant points of comparison and do nothing to advance the government's arguments. No doubt, the government has an interest in prosecuting offenses against federal officers and property. That fact alone does not preclude this prosecution against Defendants from being selective and vindictive based on the influence, communications, or direction by those in Main Justice. Nor does it preclude this Court, at this stage, from inquiring further given the government's dubious representations to the contrary.

prosecution and multiple government representations that there was no outside influence in deciding to not just bring the charges, but to persist with them notwithstanding a no bill but even further misconduct in excusing grand jurors that was brought to the U.S. Attorney's attention, but did not deter the case from moving forward, albeit after the U.S. Attorney's decision to personally appear before the grand jury on October 23, 2025. There is no indication that the *Ishkirat* case cited by the government had any of these additional elements that beg for further inquiry in light of the government's subsequent representations to this Court.

Questions remain about communications with Main Justice attorneys during the grand jury proceedings, including whether they were advised about the grand jury's first "no bill" and had any discussions or communications about continuing to press forward with charges against Defendants. Should such communications exist, then the government's prior representations to the contrary made to this Court could be seen to violate 18 U.S.C. §401(1) and (3), or be viewed as sanctionable by the Court under its inherent powers, regardless of the government's dismissal of the charges against Defendants. At bottom, based on what we currently know occurred in this case, the government is not entitled to a presumption of regularity, and the Court should inquire further into the communications and interactions between the Chicago U.S. Attorney's office and others outside that office to determine whether the government's representations to this Court were false and misleading.

## III. THIS COURT SHOULD NOT ACCEPT THE GOVERNMENT'S CLAIM THAT OPR CAN OR WILL ADEQUATELY INVESTIGATE ADMITTED MISCONDUCT BY MULTIPLE AUSAS IN THIS CASE.

The government urges the Court not to exercise its discretion to investigate its acknowledged misconduct in this matter and leans heavily on the Department of Justice's OPR Section as a reason this Court can trust the government to police its own (Dkt. 247, pp. 41-43). The government ironically asserts, "the matter has caught 'the Justice Department's attention.'"[19] (*Id*. at 42).

While historically OPR could be an effective tool to investigate prosecutorial misconduct within the Department of Justice, the objective evidence demonstrates the OPR of today is no longer able or incentivized to conduct the independent and thorough investigation required in this case. First, this Administration has made clear its lack of commitment to investigating its own misconduct within the DOJ by slashing the resources dedicated to investigating misconduct. This Administration cut the number of attorneys assigned to the OPR Office by over 40%, reducing the number of employees at OPR from 29 to 16.[20] Not only has the Administration cut the OPR workforce nearly in half, it has not even bothered to replace the Director of OPR who was fired over a year ago.

---

[19] As now finally acknowledged by the government this matter "caught the Justice Department's attention" before the case was ever indicted.

[20] According to DOJ records, OPR received 1,666 complaints during fiscal year 2025 yet only opened seven formal investigations. *See* Andrew Goudsward and Brad Heath, *At Trump's DOJ, Watchdogs Gutted as Misconduct Complaints Soar*, U.S. News by Reuters, Aug. 6, 2026, available at: https://tinyurl.com/3c66xzth (last accessed September 15, 2026).

The government is asking this Court to abdicate its independent judgment and stand down on its own investigation and trust DOJ to police its own despite objective evidence demonstrating this Administration has no desire to investigate internal misconduct. Gutting OPR's resources and refusing to name a new Director would be disturbing at any point in time, but taking this approach at this time given a surge in misconduct complaints at the DOJ is even more troubling.

There are consequences to DOJ's many public and well-documented failings to do the right thing over the past two years and those failings have consequences namely the lost of trust by the public and the Courts. As stated by Bruce Green, a legal ethics expert, "[w]e see all these opinions where judges are critical of the government lawyers and then we're not seeing anything coming out of OPR . . . So how can you trust them?"[21]

### A. The U.S. Attorney Has Demonstrated He Is Unable to Fairly Investigate and Address the Misconduct That Occurred.

Another reason this Court should exercise its inherent discretion to ensure that there will be accountability for the acknowledged misconduct that occurred in its courtroom is the now acknowledged significant failings of USA Boutros to identify and alert either the Court, or OPR, to the misconduct of his employees *before* defense counsel forced the issue.

Buried in a footnote on page 16 of its response, U.S. Attorney Boutros for the first time acknowledges that he personally received a transcript of the now infamous

[21] *Id.*

October 9, 2025, grand jury session just 5 days later on October 14, 2025 (Dt. 247, p. 16, fn 9).[22] This stunning admission raises numerous questions about which the Court must inquire and makes plain the fact that this U.S. Attorney's Office cannot fairly or impartially investigate this matter.

Acknowledging that he possessed the October 9 transcript as early as October 14, 2025, is critical for multiple reasons. First, it stands in stark contrast to his statement to the Court that he was not aware of the vouching that occurred on October 8 until the end of April 2026, nearly 6 months later. USA Boutros told this Court:

> I also want to put on the record now that these minutes have been unsealed pursuant to your order, that I was completely unaware of any vouching that took place in the grand jury, and only became aware of it on either April 27 or the 28th.

5-21-26 Tr 51:6-9. Because any lawyer reading just the first two pages of the October 9 grand jury transcript, much less a highly experienced federal prosecutor, would spot the overt vouching issue, determining whether the transcript that was emailed to him was read, including reviewing the computer data that would objectively stablish whether the transcript was opened or forwarded, and finding out why the transcript was ordered – on an expedited basis – is the minimum required to ascertain the base facts to inform the Court's judgment. Clearly, reason and common-sense dictate that someone in the supervisory chain ordered the transcript on an expedited basis, as the

[22] The U.S. Attorney claims he is "quite certain he did not review the transcript at that time." (Dkt. 247, p. 16, fn 9). Still unknown, however, is who in the U.S. Attorney's Office or the DOJ *did* review it "at that time."

"Experienced AUSA 1" and "Junior AUSA" were in the room. Reason and common sense also dictate that those in the supervisory chain would have reviewed and "expedited" grand jury transcript after a No-Bill, especially the individual who would have been responsible for authorizing the re-presentment of the case for a second time to the grand jury.[23] Surely the U.S. Attorney would not have authorized the representment of the indictment, something that rarely has occurred in the Northern District of Illinois, without reading the transcript of what occurred during the first presentment. These open questions—triggered by the new disclosure in the government's Response—cast doubt on other representations made before this Court.

## IV. THE COURT SHOULD ORDER DISCOVERY FOR THE PENDING HYDE AMENDMENT PETITIONS.

Finally, the Court should grant Defendants' request for limited discovery in support of their Hyde Amendment claims for the reasons set forth in their motion. (Dkt. 206). While the government has remained committed to payment of attorney's fees, no amount has been settled upon. The limited discovery Defendants seek focuses on issues related to bad faith, vexatious, and/or frivolous nature of the litigation. This discovery is related to the Hyde Amendment proceedings. Whether or not there were

---

[23] *See* U.S. DOJ, Justice Manual, Power of a Grand Jury Limited by its Function, JM9-11-120:

> Approval Required Prior to Resubmission of Same Matter to Grand Jury: Once a grand jury returns a no-bill or otherwise acts on the merits in declining to return an indictment, the same matter ( i.e., the same transaction or event and the same putative defendant) should not be presented to another grand jury or resubmitted to the same grand jury without first securing the approval of the responsible United States Attorney.

JM9-11-120, available at: https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.120 (last visited Sept. 15, 2026).

communications with Main Justice that the government not only concealed from the Court and Defendants, would most certainly be relevant to those issues, especially as the government now minimizes the prior misconduct as "mistakes." Issues regarding potential privileges can be dealt with once the government responds to the discovery requests, including with *in camera* review, as opposed to the blanket shield that the government seeks cover under. (Dkt. 247, p. 39).

The government's reliance on *Trump v. United States*, 603 U.S. 593 (2025) (Response, p. 40) to oppose Defendants' requests for discovery is both curious and concerning. In *Trump v. United States*, the Supreme Court held that the President of the United States is absolutely immune from criminal prosecution for core presidential acts done in the exclusive sphere of presidential immunity. The citation is curious to the extent that it suggests that President Trump was involved in this prosecution—which would directly contravene the representations the prosecutors have made to this Court and defense counsel. The citation is also concerning because it is wielded as an impenetrable shield to oppose Defendants' request for discovery. But *Trump v. United States* dealt with a narrow question of presidential immunity for exclusively presidential acts done within the executive's core authority. The case does not grant blanket immunity from discovery requests to investigate the misconduct of those downstream of the Executive such as U.S. Attorneys and prosecutors are also immunized.[24] It would grossly expand the narrow holding of

[24] Nor does *Trump v. United States* extend criminal immunity to any official other than the President, including U.S. Attorneys and federal prosecutors. *See Trump v. United States*, 603 U.S. at 675 (Sotomayor, J., dissenting) ("The public interest in criminal prosecution is particularly strong with regard to officials who are granted some degree of civil immunity

*Trump v. United States* to preemptively immunize and insulate the entire executive branch from *any inquiry*. Again, what is at stake at this stage is not just whether those outside the Chicago U.S. Attorney's office had any role in the decision to select any of the Defendants for prosecution or had communications with the office at any time—it is also about the veracity of the government's prior representations to this Court that no such communications occurred.

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in Defendants' opening motions (Dkt. 225, 226, and 227), the Court should exercise its inherent authority and:

- Require the government to produce to the Court, *in camera*, any communications among/between anyone in the Chicago U.S. Attorney's Office and anyone from Main Justice, to include emails, text messages, phone logs and calendar invites.

  Appoint a special counsel to conduct an investigation of the facts pursuant to Federal Rule of Criminal Procedure 42, or alternatively an *amicus curiae* to assist with an investigation into the government's misconduct.

- Order limited discovery in connection with Defendants' *Hyde* Amendment petitions.

---

because of their duties. It is in those cases where the public can see that officials exercising power under public trust remain on equal footing with their fellow citizens under the criminal law."); *see also* Zachary S. Price, *Even if the President is Immune, His Subordinates are Not*, Yale Journal on Regulation, July 11, 2024, available at: https://tinyurl.com/4sksupez (last visited Sept. 13, 2026) ("even when the President is immune (and *Trump* carries significant ambiguities about the scope of that immunity), he or she will often be able to take unlawful action only if subordinate officers are willing to risk personal legal jeopardy or career damage by doing so.").

Dated: September 15, 2026

Respectfully submitted,

**/s/ Nancy L. DePodesta**
**/s/ Carly Alana Chocron**
Taft Stettinius & Hollister LLP
111 E Wacker Dr, Suite 2900
Chicago, IL 60601
312-836-5884
ndepodesta@taftlaw.com
cchocron@taftlaw.com
*Attorneys for Michael Rabbitt*

**/s/ Joshua G. Herman**
Law Office of Joshua G. Herman
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
312-909-0434
jherman@joshhermanlaw.com

**/s/ Molly Armour**
Law Office of Molly Armour
53 W. Jackson, Blvd., Suite 1424
Chicago, IL 60604
773-746-4849
armourdefender@gmail.com
*Attorneys for Katherine Marie Abughazaleh*

***/s/ Terence H. Campbell***
***/s/ Valerie Ann Davenport***
Cotsirilos, Poulos & Campbell, Ltd.
55 E. Monroe Street, Suite 3250
Chicago, IL 60603
312-263-0345

tcampbell@cotsiriloslaw.com
vdavenport@cotsiriloslaw.com
*Attorneys for Andre Martin*

***s/ Christopher Parente***
***/s/ Damon M Cheronis***
Cheronis & Parente
140 S. Dearborn, Suite 404
Chicago, IL 60603
773-458-4899
cparente@cheronislaw.com
damon@cheronislaw.com
*Attorneys for Brian Straw*

**/s/ Cynthia Giacchetti**
Law Office of Cynthia Giacchetti
53 W. Jackson Blvd., Suite 1035
Chicago, Illinois 60604
cg@cgdefense.com
312-939-6440
*Attorney for Catherine Sharp*