**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 25-cr-693 |
| v. | ) | |
| | ) | Judge April M. Perry |
| MICHAEL RABBITT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# ORDER

## I. Government's Response to the October 9 Request for Evidence

On October 30, 2026, the Government filed its "Response to the Court's October 9 Request for Evidence and Memorandum Addressing Federal Rule of Criminal Procedure 42." *See* Doc. 285. In pages one through four of the Government's Response, the Government professed confusion about the Court's minute order of October 9 and instructed the Court to "enter an amended order and the United States will respond accordingly at the appropriate time." *Id*. at 2. The Court interprets the Government's directive as a motion for clarification.[1] To clarify: the Court's October 9 minute order was, as phrased, a request for voluntary compliance with the Court's factual inquiry regarding the misconduct that has occurred before it in this case. The October 9 order requested voluntary compliance for two reasons:

(1) The Court believed that the Government would, in fact, comply voluntarily. The Court held an hour-long hearing on October 1, 2026 for the very purpose of discerning whether the Government had any objection to voluntary compliance, and apart from raising privilege concerns (which were accounted for in the October 9 order), the Government provided no reason that it would not comply. *See* Doc. 271 at 24–25.[2] Moreover, voluntary compliance seemed to be the Government's preferred path, given the Government's strong objections to a third-party with subpoena power being appointed to investigate this matter. Finally, the Court took the Government at

[1] A motion for clarification is the proper procedural tool when a party is unclear about the scope of a court order. Motions for clarification are of course best filed shortly after receiving the court order, rather than three weeks later and seventy-five minutes before the close of business on the date that compliance with the court order was requested. The timing of the Government's filing could easily lead one to conclude that the goal of the filing was not to cure genuine confusion about the Court's order, but instead to inject unnecessary delay into these proceedings.

[2] Specifically, the Court asked the Government's attorney, "If I thought there was enough smoke, you would be willing then to produce documents subject to claims of privilege?" Doc. 271 at 25. The Government's attorney replied, "That's my understanding, correct." *Id*.

its word that it was interested in regaining the Court's trust after its acknowledged missteps. *See* Doc. 247 at 40. Trust is best rebuilt through cooperation, not gamesmanship.[3]

(2) If the involved prosecutors' statements to the Court were truthful, the documents the Court requested would be exculpatory. As is discussed in detail below, at least two statements have been made to the Court which the Court now believes were inaccurate. For both statements, documents within the Government's possession could provide objective corroboration that the prosecutors' statements were truthful. Generally, attorneys appreciate the opportunity to provide evidence that they have not lied to the Court, and the Court wanted to provide that opportunity to these prosecutors.

Despite this, the Government now states that it "has not agreed to provide any information to the Court." Doc. 285 at 2. Instead, the Government demands that the Court provide "concrete notice of the factual basis for any investigation," *id*. at 1, and asserts that there is an "ambiguous record about why there is an investigation in the first place," *id*. at 2. To be clear: the factual basis for the Court's inquiry is not a mystery to anyone who has had any involvement with this case or even conducted a cursory review of the docket. However, given that the Main Justice attorney who filed the October 30 response did so immediately after having filed his appearance on the day the response was due, the Court will address his professed confusion and provide a detailed explanation for its document requests.[4]

The Court's first request was for "all communications between September 26, 2025 and March 30, 2026 from, to, or with anyone outside of the Northern District of Illinois U.S. Attorney's Office (other than the local FBI investigators assigned to the case) regarding any investigatory or charging decisions for this case." *See* Doc. 276. This language exactly mirrors AUSA William Hogan's assurance to the Court on March 30, 2026 that "there are **no** communications of any nature from, to, or with ***anyone*** outside the USAO (other than the local FBI investigators assigned to the case) regarding any investigatory or charging decisions. To be crystal clear, this specifically includes anyone in the White House and all components and offices

---

[3] The Department of Justice ("DOJ") has adopted this principle through its Corporate Enforcement and Voluntary Self-Disclosure Policy, under which corporations that voluntarily self-disclose their misconduct to DOJ and fully cooperate with DOJ's investigation are able to avoid criminal prosecution. *See Voluntary Self Disclosure and Monitor Selection Policies*, U.S. Dep't of Just., https://perma.cc/8DSG-TNUV (July 21, 2026). The Court finds it curious that DOJ encourages other entities to proactively investigate, confess, and provide evidence of their potential wrongdoing while at the same time asserting that it is in an "untenable position," Doc. 285 at 2, when it is asked to do the same.

[4] The Court's inquiry is not limited to the two topics raised by the document requests. Rather, the document requests were limited to those matters that concern the Court which could have been easily addressed with documentary evidence.

of Main Justice." Doc. 110 at 3–4 (emphasis in original). As the Court made clear at the October 1 hearing on this issue, the Court understood AUSA Hogan's statement to mean what it said—no one from outside of the Chicago U.S. Attorney's Office ("USAO") attempted to affect the course of the case. *See* Doc. 271 at 43–46. Furthermore, the Government knew in real-time that this was the Court's interpretation of AUSA Hogan's assertion, because the Court summarized its understanding in open court on April 7 by stating: "the prosecutors agreed to provide evidence of external forces communicating with the Chicago U.S. Attorney's Office about this case, and they have now said there is no such evidence." Doc. 132 at 6.[5] No federal prosecutor present in court on April 7 indicated that the Court's interpretation of the sweeping language used by AUSA Hogan was mistaken, and the Court explicitly relied upon its understanding to deny a defense request for discovery. *See id.*

However, since April 7, the Government has become what can only be described as cagey about its communications with those outside of the USAO. *See, e.g.*, Doc. 271 at 42–46. For example, the Government has stated that AUSA Hogan's statement was "true as it relates to pre-charging decisions," *id.* at 44, but then refused to explain what it meant by "pre-charging" in a case where the grand jury refused to return an indictment on one occasion, then was re-presented with evidence two more times before returning an indictment, and the felony charge was later dismissed and a misdemeanor charge issued, *see id.* at 44–48. The Government has at the same time argued that if any such communications did exist, they would be privileged, but also refused to admit that the proper way to raise a claim of privilege if there were relevant documents was to assert it at the time the documents were requested. *See id.* at 41–42; *see also In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) (noting that the party seeking to establish privilege bears the burden of demonstrating that the privilege applies and that any assertion of privilege "must be made on a document-by-document basis"). Finally, the Government has now acknowledged an unknown number of "discussions between the [USAO] and Main Justice regarding such things as case updates." Doc. 247 at 47 n.15. The Court cannot imagine what "discussions" regarding "case updates" would not have been responsive to the request for communications regarding investigatory or charging decisions.[6] And the Government's newest interpretation that it was only required to disclose communications "in which it took direction

---

[5] AUSA Hogan's affirmance that there were no such communications was repeated and inflammatory. *See, e.g.*, Doc. 110 at 1–3 (alleging that former defendants' belief that "external political influence" had led to the charges in this case was "completely false" and that it was a "nonsensical hypothesis that officials in Washington had such an interest in local Illinois government" that was "the product of fevered paranoia and delusional speculation").

[6] It has been alleged by Douglas DePodesta, then-Special Agent in Charge of the FBI Chicago Field Office, that there was an October 7, 2025 meeting between U.S. Attorney Andrew Boutros, Attorney General Todd Blanche, FBI Director Kashyap Patel, and Assistant Attorney General Colin McDonald regarding this investigation. *See DePodesta v. Boutros et al.*, Case No. 26-cv-13506, Doc. 1. ¶ 48 (N.D. Ill. Nov. 2, 2026). If this is the type of discussion that the Government is alluding to, it would have been covered by the discovery request and directly contradicts AUSA Hogan's assertion to the Court.

from anyone outside" the USAO, *see id.*, is totally unsupported by the contemporaneous discussions on this topic. *See, e.g.*, Doc. 278 at 5 (AUSA Hogan agreeing on March 19 to disclose any "communication from someone outside the U.S. Attorney's [O]ffice in government urging, encouraging, [or] pushing for a particular prosecution"). The Government's additions of caveats and carve-outs to what began as an affirmative statement of fact indicates to the Court that the representation that "there are **no** communications of any nature from, to, or with ***anyone*** outside the USAO" was false. *See* Doc. 110 at 3.

The Court's second request for documents was for "the October 14, 2025 email sent to U.S. Attorney Boutros attaching the October 9, 2025 Grand Jury transcript and any replies to or forwards of that email." *See* Doc. 276. This request arose from USA Boutros's statements to the Court on May 21 and August 4, 2026. Specifically, on May 21, USA Boutros appeared before the Court to dismiss the charges against the former defendants. His presence was not requested by the Court, nor was he questioned by the Court. He instead gave a monologue that spans five uninterrupted transcript pages. *See* Doc. 187 at 50–54. During that statement, USA Boutros volunteered that he was "completely unaware of any vouching that took place in the grand jury, and only became aware of it on either April 27 or the 28th . . . . That was the first time any issue of vouching rose to my level. And, frankly, to the level of anyone in the front office." *Id.* at 51. However, it has since come to light that at the time USA Boutros made that statement, he had for more than seven months been in possession of the transcript that contained—on the first substantive page—the vouching at issue. Doc. 247 at 22 n.9. USA Boutros obtained that transcript just five days after the problematic grand jury appearance. *Id.* USA Boutros informed the Court on August 4, 2026 that while he may have been emailed the transcript on October 14, 2025, he is "quite certain he did not review the transcript at that time." *Id.*

USA Boutros's statements are hard to credit. Grand jury "no bills" are exceedingly rare. To anyone who has been a federal prosecutor, a no bill would be an immediate red flag that something has gone very wrong in the grand jury. Because of this, USA Boutros himself had to approve the re-presentment of the case to the grand jury. *See* U.S. Dep't of Just., Just. Manual § 9-11.120 (available at https://perma.cc/9BYY-2W97). He apparently did so, because the first re-presentment occurred on October 16. The idea that USA Boutros would have made such a significant decision without reviewing the best evidence available to him about what went wrong in the grand jury is nearly unfathomable.

For the foregoing reasons, as well as those previously stated on the record in open court on October 1 and May 21, 2026, the Court concludes that there is more than an adequate factual basis for the Court to pursue an inquiry as to whether willful false statements were made to the

Court. Accordingly, the following individuals must[7] appear to testify under oath in Courtroom 1725 on November 16, 2026 at 9:00 a.m.:

1. USA Andrew Boutros
2. AUSA William Hogan
3. AUSA Matthew Skiba
4. AUSA Andres Almendarez

The scope of the requested testimony will include the grand jury transcripts at issue in this case and the redactions to those transcripts, the accuracy of statements made to the Court regarding communications with those outside of the USAO about this case, USA Boutros's statements to the Court on May 21, and prosecutors' repeated failures to correct the Court's stated misconceptions about the aforementioned matters.

The Court will also accept testimony from any former or current employee of the U.S. Attorney's Office or federal law enforcement agency who has first-hand knowledge about the above events and who wants to ensure a full and accurate record is presented to the Court.

Finally, the Government is given an additional three days to produce the documents previously requested by the Court. If it declines to do so by November 5, 2026 at 5:00 p.m., the Court will make factual findings and determine the appropriate next steps based upon the record currently before it and which is developed at the November 16 hearing as well as the legal briefing that has been requested from Professor William Baude.

## II. Government Staffing Changes

In addition to the Government filing its responsive brief on October 30, there were two other filings of note that day. Specifically, the two AUSAs who had been handling the case following the dismissal of charges both moved to withdraw. Their motions stated only that they were "no longer assigned to this case." *See* Docs. 279, 281. Several hours later, Associate Attorney General ("AAG") Stanley Woodward Jr. filed his appearance. *See* Doc. 283.

AAG Woodward's appearance creates a new complexity for this case. Applying the presumption of regularity (not to mention the Rules of Professional Conduct), AAG Woodward would have fully educated himself about the facts of this matter before signing and filing the Government's brief. *See Model Rules of Pro. Conduct* r. 1.1 ("A lawyer shall provide competent representation to a client. Competent representation requires the . . . thoroughness and preparation reasonably necessary for the representation.") (available at https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_pr

[7] The Court uses "must" in its legal sense, which is to say it is mandatory. *See United States v. Cunningham*, 54 F.3d 295, 302 (7th Cir. 1995) (noting that in legal terms, "may" is permissive, whereas "must" is mandatory).

ofessional_conduct/rule_1_1_competence/).[8] This preparation presumably would have included reviewing the documents requested by the Court[9] and discussing the matter with the involved prosecutors. If he took the steps that would be expected of competent counsel before filing the Government's October 30 brief, AAG Woodward has been exposed to evidence that an appointed special prosecutor would not be able to obtain. For example, AAG Woodward would have reviewed documents which DOJ claims are privileged. *See, e.g.*, Doc. 247 at 25. And unless the implicated prosecutors were provided with *Garrity* admonishments before any discussions, AAG Woodward also may have been exposed to compelled statements. *See Garrity v. New Jersey*, 385 U.S. 493, 496 (1967) (holding that statements compelled from employees by nature of a choice between "self-incrimination or job forfeiture" are not admissible in a subsequent criminal prosecution). Under established DOJ procedures, the proper way to deal with any such issue is to remove the tainted prosecutor from the team making prosecutorial decisions. *See, e.g.*, *United States v. Proano*, 912 F.3d 431, 437 (7th Cir. 2019) (discussing use of a filter team to remove protected materials from a case file before transferring the case to the prosecution team).

The problem is, of course, that the Government has taken the position that only the Attorney General can supervise any prosecution arising from this case, and if the Attorney General is unable to do so, then the Deputy Attorney General, AAG, or Solicitor General would take his place. *See* Doc. 285 at 5 n.2. The Court previously shared its concerns with the Government about potential conflicts with the Attorney General supervising this investigation, given the former defendants' suspicion that high-level supervisors within the Department of Justice had been involved with the relevant events. Now, high-level DOJ supervisors are in fact involved.

Therefore, to the extent the Government persists in its position that the Attorney General must supervise any potential criminal investigation, AAG Woodward must submit a certification by November 13, 2026 that the Attorney General, Deputy Attorney General, and Solicitor General have not been provided with any evidence during the pendency of this case that a special prosecutor would not be able to consider when contemplating whether or not to file charges. This includes exposure to any communications over which DOJ claims a privilege (including, for example, meetings regarding this investigation which may have taken place on October 7, 2026) as well as potentially *Garrity*-protected statements. If the Attorney General, Deputy Attorney General, or Solicitor General have been provided with such evidence, either directly or in summary fashion, or were in fact participants in the relevant communications, the AAG must file

[8] The Court cites to the Model Rules of Professional Conduct adopted by the American Bar Association, as those are the applicable ethical rules of this Court pursuant to Local Rule 83.50.

[9] Although the Government chose not to provide the documents as requested on October 30, 2026, it would have presumably both gathered and reviewed the relevant documents before making such a weighty decision.

a legal memorandum by November 13, 2026 explaining why they would still be able to supervise a potential criminal investigation involving those matters.

The motions to withdraw filed by AUSAs Diane MacArthur and Nathaniel Whalen, Docs. 279, 281, are granted, and the Court strikes the motion presentment dates of November 5 and 10, 2026.

April M. Perry

Dated: November 2, 2026

APRIL M. PERRY
United States District Judge