# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 25 CR 693 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MICHAEL RABBITT, | ) | |
| KATHERINE MARIE ABUGHAZALEH, | ) | |
| ANDRE MARTIN, CATHERINE | ) | |
| SHARP, BRIAN STRAW, and | ) | Chicago, Illinois |
| JOSELYN WALSH | ) | October 1, 2026 |
| Defendants. | ) | 1:00 p.m. |

TRANSCRIPT OF PROCEEDINGS - HEARING ON MOTION
BEFORE THE HONORABLE APRIL M. PERRY

APPEARANCES:

For the Government: HON. ANDREW S. BOUTROS
UNITED STATES ATTORNEY
BY: MS. DIANE MacARTHUR
MR. MAXWELL LISY
MR. NATHANIEL WHALEN
219 S. Dearborn Street, Suite 500
Chicago, Illinois 60604

For Defendant Michael Rabbitt: TAFT STETTINIUS & HOLLISTER, LLP
BY: MS. NANCY L. DePODESTA
111 East Wacker, Suite 2600
Chicago, Illinois 60601

For Defendant K. M. Abughazaleh: LAW OFFICE OF JOSHUA G. HERMAN
BY: MR. JOSHUA G. HERMAN
53 West Jackson Boulevard, Suite 404
Chicago, Illinois 60604

LAW OFFICE OF MOLLY ARMOUR
BY: MS. MOLLY ARMOUR
53 West Jackson Boulevard, Suite 1424
Chicago, Illinois 60604

APPEARANCES (Cont'd):

| | |
|---|---|
| For Defendant Andre Martin: | COTSIRILOS, POULOS & CAMPBELL, LTD.<br>BY: MR. TERRENCE H. CAMPBELL<br>55 East Monroe Street, Suite 3250<br>Chicago, Illinois 60603 |
| For Defendant Brian Shaw: | CHERONIS & PARENTE<br>BY: MR. CHRISTOPHER PARENTE<br>MR. DAMON CHERONIS<br>140 South Dearborn Street, Suite 404<br>Chicago, Illinois 60603 |
| For Defendant Catherine Sharp: | LAW OFFICE OF CYNTHIA GIACCHETTI<br>BY: MS. CYNTHIA GIACCHETTI<br>53 W. Jackson, Suite 1035<br>Chicago, Illinois 60604 |
| For the Intervenor Sheri Mecklenburg: | AKERMAN, LLP<br>BY: MR. SERGIO ACOSTA<br>MR. JOEL BERTOCCHI<br>71 S. Wacker Drive, Suite 4700<br>Chicago, Illinois 60606 |
| Court Reporter: | Noreen E. Resendez, CSR, RPR, CRR<br>Official Court Reporter<br>219 S. Dearborn Street, Room 1728<br>Chicago, Illinois 60604<br>312-582-5267<br>Noreen_Resendez@Ilnd.uscourts.gov |

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURTROOM DEPUTY: Calling case 25 CR 693, USA vs. Rabbitt, et al.

THE COURT: All right. Come on up.

MR. LISY: Your Honor, Maxwell Lisy, L-I-S-Y, on behalf of the United States.

MR. WHALEN: Nathaniel Whalen on behalf of the United States. And at counsel table is Diane MacArthur.

THE COURT: Good afternoon.

MR. CAMPBELL: Terry Campbell on behalf of Andre Martin, who's present in court.

MR. PARENTE: Good afternoon, Your Honor. Chris Parente and Damon Cheronis for Mr. Straw, who is behind me.

MS. DE PODESTA: Good afternoon, Nancy DePodesta on behalf of Michael Rabbitt, who is here.

MR. HERMAN: Good afternoon. Josh Herman and Molly Armour on behalf of Kat Abughazaleh, who is present.

MS. GIACCHETTI: Good afternoon, Judge. Cynthia Giacchetti on behalf of Catherine Sharp, standing to my left.

MR. ACOSTA: Good afternoon, Your Honor, Sergio Acosta and Joel Bertocchi for movant/intervenor Sheri Mecklenburg.

THE COURT: All right. Good afternoon, everyone.

Let's start with the motion to intervene.

Don't go too far, Mr. Acosta.

First, does anyone want to be heard on this motion? I know the defendants have already stated they do not -- sorry -- former defendants have already stated they do not object.

Does the government have a position?

MR. WHALEN: Judge, the government doesn't have a position at this point, just because I think the motion was contingent on this Court continuing with additional hearings, and depending on which direction this Court goes as to any hearing, that might be moot.

So at this point, we just think it's premature to have a position on it.

THE COURT: Okay. The motion is granted.

Given that the defendants -- I'm sorry, the questions presented could affect not only the individual law licenses of the AUSAs who have been implicated, but also the possibility of a criminal prosecution, the stakes are very personal and very high, and I don't think that the U.S. Attorney's Office necessarily will be aligned with each of the individual AUSAs, so intervention is both appropriate and I think necessary to ensure that Ms. Mecklenburg's interests are represented. And I would make the same ruling with respect to any of the other individual AUSAs should they ask to intervene.

And just to be clear, the intervention is only for the purpose of the motion for sanctions and to appoint the

special prosecutor, which is what we will be talking about second today.

So I'm going to ask if you could step back, and we'll talk first about the motion for attorney's fees and discovery.

MR. ACOSTA: Of course, Your Honor.

THE COURT: Thank you.

So we're going to start with the motion for attorney's fees for litigation expenses and for discovery as related to the Hyde Amendment. I've got a few questions, and I'll ask after the questions if anybody wants to say anything else for the record.

Let me ask both, I'm assuming you have not settled the issue at this point, or agreed to the fees?

MR. LISY: That's correct, Your Honor.

THE COURT: Okay. On July 7th the government asked for time to negotiate. Have you been negotiating?

THE GOVERNMENT: There have been communications and some talks between the parties. They've asked us to look into some additional issues, and the parties are continuing to talk and look into those issues.

THE COURT: Does that sound about accurate?

MR. PARENTE: So just one point I want to make sure. Again, the offer from -- just so we're clear, the offer from the government was that they were going to pay fees, but it's at a much reduced rate.

All counsel gave individual defendants a reduced rate, but still much, much higher than what the government is offering to pay. So the ask that we made of US Attorney's Office is, would they consider, since they have owned their mistakes and said that they want to fix what they've caused here, all of our clients are out a significant amount of money. They have offered to pay much, much less than our clients have to pay us. So would they consider, even if they think that the statutory rate is the correct rate under the rules, given their admitted misconduct here and their wanting to kind of correct their mistakes, would they be willing to pay the higher rate that we actually billed our clients at. And we've been waiting to hear back on that.

MR. CAMPBELL: And I'll add one thing to that, Judge, which is, I think the, at least, existing dispute is whether there is a special factor or not. And the statute doesn't provide any limits as to what can be considered a special factor, and so to the extent we are, and we are at this point, at odds on that issue, we've asked for discovery on that issue.

THE COURT: On the issue of whether a special factor is present?

MR. CAMPBELL: Yeah. So, my view is that if there are certain things that we've asked for -- it's overlapping with the discovery that we've asked for. But if there are

additional factors that go beyond just bad faith or vexatiousness, and we think that there may well be, if it's not already apparent to the Court, we think that further discovery would show that, that that would be a special factor.

So, for example, if there are continuing misrepresentations that have occurred to the Court, I think that would be a special factor that would warrant the Court saying, no, you're going to get this, albeit reduced from market rates, but higher than the statutory rate, which was based on the CJA rate back in 1996 adjusted for inflation.

THE COURT: Do you have any caselaw about special factor being adjusted based upon the vexatiousness of the conduct?

MR. CAMPBELL: So there is, at least as far as I know, quite sparse caselaw on this topic.

THE COURT: At all. Okay.

MR. CAMPBELL: We did cite in our filings a couple cases that say, yes, a special factor is here, I think in less severe factual circumstances. And so what we're relying on is, this is something over and above mere vexatiousness or bad faith, but that there is misconduct here that warrants the Court saying, yes, that is a special factor.

THE COURT: Okay.

MR. CAMPBELL: And as I say, the statute doesn't

limit it. It just says a special factor, for example, and gives an example.

THE COURT: Let me ask the government. Are you agreeing to vexatious? Are you agreeing to frivolous? Are you agreeing to bad faith? Or some combination of those three?

MR. LISY: Neither, Your Honor. The government is not taking a position to any of those. We are not admitting to any specific liability here. We are just not requiring the former defendants to prove those counts. It's just not at issue. We've consented to the fact that they're eligible and entitled to reasonable attorney's fees and costs. So it's just not an issue that needs to be proven here.

THE COURT: So you think that I can make a finding that attorney's fees are required without making a finding as to vexatiousness, frivolousness, or bad faith?

MR. LISY: Yes. It's the same idea -- this is a civil issue within this specific criminal case. And like any civil issue, the parties can agree that there is no specific element of any issue that has to be proven. We are just -- the United States is not requiring these defendants to prove that the actions were vexatious, frivolous, or in bad faith.

THE COURT: Well, generally speaking in most civil cases, don't the parties acknowledge that it has been proven, rather than refusing to acknowledge it has been proven and

then say skip over that part?

MR. LISY: We're acknowledging that they're entitled to those fees.

THE COURT: Okay.

MR. LISY: That is the position of the United States.

THE COURT: Okay. For the defendants, acknowledging that there is almost no caselaw out there on this, have you found any Hyde Amendment case where discovery was ordered to be given to the defendants?

MR. CAMPBELL: So the answer is, yes. And I can't cite you the case name off the top of my head. But we did cite at least one and I think two cases in our filings. I know there would be one within the last week where the answer was, yes, they made the prima facie showing that they were entitled to discovery. So the answer is yes.

THE COURT: The Court was entitled to the discovery or the defendants were entitled to discovery?

MR. CAMPBELL: You got me on that detail. I thought it was the defendants, but I will add the caveat that the statutory framework, I think, says, you know, particularly if it involves, you know, potentially privileged stuff that would go to the Court in camera. So that may be the first step with respect to the things that we are asking for to prove the special factors.

THE COURT: Well, I don't think it's the first step.

I mean, the Hyde Amendment says explicitly, the Court may receive evidence ex parte and in camera. So the statute itself says the Court can get discovery.

If you had a case where a defendant had gotten discovery -- I cite checked the ones in your brief. I don't remember seeing it. And I certainly haven't found one myself. I encourage everybody to start cite checking. We're going to be here a bit. That would be an important factor for me to know if it existed, because I'm not aware of one.

Similarly, I am not aware of any case where there was a public hearing with evidence presented. Are you all?

MR. CAMPBELL: Not off the top of my head, no.

THE COURT: Okay. Because, again, the Hyde Amendment says: "The evidence or testimony so received shall be kept under seal." Which would indicate to me the statute does not allow for the presentation of any public hearing.

Does the government have any thoughts on that?

MR. LISY: Your Honor, the government agrees. There is no case that the United States is aware of that would allow for this to be made into a public hearing. The Hyde Amendment is a statutory remedy to fix a private injury. It is not meant to be a public hearing. This is not FOIA. It is not used for a disciplinary procedure.

Further, as far as discovery goes, the parties have both, I believe, cited to *United States vs. Terzakis*, which is

held in the Northern District of Illinois under Judge Pallmeyer and then up to the Seventh Circuit where the Seventh Circuit explained that the Hyde Amendment does not entitle the moving party to discovery as a matter of right.

And Judge Pallmeyer even explained that, yes, it is for the Court to look at things and for in camera inspection. But, Your Honor, that in camera inspection is to determine whether or not the government's position was vexatious, frivolous, or in bad faith. The United States is not contesting that here. There is no discovery or in camera inspection of any documents that Your Honor could do that would change the rate or hours that defense counsel has worked on this case.

Furthermore, to go back to the special factors aspect of it, special factors are, again, in relation to rate that the defense counsel is entitled to that doesn't go to vexatiousness or in bad faith, and the Eleventh Circuit in *Pollgreen vs. Morris*, 911 F.2d 527, specifically explained that any litigation eligible for EAJA fees, E-A-J-A, which the Hyde Amendment is premised on, by definition involves the government's pursuit of an unjustified position. Meaning this is not a question of scale of bad or how bad the position was means that there is more or less fees. They don't relate.

THE COURT: All right. Are there any other arguments from either side as to the issue of attorney's fees,

litigation expenses, or Hyde Amendment discovery?

MR. CAMPBELL: I don't think that last statement is correct as far as the limitations on what the Court can consider to be a special factor. It's unlimited. And so if there are additional facts that come to light through discovery that is provided to the Court, for example, additional misrepresentations to the Court or overt misrepresentations of what material evidence existed with respect to an issue that was to be presented to the Court or a constitutional violation of vindictive prosecution, if there's evidence of that, any of those, would be a special factor that the Court can consider and say, no, the rate ought to be higher.

MR. PARENTE: Judge, just to follow up on that, again, we've been consistent from the beginning. To your question about whether this goes to the Court or defense counsel, we've always been, from the beginning, okay with you taking the discovery. Because if there is something there, which we often had thought there was along the way, we were fine with just you finding it. They're the ones that started redacting stuff and playing those games.

So if you order the discovery, you say, you know what, maybe it did take special skill from this defense team who has former prosecutors on it, who has experienced defense attorneys on it, and the US Attorney's office was engaging in

the games that they've admitted they've engaged in, they do deserve a higher rate because it did take special skill to uncover this. And maybe that was based on their special training as the defense team in this case.

We're fine with you taking a look at it. We don't need to see it. And if you look at it and you say, hey, there is something here that warrants a higher rate, then we can discuss whether we get it or not. But that first step is fine with us if you take it. But we do want them held to account and have to turn that stuff over because I do think there are things in there that you can find a special factor based on.

THE COURT: Anything else on this issue you all want to argue?

Government?

MR. LISY: Your Honor, I do want to clarify. The last position made by the defendants is exactly what is improper with going through discovery here based on the Hyde Amendment. That is not the proper vehicle or avenue for defense counsel to -- or for anyone to be seeking to find disciplinary actions in relation to any conduct that happened during the course of this litigation.

The Hyde Amendment very simply is a civil matter where there's a statutory remedy for a private injury. That's it. And so to use this as a way to conduct disciplinary matters, it's just not appropriate under the Hyde Amendment.

MR. PARENTE: To be clear, I'm not asking for disciplinary matters. I'm saying is the Court entitled to find a higher rate in this case. Because when would you ever find a special factor if what he's saying is correct?

The point here is, was their conduct so egregious that it took special skill by a specific defense team to uncover it because they didn't do what they're now doing and therefore, the Court could make the decision, I do find a special factor and I do think a higher rate is deserved here. That's the point.

It also goes along with the fact that will uncover more bad conduct but that's not the point of it. And if they want to, they can just agree like we asked them to, to pay the rate so they can kind of cure the part of the damage that they did to these six people through their conduct. That's the easy way to solve this. Just pay the actual rate that these guys had to pay because they brought forth a bad indictment like this.

That is the way to solve it.

MS. ARMOUR: And, Your Honor, just to root that back into the discovery, it is that at this point and as all of these filings have shown us, there is still information yet unknown to the defendants. And in the context of the Hyde Amendment claim, the inability to know fully the scope of potential bad faith, vexatiousness, frivolousness, puts us at

a disadvantage in establishing our entitlement to fees. So that is the root of what the discovery in the Hyde Amendment context is for.

THE COURT: Anything else from the government?

MR. LISY: There is no caselaw that I'm aware of where an attorney's fees would be based off of somebody else's conduct for the purpose of EAJA or the Hyde Amendment. Their fees or what they charged their client is what they charged, and no discovery is going to make any change to that.

MR. PARENTE: Not if it was institutional bad conduct, Judge. If you find from the discovery that this was institutional bad conduct that could not have been discovered but for this defense team's specific skills, I think you can say, I agree that there's a special skill here, a special factor, to warrant a higher rate. Because this wasn't one rogue prosecutor. This was an entire office possibly going up to the US Attorney covering this all up and causing this to go on and on and on while these guys are paying more and more fees at this rate, then the government's going to say, oh, sorry about that. We're going to pay you at this rate and you're out that money. That's the point of this.

You can find a special factor here if the discovery shows you that this was not a one-off bad prosecutor but was an institutional decision to prolong this case and have Mr. Straw and the others incur higher and higher fees, and

then they come in at the end and say, yeah, we made a mistake. Here's pennies on the dollar; go away. That's not how this should work and they should know that. And if they really want to address it, they should make an offer at the full amount that our clients had to pay because of their admitted misconduct.

THE COURT: Anything else?

MR. LISY: Your Honor, the parties are still within negotiations and are still talking about fees and rates. We have not come to any sort of impasse as to what that is.

Those -- any sort of special factor has not really been identified or put before this Court. The rates have not been -- or fees have not been put before this Court and the parties are not complete. Like any parties in civil litigation, they should have the opportunity to see if they can come to an agreement without going through further discovery and litigation.

THE COURT: All right. So the Hyde Amendment, obviously the statute, it provides very specific relief. And the relief it provides is reasonable attorney's fees and other litigation expenses when there has been a proven violation. It does not provide for punitive damages. It does not provide for any other remedies, monetary or otherwise, depending on the nature of the Hyde Amendment violation or how egregious it is.

It also does not provide for public hearings. To the contrary, it explicitly says that to determine whether a violation occurred, the Court may receive evidence ex parte and in camera and the evidence or testimony so received shall be kept under seal.

I have not found, and as I've already mentioned, you have not cited any case in which discovery was provided to the defendant or a public hearing was held.

Here the government has acknowledged a violation or at least has said they would not contest that a violation occurred, and it is further agreed to pay reasonable attorneys' fees and expenses.

So I don't think discovery will advance. The only matter that is currently at issue, which is what are the reasonable attorneys' fees and expenses. Could there be a whole host of malfeasance unknown to the defendants, former defendants and me?

The defendants have specifically implied that there is further misconduct and additional misrepresentations that none of us know about. At this point I think it would be naive for me to say that couldn't have happened, but to the extent there was additional misconduct, untruths, fraud on the Court that we did not know about, it did not affect the attorneys' fees or costs in this matter for the simple fact that you didn't know about it, and therefore, it did not

affect your work on the defendants' behalf.

The former defendants have provided many reasons why they and the public deserve full transparency about what has occurred and full accountability to compensate their clients for the fees that they have incurred. Those arguments are very compelling. They are not, however, based on law. Those are policy arguments. Policy is not an area in which Courts are supposed to tread.

Congress provided through the Hyde Amendment a remedy for bad-faith prosecutions. Congress could have provided for public hearings. Congress could have provided for punitive damages, all the things that the former defendants have asked for when prosecutors are found to have abused their authority, and it didn't.

It provided for reasonable attorneys' fees and costs and evidence to be received ex parte and in camera. That's it.

It's my job to apply the law and not to make the law. The motion for attorneys' fees and costs will be granted. The motion for discovery pursuant to the Hyde Amendment will be denied.

I'm going to encourage the parties, and in fact, direct the parties to meet and confer to see if they can agree on what the reasonable attorneys' fees and expenses are in this case. If you all can't, I'm happy to schedule a

settlement conference either with myself or the magistrate judge to attempt to mediate the issue.

I do think the defendants' arguments regarding the special factors is compelling and could be persuasive but it will only come into play if you all are unable to agree on what the compensation should be in this case.

At that point, I will set a briefing schedule for argument and a hearing about what the fees and expenses were and what special factors you think should be used to increase those fees and expenses.

So let me pause for a moment and ask you, do you all want to meet and confer and then submit a status report to the Court about whether you want to continue meeting together, come in for a settlement conference, or pursue some other path?

MR. CAMPBELL: On behalf of Mr. Martin, I think that makes good sense. We have met twice by phone. We should have one more meeting and we'll know very quickly whether there is an agreement or not. And then on behalf of Mr. Martin, I would welcome a settlement conference.

MR. PARENTE: Same for Defendant Straw Your Honor, or former Defendant Straw.

MS. DE PODESTA: We agree on behalf of Mr. Rabbitt.

MR. HERMAN: Yes, on behalf of Ms. Abughazaleh as well.

MS. GIACCHETTI: Same for Ms. Sharp.

THE COURT: How long do you need?

MR. CAMPBELL: For the conference, you know, we can do it in probably 10 days.

MR. LISY: Your Honor, based on the negotiations that we've already had and some questions that still need to be answered from the United States on -- for internally speaking, we're going to need more than 10 days to, one, have answers to those questions; two, speak to the defendants and then determine whether or not negotiations will still be fruitful about a settlement conference.

If we could provide a status report in 30 days, I think that would be more effective.

MR. CAMPBELL: That's fine. And just so you have it clearly delineated, we have not asked for punitive damages or anything else. We are asking for the reduced rates that we charged and that's it.

And so the issue is, correctly put, that it is in the government's hands now as of our last discussion and it's either going to be a yes or no.

THE COURT: Okay. What's a 30-day date, please?

THE COURTROOM DEPUTY: November 2nd.

THE COURT: November 2nd for a joint status report as to what you all would propose for next steps as to the attorneys' fees and costs.

All right. Also pending is a motion to appoint a special counsel and prosecute -- to prosecute any potential criminal contempt and for sanctions.

I appreciate very much the defendants having raised these issues, but ultimately these are questions about the Court's orders, whether or not they were followed, and whether the administration of justice was otherwise obstructed.

In other words, these aren't issues in which the defendants have any particular stake.

So my questions on this are going to be directed only to the government and to Mr. Acosta, to the extent he has a different perspective.

To streamline things, Mr. Acosta, I'm going to ask -- I've got several lines of questions. At the end of each of them, I will ask you if you disagree with anything the government has presented, so that I can get Ms. Mecklenburg's take as well. All right?

MR. ACOSTA: Very good. Thank you, Judge.

THE COURT: So, if former defendants and their counsel want to have a seat, that might make things easier so they can see everybody.

All right. The government, let's start by talking about inherent authority and specifically noncriminal sanctions. To be clear by "noncriminal," I'm talking about sanctions not pursuant to 18 USC Section 401 or Federal Rule

of Criminal Procedure 42.

So let me ask you first, I'm assuming you don't object to the concept that I have an inherent authority to sanction, separate and apart from criminal contempt; Is that true?

MR. WHALEN: I'll be handling this, Your Honor.

That's correct. We do not object to that principle, correct.

THE COURT: The former defendants have suggested that I could appoint an amicus whose job it could be to investigate the facts of the misconduct before the Court and to provide the summary of the evidence gathered. Does the government have a position on that idea?

MR. WHALEN: We do, Your Honor. An amicus is typically appointed in cases where you're trying to deal with the integrity of the conviction. So an amicus is appointed on appeal to represent one party or another when the conviction is at stake. That's the case that they cited in terms of how this happened, however many years ago that was. When amicus was appointed, we were still post conviction, but the conviction was at issue. And that's where the amicus added value.

I'm unaware of any case where the Court has appointed an amicus for the purpose of figuring out whether there's willful misconduct pursuant to an inherent authority.

THE COURT: All right. So if not an amicus, does that mean that the government will cooperate if I asked for the presentation of evidence to help advance the factfinding on those topics?

MR. WHALEN: Certainly it's within Your Honor's authority to ask the presentation of certain types of evidence in terms of the inherent authority.

What the *In Re: United States* case says -- and I'm sorry, there are a lot of *In Re: United States* cases that we cited. Rogan is the party at issue in that case.

What the Seventh Circuit cautioned in that case is, the Court can certainly, pursuant to its inherent authority, ask factual questions. You can look at the outputs produced by the United States and the government. Where the line begins to blur and potentially becomes problematic is when the Court is asking about deliberative process and what position the U.S. took and why it took the position.

THE COURT: All right. So the question was, would you cooperate with fact finding? The answer is, it depends?

MR. WHALEN: That is the answer, Your Honor.

THE COURT: So much like Magic 8 Ball, we'll shake and it and see what happens when I ask the questions?

MR. WHALEN: Well, Your Honor, I think there's a limitation in terms of what we can answer, right? So I have a client that I have to represent, the United States, and there

are privileges at stake that I cannot, for example, waive.

Depending on the question the Court asks, there are answers that an AUSA specifically could not necessarily answer to the extent that the client wants to protect the privilege. And so without being evasive, the answer really is, yes, it depends on the question being asked.

But certainly the Court could ask questions the same way the Seventh Circuit, you know, if there's a brief that doesn't have an order attached and the parties have signed and said, I swear under penalty of perjury that I've attached this order, the Court can say, explain yourself, explain why you shouldn't be sanctioned. And that is certainly permissible action pursuant to this Court's inherent authority.

THE COURT: Is privilege the only problem you would foresee with the Court conducting factfinding? Is that the only thing that you would foresee not cooperating with if I asked for privileged matters?

MR. WHALEN: I can't think of anything -- the government can't think of anything else at this point that would be problematic, correct.

THE COURT: Okay. So generally speaking, if I asked you to produce documents, you would produce them subject to claims of privilege?

MR. WHALEN: I think if this Court determines that there has been willful misconduct and it directs us to produce

documents, we would ask, as you said, to kind of preserve the privilege as it relates to those. I think, depending on the nature of those documents, that would be within this Court's power.

THE COURT: I mean, the problem that I see with that statement is you made it kind of circular. If I find there's a problem, then I can investigate the problem.

The point of asking for the documents or the witnesses, is to see if there has been willful misconduct.

MR. WHALEN: I understand. And we're in kind of unchartered territory in terms of inherent authority. In that we haven't really found cases where it relates to actions taken kind of in an attorney's particular role as an advocate. Where it more neatly fits in is where there's an order and the party disobeys the order. And that's kind of where there is a prima facie case of willful misconduct, and that's kind of what triggers the hearing.

THE COURT: So if I were to find a prima facie case -- I mean, again, you are talking about contempt, not inherent authority. And I'm trying at this moment to dwell on the inherent authority.

If I thought there was enough smoke, you would be willing then to produce documents subject to claims of privilege?

MR. WHALEN: That's my understanding, correct.

THE COURT: Okay. And similarly with witnesses?

MR. WHALEN: This Court certainly has the authority to ask witnesses to come testify about factual matters, correct.

THE COURT: All right. And Ms. Mecklenburg has obviously appeared via counsel. Are any of the individual AUSAs, other than Ms. Mecklenburg, represented by counsel outside of DOJ at this point?

MR. WHALEN: I think they might be. I can't answer that for sure, Your Honor.

THE COURT: Okay. So do you know if they would cooperate with a factual injury?

MR. WHALEN: We have not asked them that question, Your Honor. I can certainly go back and ask and file something with the Court if the Court would be interested in the answer to that question.

THE COURT: Okay. So you don't know at this moment whether anyone would "take five" on questions the Court might ask?

MR. WHALEN: I have not asked that question. I do not know the answer to that, correct.

THE COURT: Okay. With respect to the inherent authority portion of this, do you have any thoughts, Mr. Acosta?

MR. ACOSTA: No, Judge. We generally agree with

their position on that.

I would note that Ms. Mecklenburg, as far as production of documents, has no access to any documents. We've been working on that for some time so that she can respond properly to OPR. We do not have access to those document.

And I would note also that as of late Friday afternoon we received a very direct admonition from the Department of Justice advising and reminding Ms. Mecklenburg of her obligations with respect to privilege conversations, et cetera.

THE COURT: Do you anticipate that Ms. Mecklenburg would make herself available to testify if it should become necessary?

MR. ACOSTA: I expect that she would, Judge. We have not discussed that with her in any detail.

THE COURT: Okay. Let's move on to separate and apart from inherent authority, criminal contempt either under Section 401 and/or Rule 42.

For the government, you have noted that that Rule 42 allows me, first, to ask an attorney for the government to prosecute the matter. Out of curiosity, would DOJ accept such a referral?

MR. WHALEN: I can't answer that at this point, Your Honor.

THE COURT: Okay. Rule 42 also explicitly authorizes the appointment of another attorney if the interests of justice require it. This is, I think, the portion that you take issue. So let me just ask straight out: Is it the Department of Justice's position that Rule 42 is unconstitutional?

MR. WHALEN: It's the Department of Justice's position that to the extent the Court were to ask another attorney not subject to the review of the Attorney General to prosecute a criminal crime, that would be unconstitutional.

THE COURT: So the portion of Rule 42 that allows me to appoint a special prosecutor is fine so long as that special prosecutor reports to the Attorney General?

MR. WHALEN: And that's what the Second Circuit found in the *Donziger*, case, Your Honor, correct.

THE COURT: As a practical matter, how would you envision that working?

MR. WHALEN: Which part, Your Honor?

THE COURT: The part where I appoint an independent person in the interest of justice to investigate the Department of Justice, and that person is then supervised by the Department of Justice.

MR. WHALEN: Well, Your Honor, to the fair, as I understand it, a special prosecutor wouldn't be appointed to investigate the Department of Justice as a whole --

THE COURT: That's fair.

MR. WHALEN: -- we're dealing with individuals within the Department of Justice.

THE COURT: That is fair.

MR. WHALEN: I think, Your Honor, it would work the same way that it works every time we have a prosecutor subject to the supervision of the Attorney General, which is they would have an obligation to enforce the laws fairly and equally, as any prosecutor does.

THE COURT: So what if the former defendants are correct and someone at a high level in the Department of Justice did something wrong here?

MR. WHALEN: Well, Your Honor, that's why the OPR mechanism exists in large part, because what you probably run into -- the problems you run into when you appoint another attorney is there are issues that relate to privilege, as we previously talked about. There are issues that relate to disclosures. And what OPR has to its benefit is that it's able to review all of that stuff not subject to restrictions.

So that's why this has been a time tested and true method to investigate any allegations of misconduct within the Department of Justice.

THE COURT: OPR doesn't investigate criminal offenses.

MR. WHALEN: OPR does not investigate criminal

offenses, Your Honor, correct. They make referrals. I don't know off the top of my head whether they do make referrals for criminal prosecution.

THE COURT: I mean, look, there is a couple problems with OPR, apart from the ones former defendants pointed out. The first one is, it's not a criminal investigating body. The second one is it answers straight up to the same folks. However, it would have access, as you said, not only to privileged material, but also potentially to compelled statements, which cannot be used in any criminal investigation or prosecution.

So I actually don't think OPR can force employees to talk to them and to make admissions, which in a criminal matter would be unable to be used and, in fact, would have to be screened completely from anyone who is doing a criminal investigation.

So I think we got to take OPR out of the equation when we're talking about a special prosecutor, who also -- I mean, it's not like a special prosecutor would report to OPR, right?

MR. WHALEN: That's correct.

THE COURT: They would be reporting to the Attorney General.

So let's go back to the idea that the defendants have alleged that people at a high level in the Department of

Justice were involved in things that could constitute obstruction of justice. Who would my special prosecutor, if I were to appoint one, even report to in DOJ? How would they maintain all of the conflict rules are followed?

MR. WHALEN: Your Honor, they would have to appoint -- they respond and report to the attorney general because they would be investigating a criminal violation of 18 USC 401 and it is the role of the executive branch to -- and the attorney general specifically, to enforce the criminal laws. And so that's why they would have to be reporting to the attorney general.

In terms of, you know, we've dealt with filter reviews, we've dealt with recusals where various offices can't handle a particular matter. I don't know the intricacies of how you would kind of wall off one from another.

THE COURT: I don't either. The justice manual requires US Attorneys' office employees and entire offices to recuse themselves when there is either an actual or even an apparent conflict.

Do you have any idea what main justice does when there's either an actual or apparent conflict?

MR. WHALEN: When main justice has a conflict itself?

THE COURT: Yeah. Or say the attorney general.

MR. WHALEN: I do not know.

THE COURT: All right. You've made the point in your

briefing that criminal contempt can only be used to punish those who act in bad faith, vexatiously, or wantonly, and you've argued that's not the case.

On the other hand, we just talked about the Hyde Amendment and you've agreed that it applies. And the Hyde Amendment only applies when there has been vexatious, frivolous, or bad-faith conduct.

So we have two-thirds overlap in the standards and yet you say one is conceded to, the other doesn't exist. How are you reconciling that?

MR. WHALEN: Again, Your Honor, we are not conceding as to the first element of the Hyde Amendment. We're just not disputing it. And I do think there is a difference because we're dealing with civil litigation as it relates to the Hyde Amendments. Parties regularly do not dispute the proof as to a particular point. That's not a concession of guilt as it relates to a criminal violation.

THE COURT: All right. We have not discussed at all Rule 42(b), which is summary disposition under which there would be no special prosecutor at all. I would apparently investigate. I would then make the charging documents. I would decide whether or not the charge is founded, and then I would punish.

Do you have any problems with 42(b) from a constitutional standpoint?

MR. WHALEN: We do not have a problem with that, in large part, because I think the question -- so there's investigation Your Honor is talking about. I mean, that was one of the predicates of the Court's question. As I understand it, that's pursuant to summary contempt.

So when there's really no further investigation that needs to happen, right, it's a situation where there's a prima facie evidence of a violation of contempt. You know, the easiest example is the Court says, don't talk. You can't bring up the following points during closing argument, and the lawyer brings up the point during closing argument. Right?

To the extent that this Court believes that that's contemptuous conduct, that's subject to summary disposition.

THE COURT: I agree with you on that. There isn't much caselaw in this realm, as we've noted with the Hyde Amendment, also with respect to Rule 42 and Section 401. Do you think that this case does not present a case that would be eligible for summary disposition?

MR. WHALEN: That's correct, Your Honor.

THE COURT: Which is correct?

MR. WHALEN: I'm sorry. I don't believe that there is evidence of prima facie showing of willful contempt as it relates to anything exclusively within the Court's, kind of, vision, for lack of a better phrase.

THE COURT: But if I disagreed with you, and a prima

facie case has been met, would you believe that I can move forward on the summary basis to investigate, write up the charge, and then punish conduct if I concluded it was willful?

MR. WHALEN: Your Honor, I'm hesitating some on the investigative part because I don't see that that's really within the Court's purview, to investigate as it relates to contempt done in its presence. I think what that considers is a situation where all the evidence is what you saw.

And so there might be an instance, for example, if you tell me, you know, don't bring up X in closing argument. I bring up X in closing argue. I wouldn't call it investigation if you would say to me, Mr. Whalen, why did you bring up X in closing argument, you know, what's your defense?

And so that's just a little bit of my hesitation about the word "investigate." I do think the Court has the authority to say you said X, tell me why you shouldn't be held in contempt.

THE COURT: Have you found any case that draws that line for 42(b), like super-duper obvious contempt is fine but less obvious contempt is not?

MR. WHALEN: Your Honor, I have not found many cases outside the realm of a violation of a specific order and that's kind of the problem that we're working with here, and that, I think, is actually a telling point because this isn't the type of thing that's really subject to a contempt --

criminal contempt proceeding. Right.

We have a situation where courts are employing Your Honor to use your power sparingly and only in extraordinary circumstances. They're telling you to just -- when it comes to attorneys, be especially careful about using that power because you run the risk of affecting the advocacy of the parties in front of Your Honor.

And what they're saying is also give special deference in terms of anyone who appears in front of you, especially the prosecutors, because there are these kind of mechanisms outside of here. In terms of the word "accountability," there is accountability to be held outside of a criminal contempt proceeding. And so that's why I do think there are no cases along those lines.

The closest I could come, Your Honor, in terms of kind of misconduct that's not the violation of a straight order that analyzed this contempt analysis is the case out of Massachusetts, Your Honor. I'm trying to pull it up. It's *U.S. vs. Jones* that we cite in our brief, a 2009 case out of Massachusetts. I can give you the cite, but it's in our brief.

And that's a situation where there were 9 Brady violations over the courts of about two decades in one district. The District Court throws up its hands and says, listen, we've tried everything. Right. You are not

necessarily violating an order. There was a standing order. What you're doing is you continue to make these really important mistakes in my courtroom, and I need to do something about it.

And so the Court pulled the parties in -- or at least asked the party, explain yourself. And the AUSA said, Your Honor, I'm sorry. I understand. We're doing training. We're going to get better. And the Court in that case talked about gradual punishment, and it found that the issuance of the order and kind of reviewing and monitoring the circumstance was enough rather than criminal contempt because criminal contempt should be used only in rare circumstances and it should only be used to the least amount necessary to achieve the goals desired.

THE COURT: Well, and it can only be used when the conduct is willful, right?

MR. WHALEN: That's correct, Your Honor.

THE COURT: That is rarely something that's going to appear on the face of the record before the judge without further fact finding. That's why I'm really trying to drill down with you on the concept. I mean, you're saying on the one hand there's no prima facia case of contempt. On the other hand, you're saying, but really you can't engage in any fact finding, which leaves us where?

MR. WHALEN: Well, where it leaves us is, again, we

have the situation where the initiation of contempt proceedings does require this prima fascia finding of contempt. And I do think the reason it does that is because this isn't just a, we're going to open an investigation because we're at an accusation stage.

Contempt is a very serious power, and that's what the courts have said. And so prima facie means enough evidence that, if believed, you're going to rule against the party. And so it kind of presumes that when the Court initiates these proceedings pursuant to Rule 42, there is already enough evidence that, if believed, would result in a finding against us.

THE COURT: What's the Department of Justice's standard for opening a criminal investigation against a person?

MR. WHALEN: It's probable cause.

THE COURT: No. That's for Brady charges. What's the standard for opening a criminal investigation?

MR. WHALEN: Oh, I apologize, Your Honor. I believe it's reasonable cause.

THE COURT: That's a lot lower than prima facie case.

MR. WHALEN: Judge, I think the reason for that is because you have a judge who's initiating the prosecution when it comes to contempt in Rule 42, and that is a different animal, for lack of a better phrase.

THE COURT: Why should a judge's standard be higher than the Department of Justice's?

MR. WHALEN: Because of the authority that comes with this Court's position and the power that comes with this Court initiating a criminal contempt proceeding.

THE COURT: You think an investigation instituted by the Department of Justice carries less power and less weight?

MR. WHALEN: I think an investigation instituted by the Department of Justice isn't necessary public from the get-go. It isn't -- I do think it probably does carry less weight as it relates to attorneys appearing on behalf of the judge, yes.

THE COURT: Okay.

Mr. Acosta, anything you want to say on the criminal contempt part of the questions?

MR. ACOSTA: Judge, we would like the opportunity to brief this issue, but with respect to Ms. Mecklenburg in particular, I think if the Court looks at her conduct separate and apart from some of the other issues that are involved in this case, we think that the argument for criminal contempt is even less strong with respect to Ms. Mecklenburg.

THE COURT: I mean to be clear, at this point I'm trying very hard not to reach the merits. I don't think it's appropriate to reach the merits right now.

What I'm trying to figure out is the party's position

on the mechanism for getting to that point. It is, at this moment, less than clear from both of you.

MR. BERTOCCHI: Your Honor, I would also point out in Ms. Mecklenburg's -- I won't say defense -- but the misconduct that has been described by the former defendants and attributed to her is stuff that happened in the grand jury and not before you. She was gone, as everybody knows, by I think February of this year, so maybe -- and I don't want to put any ideas in people's heads -- maybe Chief Judge Kendall might have something to say about it; but there really isn't any claim made so far by the former defendants that she did anything in, what I will call this case, the one we're here on today.

THE COURT: I agree with that.

All right. Let's move on to privilege, which has loomed large in our discussion so far.

Is it the Department of Justice's position that if someone is prosecuted because of their political affiliation, their First Amendment conduct, race, any other legal consideration that the documents that show that will be privileged?

MR. WHALEN: I think there is caselaw -- the government believes there is caselaw out there that says when -- in the FOIA context is where I've seen it -- when there has been a showing of potential selective or vindictive

prosecution, this court can, pursuant to an order, kind of maintaining the privilege reviewed in the documents.

And hopefully I answered your question, Your Honor. I don't mean to be --

THE COURT: I'm thinking it through.

MR. WHALEN: Sure.

THE COURT: I'm going to ask you again because I'm not sure you did.

MR. WHALEN: Okay.

THE COURT: If there is a document that says, we are going to prosecute all of the people of color for this offense and none of the white people, would that be privileged, in your opinion?

MR. WHALEN: It depends on the situation in which the document is being asked to produce. And what I was trying to get at there is --

THE COURT: Let's assume it's a malicious prosecution motion brought by a defendant who is a person of color, who says I was only prosecuted based on my race.

MR. WHALEN: Yes. So there is caselaw that suggests when the government's intent as it relates to a selective or vindictive prosecution is now at play and there's been enough to kind of meet that initial threshold, this Court -- and again, I see it in the FOIA context, and so I think it's applicable to the selective or vindictive prosecution. This

Court can order the government to turn over those documents to determine whether there has been a selective or vindictive prosecution.

THE COURT: Okay. I'm assuming it's not your position that if one of those legal considerations is at issue in a case, that a prosecutor should lie to the government or the Court about whether or not the communication exists?

MR. WHALEN: Your Honor, it's the position of the Department of Justice we should never lie to Your Honor.

THE COURT: So if there's a claim of privilege, doesn't that need to be made at the time the relevant communication is requested?

MR. WHALEN: I don't know the answer to that.

THE COURT: I mean, certainly AUSAs, like all lawyers who appear before me, have a duty to be truthful, right?

MR. WHALEN: Correct. I'm sorry.

THE COURT: And privilege isn't automatic, right? I mean, Courts review documents for claims of privilege all the time.

MR. WHALEN: Correct.

THE COURT: So if something is requested, either by the opposing side or by the Court, and it is privileged, isn't the onus then on the person who is asked for that communication to say, there are no non-privileged documents that are responsive, or something else of that ilk?

MR. WHALEN: Your Honor, I'm sorry. I don't know the answer to that at this point. I'm happy to provide additional briefing if it would help.

THE COURT: All right. Well, in this case I was told that there were no relevant communications at all. Period. Hard stop.

If there are, in fact, no relevant communications to the malicious prosecution, vindictive prosecution motion, what privilege could possibly exist here?

MR. WHALEN: Your Honor, may I just grab something off the table for a second?

THE COURT: Sure.

MR. WHALEN: Thank you.

And the reason I'm grabbing this, Your Honor, is the representation was not made that there were no communications period or stop, as I understand it.

Our representation in docket 110, starting on pages 3 and 4. We were responding to the former defendants' request for documents. And their request is on page 94 -- I'm sorry -- docket 94.

So if you look at docket 94, page 6, they said, quote, these -- I'm not quoting here, these documents, quote, "Give rise to a prima facie showing sufficient to warrant discovery in to any role the White House may have held in influencing, if not directing, the prosecution of this case."

And the government responded at docket 110, pages 3 to 4, and said that there are no communications showing who was -- "The indictment in this case was proposed, reviewed and approved exactly like hundreds of others routinely brought by the USAO year-in and year-out, that is without any influence or interference by anyone outside the USAO."

And then the government goes on and says, "The decisions about who and what to charge were made by USAO prosecutors and their supervisors based solely on positive identifications of the defendants and evaluations of their individual criminal conduct."

Tying back to that, we then say, "Accordingly, there are no communications of any nature or form to or with anyone outside of the USAO regarding investigatory or charging decisions."

How I read that sentence and paragraph is that there are no communications prior to the decision to charge the former defendants directing us to charge these particular individuals. Because, Your Honor, on page 4 there is this footnote, footnote 2, where we say, we have alerted DOJ about our decision to charge these individuals, right. That in and of itself is saying, yes, there are communications, they are just post charging.

THE COURT: All right. So what I have says -- and this is, I think, exactly what you quoted, "Accordingly, there

are no communications of any nature from, to, or with anyone outside of the U.S. Attorney's Office, other than the local FBI investigators assigned to the case, regarding any investigatory or charging decisions. To be crystal clear, this specifically includes anyone in the White House and all components and offices of Main Justice."

Is it your position that statement is true, or is it your position that statement is truthy because there are privileged communications of this nature?

MR. WHALEN: Our position is that is true when tied back to the opening of the paragraph where it says, no one -- excuse me -- There was no communications about influence or interference by anyone outside the USAO.

And so this statement is true as it relates to precharging decisions, Your Honor.

THE COURT: But possibly untrue as it relates to things that happened after the decision was made?

MR. WHALEN: Well, Your Honor, we made clear and we tried -- we clearly did not make clear. We attempted to clarify that there were communications after the decision was made between us and the Department.

THE COURT: I mean, here's what I'm having a little struggle with. The decision is not, as in most cases, a one-time thing because we have a cross-memo that goes up the chain that at some point has an indictment with it that gets

signed. And then we have a whole lot of other things that happened in the weeks that follow where the case gets presented, there's a no bill, re-presented, re, re-presented.

So are you saying charging decision as in the moment whoever at the top of the chain, whichever chain it was at the time, agreed that charges should issue? Or are you accounting for all of this later time period where there were arguably other decision points that needed to be made, not the least of which was after the no bill? Again, the US Attorney, as I understand it, had to affirmatively make the decision to represent.

So, I guess, it would help me if you would clarify what your decision point is that you are using for that very nuanced and specific statement.

MR. WHALEN: Your Honor, we attempted to clarify in our response on footnote 15, page 41.

THE COURT: You didn't. Footnote 15 is a mess.

"The front office is not aware of any communications in which it took direction from anyone outside the USAO regarding decisions as to what investigatory steps the local prosecution team would take or who the local prosecution team would charge when prosecutors went into the grand jury to indict this case."

Okay. So "the front office is not aware" is different from there were no communications. "In which it

took direction" is different from no direction was given to us. "As to what investigatory steps or who would be charged" is different than what would be charged. And "when prosecutors went into the grand jury to indict this case," I mean, they went into the grand jury to indict the case on three separate occasions.

So I appreciate you trying to clarify. That is a highly ambiguous statement, and given that I've already been confused, shall we say, several times about what the facts are with respect to this issue, I want to make it clear now.

So "the front office is not aware." Does that mean there could be, but at this moment the front office does not remember whether there are any communications?

MR. WHALEN: Your Honor, I can't speak as to what the front office is saying there.

THE COURT: Okay. "In which it took direction," does that leave open, it sounds like to me, the possibility that directions were given but not taken, or because the US Attorney had already made the decision, he didn't consider it that he had to take any direction, because the directions were already aligned?

MR. WHALEN: Your Honor, I think I can shortcut this. I'm not going to be able to provide any factual insight into this particular question that the Court is asking.

I understood this to be an oral argument, and I'm not

here to supplement the record with additional facts. And I understand what the Court is asking, I'm just not in a position where I can do that.

THE COURT: I mean, I didn't intend to engage fact finding either at this stage, but you're telling me -- you're making a lot of claims of privilege. And look, if there are no documents that are material, there is no privilege. No documents, no privilege.

The constant repetition of privilege indicates to me there is something out there that is relevant and material.

MR. WHALEN: Well, Your Honor, I think even -- I don't know that the claim of privilege necessarily goes to only responsive and relevant documents. Right? When the Court is asking us to produce documents and they are privileged documents, I understand you can say, there are no responsive documents. That's like saying, you know, I'm not guilty of a crime. I understand that you could always say that.

I don't think the Court should necessarily infer -- and I could look at the caselaw, I might be wrong about this. I don't think that the Court should infer the fact that we're saying there are potentially privileged communications necessarily means that there is a responsive communication to the question.

THE COURT: I'm inferring it only because my first

question I got was there's nothing. No way, no how. And now your argument has changed pretty significantly. And is, if there were something, it would be privileged.

MR. WHALEN: I don't believe I said there is no way, no how communications.

THE COURT: You didn't.

MR. WHALEN: Your Honor, I think reading docket 110, I mean -- I'm telling the Court docket 110, as a read it, and I think our position has been, that there are communications between us and DOJ, and we're not hiding that fact.

Now what document 110 says, as I read it, is there are no communications about the direction of the charging and indictment in this case.

THE COURT: But at what stage?

MR. WHALEN: I understand Your Honor's question.

THE COURT: Because I didn't know at the time I got docket 110 that there were multiple presentations, I don't think.

MR. WHALEN: I think that's probably correct.

THE COURT: All right. So in addition to waiving privilege by not asserting it when you should, you can also waive privilege by disclosure, right? By talking about what the documents contain.

So, for example, if DOJ has made press statements about what certain documents contain, wouldn't that be a

waiver of privilege?

MR. WHALEN: Your Honor, if the Court is willing to indulge me, I'd like to brief this issue, because I have found a case that I think is on point and out of the Seventh Circuit as it relates to a press statement made by someone high up within the Department of Justice after the September 11th attacks. I want to make sure I don't misrepresent the holding of that case. But what I understand it to say is that it might waive the privilege as to that particular statement that's made, but it's not necessarily a full subject matter or even document matter waiver.

THE COURT: I think it's probably right it's not subject matter waiver. But I would question whether you can only refer to only the good parts of the document and not waive your privilege on any bad parts of the document.

MR. WHALEN: I understand.

THE COURT: All right. Don't worry, this will not be your last opportunity.

Mr. Acosta, anything you want to add on the privilege aspect here?

MR. ACOSTA: No, Your Honor.

THE COURT: Is there anything else that government wants to argue as to the special prosecutor and sanctions portion of the oral argument?

MR. WHALEN: Your Honor, I would just reiterate the

high bar that's set for initiating a contempt proceeding on these lines and the kind of steady drumbeat of expressing to the Court that it should only exercise this authority in rare circumstances and to achieve the goal desired.

As we wrote in our response brief, there has been tremendous response as a result of this case within the United States Attorney's Office downstairs. Certainly this Court's statements have been publicized, individual AUSAs have been self-referred to OPR. We have instituted massive changes to make sure certain things that took place in this case will not happen again.

As I read the caselaw as it relates to contempt, inherent authority, it's the Court's way of vindicating itself to make sure its rules are respected and its orders are respected. There was no specific order violated in this case, but I'm telling you, Your Honor, your message has been received loud and clear.

THE COURT: All right. So first let me just say that poor use of prosecutorial resources, incompetence, bad judgment, bad discussion making, failure to follow internal procedures, or OPR referral obligations are obviously not punishable by Courts.

I also think we are past the point of inquiring into malicious or vindictive prosecution. The remedy for a malicious or a vindictive prosecution in a federal criminal

case is dismissal of the charges, which has already happened here.

My sole focus at this point is on lack of candor, concealment of material facts, or other misconduct that occurred before me and whether that misconduct, if it exists, constituted a crime, or if not, something that should otherwise be sanctioned.

It's often said that the cover-up is worse than the crime. Sometimes people cover things up because they did something illegal. Sometimes people cover things up because they did something embarrassing, although not illegal. Sometimes people cover things up because they don't want to have to deal with an inquiry into whether or not something was embarrassing or illegal or both.

From my perspective, it does not matter. So for example, even if there was no malicious or vindictive prosecution as a matter of law, if the government or specific prosecutors concealed evidence or lied to me about what communications existed in order to not have to deal with the inquiry or in order to not have to deal with the malicious or vindictive prosecution motion, I do believe that constitutes obstruction of the administration of justice.

A lot of the briefing that I've gotten thus far conflates all of the things that went wrong here under the word "contempt." But really what we're talking about could be

pursued in a lot of different ways. 18 USC 401 is a criminal statute. It punishes contempt by a fine or imprisonment. The violation has to be proved beyond a reasonable doubt.

Separate and apart from that, the Court has the inherent authority to sanction abuse of the judicial process and litigation misconduct. The standard of proof there is only a preponderance of the evidence.

There is one other potential statute issue which is 18 USC 1512, which involves the concealment of the documents with the intent to impair their availability for use in an official proceeding. That's also a criminal statute but not one that I have the ability to refer for prosecution, unlike Section 401.

I want to make quite clear that I am not reaching any conclusions today about what occurred or whether what occurred was intentional or willful. However, it is quite clear to me, as the government has acknowledged, that several aspects of this prosecution were very flawed. And there is certainly evidence in the record that would indicate that representations made to me were not accurate. And I use the word "not accurate" rather than "false" because I'm not at this time making a finding of wilfulness or intent.

But it is clear to me that the mistakes and the inaccuracies were material because they affected how I approached the case and various rulings that I issued. And,

therefore, they have affected the trajectory of the case and how long those six defendants were subject to criminal prosecution and how much in legal fees they were required to pay. It affected not only their pocketbooks, but their lives.

The government has pointed out that contempt proceedings take on a greater public importance when they are initiated against federal prosecutors in their official capacities. I agree. But the reason it takes on a greater public importance is that federal prosecutors who err, either unintentionally or willfully when conducting their official duties, affect the functioning of the criminal justice system.

I think it's Spiderman who said, with great power comes great responsibility. Stan Lee is obviously not binding upon me. The Seventh Circuit is, and they echoed that concept in a way that I think is powerful. The greater the power that defies law, the less tolerant can this Court be of defiance.

The fact that the prosecutors here exercised great power is not a mitigating factor; it is an aggravating one.

I want to note that I appreciate the policy changes and training that have apparently been put into place at the US Attorney's office, those things really aren't entering into my analysis here. If there were office-wide problems, the very least that should be done is to fix them.

An assurance now that things will be done the way they always should have been done and, frankly, the way I

thought they always were done, is not very compelling.

Sanctions and criminal contempt are individual punishments for individual misconduct which institutional changes just don't address, and if for no other reason, they are reserved for willful or intentional misconduct. Training does not fix willful or intentional misconduct.

So in sum, institutional changes may have been necessary but they are not sufficient.

I agree that because of the seriousness of the interests that are implicated, further fact finding is necessary here and prudent. Given the government's, I will take it as an agreement to cooperate with me as to fact finding to the extent it does not implicate privilege, and I'm going to go ahead and create a list of things that I would like further evidence on.

You all can decide whether you would like to present that live, whether you would like to present it in writing. However, whatever you present has to be under oath, under penalties of perjury. And I am telling you right now it will be considered material to the Court's decision.

I want to do that fact finding before I make any contempt referral, to the extent I do, to any special prosecutor, because I agree that a criminal prosecutor is reserved for only the most serious of contempts or misconduct.

I also think it is prudent to ask for more legal

briefing on the separation of powers issue and on 42(b), to the extent that you think there is some line in the sand that can be drawn between when a prosecutor is appropriate and when one is not required.

So let me ask, how long does the government need to file that brief?

MR. WHALEN: Your Honor, just to clarify, when you say "separation of powers issue," you mean in terms of appointing another attorney?

THE COURT: Correct. Any issues you may have with Rule 42(a) or (b).

MR. WHALEN: Would 30 days be sufficient, Your Honor?

THE COURT: Sure. I do want to make clear because I think there is at least a possibility that a one-year statute of limitations applies. I am not going to give any extensions of time on that.

MR. WHALEN: That's fair, Your Honor.

THE COURT: So 30 days I believe is November 2nd.

THE COURTROOM DEPUTY: Correct.

THE COURT: Given that this is no longer an adversarial proceeding, I'm going to appoint an amicus to brief the opposing position of the government as to the constitutionality of Rule 42.

I spoke late last week with William Baude, who is the faculty director at the University of Chicago's Law School,

Constitutional Law Institute, and he agreed to serve in that capacity.

So Mr. Baude's brief will be due roughly 30 days after November 2nd, which is --

THE COURTROOM DEPUTY: December 2nd.

THE COURT: -- December 2nd. Does the government have anything else that we should discuss today?

MR. WHALEN: Just one question in terms of Your Honor's questions, to the extent that they relate to Ms. Mecklenburg, would you like us to try to coordinate a response or would you like --

THE COURT: That seems tough. I assume you would like to brief separately? I mean, you can try to coordinate but Ms. Mecklenburg is welcome and entitled to submit a separate paper, to the extent she believes one is necessary.

MR. WHALEN: Thank you.

THE COURT: Anything else from the government?

MR. WHALEN: Nothing further, Your Honor.

THE COURT: Anything from Mr. Acosta?

MR. ACOSTA: No, Your Honor.

THE COURT: Anything from the former defendants in the back?

MR. CAMPBELL: No, Judge.

THE COURT: All right. Thank you all.

MR. LISY: Thank you, Your Honor.

THE COURTROOM DEPUTY: Please rise.

(Concluded at 2:10 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Noreen E. Resendez* — *October 05, 2026*

Noreen E. Resendez, CSR, RPR, CRR — Date

Official Court Reporter